## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TESLA INDUSTRIES, INC., a Delaware Corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 06-55-GMS |
| DAVID C. WALDMANN, LYNDOL W. HOLLINGSWORTH, CHARLES MINNICK a/k/a CHUCK MINNICK, and NEW MILLENNIUM TOOLS, INC., an Oregon Corporation, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## PLAINTIFF, TESLA INDUSTRIES INC.'S MEMORANDUM IN OPPOSITION TO NMT DEFENDANTS' MOTION IN LIMINE NO. 1 SEEKING EXCLUSION OF CERTAIN TRIAL WITNESSES LISTED BY TESLA

Brian A. Sullivan (#2098)
Robert D. Wilcox (#4321)
Amy D. Brown (#4077)
WERB & SULLIVAN
300 Delaware Avenue, 13th Floor
P.O. Box 25046
Wilmington, Delaware 19899
Telephone: 302-652-1100
bsullivan@werbsullivan.com

Paul E. Crawford (#493)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 N. Orange Street
P.O. Box 2207
Wilmington, Delaware 19899
Telephone: 302-888-6262
pcrawford@cblh.com

April 19, 2007

Attorneys for Plaintiff
Tesla Industries Inc.

**TABLE OF CONTENTS**

I.    Nature and Stage of Proceedings ................................................................................ 1

II.   Summary of Argument ............................................................................................... 1

III.  Counterstatement of Facts........................................................................................ 1

IV.   Argument .................................................................................................................. 3

V.    Conclusion ................................................................................................................ 5

# TABLE OF AUTHORITIES

**Cases**

*Falconer v. Penn Maritime*,
    232 FRD 37 (D.Me. 2005) ..........................................................................4

*Konstantopoulus v. Westvaco Corp.*,
    112 F3d 710 (3d Cir 1997) .......................................................................4

*Patterson v. Balsamico*,
    440 F3d 104 (2d Cir 2006) .......................................................................4

*Stambler v. RSA Security Inc.*,
    212 FRD 470 (D.Del. 2003) ......................................................................4

This Memorandum is submitted by Plaintiff, Tesla Industries Inc. ("Tesla"), in opposition to NMT Defendants' Motion in Limine No. 1: to preclude Tesla and Its Counsel From Calling or Otherwise Utilizing Late-Disclosed Witnesses ("NMT MIL 1" DI 133).

## I.    NATURE AND STAGE OF PROCEEDINGS

The Verified Complaint in this action was filed January 27, 2006.  It is a voluminous pleading with attached affidavits and exhibits (A-I) chronicling the systematic transfer of Tesla's confidential information and Trade Secrets to Defendants.

A Rule 16 Scheduling Conference was held on May 9, 2006 (DI 31).  A Minute Entry of even date and a followup Scheduling Order (DI 36) established the schedule for this case. Nether of these entries establishes a date for **final** identification of witnesses.[1]  The discovery deadlines in these entries are: (1) November 30, 2006 for fact discovery, (2) December 29, 2006 for initial expert disclosures and (3) February 28, 2007 for expert discovery (DI 36, ¶3).  All of Tesla's proposed fact and expert witnesses were identified, with contact addresses, before these deadlines.

## II.    SUMMARY OF ARGUMENT

Each fact and expert witnesses challenged by Defendants was identified before the deadlines set in the Scheduling Order (DI 36) entered in this case.

## III.    COUNTERSTATEMENT OF FACTS

Of the eight contested witnesses listed in NMT MIL 1 (page 2) only five (Morales, Kern, Batipps, Lassiter and Barone) are likely to be called as fact witnesses at trial.[2]  Each of these

---

[1] **Initial** disclosures were due June 23, 2006 (DI 36, ¶1).
[2] Final determination of trial witnesses will be made after Defendants provide their portions of the Pretrial Order. Even though the Pretrial Order is due April 30, 2007, Defendants refused to supply any of their portions of that Order until April 19th – the day this Memorandum is due.

potential fact witnesses was disclosed before close of fact discovery. Had Defendants requested additional time to take the depositions of these, or any other listed witnesses, Tesla would have agreed to that request. Instead Defendants are attempting to foreclose their trial testimony with a technical Motion in Limine.

Mr. Batipps and Lassiter are civilian employees of the U.S. military who worked with Tesla in developing components for top secret military equipment, including an Unmanned Aviation Vehicles (UAV) operated by the Navy called the "Global Hawk". Details of such devices were improperly obtained by Defendant Waldmann and sent to other Defendants in violation of Naval regulations and Waldmann's employment contract (See Complaint, ¶ 14 and Exhibit J thereto).

Mr. Lassiter surfaced as a witness in early November 2006 and was identified as such in mid November 2006. Full details of Mr. Lassiter's involvement were provided by Tesla's president, Mr. Masilotti, during his November 22, 2006 deposition (See Masilotti Dep Tr 40, 134-135 attached at Exhibit 1 hereto).

Mr. Batipps likely testimony was also explained in Mr. Masilotti's November 22, 2006 deposition (See pages 47-49 of Masilotti deposition attached at Exhibit 1 hereto). Mr. Masilotti explained that Mr. Batipps would likely be called to counter the "whistle blower" counterclaim of Defendant Waldmann that Tesla fired him in retaliation for threatening to disclose alleged defects in Tesla equipment (See Count XI of Defendant Waldmann Counterclaim, DI 26, ¶¶103-113).

Among the potential fact witnesses challenged by Defendants is Mr. Morales, a Tesla employee. As explained in Mr. Masilotti's deposition Mr. Morales will likely testify regarding

Mr. Waldmann's physical removal of certain Tesla manufacturing materials from the Tesla plant (Masilotti Dep Tr 87-88, 209-213 attached at Exhibit 1 hereto). Mr. Kern and Mr. Barone are former employees who may be called to testify.

The other trial witnesses among the eight who are the subject of NMT MIL 1 are Donald Stewart and Roger Guillemette. Stewart is principally an expert witness who was identified on December 12, 2006 (NMT MIL 1, Exhibit 5) over two weeks before his expert report was due. His comprehensive expert report was provided to Defendants on December 29, 2006 per the Scheduling Order (See Exhibit 2 hereto). Defendants took his deposition on February 15, 2007. Tesla is at a loss to understand how this timely identification of Mr. Stewart, provision of his expert opinion and availability for deposition in any way prejudiced Defendants.

Mr. Guillemette was identified and deposed on a timetable similar to that for Mr. Stewart. He is an active duty Warrant Officer at the Aberdeen Proving Grounds who has served in Iraq and numerous other military theatres. Based on this experience he opined that "The Tesla Industries NATO connector is far superior to any NATO Connectors which the Army has been using in the field" (See page 3 of Guillemette expert report attached as Exhibit 3 hereto).

## IV.    ARGUMENT

NMT MIL 1 at footnote 1 indicates acceptance of Messrs Stewart and Guillemette as expert witnesses but nevertheless are moving "to preclude Tesla from eliciting any fact or lay opinion testimony from these two witnesses." Since both Stewart and Guillemette were made available for deposition on any subject of Defendants choosing, Defendants had the opportunity to question them on any subject, even those outside their expert reports. As such there is no basis for any anticipatory limitation on their trial testimony through a Motion in Limine.

Tesla did not play "hide the ball" with Messers Baytipp, Lassiter, Kern, Morales and Barone's identity as alleged by Defendants (NMT MIL 1, page 4). They were identified in mid November, 2006. The substance of their likely testimony was explained in Mr. Masilotti's November 22, 2006 deposition. Had Defendants bothered to ask for extra time to depose these witnesses, Tesla would have agreed to that request. Instead, Defendants write a letter setting up the issue for needless motion practice (See last paragraph of Exhibit 8 to NMT MIL 1).

Defendants' approach is compounded by the absence of legal authority for its approach. Defendants cite four cases in NMT MIL 1 (page 3). None support their request to preclude the trial testimony of Tesla's witnesses. All of these cases cited by Defendants dealt with identification of witnesses **after** close of fact or expert discovery and/or close to trial.[3] In this case all of the challenged Tesla witnesses were identified **before** close of discovery and/or at least 5 months prior to trial.

---

[3] In *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir 1997) the excluded expert witness was not identified until 18 months after an expert discovery cutoff and only three (3) weeks before trial. In *Stambler v. RSA Security Inc.*, 212 F.R.D. 470 (D.Del. 2003) Judge Robinson excluded use of witnesses not identified until four (4) months after close of discovery and six weeks before trial. The Second Circuit in *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir 2006) was dealing with an identification of witnesses **ten days before trial**. Unlike this case, the witnesses in *Falconer v. Penn Maritime, Inc.*, 232 F.R.D. 37, 38-39 (D.Me. 2005) were not identified until the Pretrial Order was filed, or even later.

## V.    CONCLUSION

NMT MIL 1 is another instance of Defendants misguided reliance upon inapposite law and facts to support unnecessary motion practice.  All of Tesla's proposed trial witnesses were identified before deadlines established in the Scheduling Order.  They should be allowed to testify.

Respectively submitted,

Dated: April 19, 2007

*/s/ Robert D. Wilcox*
Robert D. Wilcox (#4321)
Brian A. Sullivan (#2098)
Amy D. Brown (#4077)
WERB & SULLIVAN
300 Delaware Avenue, 13th Floor
P.O. Box 25046
Wilmington, Delaware 19899
Telephone: 302-652-1100

Paul E. Crawford (#493)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 N. Orange Street
P.O. Box 2207
Wilmington, Delaware 19899
Telephone: 302-888-6262

Attorneys for Plaintiff
Tesla Industries Inc.

Exhibit 1

1 (Pages 1 to 4)



**Page 1**

1  IN THE UNITED STATE DISTRICT COURT
2  FOR THE DISTRICT OF DELAWARE
3  ------------------------------X
   TESLA INDUSTRIES, INC.          :
4                          : Civil Action
       Plaintiff,          : No. 06-055 GMS
5                          :
       vs.                 :
6                          :
   DAVID C. WALDMANN, LYNDOL W.    :
7  HOLLINGSWORTH, CHARLES MINNICK  :
   a/k/a CHUCK MINNICK, and NEW    :
8  MILLENNIUM TOOLS, INC.,         :
                           :
9      Defendants.         :
10 ------------------------------X
11
12 Confidential videotaped deposition of DAVID MASILOTTI
13           Wilmington ,Delaware
14         Wednesday, November 22, 2006
15              9:19 a.m.
   Job No.: 24-91258
16 Pages 1 - 303
17 Reported by: Gail L.Inghram Verbano, CSR, RMR, CRR
18
19
20
21              CONFIDENTIAL
22
23
24
25

**Page 2**

1
2      Confidential videotaped deposition of
3  DAVID MASILOTTI, held at the offices of:
4
5
6      CONNOLLY, BOVE, LODGE & HUTZ
           1220 North Market Street
7          Wilmington, DE  19801
              (302)658-9141
8
9
10
11      Pursuant to agreement, before Gail L.
12 Inghram Verbano, California Certified Shorthand
13 Reporter, Registered Merit Reporter, and Certified
14 LiveNote Reporter.
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1      A P P E A R A N C E S
2
3  ON BEHALF OF PLAINTIFF TESLA INDUSTRIES
4
5      ROBERT WILCOX, ESQUIRE
6      WERB & SULLIVAN
7      300 Delaware Avenue, 13th Floor
8      Wilmington, Delaware 19801
9      (302)652-1100
10
11
12      and
13
14      PAUL CRAWFORD, ESQUIRE
15      CONNOLLY, BOVE, LODGE & HUTZ
16      1220 North Market Street
17      Wilmington Delaware  19801
18      (302)658-9141
19
20
21
22
23
24
25

**Page 4**

1  A P P E A R A N C E S (Continued):
2  ON BEHALF OF DEFENDANT DAVID WALDMANN:
3
4      JOHN A. ADAMS, ESQUIRE
5      SUSANIN, WIDMAN & BRENNAN, P.C.
6      Suite 240, Executive Terrace,
7      455 South Gulph Road
8      King of Prussia, Pennsylvania 19406
9      (610)337-4510
10
11
12  ON BEHALF OF DEFENDANTS LYNDOL HOLLINGSWORTH, CHARLI
13  MINNICK, AND NEW MILLENNIUM TOOLS, INC.,:
14
15      RODNEY R. SWEETLAND, III, ESQUIRE
16      ADDUCI, MASTRIANI & SCHAUMBERG, LLP
17      1200 Seventeeth Street, N.W.
18      Washington, D.C. 20036
19      (202)467-6300
20
21
22  ALSO PRESENT:
23      DAVID WALDMANN
24      TRUEE DORSEY
25      SCOTT PICKERING, VIDEOGRAPHER

Case 1:06-cv-00050-CONFIDENTIAL VIDEOTAPED DEPOSITION OF PAUL MASILOTTI Page 3 of 9
CONDUCTED ON WEDNESDAY, NOVEMBER 22, 2006

10 (Pages 37 to 40)

37

1  Q  And other than, I believe it was
2  Mr. Phillips, have you ever reported anybody else to
3  the police in connection with your relationship with
4  Tesla Industries?
5  A  Have I ever reported anybody to the police
6  that worked for Tesla Industries?  Yeah, there was a
7  few occasions.
8  Q  On how many?
9  A  I don't know.  Maybe three or four.
10  Q  Do you recall any of those individuals'
11  names?
12  A  No.
13  Q  At the commencement -- prior to the
14  commencement of the deposition, as you were walking
15  in the room, did you tell Mr. Waldmann that he was
16  going to go to jail?
17  A  Huh?
18  Q  Did you tell Mr. Waldmann this morning
19  that he was going to go to jail as you were walking
20  in the room?
21  A  Yes, I did.
22  Q  All right.  Why did you say that?
23  A  Because of what he did to my company and
24  me.
25  Q  Have you reported Mr. Waldmann to the

38

1  police?
2  A  Yes, I have.
3  Q  And when did you do that?
4  A  I was contacted by Criminal Investigations
5  of the United States Navy probably about a week ago.
6  Q  When did you make a report in connection
7  with Mr. Waldmann?
8  A  I didn't.  The program manager contacted
9  them.
10  Q  And what was the nature of that contact?
11  A  They just asked me to cooperate with them.
12  Q  And what did they say that they need your
13  cooperation on?
14  A  They just asked me to cooperate with them.
15  Q  What was your understanding of what they
16  wanted you to cooperate with?
17  A  The involvement of information regarding
18  programs that Tesla Industries is working on.
19  Q  What was the date that you received that
20  call?
21  A  I think that was probably last week.
22  Q  What day last week?
23  A  I think it was Wednesday.
24  Q  What was the identity of the individual
25  who contacted you?

39

1  A  What was the identity?
2  Q  Who were they?
3  A  Criminal investigations, CID.
4  Q  Do you have a name?
5  A  Not on me, no.
6  Q  Do you have that name someplace?
7  MR. WILCOX:  Objection to the form.
8  Can you read the question back.
9  (Record read.)
10  MR. WILCOX:  Withdraw the objection.
11  THE WITNESS:  Yeah.  I believe it's back
12  at my office.
13  BY MR. SWEETLAND:
14  Q  Do you have a card from that individual?
15  A  No, not with them personally.
16  Q  So you wrote down their name during the
17  phone call?
18  A  I wrote down their name when the program
19  manager called and asked me to speak to them.
20  Q  When did the program manager call?
21  A  I believe that was -- let's see.  I
22  believe that was earlier on in the week or the end
23  of the week.  So it had to be the week before last.
24  Q  And who was the program manager who
25  contacted you?

40

1  A  The program manager of the Global Hawk.
2  Q  And what is his or her name?
3  A  Walt Lassiter.
4  Q  How do you understand that last name to be
5  spelled?
6  A  L-A-S-S-I-T-E-R, I believe.
7  Q  And how long did the conversation with
8  Mr. Lassiter last?
9  A  The conversation with him?
10  Q  Yes.
11  A  Probably 10 or 15 minutes.
12  Q  What information did Mr. Lassiter
13  communicate to you during that conversation?
14  A  I'm not at liberty to say.
15  Q  If you don't tell me right now,
16  Mr. Masilotti --
17  Mr. Wilcox, I would ask that you instruct
18  your witness to answer my questions.
19  A  They're -- they're information of a
20  confidential nature of a program that I'm working on
21  for the United States military.
22  MR. SWEETLAND:  Mr. Wilcox, will you
23  instruct your client to answer the question or not?
24  MR. WILCOX:  I'm not going to instruct my
25  client to violate what his perception of security

Case 1:06-cv-00005-GMS Document 155-2 Filed 05/18/2005 Page 4 of 9



45

1  in a nature of something that I'm doing that's of
2  national security.
3      Q    Did they ask you any technical information
4  during that discussion?
5      A    It was discussed, yes.
6      Q    Other than an attorney, have you had any
7  other discussions regarding this case with any other
8  person?
9      A    Sure.
10     Q    Who?
11     A    My wife.
12     Q    Other than an attorney and your wife, have
13 you ever had any discussions regarding this case
14 with any other person?
15     A    Sure; my father.
16     Q    Who is your father?
17     A    My father.
18     Q    What's his name?
19     A    Donald.
20     Q    Where does Donald -- is his last name
21 Masilotti?
22     A    That's correct.
23     Q    Where does he reside?
24     A    In Vineland, New Jersey.
25     Q    And what are the substance of any

46

1  conversations that you've had with your father
2  regarding this case?
3      A    The goings on and the occurrences of the
4  case.
5      Q    Other than your father, your wife and any
6  attorneys, have you had conversations with any other
7  individual regarding this case?
8      A    Yeah; my mother.
9      Q    Other than your father, your mother, your
10 wife and your attorneys, have you had conversations
11 with anybody else about this case?
12     A    My personnel.
13     Q    By "personnel," you mean employees of
14 Tesla?
15     A    That's correct.
16     Q    Other than your employees or the employees
17 of Tesla, your mother, your father, your wife and
18 your attorneys, have you discussed this case with
19 anybody else?
20     A    Yeah. I believe I've discussed it with --
21 I believe I've discussed it with a couple of my
22 customers.
23     Q    Which customers are those?
24     A    Customers that are military.
25     Q    That's not the answer to my question,

47

1  Mr. Masilotti. What are the names of those
2  individuals?
3      A    They're witnesses. They're on the witness
4  list.
5      Q    Which individuals are those?
6      A    Okay. Ray Batipps.
7      Q    Okay. And when have you had conversations
8  with Mr. Batipps?
9      A    Just recently.
10     Q    How recently?
11     A    Probably within the last month.
12     Q    On how many occasions have you
13 communicated with Mr. Batipps regarding this case?
14     A    A couple of times.
15     Q    And in those couple of times, what was the
16 substance of the information that you communicated
17 to Mr. Batipps?
18     A    Allegations that were made against my
19 company and --
20     Q    And what are those allegations?
21     A    Mr. Waldmann saying I built thousands of
22 defective units and sold them to the government.
23     Q    Did you discuss anything else with
24 Mr. Batipps?
25     A    About him being a witness.

48

1      Q    Okay. And what, if anything, did
2  Mr. Batipps communicate to you?
3      A    He agreed.
4      Q    Was any other information communicated
5  than what you have just identified?
6      A    That was pretty much the scope of the
7  conversation.
8      Q    And what is the nature of your expectation
9  of Mr. Batipps' serving as a witness in this case?
10     A    Well, Mr. -- Mr. Batipps is going to
11 testify that he's had zero defects in our equipment
12 since it was deployed in Iraq.
13     Q    Other than Mr. Batipps, your mother, your
14 father, your attorneys, your wife and any employees,
15 have you had communications with anybody else
16 regarding the facts in this case?
17     A    Other witnesses, the potential witnesses.
18     Q    And who might they be?
19     A    I guess there's the U.S. Army.
20     Q    Anybody in particular in the U.S. Army?
21     A    I believe his name is Avocero.
22     Q    How is that spelled?
23     A    Chief Avocero.
24          I don't know the spelling.
25     Q    And where is Chief Avocero located?

Case 1:06-cv-00055-GMS Document 152 Filed 04/19/2007 Page 5 of 9
CONFIDENTIAL VIDEOTAPED DEPOSITION OF DAVID ZELOTH
CONDUCTED ON WEDNESDAY, NOVEMBER 22, 2006

13 (Pages 49 to 52)

**49**

1   A   He's located in Aberdeen, Maryland.
2   Q   At Aberdeen Proving Grounds?
3   A   Uh-huh.
4   Q   And on how many occasions have you had
5   communications with Chief Avocero?
6   A   I didn't have them myself directly. I had
7   one of my employees conduct them.
8   Q   Who was that?
9   A   Mr. Mooney.
10  Q   What understanding, if any, do you have
11  regarding what Chief Avocero may testify to in this
12  case?
13  A   Mr. Waldmann's activities.
14  Q   And how would you characterize those
15  activities in general?
16  A   His activities.
17  Q   His activities.
18      Other than Mr. Batipps, Chief Avocero,
19  your wife, your mother, your father, your attorneys
20  and your employees, have you discussed this case
21  with anybody else?
22  A   That's about all I can recollect at this
23  point.
24  Q   Is there anything that would refresh your
25  recollection?

**50**

1   A   That's about all I can recollect.
2   Q   Are there any documents that would refresh
3   your recollection?
4   A   Not to my knowledge.
5   Q   Did you review any documents in
6   preparation for today's deposition?
7   A   No, I did not.
8   Q   Other than speaking with an attorney, did
9   you do anything in preparation for today's
10  deposition?
11  A   No, I did not.
12  Q   Other than your mother, your father, your
13  wife and your attorneys, have you discussed today's
14  deposition with any other person?
15  A   No, I have not.
16  Q   Did you discuss Frank Mooney's deposition
17  with him?
18  A   Briefly.
19  Q   When?
20  A   I believe it was a couple of days ago.
21  Q   Where did that discussion take place?
22  A   In -- in my -- in his office.
23  Q   Was anyone else present?
24  A   No.
25  Q   What was the substance of your discussion

**51**

1   with Mr. Mooney regarding his deposition?
2   A   Just how did it go?
3   Q   What did he say?
4   A   He said it went fine.
5   Q   Anything else?
6   A   That was pretty much it.
7   Q   Did you discuss Joseph Talbot's deposition
8   with him?
9   A   No, I did not.
10  Q   Did you discuss Daniel -- is that
11  pronounced "Roscioli"?
12  A   "Roscioli."
13  Q   -- Roscioli?
14  A   No, I did not.
15  Q   Approximately how many times before today
16  have you given sworn oral testimony?
17  A   In regards to what?
18  Q   Anything.
19  A   In court?
20  Q   Approximately how many times have you
21  testified in court?
22  A   I have no idea.
23  Q   More than a hundred?
24  A   No.
25  Q   More than 10?

**52**

1   A   Yeah.
2   Q   More than 50?
3   A   I don't think so.
4   Q   More than 25?
5   A   I'm not sure.
6   Q   Would it be fair to say between 10 and 25
7   times?
8   A   It's possible.
9   Q   Other than testifying in court, have you
10  ever had your oral testimony taken in the context of
11  a deposition?
12  A   Yes.
13  Q   On approximately how many occasions?
14  A   I believe twice.
15  Q   And what were those two occasions?
16  A   The Chancery Court case --
17  Q   This is the --
18  A   -- Tesla versus Fantasia.
19  Q   And what was the other occasion?
20  A   That was in a custody suit.
21  Q   This was involved with your divorce?
22  A   That's correct.
23  Q   Have you ever had any communications with
24  anyone who you understand to be an expert witness in
25  this case?

Case 1:06-cv-00050-SLR CONFIDENTIAL VIDEOTAPED DEPOSITION OF WALTER CRAIG LOTH Page 6 of 9
CONDUCTED ON WEDNESDAY, NOVEMBER 22, 2006

22 (Pages 85 to 88)



**85**

1     Q   Was the retention of his services
2 authorized by the board of directors of Tesla?
3     A   I am the board of directors of Tesla.
4     Q   There are no other members of the board?
5     A   Not at the present, no.
6     Q   Other than tampering with Tesla vehicles,
7 do you have any other facts that indicated somebody
8 was trying to hurt you during that time period?
9     A   Well, I think that was more than enough.
10     Q   And you'd never had a bodyguard before
11 this time?
12     A   Never.
13     Q   Even when Mr. Zimmerman had threatened
14 your life?
15     A   No.
16     Q   Was Mr. Gabriel armed?
17     A   Yes, he was.
18     Q   Do you know whether or not he had a
19 license to carry a concealed weapon in Delaware?
20     A   Yes, he did – not in Delaware. Delaware
21 has, I believe, a reciprocity or some type of
22 agreement with California and several other states.
23     I believe he had licenses in five
24 different states.
25     Q   Are you licensed to carry a firearm?

**87**

1 and the company was asked to correct a safety
2 deficiency by the inspectors, and he failed to
3 comply with that.
4     Q   Any other reasons that he was fired?
5     A   He became very belligerent and grossly
6 insubordinate when he was asked why he didn't comply
7 with the inspectors, and I terminated him.
8     Q   Other than his malfeasance in his job and
9 his belligerency, were there any other reasons that
10 you terminated him?
11     A   No. It was – it was just an incident
12 that occurred.
13     Q   Why is it, in spite of his belligerency
14 and malfeasance with safety matters, did you rehire
15 him?
16     A   The guy has like, I believe, six or seven
17 children.
18     Q   Are you involved in any employment-related
19 dispute with Mr. Gresk currently?
20     A   No.
21     Q   Or Tesla? Is Tesla involved with any?
22     A   No.
23     Q   Who is Mr. Roberto Morales?
24     A   He is the electrical mechanical assembly
25 foreman.

**86**

1     A   No, I am not.
2     Q   Who is David W. Gresk?
3     A   He was an employee of Tesla Industries.
4     Q   When was he an employee?
5     A   I believe he was an employee – I couldn't
6 give you the exact dates. I'm not certain. I
7 believe he worked there for about a year.
8     Q   Was that within the last two years?
9     A   Yes, it was.
10     Q   And what was his position at Tesla?
11     A   He was a – he was a foreman in the
12 machine shop.
13     Q   And under what circumstances did
14 Mr. Gresk's employment with Tesla cease?
15     A   He resigned.
16     Q   Was he asked to resign?
17     A   No, he was not.
18     Q   Would you have fired him had he not
19 resigned?
20     A   I had fired him, but I had offered him his
21 job back.
22     Q   When did you fire him?
23     A   About a day prior to that.
24     Q   Why did you fire him?
25     A   He failed to follow the safety procedures.

**88**

1     Q   At Tesla?
2     A   That's correct.
3     Q   Currently?
4     A   Currently, yes.
5     Q   And do you understand him to have any
6 information that may be related to the allegations
7 in this case?
8     A   Yes, he does.
9     Q   And what is your understanding of the
10 allegations that he may have?
11     A   Pieces of equipment that were given to
12 Mr. Waldmann that – prototypes that have
13 disappeared.
14     Q   Anything else?
15     A   Primarily, no. That's primarily –
16     Q   If you could please direct your
17 attention – it's immediately to your right, there's
18 an exhibit –
19     What exhibit is that, Madam Court
20 Reporter?
21     THE COURT REPORTER: 63.
22     MR. SWEETLAND: I'm sorry?
23     THE COURT REPORTER: 63.
24 BY MR. SWEETLAND:
25     Q   – 63, which is the verified complaint in

Case 1:06-cv-00005-GMS Document 155 Filed 04/18/2008 Page 7 of 9
CONFIDENTIAL VIDEOTAPED DEPOSITION OF DAVID MILO
CONDUCTED ON WEDNESDAY, NOVEMBER 22, 2006

34 (Pages 133 to 136)

**133**

1  Q  And in what form was the report, oral or
2  written?
3     A  We met with them.
4     Q  And where did you meet with them?
5     A  At Tesla's office.
6     Q  With whom did you meet?
7     A  With an agent of the NAIC.
8     Q  And one or more?
9     A  There was one that we met with.
10    Q  Do you recall the individual's name?
11    A  No, I do not.
12    Q  Was it a male or a female?
13    A  It was a male.
14    Q  Was it a uniformed or nonuniformed person?
15    A  Nonuniformed.
16    Q  Approximately how old was that individual?
17    A  Oh, I don't know.  He could have been
18  maybe 30 to 35.
19    Q  And how is it that you came to meet with
20  that individual at that time, at your office?
21    A  We were requested by the DOD to contact
22  them.
23    Q  When did the DOD make that request?
24    A  Sometime around, I believe — I'd say
25  February to March.

**134**

1     Q  And who within the DOD made the request?
2     A  One of the program managers.
3     Q  And who was that?
4     A  The person who we're building the unmanned
5  aircraft —
6     Q  What's the name of that individual?
7     A  That would have been Mr. Lassiter.
8     Q  And Mr. Lassiter called you out of the
9  blue and asked you to meet with this person?
10    A  No.  We reported that we had a breach with
11  the information that we were — that it was — there
12  was a theft of the new aircraft battery information,
13  and that also the information that we were working
14  with was breached.
15    Q  And in what format was that report made to
16  Mr. Lassiter, oral or in writing?
17    A  I believe that was made orally, over the
18  phone.
19    Q  Were there any other reports made to
20  Mr. Lassiter about that purported breach?
21    A  Not to my knowledge.
22    Q  And how long was it between the time that
23  you contacted Mr. Lassiter and the time when you met
24  with some person whose name you don't remember from
25  NAIC?

**135**

1     A  It was probably maybe a day or two.
2     Q  How long did your conversation with
3  Mr. Lassiter last when you reported this?
4     A  How long did it last?
5     Q  Yes.
6     A  I couldn't tell you.  It was months ago.
7     Q  Was it more than an hour?
8     A  No.
9     Q  Was it more than a half an hour?
10    A  I couldn't tell you.  I —
11    Q  Did you report to Mr. Lassiter the name of
12  any individual that you believed had taken this
13  information?
14    A  Yes, we did.
15    Q  And whose name did you give him?
16    A  Mr. Waldmann.
17    Q  Anybody else?
18    A  Not at that time, no.
19    Q  At some other time did you give him some
20  other name?
21    A  No.
22    Q  When you met with the individual from the
23  NAIC, in your office, approximately how long did
24  that meeting take place?
25    A  Don't recall.

**136**

1     Q  Was it more than an hour?
2     A  It might have been.
3     Q  Was it more than two hours?
4     A  I don't think so.  I'm not certain.
5     Q  What was the substance of the information
6  that you communicated to the NAIC individual?
7     A  Basically the information that was taken
8  from us.  That belonged to the United States
9  Department of Defense, and also I think we met again
10  with him to go over some security measures at the
11  company.
12    Q  Did you identify Mr. Waldmann's name
13  during that meeting?
14    A  Yes, we did.
15    Q  Did you identify any other individuals'
16  names?
17    A  The only personnel at the DOD.
18    Q  None of my clients?  Not Lyn Hollingsworth
19  or Charles Minnick?
20    A  No, I don't believe we did.
21    Q  Okay.  And have you ever reported the
22  names of Mr. Minnick or Mr. Hollingsworth to any
23  individual acting on behalf of the United States
24  government?
25    A  I believe that when we were contacted by

Case 1:06-cv-00055-GMS    Document 152-2    Filed 04/18/2007    Page 8 of 9
CONFIDENTIAL VIDEOTAPED DEPOSITION OF DAVID ZABILANSKY
CONDUCTED ON WEDNESDAY, NOVEMBER 22, 2006

53 (Pages 209 to 212)

209

1    accounts yielded 5 million in sales.
2         Even though we immediately replaced him
3    with another seasonal salesman to cover those
4    accounts, those accounts suffered, in the first six
5    months of the year, better than a $2-1/2 million
6    loss, or drop in sales. They then recovered at the
7    end of the year.
8    Q    What's the lost production cost that
9    you're alleging in this case?
10   A    There was an enormous amount of theft of
11   the materials that shut our production lines down
12   for weeks on end.
13   Q    Which production lines were shut down?
14   A    Everything.
15   Q    Okay. Which ones?
16   A    For everything from the machine shop, to
17   QC, to the final --
18   Q    What's QC?
19   A    Quality control.
20   Q    How long was the machine shop shut down?
21        MR. WILCOX: Please, can you let him -- I
22   don't believe he had the opportunity to answer the
23   question.
24        THE WITNESS: I think during the theft of
25   the acetyl and the insulators, it was shut down for

210

1    over a week and a half while we secured delivery of
2    the materials.
3    BY MR. SWEETLAND:
4    Q    Is that documented in writing?
5    A    Yes, it's documented. And we'll provide
6    witnesses to back it up.
7    Q    What is QC?
8    A    Quality control.
9    Q    And when was that shut down?
10   A    They had nothing to inspect.
11   Q    What else was shut down?
12   A    Electromechanical assembly.
13   Q    And what's that?
14   A    That is the assembly of the equipment, the
15   mechanical assembly.
16   Q    And during what time period was that shut
17   down?
18   A    I believe that that took place sometime
19   around -- it could have been August of 2005. I'll
20   have to -- I'll have to check to make sure.
21   Q    What else, if anything, was shut down?
22   A    It kept us from shipping any product out
23   for over almost two weeks.
24   Q    Well, that would be a delay in delivery;
25   right?

211

1    A    No. That's --
2    Q    That's a lost production?
3    A    Yeah, it's a loss. You can't do anything.
4    Q    And what's the value of the lost
5    production that you allege?
6    A    Just -- my payroll is somewhere around
7    $110,000 biweekly. My overhead probably runs about,
8    biweekly about another $22,000. I'd say an
9    aggregate of that probably came to somewhere
10   around -- probably 60- to $70,000 worth of lost --
11   Q    And you have documents to back all of this
12   up?
13   A    We're having accountants prepare that
14   formally, yes.
15   Q    Well, I want to know about the underlying
16   documents. Do you have underlying documents that
17   show, for instance, that QC was shut down?
18   A    No. We're going to provide the managers
19   of the departments as witnesses.
20   Q    Do you have any documents to support that
21   any --
22   A    Yeah, we have documents, because the flow
23   through quality control is managed by managers; and
24   we're going to use the managers to testify to the
25   shutdown of each department.

212

1    Q    Do you have any internal memos that
2    memorialize the fact that these core functions of
3    Tesla were shut down?
4    A    We do have the emails where Mr. Waldmann
5    stole the material.
6    Q    Who are the names of these people who are
7    going to provide this testimony?
8    A    Well, Francine Stahley.
9    Q    Can you please spell that?
10   A    I can't.
11   Q    You can't. How long has she worked for
12   you?
13   A    Probably six or seven years.
14   Q    Who else?
15   A    Dennis Barone.
16   Q    How is that spelled?
17   A    B-A-R-O-N-E.
18   Q    And who else is going to testify to these
19   facts?
20   A    That will be Jerry Hulburt.
21   Q    Okay. And what's he going to testify to?
22   A    He was the -- he was the manager of the
23   machine shop, that they went to build the backup or
24   replacement parts for the parts that were missing
25   and the material was gone.

Case 1:06-cv-00055-GMS   Document 55-2   Filed 04/13/2007   Page 9 of 9
CONFIDENTIAL VIDEOTAPED DEPOSITION OF DAVID SILOT
CONDUCTED ON WEDNESDAY, NOVEMBER 22, 2006

54 (Pages 213 to 216)

**213**

1    Q   Is there anybody else that you believe is
2  going to testify to support these allegations?
3    A   Roberto Morales.
4    Q   Anybody else?
5    A   Myself.
6    Q   Of course. But there are no underlying
7  documents that say this function was shut down
8  during this time period?
9    A   I also have the invoices for the material;
10 and also the invoices and the quotations to replace
11 the missing materials.
12    Q   Anything else that you have in terms of
13 documentation?
14    A   I'm not certain of that. I'll have to
15 find out.
16    MR. ADAMS: Could I just get a list of
17 those names again, please.
18    MR. WILCOX: I have them all.
19    MR. SWEETLAND: I don't think all of these
20 people are on the --
21    MR. WILCOX: What I mean is I wrote down
22 what he just said.
23    MR. SWEETLAND: Again, I'm just -- I'm
24 stupefied that these people, I'm hearing about them
25 at a deposition when they're not in a 26(a)(2)(b)

**214**

1  report.
2    MR. ADAMS: You need to supplement.
3  Discovery is over in a week.
4    MR. SWEETLAND: How are we going to -- how
5  are we going to depose them, Mr. Wilcox? I mean,
6  this is -- this is an outrage. I've never seen
7  anything like this before.
8  BY MR. SWEETLAND:
9    Q   What value do you attribute to the loss of
10 normal growth opportunities?
11    A   That is an interpolation.
12    Q   Based on what?
13    A   Based on the growth of the sales over the
14 past five years.
15    Q   What has been the historical growth rate
16 in sales over the past five years for Tesla?
17    A   The historical growth rate over the last
18 five years was anywheres from 35 to 50 to
19 100 percent.
20    Q   Okay. So your sales --
21    A   It's an exponential curve, in other words.
22    Q   So your sales in 2005, you testified, were
23 approximately 7 million?
24    A   That's correct.
25    Q   So what were they in 2004?

**215**

1    A   They were 4 million.
2    Q   And what were they in 2003?
3    A   I believe they were 2-1/2 million.
4    Q   And 2002?
5    A   I believe they were 2 -- about 2 million.
6    Q   And 2001?
7    A   I believe they were about the same.
8    Q   What were they -- what was the rate of
9  growth between the time that you founded Tesla,
10 then, and 2001?
11    A   My first year it was about a half a
12 million.
13    Q   And you went from a half a million in the
14 first year to, in 2001, a million?
15    A   Pardon me?
16    Q   What was the -- what did you grow to
17 between the time that you started the company and
18 2001?
19    A   Like I said, it was 7, over 7 million.
20    Q   No. In 2001, what were your sales?
21    A   In 2001? I believe my sales were
22 somewheres around 2 million, 2-1/2 million.
23    Q   And in 2000?
24    A   You just asked me about -- oh, 2000?
25 There I'm going by -- not by fiscal year, so that's

**216**

1  where I'm getting confused.
2    I believe my sales were somewheres
3  around -- probably one and a half million.
4    Q   So you didn't grow very much between the
5  time you founded it and 2000, though?
6    MR. WILCOX: Objection; characterization.
7    THE WITNESS: Yeah, it did.
8  BY MR. SWEETLAND:
9    Q   What, if anything, do you attribute the
10 more significant growth that's occurred since 2000?
11    A   Well, like anything, it's -- we've spent
12 10 years marketing our products. We've gotten
13 entrenched in a marketplace. People trust us. So,
14 you know, there's a growth curve there that is not
15 linear, because of that.
16    We've also invested a massive amount of
17 money and time and energy and effort in new
18 machinery, equipment.
19    Q   Would you attribute the occupation in Iraq
20 and Afghanistan to your increase in sales?
21    A   That drove some of it, yes.
22    MR. WILCOX: Objection to the form.
23    Please read the question back.
24    MR. SWEETLAND: He already answered.
25    MR. WILCOX: Well --

Exhibit 2

RECEIVED BY HAND

DEC 2 9 2006

A&G

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

TESLA INDUSTRIES, INC.,            )
                                   )
            Plaintiff,             )
                                   )
    v.                             )    C.A. No. 06-055-GMS
                                   )
DAVID C. WALDMANN, LYNDOL W.       )
HOLLINGSWORTH, CHARLES             )
MINNICK a/k/a CHUCK MINNICK, and   )
NEW MILLENNIUM TOOLS, INC.,        )
                                   )
            Defendants.            )

### EXPERT TESTIMONY OF DONALD P. STEWART

I.    **Introduction**

I have been retained by Plaintiff, Tesla Industries, to provide information relating to some of the issues which I understand will be tried in the above-captioned litigation. I expect to provide this testimony in conjunction with one or more of the following issues: First, I understand that there are issues in this litigation relating to the identification of, and access to, personnel within the military procurement system who can make decisions regarding purchase of equipment offered by outside contractors.

I will discuss my concern about the sensitive military information obtained by Mr. Waldmann which was resident on his home computer. The customer file information on his personal computer is considered sensitive and confidential by the US Army and the Department of Defense.

It is the purpose of this report to outline my expected testimony on these and other issues and the basis of any opinions rendered in connection with that testimony.

II.    **Pertinent Experience, Knowledge And Training**

Attached is my resume describing relevant experience and various military related positions including acquisition of tool sets and tool optimization for approximately seven years prior to my retirement in September 2006. Throughout my 26 year career with the military, I have been stationed at the Rock Island Arsenal in Rock Island, Illinois. This facility has responsibility for development and procurement of a broad range of military hardware ranging from tank turrets to tools and tool sets. Over the past 7 years I have been actively involved in military procurement and worked closely with Procurement Contracting Officers (PCO) responsible for obtaining these tools. My role in procurement was primarily in the evaluation of tools. My main function was to coordinate the research of new and emerging tool initiatives and work hand in hand with a procurement official to have these items acquired by the military.



*150*

EXHIBIT NO.
2/15/07
S. NELSON

**III.    Pertinent Materials Reviewed**

I have reviewed the following materials in preparation for rendition of testimony in this matter. These materials include:

1. Stipulated Protective Order Regarding Confidentiality

2. Complaint and attachments

3. A group of documents which appear to be emails relating to the tool or proposed tool that I understand is one of the items at issue in this matter.

4. A listing of Tesla Industries' customers which I understand was available to one or more of the Defendants in this matter. These customer lists include document number 357-475, 478, and 484-579 as well as P Supp 1692-1712.

5. Document described as Plaintiff's Supplemental Response to Interrogatory No. 9 of Defendants which I understand contains a listing of Tesla Industries' confidential/trade secret information including that pertaining to the afore-mentioned tools.

7. Defendants document number NMT-MIN 003

8. Tesla Industries document numbers 290-316

In addition to the above I understand there are numerous other documents which I may review in the future pending approval of my access to same by Defendants. I understand that this access may be requested.

**IV.    Statement Of Expected Opinions And Reasons**

As mentioned above, I am familiar with the military procurement system and particularly the steps necessary to introduce new equipment to the military. Any new product must pass through several stages of review and approval before being considered applicable for military use. One of the first prerequisites is an existing reputation for quality, durability and reliability. Thus, it is difficult for new companies to sell into the military procurement system without a prior reputation or history with the military procurement system. In retrospect this explains why one or more of the above defendants relied upon an association with an established and well regarded supplier of military equipment, Tesla Industries. This will be discussed in more detail below.

Returning to the steps to be followed in the military procurement system, the first of those steps is an initial evaluation of the equipment. The primary facilities for screening such equipment are Aberdeen Proving Grounds in Aberdeen, Maryland and Fort Leonard Wood in Missouri. I am personally aware that a so-called powered wrench was tested by one or more of the defendants at Aberdeen Proving Grounds and that testing failed because of overheating of components in the wrench.

-2-

If a product passes initial muster at the engineering school level, the product and the product manufacturer would then be referred to a major supporting command for the purpose of integrating the product into military systems. The principal supporting commands that I worked with were TACOM (Tank and Automotive Command) and CECOM (Communication and Electronics Command).

The next step in the military procurement system is acquisition of a national stock number (NSN). If a product is approved by the above organizations it will then, and only then, be given an NSN which is an essential predicate to selling any product to the military. The NSN then becomes the ordering serial number for all future purchases by the military and identifies the manufacturer of that product.

I personally helped the defendants obtain an NSN for their DC Impact Wrench. That was done based on an understanding, heavily promoted by Mr. Waldmann, that this was a product of Tesla Industries. I learned at a later date, much to my surprise, that the DC Impact Wrench was neither manufactured, promoted, authorized nor associated with Tesla Industries. My assumption that this was a Tesla Industries product was predicated on fliers sent to me by Mr. Waldmann containing reference to Tesla Industries and by the fact that email about the DC Impact Wrench came by way of a Tesla email address. Had it come to my attention that the DC Impact Wrench was not a Tesla Industries product, it is highly unlikely that the item would have been accepted for testing and review on the expedited basis that it was and ultimately given an NSN. It is now my understanding that the entity developing the DC Impact Wrench at the time the NSN was obtained was a new organization called NMT (New Millennium Tools). I now understand this was a start up company which had no track record or history of business with the military. By contrast, Tesla Industries is well known to me as a premier provider of quality equipment. It is my opinion that acquisition of a NSN for the DC Impact Wrench, had the true facts been disclosed to me, would have been difficult to acquire.

To further explain my opinion regarding the unlikelihood of granting NMT an NSN it is helpful to explain the following sequence of events.

1.     The initial device proposed to me by Mr. Waldmann was identified as the DC Impact Wrench and included a device with a NATO connector which enabled powering of the wrench directly from a 24-volt source or a Tesla power supply. The promotion of this wrench as being usable with a Tesla power supply unit further reinforced my (mistaken) belief that the power wrench was a Tesla product. The DC Impact Wrench, when tested with a Tesla power unit at Aberdeen Proving Grounds, failed because of excess power which caused a meltdown of the wrench. At that point in time there was no possibility of Mr. Waldmann/NMT obtaining an NSN for their tool.

2.     To overcome this obstacle, Mr. Waldmann/NMT returned to me with a different arrangement for powering the tool, namely, a portable rechargeable battery pack. This changed powering system eliminated the overheating experience with the first version of the DC impact wrench and thereby facilitated acquisition of an NSN for the battery powered DC impact wrench.

Once a potential vendor receives an NSN for a product it wishes to sell to the military, the next hurdle in implementing those sales is gaining interest of procurement officials at

military installations. There also has to be a requirement and/or initial need for the item. Military bases in the Continental United States (CONUS) number in the thousands. In addition to the actual military installations there are multiple facilities such as TACOM, Aberdeen Proving Grounds that employ personnel who have purchasing decision capabilities and would be of importance to a potential vendor, especially with respect to a new product or product system. None of the individuals at the military installations or locations like TACOM who would have purchasing or technical review responsibilities are readily identifiable to any vendor unless that vendor has access or prior knowledge of the point of contact persons (POC) at these facilities.

None of the names and duties of military or civilian personnel having purchasing responsibility or interest is generally known either inside or outside of the military. There is no directory of such personnel to my knowledge. Thus, any knowledge of POC at any installation would have had to be known to Mr. Waldmann before his contacts or visits to a facility. That knowledge would be obtained through his prior contact with such personnel in his position at Tesla Industries. Only through actively working with government employees, usually for a long period of time, can a potential vendor develop a business relationship necessary to promote and sell items to the military.

One example of the difficulty getting access to pertinent personnel at a military installation would be the practical difficulties of contacting pertinent personnel at TACOM. Having worked at TACOM for 26 years, I know first hand that ready access to pertinent personnel is extremely difficult. Cold calls on a base would be next to impossible. Security since 9/11 has been heightened to a point that only people with authorized access can gain access to the facility. For a vendor to enter an installation like TACOM the vendor must be invited by a member of that installation who would then request from security a pass for them to enter a certain portion of the installation. The vendor, the company's name, their area of origination be it U.S. or overseas must be verified and vendors would only be allowed on TACOM's installation with an escort and then only allowed into a limited area of the installation. Given these restrictions, and the fact that there are over 6,000 personnel in TACOM facilities (Rock Island and Warren), the chances of a cold call linking a vendor with the right person responsible for purchasing decisions is remote or nil.

For all of the above reasons, it is my opinion that Mr. Waldmann would have to rely upon customers identified during his employment at Tesla Industries to effectively promote and sell any products on behalf of New Millennium Tools or like organizations.

I understand that a suggestion has been made that access to appropriate military personnel with purchasing authority can be acquired through attending trade shows and/or by general visits to facilities offering demonstration of equipment to base personnel in general. With regard to trade shows, most personnel from military facilities at such shows are not the purchasing agents for that facility or actively pursuing procurements at these trade shows. In fact they are there to display the current military hardware available through their facility. They are there to conduct sales rather than purchases.

With regard to another alleged avenue of access to military procurement asserted by the defendants, namely, general demonstrations at bases, it has been my experience that cold calls are not accepted; much prior communication would have had transpired before anybody

-4-

demonstrates at an installation. At no point can anybody drive up to an installation without prior point of contact (POC) for a demonstration.

Also while reviewing documents in preparation for this report, I came across a listing out of a military database called LOGSA (Logistics Report Agency). This info is confidential to government employees only. In particular it gives the requesting unit and the unit's current location which is secure and classified data. I was extremely surprised that Mr. Waldmann had forwarded this from a Tesla email account to his home email account which is prohibited conduct. I was also surprised to see that Mr. Waldmann requested this information from an active duty solider, Mr. Cassity, who was deployed in Southeast Asia. I expect the deployed solider, seeing an "army.mil" email address for Mr. Waldmann, assumed that the sender using the military email address was authorized to receive this information. The "army.mil" email extension is reserved for active duty military and certified government employees. Only a contractor doing direct business with the military may be granted access to an "army.mil" email account.

I have also seen documentation indicating that Mr. Waldmann used a "army.mil" account to forward info about potential funding sources for NMT to Mr. Hollingsworth and/or Mr. Minnick while still employed by Tesla Industries. These sources included funding from the Army's Small Business Innovation Research (SBIR) and the Special Operations Command (SOCOM).

Among the documents I reviewed are those attached to the complaint which, in part, comprise spreadsheet listings containing DODDAC numbers for a particular Tesla product (NSN 6130014755321). This listing, that Mr. Waldmann received from Mr. Cassity, contains classified military data such as the correct locations of deployed military units. This is confidential information and a possible security violation of military policies and procedures. I was distressed that this information was sent to Mr. Waldmann's personnel email address.

I have been informed that Mr. Waldmann has indicated that the aforementioned DODDAC reports were sent to his home email for the purposes of preparing a quarterly sales report for his employer, Tesla Industries. Aside from the aforementioned impropriety of his having the DODDAC information, in my opinion this information would not enable him to prepare current quarterly sales report for his then employer Tesla Industries. I say this in part because it is unlikely that Mr. Waldmann had sufficient information available to him to cross reference DODDAC numbers to specific units to whom he sold Tesla products. Cross referencing of DODDAC to individual military units is available only government computers and is classified information. If Mr. Waldmann had such information, he or the person providing such information is guilty of a serious security breach. If he does not have this information there is no way in which he could convert the DODDAC information to the specific units which is what he contends.

## V.    Exhibits To Be Used at Trial

I expect that some of the documents referenced above, plus demonstrative exhibits, may be used in conjunction with my trial testimony.

**V.     Listing of Pertinent Publications and Other Expert Testimony**

There are no publications in my name in the last ten years.  I have not testified (by deposition or trial) as an expert in the last four years.

My compensation in connection with this matter is $55.00 per hour plus reimbursement of expenses.

I subscribe to the content of the above report.


_Donald P. Stewart_
Donald P. Stewart

_Dec 28 2006_
Date

2619 14th Ave, Moline Il 61265          309-762-9862

Donald Stewart

| | |
|---|---|
| **Experience** | 2000-2006     Tools Modernization Group  Rock Island Arsenal, Rock Island, Il |

**Team Leader for Tool sets and management expert for tool optimization**

- Reviewed new tools and their applicability to the Army mission..
- Provided detailed analysis for the current tool sets, kits, and outfits to determine if they met the current need.
- Work closely with the Engineering school as they determine emerging Army requirements.
- Coordinated program management, inventory, and acquisition functions. This included procurement, distribution, production, scheduling, requirements determination, and provisioning.
- Reviewed and provided analysis to higher management of all new Army systems to ensure that no special tools were required if similar tools were available to the public

1995–2000
**Mobile Shop Set Team Leader**

- Managed all mobile shop shelters. These included the Shop equipment, contact maintenance. This is a HUMMVV conversion with a full tool load, air compressor and welder.
- I also had the Shop Equipment Welding. This is a trailer mounted weld shop with tools and all welding equipment.
- I was the Army Diving Team Leader and we managed and maintained over 20 different types of diving tool sets. This included the underwater construction set with 3 containers of underwater tools including welders and various "jaws of life" type equipment.

1989–1995
**Team Leader, Chemical Defense Equipment**

- I served as the team leader in the chemical division focusing on defense against chemical, biological and nuclear weapons.
- I was the director of support for the Service Response Force. This is an ad-hoc group of experts from the government and Army, trained to respond to any accident or incident world wide.
- Served in operation Desert Shield and Desert Storm as the Army's chemical liaison officer. The only civilian to do so.

Exhibit 3

RECEIVED BY HAND

DEC 2 9 2006

A&G

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TESLA INDUSTRIES INDUSTRIES, INC., )
)
Plaintiff, )
)
) C.A. No. 06-055-(GMS)
. . .v. )
)
DAVID C. WALDMANN, )
LYNDOL W. HOLLINGSWORTH, )
CHARLES MINNICK a/k/a CHUCK MINNICK, and )
NEW MILLENNIUM TOOLS, INC., )
)
Defendants. )

## REPORT OF PROPOSED TESTIMONY OF ROGER GUILLEMETTE

### I. Introduction

I have been retained by Plaintiff Tesla Industries to provide information relating
to some of the issues which I understand will be tried in the above-captioned litigation. I
expect to provide this testimony in conjunction with the unique features of Tesla
Industries' NATO Connector compared to other companies' connectors.

### II. Pertinent Experience, Knowledge And Training

Attached is my curriculum vitae describing twenty-three years of experience in
the military. I have seen and used standard NATO Connectors throughout the twenty-
three years I have been in the Army. I have used Tesla Industries' NATO Connectors
since 2004 when I began working as an Instructor, Writer, and Equipment Analyst for the
Army at Aberdeen Proving Ground in Aberdeen, Maryland.



157

EXHIBIT NO.
G. NELSON

### III. Pertinent Materials Reviewed

Additionally, I am familiar with military trained I have reviewed the following materials in preparation for rendition of testimony in this matter. These materials include:

1. Complaint and attachments.

2. Tesla Industries' Supplemental Response to Interrogatory No. 9 of Defendants Lyndol W. Hollingsworth, Charles Minnick, and NMT's Interrogatories directed to Tesla Industries.

3. Stipulated Protective Order Regarding Confidentiality.

4. Recent Tesla Industries brochures (Plaintiff's document production nos. 899-966 and 1019-1039).

Additionally, I am familiar with military technical operations and requests, procurement procedures, test procedures, and military equipment installation and maintenance procedures and requirements. In addition to the above I understand there are numerous other documents which I may review in the future pending approval of my access to same by Defendants. I understand that this access has been requested but a decision on that access had not been provided by Defendants as of the time this report was prepared.

### IV. Statement of Expected Opinions And Reasons

In my opinion, Tesla Industries' NATO Connectors are far superior to other NATO Connectors which are used in the Army.

Throughout my twenty-three years in the Army, standard NATO Connectors have been used by the army in the field to jumpstart vehicles. I have been using Tesla

Industries' NATO Connector since 2004. The reaction to the Tesla Industries NATO Connector has been overwhelmingly positive.

The Tesla Industries NATO Connector is far superior to any NATO Connectors which the Army has been using in the field. It is far more durable. For example, I witnessed a tank run over one of Tesla Industries' NATO Connectors and it remained intact and functional, whereas other NATO Connectors in the army would have been smashed and ruined. Due to the rough nature of operations in the field, it is not uncommon for vehicles to run over NATO Connectors. Therefore durability is an important feature of a Connector. The non-destructive features of Tesla Industries' products are unique and highly desirable, especially in training or combat arenas.

When deployed in hot, desert areas, such as Iraq, other NATO Connectors deteriorate from the ultraviolet rays of the sun, but Tesla Industries, Inc.'s NATO Connectors are uniquely UV resistant.

Further, Tesla Industries sells tools that can replace the negative and positive probe on the NATO Connector in case of an electrical malfunction that damages the probe. This enables a unit to repair its Connector on its own rather than having to purchase a new one. I am unaware of other companies selling such tools with their NATO Connectors. Again this is a unique feature of Tesla Industries' products.

The Tesla Industries NATO Connector is safer to use than other NATO Connectors. A common problem with standard NATO Connectors in use by the Army is that their cables become exposed over time which poses the risk of shock to soldiers. Unlike other products, Tesla Industries' NATO Connector is protected, airtight, and watertight which limits the risk of shock to soldiers.

This report is signed this 28th day of December, 2006

Expert

**NAME:** Roger Urbain Guillemette
**RANK:** CW3(P)

**ADDRESS:** 11 Gull Circle
Northeast, MD 21901
(410) 287-8691

**PERSONAL DATA:**

**UNIT:** HHC 61st ORD BDE
Aberdeen, MD 21005
(410) 287-8691

**DOB:** 08 May 1966
Marital Status: Married
Dependents: Two
Total AFS: 23 Years

## SUMMARY OF QUALIFICATIONS

Experienced Maintenance and Logistical Manager with 23 years of accomplishment in program evaluation, planning, policy analysis and formulation, systems development and budgeting.

- Gathered and organized logistical data to recommend systems, procedures and organizational changes to executive management using oral, written and power-point formats.
- Analyzed new and current work problems and procedures in the areas of organizational changes, communications, information flow, integrated service production methods, inventory control and cost analysis and evaluated outcomes to recommend alternative solutions and improved processes.
- Designed and implemented proposed improvement plans to test processes before implementation, conferred with personnel to ensure successful implementation, documented findings, and prepared recommendations for executive management.
- Recommended the purchase of equipment and materials in excess of three million dollars and designed area layouts to support multiple tactical deployments and the relocation of the U.S. Army Ordnance Center and Schools.
- Organized, created, and participated in team projects.
- Developed and implemented records management programs for filing, protection, and retrieval of historical records, and assured staff compliance with the programs.
- Designed, evaluated, recommended, and approved various reports and training programs.
- Prepared materials to train workers in the use of new forms, reports, procedures, and equipment in accordance with U.S. Army regulation.
- Managed defense contractors and Army maintenance personnel – conducted on-site inspections, evaluated work performed, and methods, equipment, and personnel used.

## PROFESSIONAL EXPERIENCE

**US Army, Active Duty**                                             1984 – present

**Instructor/ Writer/ Equipment Analyst**                    2004 – present

- Taught logistical professional development and technical trouble-shooting operations to students from diverse backgrounds using oral, written, and web-based communication techniques.
- Analyzed, created, and recommended improvements to workflow schedules for Junior and Senior Maintenance and Logistical and Technical Professional Development courses.
- Wrote and implemented technical lesson plans for basic automotive engine diagnostics and theory.

- Played a central role on a four-person team to evaluate and analyze new military equipment, including weapons systems.
- Consulted with potential defense contractors to analyze technical data, projects and plans to evaluate potential new systems and equipment for the US Government.
- Actively evaluates and analysis's on a quarterly basis new innovations to technology and equipment to be introduced into the military.
- Wrote and implemented employee orientation, training, and evaluation manuals.
- Supervised and evaluated eight personnel.

**Logistician / Maintenance Manager**                    1996 – 2005

- Managed equipment maintenance operations for more than 600 pieces of equipment.
- Created, analyzed, organized, and allocated service related resources to ensure efficient management, maintenance, and repair of military vehicles.
- Created a maintenance operation center with more than 140 pieces of equipment and 36 personnel valued at more than 3.5 million where none existed before.
- Developed, implemented, and maintained an organizational maintenance records management system in accordance with US Army regulation where none existed before.
- Supervised and directed work processes that ensured regulations, procedures, and protocols were rigidly adhered to.
- Continually analyzed maintenance workflow operations to identify problems or potential improvements and subsequently developed and implemented changes in policy and procedures.
- Managed repair parts department with a budget over $2,000,000; ensured minimal wait times for critical repairs.
- Conducted extensive research and prepared credit packets which ultimately saved his unit over $1.1 Million dollars in under one year.
- Managed and supervised the maintenance of over 200 combat systems valued at over $250 Million dollars on a repair budget of $1.8 Million dollars during hostile combat operations.
- Developed and refined Standing Operating Procedures (SOP) for all maintenance operations, including safety, fire prevention, environmental protection and physical security.
- Managed and led major logistical initiatives to include: safe transport, repair, and maintenance for multiple ground assault convoys with more than 326 pieces of equipment and 500 personnel each across hostile territory.
- Oversaw logistical management of equipment spread over wide regions of Iraq; supported critical out of sector operations involving high levels of uncertainty and risk under stressful hostile conditions.
- Created, designed, and integrated individual maintenance operations into consolidated maintenance teams for multiple organizations resulting in increased efficiency and productivity.
- Oversaw massive global re-basing program for over 300 vehicles.
- Managed 24 defense contractors and more than 126 Army maintenance personnel - conducted on-site inspections, evaluated work performed, and methods, equipment, and personnel used
- Conceived and implemented safety mechanical inspection program, resulting in substantially reduced breakdowns, improved performance.
- Analyzed statistical data to establish trends; proposed recommendations; prepared reports, briefings, and presentations; and effectively communicated results to executive management in weekly and monthly meetings.
- Developed and implemented comprehensive training plans, ensuring all military and civilian personnel were fully competent and capable of outstanding performance.

- Participant member on Military Decision Making Process (MDMP) teams to analyze, design, develop, implement and evaluate organizational training and performance.

Non-Commissioned Officer and Mechanic                                     1984-1996

## PROFESSIONAL TRAINING

Senior Automotive Maintenance Warrant Officer Course, Distinguished Honor Graduate, 2005
Systems Approach to Training, 2005
Supervisor Development Course 2005
Instructor Training Course, 2004
Support Cadre Training Course, 2004
Manager Development Course, 2002
Maintenance Managers Course, 2002
Leaders STAMIS Orientation Course, 2002
Action Officer Development, 1999
Battalion Motor Officer Course, 1999
User Level Maintenance Certification Course, 1998
Unit Maintenance (Light) Warrant Officer Course, Distinguished Honor Graduate, 1996
Warrant Officer Candidate Course, Distinguished Leadership Award, Top 20%, 1996
Motor Pool Operations / Managers Course, 1994
Basic Noncommissioned Officer Course, Commandant's List, top 20%, 1992-1993
Primary Leadership Development Course, 1987

## ASSIGNMENT LOCATIONS

Fort Sill, OK., 1984
Wertheim, GE, 1985 -1989
Fort Hood, TX, 1989 – 1991
Garlstadt, GE, 1991-1992
Giessen, GE, 1992 – 1993
Fort Hood, TX, 1993 – 1996
Wiesbaden, GE, 1996 - 1999
Fort Stewart, GA, 1999 – 2004
Aberdeen, MD, 2004 – Present

## OPERATIONAL DEPLOYMENTS

Saudi Arabia, 1990 -1991
Hungary, 1996 – 1998
Italy, 1998 – 1999
Bosnia, 2000 – 2001
Saudi Arabia, 2002 – 2003
Iraq, 2003

## CERTIFICATE OF SERVICE

I hereby certify that on April 19, 2007, a true and correct copy of the foregoing

PLAINTIFF, TESLA INDUSTRIES INC.'S MEMORANDUM IN OPPOSITION TO NMT

DEFENDANTS' MOTION IN LIMINE NO. 1 SEEKING EXCLUSION OF CERTAIN TRIAL

WITNESSES LISTED BY TESLA was caused to be served on the following via CM/ECF filing:

<table>
<tr>
<td>

VIA HAND DELIVERY AND
ELECTRONIC MAIL
John D. Demmy
Stevens & Lee
1105 North Market Street
7th Floor
Wilmington, Delaware 19801
jdd@stevenslee.com

</td>
<td>

VIA HAND DELIVERY AND
ELECTRONIC MAIL
Steven J. Balick
John G. Day
Ashby & Geddes
222 Delaware Avenue
P.O. Box 1150
Wilmington, Delaware 19899
sbalick@ashby-geddes.com

</td>
</tr>
<tr>
<td>

VIA ELECTRONIC MAIL
John A. Adams
Adam C. Gerber
Susanin, Widman & Brennan, P.C.
South Gulph Road, Suite 240
King of Prussia, PA 19406
jaadams@swbcounsellors.com

</td>
<td>

VIA ELECTRONIC MAIL
Louis S. Mastriani
Rodney R. Sweetland, III
David F. Nickel
Adduci, Mastriani & Schaumberg, L.L.P.
1200 Seventeenth Street, N.W., Fifth Floor
Washington, District of Columbia 20036-3006
nickel@adduci.com

</td>
</tr>
</table>

_/s/ Paul E. Crawford_
Paul E. Crawford, Esquire (#493)
pcrawford@cblh.com