UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TESLA INDUSTRIES, INC., a Delaware Corporation,<br><br>           Plaintiff,<br><br>v.<br><br>DAVID C. WALDMANN, LYNDOL W. HOLLINGSWORTH, CHARLES MINNICK a/k/a CHUCK MINNICK, and NEW MILLENNIUM TOOLS, INC., an Oregon Corporation,<br><br>           Defendants. | )<br>)<br>)<br>)<br>)<br>)  Civil Action No. 06-55-GMS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFF, TESLA INDUSTRIES INC.'S MEMORANDUM IN OPPOSITION TO NMT DEFENDANTS' MOTION IN LIMINE NO. 4 TO PRECLUDE CERTAIN TYPES OF TESTIMONY BY TESLA'S PRESIDENT DAVID MASILOTTI**

Brian A. Sullivan (#2098)
Robert D. Wilcox (#4321)
Amy D. Brown (#4077)
WERB & SULLIVAN
300 Delaware Avenue, 13th Floor
P.O. Box 25046
Wilmington, Delaware 19899
Telephone: 302-652-1100
bsullivan@werbsullivan.com

Paul E. Crawford (#493)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 N. Orange Street
P.O. Box 2207
Wilmington, Delaware 19899
Telephone: 302-888-6262
pcrawford@cblh.com

April 19, 2007

Attorneys for Plaintiff
Tesla Industries Inc.

## TABLE OF CONTENTS

I. Introduction .................................................................................................... 1

II. Argument ....................................................................................................... 2

III. Conclusion ..................................................................................................... 4

# TABLE OF AUTHORITIES

**Cases**

*Asplundh Manufacturing Division v. Benton Harbor Engineering*,
    57 F.3d 1190 (3d Cir. 1995) ...................................................................2

*Newport Electronics, Inc. v. Newport Corp.*,
    157 F.Supp.2d 202 (D. Conn. 2001) ........................................................3

**Rules**

Fed.R.Evid. 701 ...............................................................................................2

This Memorandum is submitted by Plaintiff, Tesla Industries Inc. ("Tesla"), in opposition to NMT Defendants' Motion in Limine No. 4: "To Preclude Mr. David Masilotti From Offering Lay Opinion or Expert Testimony" (NMT MIL 4, DI 136).

## I.   INTRODUCTION

Mr. Masilotti, like Bill Gates[1], does not have a college degree. Both have been highly successful businessmen, one a little more than the other. Would anyone dare to suggest that Mr. Gates is not an expert in his field just because he lacks a college degree? Yet that is what the NMT Defendants assert (NMT MIL 4, page 3).

Mr. Masilotti, like Mr. Gates, is a self taught genius in the field of electronics, particularly for military applications. He almost single-handedly expanded Tesla operations from a garage to its current 120,000 square foot facility in New Castle (See Masilotti Dep Tr 179 attached at Exhibit 2 hereto).

NMT MIL 4 at page 1 argues in support of its Motion that it has not received "any information relating to the alleged uniqueness or superiority of Tesla products over its competitors" and thus there is no "foundation" for any testimony by Mr. Masilotti concerning the uniqueness or superiority of Tesla's products. That argument ignores at least three established "foundations" for Mr. Masilotti's expected trial testimony:

- Full details of the unique features of Tesla's products were provided in Tesla's eighteen (18) page November 1, 2006 Supplemental Response to NMT Defendants' Interrogatory 9 ("Supplemental Trade Secret Listing") which is attached as Exhibit 4 to one of Waldmann's MIL's (DI 139).

---

[1] See Biography of Bill Gates from www.wikipedia.com attached as Exhibit 1 hereto.

1

- In many instances Tesla has no competitors. As Mr. Masilotti explained in his deposition, Tesla is the sole source supplier for many of the items it sells to the U.S. Armed Forces (See Masilotti Dep Tr 191-2 attached at Exhibit 2 hereto). He also identified those companies who do sell competitive products (Masilotti Dep Tr 252 at Exhibit 2 hereto).

- Mr. Masilotti was deposed at length regarding the uniqueness and superiority of Tesla products. This opportunity to depose Mr. Masilotti eliminates the element of surprise addressed in NMT's MIL 4 (pages 4-5).

## II.    ARGUMENT

Any trial testimony by Mr. Masilotti that goes beyond recitation of pure facts would, at most, be based on lay opinion. Lay opinion is clearly permitted under Rule 701, Federal Rules of Evidence which in pertinent part states that lay opinion "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witnesses' testimony or the determination of a fact in issue ***" is permitted. The Third Circuit addressed this issue in *Asplundh Manufacturing Division v. Benton Harbor Engineering*, 57 F.3d 1190, 1201 (3d Cir. 1995) as follows:

> In particular, courts have permitted witnesses with firsthand knowledge to offer lay opinion testimony where they have a reasonable basis--grounded either in experience or specialized knowledge--for arriving at the opinion expressed. A conclusion by the trial court that the witness possessed sufficient experience or specialized knowledge has thus often been used to determine that the witness's opinion testimony satisfies the requirements that the opinion be both "helpful to a clear understanding...of a fact in issue" and "rationally based" upon the witness's perception, as expressed in the text of Rule 701.

2

Because Mr. Masilotti has **first hand** information about the technology misappropriated by Defendants there is little anticipated need for him to go beyond that knowledge in his trial testimony in the form of expert opinion. To the extent he does testify as to the comparative benefits of Tesla products versus others it is anticipated he would testify based on first hand knowledge of these competitive products. Thus, comparisons based on first hand information would therefore not constitute expert testimony.

It is clear that first hand competitive information acquired by a party can be used in testimony "as to what products his company sells and what he understood [his competitor] was selling". *Newport Electronics, Inc. v. Newport Corp.*, 157 F.Supp.2d 202 (D. Conn. 2001) ("Such testimony stems **from his own experience** and is relevant to the issue of when Newport Electronics learned of the possible infringement and any actual confusion that exists") (emphasis added).

### III. CONCLUSION

Mr. Masilotti is the most knowledgeable witness, within and without Tesla, regarding issues pleaded in this case. His testimony should not be artificially circumscribed by arbitrarily labeling it as "expert" testimony.

Respectfully submitted,

Dated: April 19, 2007

/s/ *Robert D. Wilcox*
Robert D. Wilcox (#4321)
Brian A. Sullivan (#2098)
Amy D. Brown (#4077)
WERB & SULLIVAN
300 Delaware Avenue, 13th Floor
P.O. Box 25046
Wilmington, Delaware 19899
Telephone: 302-652-1100

Paul E. Crawford (#493)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 N. Orange Street
P.O. Box 2207
Wilmington, Delaware 19899
Telephone: 302-888-6262

Attorneys for Plaintiff
Tesla Industries Inc.

# Exhibit 1



# Before Microsoft

## by John Mirick



**Family and Early Childhood**

**First Computing Experience**

**Roots of his Business Career**

**The Birth of Microsoft**

**Bill Gates Links**

**Bibliography**

**Family and Early Childhood**

On October 28, 1955, shortly after 9:00 p.m., William Henry Gates III was born. He was born into a family with a rich history in business, politics, and community service. His great-grandfather had been a state legislator and mayor, his grandfather was the vice president of a national bank, and his father was a prominent lawyer. [Wallace, 1992, p. 8-9] Early on in life, it was apparent that Bill Gates inherited the ambition, intelligence, and competitive spirit that had helped his progenitors rise to the top in their chosen professions. In elementary school he quickly surpassed all of his peer's abilities in nearly all subjects, especially math and science. His parents recognized his intelligence and decided to enroll him in Lakeside, a private school known for its intense academic environment. This decision had far reaching effects on Bill Gates's life. For at Lakeside, Bill Gates was first introduced to computers.



**First computing Experience**

In the Spring of 1968, the Lakeside prep school decided that it should acquaint the student body with the world of computers [Teamgates.com, 9/29/96]. Computers were still too large and costly for the school to purchase its own. Instead, the school had a fund raiser and bought computer time on a DEC PDP-10 owned by General Electric. A few thousand dollars were raised which the school figured would buy more than enough time to last into the next school year. However, Lakeside had drastically underestimated the allure this machine would have for a hand full of young students.

Bill Gates, Paul Allen, and a few other Lakeside students (many of whom were the

first programmers hired at Microsoft) immediately became inseparable from the computer. They would stay in the computer room all day and night, writing programs, reading computer literature and anything else they could to learn about computing. Soon Gates and the others started running into problems with the faculty. Their homework was being turned in late (if at all), they were skipping classes to be in the computer room and worst of all, they had used up all of the schools computer time in just a few weeks. [Wallace, 1992, p. 24]

In the fall of 1968, Computer Center Corporation opened for business in Seattle. It was offering computing time at good rates, and one of the chief programmers working for the corporation had a child attending Lakeside. A deal was struck between Lakeside Prep School and the Computer Center Corporation that allowed the school to continue providing it's students with computer time. [Wallace, 1992, p. 27] Gates and his comrades immediately began exploring the contents of this new machine. It was not long before the young hackers started causing problems. They caused the system to crash several times and broke the computers security system. They even altered the files that recorded the amount of computer time they were using. They were caught and the Computer Center Corporation banned them from the system for several weeks.

Bill Gates, Paul Allen and, two other hackers from Lakeside formed the Lakeside Programmers Group in late 1968. They were determined to find a way to apply their computer skills in the real world. The first opportunity to do this was a direct result of their mischievous activity with the school's computer time. The Computer Center Corporation's business was beginning to suffer due to the systems weak security and the frequency that it crashed. Impressed with Gates and the other Lakeside computer addicts' previous assaults on their computer, the Computer Center Corporation decided to hire the students to find bugs and expose weaknesses in the computer system. In return for the Lakeside Programming Group's help, the Computer Center Corporation would give them unlimited computer time [Wallace, 1992, p. 27]. The boys could not refuse. Gates is quoted as saying "It was when we got free time at C-cubed (Computer Center Corporation) that we really got into computers. I mean, then I became hardcore. It was day and night" [Wallace, 1992, p. 30]. Although the group was hired just to find bugs, they also read any computer related material that the day shift had left behind. The young hackers would even pick employees for new information. It was here that Gates and Allen really began to develop the talents that would lead to the formation of Microsoft seven years later.

**Roots of Business Career**

Computer Center Corporation began to experience financial problems late in 1969. The company finally went out of business in March of 1970. The Lakeside Programmers Group had to find a new way to get computer time. Eventually they found a few computers on the University of Washington's campus where Allen's dad worked. The Lakeside Programmers Group began searching for new chances to apply their computer skills. Their first opportunity came early the next year when Information Sciences Inc. hired them to program a payroll program. Once again the group was given free computer time and for the first time, a source of income. ISI had agreed to give them royalties whenever it made money from any of the groups programs. As a result of the business deal signed with Information Sciences Inc., the group also had to become a legal business [Wallace, 1992, p. 42-43]. Gates and Allen's next project involved starting another company entirely on their own, Traf-O-Data. They produced a small computer which was used to help measure traffic flow. From the project they grossed around $20,000. The Traf-O-Data company lasted until Gates left for college. During Bill Gates' junior year at Lakeside, the administration offered him a job computerizing the school's scheduling system. Gates asked Allen to help with the project. He agreed and the following summer, they wrote the program. In his senior year, Gates and Allen continued looking for opportunities to use their skills and make some money. It was not long until they found this opportunity. The defense contractor TRW was having trouble with a bug infested computer similar to the one at Computer Center Corporation. TRW had learned of the experience the

two had working on the Computer Center Corporation's system and offered Gates and Allen jobs. However thing would be different at TRW they would not be finding the bugs they would be in charge of fixing them. "It was at TRW that Gates began to develop as a serious programer," and it was there that Allen and Gates first started talking seriously about forming their own software company [Wallace, 1992, p. 49-51].

In the fall of 1973, Bill Gates left home for Harvard University [Teamgates.com, 9/29/96]. He had no idea what he wanted to study, so he enrolled as prelaw. Gates took the standard freshman courses with the exception of signing up for one of Harvard's toughest math courses. He did well but just as in high school, his heart was not in his studies. After locating the school's computer center, he lost himself in the world of computers once again. Gates would spend many long nights in front of the school's computer and the next days asleep in class. Paul Allen and Gates remained in close contact even with Bill away at school. They would often discuss ideas for future projects and the possibility of one day starting a business. At the end of Gates's first year at Harvard, the two decided that Allen should move closer to him so that they may be able to follow up on some of their ideas. That summer they both got jobs working for Honeywell [Wallace, 1992, p. 59]. As the summer dragged on, Allen began to push Bill harder with the idea that they should open a software company. Gates was still not sure enough to drop out of school. The following year, however, that would all change.

**The Birth of Microsoft**

In December of 1974, Allen was on his way to visit Gates when along the way he stopped to browse the current magazines. What he saw changed his and Bill Gates's lives forever. On the cover of Popular Electronics was a picture of the Altair 8080 and the headline "World's First Microcomputer Kit to Rival Commercial Models." He bought the issue and rushed over to Gates's dorm room. They both recognized  this as their big opportunity. The two knew that the home computer market was about to explode and that someone would need to make software for the new machines. Within a few days, Gates had called MITS (Micro Instrumentation and Telemetry Systems), the makers of the Altair. He told the company that he and Allen had developed a BASIC that could be used on the Altair [Teamgates.com, 9/29/96]. This was a lie. They had not even written a line of code. They had neither an Altair nor the chip that ran the computer. The MITS company did not know this and was very interested in seeing their BASIC. So, Gates and Allen began working feverishly on the BASIC they had promised. The code for the program was left mostly up to Bill Gates while Paul Allen began working on a way to simulate the Altair with the schools PDP-10. Eight weeks later, the two felt their program was ready. Allen was to fly to MITS and show off their creation. The day after Allen arrived at MITS, it was time to test their BASIC. Entering the program into the company's Altair was the first time Allen had ever touched one. If the Altair simulation he designed or any of Gates's code was faulty, the demonstration would most likely have ended in failure. This was not the case, and the program worked perfectly the first time [Wallace, 1992, p. 80]. MITS arranged a deal with Gates and Allen to buy the rights to their BASIC.[Teamgates.com, 9/29/96] Gates was convinced that the software market had been born. Within a year, Bill Gates had dropped out of Harvard and Microsoft was formed.

**Bill Gates Links**

As you might know Bill Gates has been quite busy since forming Microsoft. Here are a few links to

keep you abreast to what he and Microsoft are up to these days.

- Bill Gates Biography: A short biography from the people at Microsoft
- The Road Ahead: The homepage of Gates's 1996 book
- Speeches: Links to Bill Gates's speeches that can be found on the web
- More speeches: More on line speeches
- Interview: An interview that Bill gave to Upside magazine
- How rich is Bill NOW!: Self-explanatory

---

## Bibliography

Wallace, James. 1993. Hard Drive: Bill gates and the Making of the Microsoft Empire, HarperCollins Publishers, New York, NY.

TeamGates.com. Sept 29, 1996, Bill's Life, http://www.teamgates.com/library/life.htm

T. Carlson. Sept 29, 1996. Altair 8800, http://www.ncsc.dni.us/fun/user/tcc/cmuseum/altair.htm

---

**Number of Words:** 1716 +4 images
© *John Mirick*
Last updated Sept 29, 1996

# Exhibit 2

Case 1:06-cv-00055-GMS    Document 154-3    Filed 04/19/2007    Page 1 of 5

CONFIDENTIAL VIDEOTAPED DEPOSITION OF DAVID MASILOTTI
CONDUCTED ON WEDNESDAY, NOVEMBER 22, 2006

1 (Pages 1 to 4)

---

IN THE UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
-----------------------------X
TESTA INDUSTRIES, INC.        :
                              : Civil Action
      Plaintiff,              : No. 06-055 GMS
                              :
      vs.                     :
                              :
DAVID C. WALDMANN, LYNDOL W.  :
HOLLINGSWORTH, CHARLES MINNICK:
a/k/a CHUCK MINNICK, and NEW  :
MILLENNIUM TOOLS, INC.,       :
                              :
      Defendants.             :
-----------------------------X

Confidential videotaped deposition of DAVID MASILOTTI
        Wilmington, Delaware
        Wednesday, November 22, 2006
        9:19 a.m.
Job No.: 24-91258
Pages 1 - 303
Reported by: Gail L. Inghram Verbano, CSR, RMR, CRR

CONFIDENTIAL

---

Confidential videotaped deposition of
DAVID MASILOTTI, held at the offices of:


        CONNOLLY, BOVE, LODGE & HUTZ
        1220 North Market Street
        Wilmington, DE  19801
        (302)658-9141



     Pursuant to agreement, before Gail L.
Inghram Verbano, California Certified Shorthand
Reporter, Registered Merit Reporter, and Certified
LiveNote Reporter.

---

APPEARANCES

ON BEHALF OF PLAINTIFF TESLA INDUSTRIES

    ROBERT WILCOX, ESQUIRE
    WERB & SULLIVAN
    300 Delaware Avenue, 13th Floor
    Wilmington, Delaware 19801
    (302)652-1100


    and


    PAUL CRAWFORD, ESQUIRE
    CONNOLLY, BOVE, LODGE & HUTZ
    1220 North Market Street
    Wilmington Delaware  19801
    (302)658-9141

---

APPEARANCES (Continued):
ON BEHALF OF DEFENDANT DAVID WALDMANN:

    JOHN A. ADAMS, ESQUIRE
    SUSANIN, WIDMAN & BRENNAN, P.C.
    Suite 240, Executive Terrace,
    455 South Gulph Road
    King of Prussia, Pennsylvania 19406
    (610)337-4510


ON BEHALF OF DEFENDANTS LYNDOL HOLLINGSWORTH, CHARLES
MINNICK AND NEW MILLENNIUM TOOLS, INC.,:

    RODNEY R. SWEETLAND, III, ESQUIRE
    ADDUCI, MASTRIANI & SCHAUMBERG, LLP
    1200 Seventeeth Street, N.W.
    Washington, D.C. 20036
    (202)467-6300


ALSO PRESENT:
    DAVID WALDMANN
    TRUEE DORSEY
    SCOTT PICKERING, VIDEOGRAPHER

---

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202) 861-3410  (800) 292-4789  (301) 762-8282  (703) 288-0026  (410) 539-3664

Page 177

1    A   That, to my best of knowledge, that the
2 contents of this are accurate or correct.
3    Q   Directing your attention on Page 5 to
4 Interrogatory No. 4 -- do you see that?
5    A   Yeah, I see it.
6    Q   Nowhere, as far as I can tell, among the
7 response from Tesla to Interrogatory No. 4, is there
8 any mention of the videotape which has consumed so
9 much of our record today. Is that correct?
10    A   And your question about this, again, sir?
11    Q   I did not see in my review any mention of
12 the videotape that we've talked about on the record
13 several times today.
14    A   I fail to understand what No. 4 has to do
15 with the videotape.
16    Q   Okay. But is it correct that when you
17 signed your -- the verification of these responses,
18 that the response to No. 4 did not mention the
19 existence of a videotape?
20    MR. WILCOX: The document speaks for
21 itself. Objection on that basis.
22    Please answer.
23    THE WITNESS: Yeah, I don't see any
24 mention of a videotape in here.
25 BY MR. SWEETLAND:

Page 178

1    Q   If you please direct your attention to
2 page, Interrogatory No. 7, and the response follows
3 over on to Page 8. It wasn't clear to me in
4 reviewing this response, does Tesla or does it not
5 have not a written document retention or destruction
6 policy?
7    A   The only policy that we have is in regards
8 to the removal of documents from the company.
9    Q   Is that policy in writing?
10    A   Yes, it is. And every employee signs it.
11    Q   How long are files maintained at Tesla?
12    A   Indefinitely.
13    Q   Is that true with data files on electronic
14 forms of data storage?
15    A   That depends on the type of data storage.
16    Q   And what are the different manners in
17 which data is treated at Tesla?
18    A   Well, we have inventory data. We have
19 accounting data. We have quality control data. We
20 have HR data, payroll data. Those records are
21 maintained indefinitely.
22    We don't destroy any electronic or paper
23 records at Tesla, unless they're in error or defunct
24 or if somebody prints out something and it's in
25 error; then it gets shredded. Nothing gets thrown

Page 179

1 out. Everything gets shredded.
2    Q   And Tesla has shredders on-site?
3    A   At every work station in every office.
4    Q   Approximately how much square footage is
5 occupied by Tesla's principal location?
6    A   Approximately total, 120,000 square feet.
7    Q   And does Tesla have any other locations?
8    A   When you say, "other locations" --
9    Q   Does Tesla do business at any other
10 address?
11    MR. WILCOX: Other than the one with the
12 120,000 --
13    MR. SWEETLAND: Yes.
14    THE WITNESS: Well, that's two locations.
15 One's -- one is across the street from the other
16 one.
17    Other than that, I have a -- a lab that is
18 located at my home that I do research and
19 development in. They're located across the street
20 from each other.
21 BY MR. SWEETLAND:
22    Q   What's the intersection where that's
23 located?
24    A   From Center Point Boulevard.
25    Q   And is the square footage that you gave me

Page 180

1 the total between the two?
2    A   Yes.
3    Q   And with Center Point Boulevard, what is
4 the cross street with Center Point Boulevard?
5    A   They're on the same street. The cross
6 street is Route 141, I believe.
7    Q   And between the two buildings,
8 approximately how many doors are there?
9    A   How many doors are there? I'd say
10 probably maybe a dozen.
11    Q   At the time Mr. Waldmann was employed at
12 Tesla, was there access control measures installed
13 on every door in both buildings?
14    A   Yes, there was.
15    Q   And were those key card controlled or
16 otherwise?
17    A   Only two doors in the whole company were
18 accessible. The rest of them were locked down.
19 They were key pad and -- they were key pad
20 accessible, and they were also controlled by a
21 receptionist.
22    Q   I see. Could employees leave from the
23 inside going out?
24    A   Yeah. Oh, yeah.
25    MR. WILCOX: Objection; vague.

189

1   A   He gave the information about where we
2   purchase the boxes that we fabricated them from. He
3   gave them all pictures of the connectors that we
4   used. He gave them all pictures of the circuitry
5   that was involved in it. That's all in an email to
6   them.
7   Q   And Tesla purchased the boxes from
8   somebody else?
9   A   Yeah, just the metal box that housed all
10  the connectors and the circuit breakers and all of
11  the parts.
12  Q   With regard to the FEMA power unit, what
13  is that?
14  A   All I know is that I met with FEMA down in
15  Orlando in 2004 to discuss building emergency power
16  supplies for FEMA.
17      When FEMA contacted Tesla in regards to
18  obtaining them after Hurricane Katrina, Mr. Waldmann
19  never informed Tesla that they had made contact. He
20  immediately sent the information to your clients,
21  along with information on the power unit, the UAV
22  power unit, which we had a variation of, that we
23  were planning on supplying them with.
24      We never knew the customer called and made
25  the inquiry. He turned around and directly supplied

190

1   it to your clients, who then pursued it as a
2   business venture and incorporated it into their
3   business plan.
4   Q   With regard to Item 9, the AC and DC power
5   inverter system and custom tool systems, what are
6   those?
7   A   Tesla Industries had started to
8   incorporate custom-built inverters into their ground
9   power units to power up tool systems, which could be
10  anything from drills, grinders, any kind of portable
11  hand or power tool -- boroscopes, lights. They were
12  for powering tools and equipment in the field.
13      Tesla had also developed a DC-to-DC
14  converter that he would control motor torque, and
15  had produced that for an application for the Navy
16  regarding power tools.
17      Mr. Waldmann was aware of that program.
18  Q   And what information did you have to
19  suggest that he transmitted that information to my
20  clients?
21  A   Well, he started up a business inside of
22  my company marketing with your clients their
23  product, in direct competition with what I was
24  planning on marketing to my customers.
25  Q   What were your plans with regard to

191

1   marketing that?
2   A   What was our plans regarding the marketing
3   of that? We were -- we are in the process of
4   introducing that product next month.
5   Q   And why is it being --
6   A   We also have a contract pending with the
7   United States Navy to supply it to them.
8   Q   Was that a bid contract?
9   A   No, that's not a bid contract. We gave
10  them a -- we gave them a proposal.
11  Q   Is -- does Tesla bid on contracts for the
12  United States military?
13  A   Do we bid on them? Not necessarily.
14  Because we're sort of what you would call a sole
15  source for most of the products that we make.
16  Q   So it's your testimony today that Tesla is
17  the sole source supplier for items to the United
18  States armed forces?
19  A   There are quite a few of them we're the
20  sole source.
21  Q   Can you name any of them?
22  A   Our ground power units.
23  Q   Anything else?
24  A   Our connectors.
25  Q   Anything else?

192

1   A   All of the unmanned aircraft parts, the
2   engine parts that we're developing for them, the
3   wheels.
4   Q   What is your understanding, if any, of the
5   nature of the sole sourcing to you? Do you know --
6   A   In other words, we're the only -- we're
7   the only current manufacturer, and they don't have
8   any technical data to turn over to other
9   contractors.
10  Q   Do you understand the term "sole source"
11  as a term of art in government contracting law?
12  A   Certainly I do.
13  Q   Is it your understanding that you are a
14  sole source supplier under that term of art?
15      MR. WILCOX: Objection to the extent it
16  calls for a legal conclusion.
17      If you understand, please answer.
18      THE WITNESS: Well, that's kind of
19  debatable. Because while we may be the only company
20  producing lightweight equipment, that's not to say
21  that they couldn't go out and buy something
22  substantially bigger or different.
23  BY MR. SWEETLAND:
24  Q   Okay. With regard to Item 10, there's a
25  statement there, on Page 10, that no Tesla

Case 1:06-cv-00055-GMS  Document 154-3   Filed 04/19/2007   Page 5 of 5
CONFIDENTIAL VIDEOTAPED DEPOSITION OF DAVID MASTLOTT
CONDUCTED ON WEDNESDAY, NOVEMBER 22, 2006

63 (Pages 249 to 252)

249

1  dual-output power supply?
2      A    I guess so. I design them for a living.
3      Q    All right. So who manufactures them?
4      A    Who manufactures them?
5      Q    Yes.
6      A    Well, that's a very broad term, a
7  dual-output power supply. I mean, that could be a
8  lab power supply that, you know, you could buy from
9  Hewlett-Packard. That's a very broad term. That's
10 like saying "transistor" or "integrated circuit
11 chip."
12     Q    Okay. How about -- is Tesla alleging that
13 any of the defendants in this case misappropriated
14 any form of dual-output power supply?
15     A    They misappropriated a lot of information.
16 They misappropriated a piece of equipment that we
17 designed for the Silent Watch program for the United
18 States Army.
19     Q    Which piece of equipment is this?
20     A    That was also a dual-output power supply.
21     Q    Does anyone else manufacture that kind of
22 dual-output power supply?
23     A    Not to my knowledge.
24     Q    You allege that my client stole an AC and
25 DC power inverter system and custom tool system; is

250

1  that correct?
2      A    No. I alleged that -- I did not allege
3  that they stole it. Mr. Waldmann took the
4  information from it.
5           What I am alleging is that they subverted
6  my organization to market their product with my
7  finances, my money, my office, my vehicles, my
8  travel expenses, my entire organization behind my
9  back while I paid for it, in prelude to me marketing
10 my own systems.
11     Q    Did anybody else market that product
12 before you allege that they took this information?
13          MR. WILCOX: Objection. Which product?
14          MR. SWEETLAND: Well, whatever he was just
15 expositing on.
16          THE WITNESS: Not like ours, no.
17 BY MR. SWEETLAND:
18     Q    Well, did anybody else market something
19 that served the same function as yours?
20     A    Oh, certainly. It's just I didn't pay for
21 it.
22     Q    Does anybody else manufacture a UAV power
23 unit assembly?
24     A    Not to my knowledge.
25     Q    Does anybody else manufacture a Global

251

1  Hawk power system?
2      A    Not to my knowledge.
3      Q    Does anybody else manufacture an interface
4  box for a UAV unit of the U.S. Navy Pioneer?
5      A    Not to my knowledge.
6      Q    Are you active in the defense contracting
7  electrical engineering field trade associations?
8      A    Yes.
9      Q    What trade associations, if any, does
10 Tesla belong to?
11     A    Oh, jeez. The Army Aviation Association;
12 the Airborne Law Enforcement Association. Quite a
13 few of them.
14     Q    Anything else comes to mind?
15     A    The National Business Aircraft
16 Association; the International Helicopter
17 Association; the United States Army Warrant Officers
18 organization, which I'm also a personal member of.
19     Q    Were you a warrant officer?
20     A    No, I was not.
21     Q    You're an honorary warrant officer in the
22 association?
23     A    No. They made -- you know. We're also a
24 member of the Army Aviation Heritage Foundation.
25          I guess I could send you a list.

252

1      Q    Does Tesla attend any trade shows?
2      A    Do we attend any trade shows? Yes, we do.
3      Q    Which trade shows do you attend?
4      A    The International Helicopter show; the
5  National Business Aircraft show; EBASE over in
6  Europe. Numerous ones.
7      Q    At those trade shows does Tesla display
8  any of its products.
9      A    Yes, we do.
10     Q    At any -- at any of the trade shows at
11 which Tesla has attended in the past year, has it
12 displayed any of the items we have discussed today?
13     A    Has it -- not any of the items that we had
14 marked as -- as trade secret or had been stolen, no.
15     Q    Based upon your knowledge of the field
16 from your company's membership in a variety of
17 associations and participation at trade shows, who
18 would you identify as Tesla's largest competitors?
19     A    Companies like Hobart, Trilectron.
20     Q    Anybody else?
21     A    The competitors? Going through trying to
22 think of some names of some of these organizations,
23 although I know who they are.
24          That's all I can think of at the moment.
25          MR. SWEETLAND: Mr. Wilcox, I have three

## CERTIFICATE OF SERVICE

I hereby certify that on April 19, 2007, a true and correct copy of the foregoing PLAINTIFF, TESLA INDUSTRIES INC.'S MEMORANDUM IN OPPOSITION TO NMT DEFENDANTS' MOTION IN LIMINE NO. 4 TO PRECLUDE CERTAIN TYPES OF TESTIMONY BY TESLA'S PRESIDENT DAVID MASILOTTI was caused to be served on the following via CM/ECF filing:

VIA HAND DELIVERY AND
ELECTRONIC MAIL
John D. Demmy
Stevens & Lee
1105 North Market Street
7th Floor
Wilmington, Delaware 19801
jdd@stevenslee.com

VIA HAND DELIVERY AND
ELECTRONIC MAIL
Steven J. Balick
John G. Day
Ashby & Geddes
222 Delaware Avenue
P.O. Box 1150
Wilmington, Delaware 19899
sbalick@ashby-geddes.com

VIA ELECTRONIC MAIL
John A. Adams
Adam C. Gerber
Susanin, Widman & Brennan, P.C.
South Gulph Road, Suite 240
King of Prussia, PA 19406
Jaadams@swbcounsellors.com

VIA ELECTRONIC MAIL
Louis S. Mastriani
Rodney R. Sweetland, III
David F. Nickel
Adduci, Mastriani & Schaumberg, L.L.P.
1200 Seventeenth Street, N.W., Fifth Floor
Washington, District of Columbia 20036-3006
Nickel@adduci.com

/s/ Paul E. Crawford
Paul E. Crawford, Esquire (#493)
pcrawford@cblh.com