## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TESLA INDUSTRIES, INC., a Delaware Corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 06-55-GMS |
| DAVID C. WALDMANN, LYNDOL W. HOLLINGSWORTH, CHARLES MINNICK a/k/a CHUCK MINNICK, and NEW MILLENNIUM TOOLS, INC., an Oregon Corporation, | ) ) ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFF, TESLA INDUSTRIES INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANT WALDMANN'S MOTION IN LIMINE TO PRECLUDE TESLA FROM REFERRING TO "LOST" OR "STOLEN" PROPERTY -DOCKET ITEM NO. 142**

Brian A. Sullivan (#2098)
Robert D. Wilcox (#4321)
Amy D. Brown (#4077)
WERB & SULLIVAN
300 Delaware Avenue, 13th Floor
P.O. Box 25046
Wilmington, Delaware 19899
Telephone: 302-652-1100
bsullivan@werbsullivan.com

Paul E. Crawford (#493)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 N. Orange Street
P.O. Box 2207
Wilmington, Delaware 19899
Telephone: 302-888-6262
pcrawford@cblh.com

Attorneys for Plaintiff
Tesla Industries Inc.

April 19, 2007

**TABLE OF CONTENTS**

I.  Nature and Stage of Proceedings ................................................................................ 1

II.  Summary of Argument ........................................................................................... 1

III.  Counterstatement of Facts........................................................................................ 2

IV.  Argument .............................................................................................................. 2

V.  Conclusion ............................................................................................................ 4

# TABLE OF AUTHORITIES

**Cases**

*ABB Air Pre-heater Inc. v. Regenerative Environmental Equipment Co.*, 167 F.R.D. 668, 673 (D. N.J. 1996)……………………………………………………………………………………..3

*Poulis v. State Farm Fire & Cas. Co.*, 747 F. 2d 863 (3rd Cir. 1984)……………………………4

*Tracinda Corp v. DaimlerChrysler AG,* 362 F. Supp. 2d 487 (D. Del. 2005)……………………4

*See, United States v. Gonzales-Benitez*, 537 F.2d 1051, 1053 (9th Cir. 1976)…………………..4

**Rules**

Fed. R. of Civ. Pro. 37(c)(1)……………………………………………………………………3

Fed. R. of Evid. 1002…………………………………………………………….................. 4

This Memorandum is submitted by Plaintiff, Tesla Industries Inc. ("Tesla"), in opposition to Defendants Waldmann's "Motion in Preclude Tesla from Referring to 'Lost' or 'Stolen' Property" (DI 141). As it is the fourth of four such motions, it will be referred to herein as "Waldmann MIL 4".

## I.    NATURE AND STAGE OF PROCEEDINGS

The Verified Complaint for, inter alia, "Theft of Trade Secrets" and "Conversion" in this action was filed January 27, 2006.  Defendant Waldmann has filed Waldmann MIL 4 to preclude ant reference to "Lost" or "Stolen" property. This is Tesla's response in opposition.

## II.    SUMMARY OF ARGUMENT

Waldmann MIL 4 is in effect, a motion seeking summary judgment on the Theft of Trade Secrets" and "Conversion" counts as a discovery sanction. Waldmann would have this Court bar Tesla from any reference to the theft of its property, even though the allegations of theft are sworn to in the Verified Complaint, in the Affidavits attached to the Verified Complaint, have been addressed in the depositions of the parties at length, and form the basis of the action. Waldmann tries to raise a discovery dispute for the first time in this Motion and seek a death-sentence sanction. Moreover, he provides no case citations from this Court, any Delaware Court, or any court in the Third Circuit to support the broad relief he seeks. The very exhibits to the Verified Complaint support the theft allegations it contains. Waldmann MIL 4 shows that there is direct testimony verifying the thefts. Waldmann's remedy at trial is cross-examination, not a Motion in Limine unsupported by any facts or case law.

## III.    COUNTERSTATEMENT OF FACTS

The Verified Complaint in this case is a voluminous pleading with attached affidavits and exhibits (A-I) chronicling the systematic transfer of Tesla's confidential information and Trade Secrets to Defendants. The affidavits and exhibits establish that items were, in fact, removed from Tesla's premises.

Since the Complaint was filed and served, the parties have engaged in months of discovery, taken and defended numerous depositions, and exchanged thousands of pages of documents, and the issues of "theft" underlie all that activity. As even Waldmann MIL 4 acknowledges at pages 2 and 3, there is evidence of "theft" as testified to by Mr. David Masilotti, President of Tesla. In addition, there is testimony by other witnesses confirming the theft.  As a result, the representation that "there was no such theft" on page 5 of Waldmann MIL 4 is contrary to other evidence and is nothing more than an aspirational statement of what Defendant Waldmann hopes he can prove at trial.

## IV.    ARGUMENT

In the Motion, Defendant Waldmann seeks to bar any reference to "theft", "stolen property", "missing sales inventory". Waldmann MIL 4, page 5. As the basis for this incredibly broad relief, Waldmann asserts that Tesla failed to supplement in response to a catch-all discovery request by another party for "any documents that support the allegations set forth in your Verified complaint… not disclosed in response in response to the Previous Requests for Production."[1]

---

[1] The fact that at least three of Waldmann's four Motions in Limine are complaints concerning responses to the NMT Defendants' discovery leads to the suspicion that Waldmann's Motions are an attempt to avoid the numerical limitation on the number of such Motions.

Waldmann asserts that there has somehow been a deficiency in Tesla's response to the catch-all document request, although he fails to identify the documents allegedly not produced. In fact, the cited portions of the deposition transcript are themselves ambiguous as to what information is being discussed and in what form. The document most clearly at issue is the "company policy on checking out equipment". *See* Exhibit 1 to Waldmann MIL 4, pp. 229:16-230:3. The documents reflecting that company policy, and Defendant Waldmann's signed Agreement of Non-Disclosure to abide by it, are made part of the Complaint as Exhibit "C".

Importantly, Court held discovery conferences in this case on October 20, 2006 and on January 18, 2007 to address the various cross-complaints regarding alleged discovery defects. The January 18, 2007 conference was held well past the November 30, 2006 fact discovery cutoff. In neither conference did any Defendant raise any concern about the alleged absence of the document that Waldmann asserts is so crucial as to now justify the relief he seeks. Copies of the transcripts of the conferences are attached as Exhibit "1" and "2".

Moreover, there is no evidence of any violation of any discovery rules and Defendant Waldmann fails to allege that he filed a Motion to Compel relating to such alleged violation. This is clearly an instance of a party who, having laid back and done nothing on discovery, now finds it convenient to raise his technical complaint in a Motion in Limine.

It is telling that Waldmann MIL 4 cites no decisions supporting Defendant's supposition that the broad sanction he seeks is justified under Fed. R. of Civ. Pro. 37(c)(1). Such relief is inconsistent with the ample decisional law after the seminal decision in *Poulis v. State Farm Fire & Cas. Co.*, 747 F. 2d 863 (3rd Cir. 1984), which mandates a deliberate analysis of specific factors as part of a consideration of sanctions. Further, Defendant Waldmann's attempted

reliance on Fed. R.of Evid. 1002 is misplaced. That "best evidence" rule clearly is designed to prevent, in most instances, a party from testifying about the contents of a document unless he has made the document itself available. *See, Tracinda Corp v. DaimlerChrysler AG,* 362 F. Supp. 2d 487 (D. Del. 2005) ("Federal Rule of Evidence 1002 provides that 'to prove the content of a writing, recording or photograph the original writing, recording or photograph is required, except as otherwise provided in these rules or by Act of Congress'"). That is not the case at bar. Waldmann attempts to turn the Rule on its head and argue in effect that if there is no document showing "theft" then no evidence of theft can be presented.[2] In this case, it is proof of theft, not the contents of a document, which are at issue. *See, United States v. Gonzales-Benitez*, 537 F.2d 1051, 1053 (9th Cir. 1976) (holding that best evidence rule did not preclude use of witness testimony concerning the substance of a conversation despite existence of a recording of the conversation).

Courts in the this Circuit have noted an "aversion, absent extreme circumstances, to the exclusion of crucial evidence." *ABB Air Pre-heater Inc.*, 167 F.R.D. 668, 673 (D. N.J. 1996); *see also In Re Paoli Railroad Yard PCB Litigation*, 35  F.3d 717, 792-793 (3d Cir. 1994) (overturning district court's decision to exclude expert testimony where prejudice was "extremely minimal"), cert. denied, 513 U.S. 1190, 131 L. Ed. 2d 134, 115 S. Ct. 1253 (1995). Indeed, exclusion of evidence is a severe sanction and is therefore often inappropriate unless the failure to disclose or supplement is in bad faith or the resultant prejudice to the opposing party cannot be cured because, for example, use of the evidence is "imminent or in progress." *ABB Air Preheater, Inc.*, supra, 167 F.R.D. at 671-72.

---

[2] As stated above, Tesla disputes vehemently that there is no documentary evidence of theft.

Although Waldmann MIL 4 is not well-founded, the Defendants have a remedy in the form of cross-examination at trial of the witnesses alleging that Tesla's property was stolen. The Defendant's attempt to prevent the trier of fact from even hearing such allegations is an attempt to preclude Tesla from presenting its case at trial, and is a severe sanction unsupported by fact or law.

## V.    CONCLUSION

For the foregoing reasons, this Court should deny Waldmann MIL 4 in its entirety.

Respectfully submitted,

Dated: April 19, 2007

/s/ Robert D. Wilcox
Robert D. Wilcox (#4321)
Brian A. Sullivan (#2098)
Amy D. Brown (#4077)
WERB & SULLIVAN
300 Delaware Avenue, 13th Floor
P.O. Box 25046
Wilmington, Delaware 19899
Telephone: 302-652-1100

Paul E. Crawford (#493)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 N. Orange Street
P.O. Box 2207
Wilmington, Delaware 19899
Telephone: 302-888-6262

Attorneys for Plaintiff
Tesla Industries Inc.

EXHIBIT 1

1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                        -   -   -

4    TESLA INDUSTRIES, INC.,        :      Civil Action
     a Delaware Corporation,        :
5                                    :
                     Plaintiff,      :
6                                    :
          v.                         :
7                                    :
     DAVID C. WALDMANN,              :
8    LYNDOL W. HOLLINGSWORTH,        :
     CHARLES MINNICK a/k/a           :
9    CHUCK MINNICK, and              :
     NEW MILLENNIUM TOOL, INC.,      :
10   an Oregon Corporation,          :
                                     :
11                   Defendants.     :      No. 06-55-GMS

12

13                       -   -   -

14                  Wilmington, Delaware
                 Friday, October 20, 2006
15                     9:00 a.m.
                  Telephone Conference

16                       -   -   -

17

18   BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.

19   APPEARANCES:

20        ROBERT D. WILCOX, ESQ.
          Werb & Sullivan
21             -AND-
          PAUL CRAWFORD, ESQ.
22        Connolly Bove Lodge & Hutz LLP

23                       Counsel for Plaintiff

24                                    EXHIBIT
                                        3
25

1

2   APPEARANCES CONTINUED:

3        DAVID F. NICKEL, ESQ.

4

5                          Counsel for Defendant Waldmann

6        (Reporter's Note:  Others on call not identified

7   in Appearances.)

8

9                     -   -   -

10

11             (Call in progress as court reporter joins.)

12             ... expert testimony.  We also would say, Your

13   Honor, we are looking for documents from the defendant that

14   will, that are in some senses necessary to allow us to

15   calculate our damages because to the extent that these

16   particular defendants had failed, they were, we believe, to

17   a large part at the expense of our client.  We have not

18   received those, Your Honor.

19             THE COURT:  So they are cross-complaints about a

20   failure with regard to damages discovery.  Is that what I am

21   hearing?

22             UNIDENTIFIED SPEAKER:  Yes.

23             THE COURT:  Have you gentlemen discussed this

24   before you got on the phone with me?

25             UNIDENTIFIED SPEAKER:  We have for several

1    months.

2                THE COURT:  What seems to be the problem?  With

3    counsel and professional lawyers who have ethical

4    obligations to the client and to the Court, what seems to be

5    the problem in resolving what seem to be fundamental and

6    basic issues?

7                MR. SWEETLAND:  Our fundamental issue is we

8    can't defend for claims of millions of dollars in documents

9    when not a single document has been produced.

10                THE COURT:  I agree with you.  Hold on.  I agree

11    with that general premise.  If what you say is true, you

12    shouldn't be expected to defend under the circumstances.

13    The question is, is what you say correct?  Plaintiff seems

14    to disagree.  Why do you disagree with that?

15                UNIDENTIFIED SPEAKER:  Your Honor, as I said, we

16    have provided information as to the categories of damages.

17    We are willing to provide additional information by November

18    1st.  And we are --

19                THE COURT:  Why November 1st?  Why is it going

20    to take them until November 1st?

21                UNIDENTIFIED SPEAKER:  Excuse me?

22                THE COURT:  Why is it going to take them until

23    November 1st?

24                UNIDENTIFIED SPEAKER:  That is essentially a

25    week and a half away.

1      THE COURT:  It would appear that these requests
2   should have been fulfilled some time ago.
3      UNIDENTIFIED SPEAKER:  We understand our
4   obligations in this regard, Your Honor.  We will deal with
5   it.  We are willing to have further --
6      THE COURT:  You have five days, counsel, to
7   comply with those requests.
8      UNIDENTIFIED SPEAKER:  Your Honor --
9      THE COURT:  To produce the information you just
10  said you were willing to produce.
11     UNIDENTIFIED SPEAKER:  Your Honor, we would ask
12  that in that regard we obtain sales information from the
13  defendants as we have previously requested and as part of
14  the calculation of our damages.
15     THE COURT:  Fair enough.
16     UNIDENTIFIED SPEAKER:  There is no sales
17  information.  We haven't sold anything.  So there is nothing
18  we can provide them.  We will reiterate that, it is very
19  clear from our discovery.  I will send an additional letter
20  that says there have been no sales.  So there is no
21  additional information from which they can derive damages
22  information.
23     THE COURT:  Have you made that statement,
24  counsel?  Have you already told your opponent that, what you
25  just said to me?

```
 1              UNIDENTIFIED SPEAKER:  We produced the documents

 2    that we believed demonstrated that there were no sales.  We

 3    thought it was clear.  If it wasn't clear, I will make it

 4    clear.

 5              THE COURT:  Counsel for plaintiff, is this the

 6    first you are hearing of this?

 7              MR. SWEETLAND:  This is the first I have heard

 8    of it.  My colleague, who is dealing with it, this is the

 9    first time we have heard this issue.

10              MR. WILCOX:  Your Honor, that was Mr. Sweetland.

11    I believe your question was directed to me.

12              THE COURT:  It was directed to you.

13              MR. WILCOX:  Your Honor, we believe the

14    documents -- that wasn't our interpretation of what the

15    documents showed.  I don't believe there has ever been an

16    affirmative statement that they have had zero sales.  If

17    that is the case, we are willing to accept the

18    representation and enter into a stipulation, evidentiary

19    stipulation accordingly.

20              THE COURT:  Great.  Counsel, you shouldn't make

21    your opponent dig through documents to answer questions that

22    are straightforward and capable of being easily resolved by

23    a straightforward answer.

24              Let's move to the next issue.

25              MR. SWEETLAND:  Your Honor, the next issue is
```

1    documents that relate to the nature of the trade secrets at

2    issue.  There were four identified categories of trade

3    secrets in the verified complaint.  And among those were

4    certain specific products of (inaudible).  We have no

5    information.  These are publicly available products that are

6    advertised on the Internet.  Typically in these sorts of

7    cases, in trade secret cases, there has to be some sort of

8    internal documents which demonstrate what was done to create

9    these trade secrets.

10              I am not aware that publicly available knowledge

11    can be a trade secret.  They have refused to provide any

12    documents related to their invention, which is something

13    that is unique.  The language of the statute is something

14    that is generally known.

15              THE COURT:  Counsel, you need to slow down a

16    little bit.  Let's sum up, for me, please.

17              UNIDENTIFIED SPEAKER:  There has been no

18    documents produced that demonstrates any item of Tesla's

19    that is not generally known, widely known or readily

20    ascertainable.  So there is no lab note, no internal design

21    documentation, nothing to show that the publicly available

22    products are somehow a trade secret, something to show that

23    they are different that is obtainable from Tesla off the

24    Internet.

25              THE COURT:  I got you.  Let's hear a response.

1              UNIDENTIFIED SPEAKER:  Your Honor, first of all,

2     we think this is a (inaudible) trade secret.  It is not a

3     patent case.  I think the issue is whether the culmination

4     of the processes involved and the final products that Tesla

5     sells primarily to the United States military and for which

6     the military pays a substantial premium because of their

7     unusual qualities are different than what can be bought off

8     the shelf, as the defendant says.

9              We strongly, of course, take issue with the

10    position that anyone can buy these over the Internet.  But

11    the request for documents related to the conception of

12    documents is to us of extremely limited if any relevance.

13    The issue is whether the final culmination of the product

14    process contains unique and proprietary information.  We are

15    willing to produce the documents, produce extensive

16    testimony as to that.

17             The request for every design drawing may be

18    relevant in a patent case.  But it's overly broad and

19    burdensome in the context of a trade secret case where the

20    products are available for testing and testimony themselves.

21    The products will speak for themselves.

22             MR. SWEETLAND:  Your Honor, in the affidavit by

23    the president of Tesla appended to the verified complaint,

24    he stated that Tesla Industries has invested millions of

25    dollars in research and development, marketing, selling and

1    services of these products.  We would like to see some

2    evidence of that.

3              It seems to me they have spent a whole lot of

4    money in coming up with these things that are supposedly

5    trade secrets.  That would certainly be probative of whether

6    or not they are a trade secret, if they have something

7    special, that is unique.  We see no evidence of that.

8              THE COURT:  What is the specific claim or

9    defense that is at issue here?

10             UNIDENTIFIED SPEAKER:  The specific product?

11             THE COURT:  No.  You are speaking generally, in

12   general terms, you have described the case as a theft of

13   trade secrets case.  Is that correct?

14             UNIDENTIFIED SPEAKER:  Yes.

15             THE COURT:  So the specific request at issue

16   requests what?  Could you tell me what it requests and what

17   claim or defense the request relates to?

18             MR. WILCOX:  Your Honor, the specific document

19   request says documents referring to or relating to the

20   conception, research, development, testing, decision to

21   develop and all specifications and drawings relating to the

22   product.  Our concern, there is no complaint, as we read the

23   agenda letter, regarding the specifications and drawings of

24   the products in their final configuration.  Our concern

25   relates to the conception, development, testing, decision to

1    develop.  Those are fundamentally internal processes.

2            It seems to me that what we are really talking

3    about here is not how the product was developed, but the

4    product in the state as it existed at the time, whether the

5    product that was sent by Mr. Waldmann, whose counsel is not

6    participating on the phone this morning, whether that

7    product that was obtained internally from Tesla Industries

8    and without question delivered to the --

9            THE COURT:  Counsel, let me get you to hold up

10    talking.  You are talking and it is not to any purpose.

11            The nature of the complaint here, counsel, you

12    are complaining that your client lost some trade secrets to

13    the defendant.  Is that the essence of the complaint here?

14            UNIDENTIFIED SPEAKER:  Your Honor, essentially,

15    what we are saying is that defendant Waldmann, who at the

16    time was an employee of Tesla Industries, delivered trade

17    secrets to the NMT defendants, and as part of a scheme under

18    which Mr. Waldmann would go to work with the NMT defendants,

19    and that he ultimately did go to work with the NMT

20    defendants and works with them today.  That is the

21    fundamental issue.

22            THE COURT:  All right.  Let me just refocus

23    myself.  We are now at that portion of the discovery dispute

24    where you, plaintiff, are complaining that you have not been

25    provided with information that is not otherwise publicly

1    available.  Is that correct?

2              UNIDENTIFIED SPEAKER:  Actually, the defendant

3    is making that claim.

4              THE COURT:  I am sorry.  That is not otherwise

5    publicly available.  Is that correct?

6              UNIDENTIFIED SPEAKER:  Yes, Your Honor.  It goes

7    specifically, the request is Request for Production No. 10

8    that Mr. Wilcox read to Your Honor.  It goes to 6 Delaware

9    Code Section 2014(a).  The nature of the trade secret is

10   something that is not readily ascertainable or generally

11   known.  If it is readily ascertainable, which is something

12   that we can obtain off the Internet or is generally known,

13   it is not a trade secret.  To be a trade secret, the only

14   way it could be a trade secret is if they have some sort of

15   internal formulations that made it different than what it is

16   that people are getting publicly.

17             THE COURT:  I am getting a better picture.  So,

18   plaintiff, what is it that you complain is wrong with that

19   request?

20             UNIDENTIFIED SPEAKER:  First of all, Your Honor,

21   the ultimate issue -- I think, and not to characterize the

22   defendants' position -- is, you know, we think we have

23   licensing products that have unique properties.  I believe

24   the defendants take the position that there is nothing

25   unique, that these are off-the-shelf products.  There may be

1  products with the same name.  They don't perform the same

2  way.  They don't serve the same military purposes.

3          We believe that it's essentially a comparison

4  between a Volkswagen, which is out on the market, and the

5  Tesla products are the Cadillac.  I don't think in that

6  situation that the defendant is entitled to know every way

7  that Tesla Industries got from the Volkswagen to the

8  Cadillac.

9          We are willing to produce the Cadillac for

10  inspection and provide testimony from various parties that

11  it is a Cadillac as compared to the Volkswagen that is

12  available off the shelf.

13          THE COURT:  Counsel, whether the analogy holds

14  up or not, why isn't the production to be made available for

15  the inspection of the relevant products and testimony

16  attendant to that sufficient to meet your needs to establish

17  that there are in fact trade secrets at issue and

18  misappropriated allegedly?

19          UNIDENTIFIED SPEAKER:  Your Honor, by

20  definition, under trade secret law, something that has been

21  sold is not trade secret, in order to be trade a secret at

22  the point in time before which it is interjected in the

23  stream of commerce.  In the final model of the product, us

24  getting that is of no benefit.  The only possibility there

25  is a trade secret is if the plan and internal formulations

1    of that Cadillac demonstrate something different.

2              So the product itself is of no use to us because

3    once having been sold, whether it be to the military or

4    others, it is no longer a trade secret.

5              THE COURT:  The fact that Coca-Cola is sold in

6    the open market does not protect the formula as a trade

7    secret.  Is that what you are telling me?

8              UNIDENTIFIED SPEAKER:  The fact -- one could

9    only determine a trade secret case of Coca-Cola -- if Your

10   Honor is inviting us to reverse-engineer, it would become

11   then publicly known.

12             THE COURT:  So in a case like this, were it

13   Coke, and there was a contention such as the one at issue,

14   there were contentions such as those at issue, you would

15   suggest it would be appropriate for the Court to order

16   production of the formulation?

17             UNIDENTIFIED SPEAKER:  Under seal, as we have

18   here attorneys' eyes only, yes, Your Honor.

19             THE COURT:  And why doesn't that work here,

20   counsel?

21             UNIDENTIFIED SPEAKER:  Well, it isn't so much a

22   question of the disclosure.  I can't imagine that a Court

23   would require the production of the Coca-Cola formulation.

24             THE COURT:  I disagree with you.  I think a

25   Judge has just ordered that.  But go ahead.

1        UNIDENTIFIED SPEAKER:  And I would invite Mr.

2   Crawford to address this issue.  Our position is that the

3   product contained the trade secrets, the products themselves

4   are available for inspection.  We believe that the

5   uniqueness and the proprietary nature of the product is

6   clear and it is reflected in the product itself.  We don't

7   believe that the sale of the product means that every

8   manufacturing and bit of know-how, the choice of materials,

9   and that's a big part of these products, specialized

10   materials, is -- we believe that that can be demonstrated

11   from the product itself.

12        The request for every design, decision, going

13   back for years over the past ten years --

14        THE COURT:  Let me interrupt.  So let's see if

15   we can come to some compromise here.  Counsel, one of the

16   objections is that the request is overly broad.  I am not

17   sure if it is overly broad or not.  It sounds rather broad.

18   Is there a way that you can see to narrow the request to a

19   more relevant range of matter?

20        UNIDENTIFIED SPEAKER:  Certainly, Your Honor.

21   We would be willing to narrow it down to only those products

22   to which the plaintiff actually claimed that my client stole

23   the secrets.  I believe there are two products, Your Honor.

24   If we can narrow it to those two products...

25        MR. CRAWFORD:  Your Honor, this is Paul

1    Crawford.  It seems like I have been invited into the

2    discussion.  I just joined the team for plaintiffs.  I am

3    catching up with this technology.  But it's a very simple

4    question that the request by defendants really goes to the

5    whole documentation and history of the development of the

6    products in question.  This isn't where, like a patent

7    request or request in a patent case, where you have to trace

8    all the gory details of the development.

9              Here we are talking about a product that has

10   been developed through extensive effort, and the product

11   embodies the trade secrets.  But the embodiment is not

12   apparent from the product itself.

13             We have provided to defendants all the details

14   of a final product.  It's really not pertinent in the trade

15   secret case how we could go from Point A to Point B, Point A

16   being the prior product that was sold to the military, Point

17   B, in being our product, which has substantial difference,

18   not only in composition but in methods of manufacture and

19   the like.

20             All that has been explained to them.

21             But to get --

22             THE COURT:  All that information is in their

23   possession.

24             UNIDENTIFIED SPEAKER:  No, it isn't, Your Honor.

25             THE COURT:  Mr. Crawford.

1          MR. CRAWFORD:  Well, the trade secrets have been

2     identified.  And we will supplement the trade secrets

3     listing to give them all the information as to what the

4     final product is, what the features are in that final

5     product, as the (inaudible) what went before.  And we will

6     get that to them ASAP.

7          UNIDENTIFIED SPEAKER:  This is the first time,

8     Your Honor.

9          THE COURT:  Will that satisfy your needs,

10    counsel?

11         UNIDENTIFIED SPEAKER:  It does.  It is the first

12    time --

13         THE COURT:  That is the first time.  Well, Mr.

14    Crawford, when are you going to get that done?

15         MR. CRAWFORD:  I would like to get November 1st,

16    if I could.

17         THE COURT:  I will give you November 1 on that.

18         MR. CRAWFORD:  Thank you very much.

19         THE COURT:  What is the next issue?

20         MR. NICKEL:  Your Honor, the next is inadequate

21    privilege log.

22         THE COURT:  What do you mean by that?

23         MR. NICKEL:  They finally gave us the privilege

24    log, after several months of promising it to us, on Tuesday.

25    A simple look at the privilege log tells you it is

1    inadequate on its face.

2              THE COURT:  Be more specific.  I don't have the

3    log in front of me.  Would you be more specific?

4              MR. NICKEL:  Yes, Your Honor.  With respect to

5    purpose, it merely says litigation issues or client

6    consultation.  It doesn't describe the general subject

7    matter of the discussion, such as to whether it is a

8    confidence or communication between an attorney, what the

9    needs of the discussion is.  We believe that is on its face

10   sufficient.  It doesn't provide Bates ranges, Your Honor.

11             THE COURT:  I got you, counsel.

12             Would you respond, please?

13             UNIDENTIFIED SPEAKER:  Yes, Your Honor.

14             THE COURT:  I am getting a really bad echo here.

15   I don't know whether anybody else is having that problem or

16   not.

17             UNIDENTIFIED SPEAKER:  We produced a privilege

18   log that identifies the date of the communications, the

19   sender, the recipient.

20             THE COURT:  So you provided the log that

21   provided what information again?

22             UNIDENTIFIED SPEAKER:  The date of the

23   communication, the sender, the recipient, all parties copied

24   on the communication, the purpose of the communication, the

25   type of communication, e-mail or memo, the number of pages,

1    the type of privilege produced.

2             I guess we are willing to work with them a

3    little bit on the question of the purpose of the

4    communication.  But I would point out to the Court that 90

5    percent of the communications identified in the log are

6    post-filing.  In other words, they occurred after the filing

7    of this litigation.  We don't believe -- you know, is there

8    really a serious question that a communication with a client

9    relating to litigation strategy is describe in a privileged

10   log is not privileged?

11            THE COURT:  Okay.  How about a response to that,

12   counsel?

13            MR. NICKEL:  Your Honor, we don't dispute that a

14   fair number of them are dated after the date of the

15   complaint.  Your Honor, we are willing to stipulate that

16   those are probably privileged documents if they are between

17   attorney and client.  What we are really looking at, to give

18   you a certain example, in the privilege log there may have

19   been approximately ten documents from defendant Waldmann to

20   Attorney Brian Sullivan's office.  Mr. Waldmann's

21   conversations with Mr. Sullivan during his deposition, at

22   which time he said that they were, Mr. Waldmann contacting

23   Mr. Sullivan about our client and the nondisclosure

24   agreement, our clients wanted Tesla (inaudible).

25            Referring to communications with Mr. Wilcox,

1    (inaudible) specific documents and we were told we wouldn't

2    receive them.  On Tuesday, when we received a privilege log

3    (inaudible) these documents and we are not going to get

4    them.

5                    MR. WILCOX:  Your Honor, if I may.  The question

6    here before the Court today is the adequacy of the privilege

7    log.  The information, as Mr. Nickel just described, he

8    clearly has enough information, if he wants to challenge the

9    privilege asserted, he certainly is entitled to do that.

10                    UNIDENTIFIED SPEAKER:  Your Honor, we request

11    the opportunity to do that, as well as with respect to two

12    other documents.

13                    UNIDENTIFIED SPEAKER:  You have that.

14                    UNIDENTIFIED SPEAKER:  Your Honor --

15                    THE COURT:  I am here.

16                    It sounds like that would be the thing for him

17    to do.  Don't file a motion.  If you want another

18    teleconference after you and counsel talk again, I am

19    willing to get back on the phone with you.  If you have

20    specific documents that are pertinent to your needs and

21    there is an assertion that you contend is improper, we can

22    discuss it.

23                    UNIDENTIFIED SPEAKER:  Your Honor, I just wanted

24    to point out again, we already discussed these Waldmann

25    documents.

1          THE COURT:  I am not going to discuss it with

2     you today, counsel.  I have other matters that I need to

3     attend.  If you want to raise this again after you have

4     tried again to resolve it, I am willing to do that.

5          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

6          One final issue?

7          THE COURT:  Yes.

8          UNIDENTIFIED SPEAKER:  E-mail communications

9     within the Tesla organization relating to certain Tesla

10    employees or officials.

11         We feel that their production with respect to

12    these individuals is grossly deficient.

13         THE COURT:  Why do you say that?

14         UNIDENTIFIED SPEAKER:  Today we have only

15    received a handful of communications relating to one of

16    their, I believe it is the president, or the leader of their

17    sales, Mr. Mooney.  Otherwise, we received few if any from

18    Mr. Masilotti.  And we have received none with respect to

19    Messrs. Roscioli, Talbot, Gresk or Gabriel.

20         Our belief is that each individual at Tesla knew

21    about the relationship between NMT and Tesla, alleged

22    misappropriation of the trade secrets, and that e-mail

23    communications as well as other documents will prove this.

24         They have not provided it to us.

25         THE COURT:  Okay.  Let's hear a response.

1         UNIDENTIFIED SPEAKER:  Your Honor, I have to

2   object most heartedly to the representation we only produced

3   a handful of e-mails.  We produced very early on in the

4   case, without a discovery request, extensive e-mails between

5   Mr. Waldmann and the NMT defendants, again, Mr. Waldmann as

6   an employee of Tesla Industries and NMT.

7         The point is that Mr. Waldmann was the only

8   party at Tesla Industries that any of these defendants ever

9   communicated with, ever communicated with.  We produced

10  every e-mail of which we were aware that relates to those

11  communications.

12        Our client is not an e-mail-based company.  We

13  are willing to certify to the existence of other people's.

14  A lot of the e-mails were deleted by Mr. Waldmann before he

15  left the company.

16        UNIDENTIFIED SPEAKER:  Your Honor, I apologize

17  if I wasn't clear.  I wasn't claiming they haven't produced

18  e-mails with respect to Mr. Waldmann.  I was claiming with

19  respect to Messrs. Masilotti, Roscioli, Talbot, Gresk and

20  Gabriel.  We answered for Mr. Mooney, and any from Mr.

21  Masilotti, there certainly is very view.

22        UNIDENTIFIED SPEAKER:  Your Honor, we believe we

23  produced what is required, what is responsive to the

24  document request.  We are willing to go back and check

25  again.  To characterize the production of the Mooney e-mails

1    as a handful, it seems to me, is really surprising.

2            But it seems to me this is an issue we should be

3    able to work out and we are willing to do that.  It may be

4    that -- I don't know what else to tell the Court.

5            THE COURT:  Take your crack at it, counsel.

6            UNIDENTIFIED SPEAKER:  We are willing to go back

7    and check again.  We are not trying to hide anything.

8            THE COURT:  That's fine.  The Court accepts your

9    offer.  Obviously, your opponent will go back, revisit the

10    issue.  Take another look at your records.  Discuss and

11    narrow the focus, if that needs to be done, of the field of

12    request, and see what you can work out.  If you can't work

13    it out, let us know.

14            UNIDENTIFIED SPEAKER:  Okay, Your Honor.  I

15    would just like to try to resolve this issue as quickly as

16    possible.

17            THE COURT:  I have just given the solution to

18    it.  You got to talk.

19            UNIDENTIFIED SPEAKER:  We understand what the

20    Court's direction is in that regard.

21            THE COURT:  Thank you, counsel.

22            (Teleconference concluded at 9:50 a.m.)

23

24                  -   -   -

25    Reporter:  Kevin Maurer

EXHIBIT 2

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                        -   -   -

 4   TESLA INDUSTRIES, INC,            :      Civil Action
                                       :
 5              Plaintiff,             :
                                       :
 6                                     :
                                       :
 7          v.                         :
                                       :
 8   DAVID C. WALDMANN, LYNDOL W.      :
     HOLLINGSWORTH, CHARLES            :
 9   MINNICK a/k/a CHUCK MINNICK,      :
     and NEW MILLENNIUM TOOLS, INC.,   :
10                                     :
                Defendants.            :      No. 06-055-GMS
11                        -   -   -

12                  Wilmington, Delaware
                 Thursday, January 18, 2007
13                      9:15 a.m.
                   Telephone Conference
14
                          -   -   -
15
     BEFORE:  HONORABLE GREGORY M. SLEET,
16
     APPEARANCES:
17
                 BRIAN A. SULLIVAN, ESQ.,
18               ROBERT D. WILCOX, ESQ., and
                 AMY RAEANN WARNER, ESQ.
19               Werb & Sullivan

20                       Counsel for Plaintiff

21               JOHN D. DEMMY, ESQ.
                 Stevens & Lee
22                     -and-
                 JOHN A. ADAMS, ESQ.
23               Susan Widman & Brennan, P.C.
                 (King of Prussia, PA)
24
                         Counsel for Defendant
25                       Waldmann
```

EXHIBIT

**7**

1   APPEARANCES CONTINUED:

2           LAUREN E. MAGUIRE, ESQ.
            Ashby & Geddes
3                   -and-
            RODNEY R. SWEETLAND, III, ESQ., and
4           IAN TARONJI, ESQ.
            Adduci, Mastriani & Schaumberg, LLP
5           (Washington, D.C.)

6                           Counsel for Defendants
                            New Millennium Tools, Inc.,
7                           Hollingsworth, and Minnick

8                   -   -   -

9           THE COURT:  Good morning.

10          UNIDENTIFIED SPEAKER:  Good morning, Your Honor.

11          THE COURT:  Who is on the line for plaintiff,

12   counsel?

13          MR. WILCOX:  Robert Wilcox for the plaintiff

14   Tesla Inc.  I am joined by Brian Sullivan and Raeann Warner,

15   both attorneys at Werb & Sullivan.

16          THE COURT:  For defendant.

17          MR. ADAMS:  John Adams for defendant Waldmann.

18          MS. MAGUIRE:  Lauren Maguire in Wilmington for

19   the NMT defendants.

20          MR. SWEETLAND:  This is Rodney Sweetland and Ian

21   Taronji in Washington, D.C. for the EMT defendants.

22          THE COURT:  Did we get everybody?

23          So this is the second conference for the purpose

24   of taking up discovery disputes.  We have some 12 or 13

25   items here.  It appears the parties are not getting along

1    very well.  Is that a correct assumption here?

2              UNIDENTIFIED SPEAKER:  I believe, Your Honor.

3              THE COURT:  Are not getting along or are getting

4    along?

5              UNIDENTIFIED SPEAKER:  Are not.

6              THE COURT:  We are going to take these matters

7    up.  First I want to inquire as to whether any of them have

8    been resolved.

9              MR. SWEETLAND:  I believe that the summary that

10   went to Your Honor, which was a very broad overview, is

11   still extant.  There were subsidiary issues that have been

12   resolved between the parties prior to this call, I

13   understand.

14             THE COURT:  Okay.  I gather everyone concurs in

15   that view?

16             MR. WILCOX:  Your Honor, we did receive some

17   documents late yesterday afternoon.  We don't believe they

18   really address most of our concerns.  But I did want to

19   acknowledge that we received them.

20             THE COURT:  Let's take up NMT's issues.

21             MR. SWEETLAND:  Your Honor, we have eight

22   issues, the first of which is a continuation of an issue

23   that was raised during our initial conference on October

24   20th.

25             THE COURT:  You have eight issues.  I see four

1    bullets.

2              MR. SWEETLAND:  Right.  But within those four,

3    some are interrogatories, some are requests for production.

4    This is by topic.

5              THE COURT:  Counsel, we are not going to stay on

6    the phone all morning on this.  Do you understand?

7              MR. SWEETLAND:  I understand.  I will be --

8              THE COURT:  That --

9              MR. SWEETLAND:  -- very brief.

10             THE COURT:  That is not directed at you --

11   counsel, listen for my voice.  Okay?  When you hear my

12   voice, shut up.  All right?  Is that understood?

13             MR. SWEETLAND:  Yes, Your Honor.

14             MR. SULLIVAN:  Yes, Your Honor.

15             Paul Crawford, one of the attorneys for the

16   plaintiffs, unfortunately, is sick.  And he was going to

17   join the conference this morning.  Given, Your Honor,

18   really, the number of issues, discovery issues that are

19   pending, Mr. Crawford's suggestion would have been that each

20   party ought to take two or three primary ones and really

21   stick to those and bring them before Your Honor.

22             THE COURT:  Thank you, Mr. Sullivan.  We will

23   see.

24             I intended to be just as rude as I just sounded,

25   because I am not happy.

1           MR. SULLIVAN:  Understood, Your Honor.

2           THE COURT:  Let's go, counsel.

3           MR. SWEETLAND:  The first issue, Your Honor, is

4  damages during the October 20th conference.  Your Honor

5  ordered Tesla to produce discovery in response to our

6  damages request.  To date, we have yet to receive any

7  documents that support the damages allegations.

8           We received an expert witness report on December

9  29th that alleges over a million dollars in lost sales.  And

10 it references as a base computation such items as tax

11 returns.  We have yet to receive a single tax return.  We

12 have yet to receive any profit-and-loss statements.  We have

13 yet to receive any internal accounts receivable.

14          THE COURT:  I got your point, counsel.  Let's

15 get a response.

16          MR. ADAMS:  Defendant Waldmann joins in that

17 request.

18          THE COURT:  Let's get a response.  Who will

19 respond?

20          MR. WILCOX:  Your Honor, we certainly are

21 willing to provide everything that was provided to the

22 expert.  We recognize they are entitled to the documents

23 that, every document that the expert reviewed.  I will make

24 sure that gets done in the next three or four days.

25          As far as the tax returns, the same is true.  We

1   will produce them.

2          We think to the extent there is personal

3   information, it should be redacted.  We would expect we can

4   resolve that with counsel.  I am not sure we have an issue

5   here.

6          MR. SWEETLAND:  Your Honor, if we get all tax

7   returns, including ones -- recent ones -- for whatever

8   reason, the expert didn't rely on the four most recent years

9   of tax returns -- we believe that we need those as well.

10  Those are the years in which Tesla has made an allegation

11  there has been lost sales.  If we get the tax returns and

12  the underlying data for the tax returns, then there is no

13  issue.

14         THE COURT:  Any difficulty with that, Mr.

15  Wilcox?

16         MR. WILCOX:  No, Your Honor.  The question, of

17  course, becomes as to what are underlying documents.

18  Theoretically, every financial document, every invoice,

19  every sale becomes part of the underlying documents.  I

20  would hope we could resolve that issue.

21         We will give the tax returns and the stuff --

22  the documents that were given to the expert.

23         THE COURT:  Is that sufficient for your needs,

24  Mr. Sweetland?

25         MR. SWEETLAND:  It is, Your Honor.

1                THE COURT:  Okay.  Next issue.

2                MR. SWEETLAND:  The second item is an

3    interrogatory answer, it is No. 22.  It is information

4    relating to allegations that Tesla has made in the

5    marketplace concerning any misconduct by my clients.  This

6    is in support of our Lanham Act allegation.  During Mr.

7    Masilotti's, the principal of Tesla, deposition, he

8    indicated he was unable to recall all the people that he had

9    talked to about what our client, my clients have allegedly

10   done.

11               Last week we received in discovery a document

12   that was apparently sent out via e-mail to some unidentified

13   number of Tesla contacts in the government contracting

14   industry.  We just want to know -- we need to know who that

15   went to, because it makes allegations of misconduct in the

16   marketplace by our clients, which goes to the Lanham Act

17   claim.  We believe the only way to answer that, because

18   during the deposition Mr. Masilotti was unable to recall the

19   full extent of it, is in the context of an interrogatory

20   response.

21               MR. ADAMS:  Mr. Waldmann joins in that request,

22   Your Honor.

23               THE COURT:  Can I assume that Waldmann joins in

24   each of the EMT requests?

25               MR. ADAMS:  I believe, Your Honor.

1          THE COURT:  You don't have to chirp up each

2    time, counsel.

3          MR. WILCOX:  Your Honor, we will certainly

4    identify the one communication in question.  We just don't

5    think there are a lot of communications of the type that the

6    defendants are looking for.  But obviously, I wasn't aware

7    that the information they got did not include the name of

8    the recipient.  We will get that to them.

9          THE COURT:  Within the same three-day time frame

10   that the other information is going to be provided.

11         MR. WILCOX:  Absolutely, Your Honor.

12         THE COURT:  Mr. Sweetland.

13         MR. SWEETLAND:  That is fine, if we have that

14   proffer, Your Honor.

15         THE COURT:  Next item.

16         MR. SWEETLAND:  The third item, Your Honor,

17   relates to, in the complaint, there is referenced a private

18   investigation that occurred at the inception or prior to the

19   litigation.  In the affidavit of Mr. Masilotti attached to

20   the complaint, in support of their request for preliminary

21   injunction, there were 14 items that were identified as

22   having been obtained as a result of the investigation.  We

23   also know that included in that investigation was a

24   tape-recorded conversation with David Waldmann.

25              We are requesting that the private

1    investigator's report include the tape-recorded statement,

2    not the transcript but the tape-recorded statement itself

3    with our co-defendant be provided.  Our basis for that is,

4    of course, under Rule 26 any statement of a party is

5    discoverable, and based upon the revelation of the result of

6    the private investigator's investigation, we believe that

7    there has been a subject matter and issue waiver of all that

8    material.

9            MR. ADAMS:  Your Honor, Waldmann would add to

10   that my client was terminated due to the investigation,

11   which we think therefore we are entitled to it.  That was

12   the basis of the termination.

13           Number two, that there has been allegations that

14   my client destroyed e-mails that was made in the deposition

15   at the end of the discovery period.  We believe this issue

16   will show that e-mails were not destroyed by my clients.  He

17   was gone by the time the e-mails were destroyed.  They were

18   in fact destroyed by Mr. Masilotti.

19           THE COURT:  Counsel, your name?

20           MR. ADAMS:  John Adams for defendant Waldmann,

21   Your Honor.

22           MR. WILCOX:  Your Honor, I think there are a

23   couple of different issues there.  I think we are kind of

24   getting off the primary issue.

25           As far as the allegation as far as the

1    disruption of e-mails, I mean, that's a question of -- you

2    know, an issue of fact.  We are at this point undertaking an

3    extensive and very expensive review of the hard drive of Mr.

4    Waldmann's computer.  We expect to be producing documents

5    that we believe will strongly support our suggestion that

6    those documents, there was a tremendous amount of material

7    deleted.  I don't know where the allegation comes from, that

8    my client was deleting information from the defendants'

9    computer.  That's to me just a bald allegation.

10           As far as the investigation report, we think

11   it's protected under Rule 26.  It's an investigation done at

12   the direction of attorneys, and, you know, it was prepared

13   in anticipation of litigation.

14           Now, the answer may be different with regard to

15   the witness statement, the recorded statement of the

16   witness.  And we are willing to take, obviously, the Court's

17   guidance on that.

18           The real issue here, if we are talking about

19   documents on a hard drive, one of the defendants in this

20   case has acknowledged that his hard drive, he removed it

21   from his computer and put it in a place he referred to as

22   very difficult to find.  We think we are entitled to get all

23   the documents off that hard drive and find out what's going

24   on with that.

25           That's the kind of issue we have been dealing

1    with, Your Honor.

2            MR. SWEETLAND:  Your Honor, I thought I would

3    respond to that when it was -- I can address that now.

4            THE COURT:  You can address that later, when we

5    come to it.

6            MR. ADAMS:  Your Honor, I would like to add,

7    when he was terminated, they had an e-mail in his possession

8    that came from an account.  It was not a Tesla e-mail

9    account.  It was one of his (inaudible) account.  We believe

10   there is an allegation --

11           THE COURT:  Counsel, I have no idea what you are

12   talking about.  Let me be real frank:  As I understand it,

13   when we started, this portion of the discussion has to do

14   with the results of a private investigation that was

15   commissioned.  Is that correct?

16           MR. ADAMS:  Yes, Your Honor, that is correct.

17           THE COURT:  And there is a desire on behalf of

18   the NMT defendants to have produced to them the report

19   concerning a particular witness who was the subject of this

20   investigation.  Is that correct?

21           MR. ADAMS:  No, Your Honor.  We want the entire

22   report.

23           THE COURT:  It appears that counsel for

24   plaintiff is prepared to provide the report of the witness.

25   That is not at issue.  Is that correct?

1          MR. WILCOX:  There is a recorded witness

2     statement, Your Honor.

3          THE COURT:  In whatever form, you indicated, I

4     think, that you were prepared to accept the guidance of the

5     Court on that.

6          MR. WILCOX:  Yes, Your Honor.

7          THE COURT:  What is the basis or would be the

8     basis for withholding the recorded witness statement?

9          MR. WILCOX:  That it was prepared as part of a

10    pre-litigation investigation, Your Honor.

11         THE COURT:  Do you wish to assert that position

12    this morning?  Or are you prepared to provide the other side

13    with the report or the statement, the recorded statement?

14         MR. WILCOX:  That is still our position, Your

15    Honor, with the guidance of the Court.

16         THE COURT:  You have raised the general issue or

17    the general objection to providing the work of the

18    investigator generally.  Is that correct?  You claim that it

19    is work product.

20         MR. WILCOX:  That's correct.

21         THE COURT:  So I don't know why we wouldn't

22    include the witness statement, why you wouldn't include that

23    within your contentions regarding work product.

24         MR. WILCOX:  We are including that, Your Honor.

25         THE COURT:  You essentially contend that an

1    investigator was hired.

2              MR. WILCOX:  That's correct.

3              THE COURT:  And that the fruits of that

4    investigators's labors are somehow protected by Rule 26.

5              MR. WILCOX:  That's correct.

6              THE COURT:  Elaborate on that a little bit more

7    for me.

8              MR. WILCOX:  Your Honor, that was done in

9    connection with retention -- you know, the plaintiff was

10   shocked to realize there was a problem, and realized early

11   on that there was likely to be some litigation.  There was a

12   suspension of one of the defendants here.  A law firm was

13   retained, and under the guidance of the law firm an

14   investigator did an internal review of various materials.

15             Now, the witness statement in question, the

16   recorded statement, was taken not by the outside

17   investigator but by an in-house security guy who had been

18   brought on.  I don't want to mislead the Court on that.  It

19   was not recorded by the investigator, the outside

20   investigator.  It was taken by an in-house security

21   consultant.

22             THE COURT:  Okay.

23             MR. SWEETLAND:  Your Honor, if I may, whenever

24   the Court has concluded, address one of these issues.

25             THE COURT:  Yes.

1          MR. SWEETLAND:  From our perspective, again,

2    Your Honor is correct there are really two subsidiary issues

3    to this.  There is the issue of a tape-recorded statement of

4    a party defendant, which we believe under black-letter law

5    is discoverable under any circumstances, regardless of who

6    obtained it or why.  He is a party defendant.  That is not,

7    we don't believe, a significant legal issue.

8          The second issue, as to the discoverability of

9    the fruits of the private investigator, we believe that

10   there has been a waiver because at least 14 separate items

11   that were discovered by that private investigator were

12   explicitly referenced in the complaint and the affidavit

13   that was attached in support of it.  Even if the work

14   product privilege did apply, and it may very well have

15   initially, when the plaintiffs chose to include the fruits

16   of the investigator's research in the moving documents that

17   initiated the case, they put that issue in this litigation.

18          THE COURT:  Okay.  So Mr. Sweetland has put a

19   finer point on the discussion.  Mr. Wilcox, why don't you

20   address first the contention that this is, after all, the

21   statement of a party, albeit the product of an in-house

22   investigation, nonetheless, a statement of a party and

23   therefore subject to production.

24          MR. WILCOX:  I don't agree with Mr. Sweetland

25   that it is necessarily black-letter law that it somehow cuts

1  through the privilege.  We are all aware that work product

2  is a qualified privilege.

3            Again, I would kind of seek the guidance of the

4  Court on that.  Obviously, I don't feel as strongly about

5  that particular issue, about the tape recording, as I do

6  about the --

7            THE COURT:  Let me interrupt, because this is

8  the kind of thing that judges find time-wasteful.  I think

9  that this is something, this particular, very narrow issue,

10  is something that should have been capable of being worked

11  out by the parties.  Whether it is black-letter law or not,

12  it is a statement of a party.  You might have imagined that

13  I was probably, most judges would probably say, you have got

14  to give that over.  Wouldn't you reasonably anticipate that

15  kind of ruling?

16            MR. WILCOX:  That is fine, Your Honor.  We

17  accept that ruling, and we will turn it over.

18            THE COURT:  What I am asking for is a little

19  better exercise of your discretion as lawyers in the future

20  on these kinds of matters.

21            So let's talk about the waiver.  Why don't you

22  respond to the contentions that you have waived work

23  product.

24            MR. WILCOX:  I don't believe we have waived work

25  product, Your Honor.  There were references to the fact that

1    there was an investigation report.  The report clearly

2    itself was not attached to the complaint and has not been

3    disclosed anywhere in there.  The fact that an investigation

4    itself was done doesn't, in my view and under our review of

5    the law, constitute a waiver of the contents of the report

6    itself.

7               MR. ADAMS:  Your Honor, I would say, if they are

8    going to take that position, they can't say at trial that

9    they did an investigation of my client, they terminated him

10   based on the investigation, and they are not going to turn

11   it over.

12              THE COURT:  I agree with you.

13              MR. WILCOX:  We don't need the investigative

14   report at trial to prove the reason --

15              MR. ADAMS:  You are going to have a hard time

16   saying why he was terminated, what is the reason why you let

17   him go.

18              THE COURT:  Counsel, you will address your

19   remarks to the Court and you won't interrupt your opponent

20   like that.

21              Had you finished, counsel?

22              MR. ADAMS:  Yes, Your Honor.

23              THE COURT:  Had you finished, Mr. Wilcox?

24              MR. WILCOX:  Your Honor, I don't believe we

25   intend to introduce the report at trial.  Obviously, if we

1    intended to introduce it at trial, we would have already

2    produced it.

3                MR. ADAMS:  Your Honor, as far as referencing,

4    if they want to tell the jury they did an investigation and

5    based on that investigation they didn't pay my client the

6    money he was owed and they terminated employment, they

7    weren't entitled to the investigation.

8                THE COURT:  Is that the intended use of this

9    material?

10               MR. WILCOX:  We are not -- we don't need the

11   investigative report at trial, Your Honor.

12               THE COURT:  Not the report.  He contends that

13   you might desire to reference the report before the jury and

14   that should be precluded as well if you are not going to

15   turn it over and give them a fair opportunity to challenge

16   the report.

17               MR. WILCOX:  That seems to strike me as an issue

18   for a motion in limine, Your Honor.

19               THE COURT:  Probably right.  But you must

20   understand that he is probably going to have a fairly strong

21   position in limine should you at this point determine that

22   you are not going to turn this over.

23               MR. WILCOX:  I am aware of that, Your Honor.

24               THE COURT:  I am not going to order that you

25   turn it over at this point.  But remember the discussion

1    here today.  Of course, we are having it transcribed.

2              The next matter.

3              MR. SWEETLAND:  Your Honor, I will wrap up with

4    two more issues.

5              The first is, we believe that e-mails have been

6    withheld in response to numerous interrogatories.

7    Approximately nine Tesla employees identified at the

8    inception of the case who had discoverable information

9    relate to this.  Of those nine, only two have had a

10   substantial number of e-mails supplied.  Three have had no

11   e-mails, and Mr. Masilotti, who describes himself as the

12   chief cook and bottle washer of Tesla, the plaintiff, there

13   is only two e-mails from him.  We find it inexplicable as to

14   the absence of e-mails.

15             THE COURT:  Where are the e-mails?

16             MR. WILCOX:  Your Honor, we have been through

17   this issue multiple times.  There has been much testimony

18   about it at the depositions of any witnesses that the

19   defendants wanted to take.  Everything has been produced

20   that's out there.  The company did not -- I mean, it seems

21   to me that a lot of the issues that are being raised by the

22   defendants, and I think it is especially true with regard to

23   what they regard as insufficient responses to requests for

24   admissions, which has been a huge issue regarding

25   authenticity of various types of documents, they just don't

1  like the answer.  They are somehow asking the Court to

2  direct us to give a particular answer that doesn't square

3  with the facts, as we see them.

4          THE COURT:  So your point is you have produced

5  all the e-mails that ought to be produced.

6          MR. WILCOX:  That's correct.

7          THE COURT:  Counsel, what else would you have

8  him do?

9          MR. SWEETLAND:  If he is willing to represent

10 that to Your Honor, he set that in stone, and I will move

11 along.

12         THE COURT:  He is an officer of the Court.  We

13 will have to accept that recommendation.  I will accept it.

14 I have no reason not to.  I don't think you do, either.

15         There is a desire to extend the time to complete

16 expert discovery.  I don't have an objection to that

17 necessarily.  Does the other side?  Is this a joint request?

18 Whose request is this?

19         MR. SWEETLAND:  This was the NMT defendants,

20 Your Honor.

21         THE COURT:  Is there an objection from Tesla?

22         MR. WILCOX:  To the extent there is a short

23 extension, Your Honor, that would be fine.  But we have

24 asked for cooperation on a number of discovery issues and we

25 haven't gotten any extensions -- well, I won't say we

1   haven't gotten any.  But I guess we should have asked the

2   Court for all our extensions.

3            THE COURT:  The only entity that is empowered to

4   grant an extension or amendment to the schedule is the

5   Court.  I want you all to keep that in mind.

6            MR. WILCOX:  Yes, Your Honor.  We accept the

7   Court's guidance on this again, of course.  We would consent

8   to a short extension of the time for discovery.  We don't

9   believe it is necessary.  I think the Court is making it

10  very clear it wants us to be cooperative.

11           THE COURT:  What is the reason for NMT's

12  request?

13           MR. SWEETLAND:  We are unable to even initiate

14  the deposition of the plaintiff's experts because we haven't

15  received this underlying information.  We, for instance, had

16  discovery requests asking for any documents provided to or

17  received from expert witnesses.  We received none of that.

18  At the beginning of this call --

19           THE COURT:  Some of the information that we

20  discussed earlier in the call would fall into that category.

21           MR. SWEETLAND:  Yes, Your Honor.

22           MR. ADAMS:  Our deadline for producing experts

23  is tomorrow.

24           THE COURT:  For producing expert reports and/or

25  deposing them as well?

1            MR. ADAMS:  To produce reports.  We can't do

2   that because we don't even know all this information.

3            THE COURT:  So you are requesting an extension

4   of the entire expert process, the production of opening

5   reports, rebuttals, then the time to complete expert

6   discovery.  Is that correct?

7            MR. SWEETLAND:  No, Your Honor.  We would only

8   request time to do the defendants' rebuttal reports to the

9   plaintiff's reports.  We do not, the NMT defendants do not

10  anticipate providing affirmative evidence for the

11  counterclaims reports.  We only need the time, some period

12  of time after this production is effected in which to depose

13  their experts and determine whether or not we are going to

14  provide counter-experts.

15            MR. WILCOX:  Your Honor, Mr. Sweetland is

16  correct.  The plaintiff has produced the reports in a timely

17  fashion as directed by the Court previously.  We said we

18  would give them the documents in three days.

19            THE COURT:  How much time do you need, counsel?

20            MR. SWEETLAND:  Twenty days for us to do our

21  rebuttals.

22            THE COURT:  Any difficulty with that, counsel?

23            MR. WILCOX:  No.  That is fine, Your Honor.  But

24  I do want to make it clear why I don't accept that we

25  haven't produced any of the documents.

1          THE COURT:  I understand your position.

2          What would that be, Ms. Walker?

3          MS. WALKER:  February 7.

4          THE COURT:  We will grant until February 7 for

5  the purpose of producing the NMT rebuttal reports.  What is

6  the current cutoff for expert discovery?

7          MR. SWEETLAND:  I believe it's the 27th or 28th.

8          THE COURT:  Okay.  I skipped over deficiencies

9  in admissions.  Is this on both, all three parties' -- no,

10  it is not.  It is just on NMT's list of issues.

11          MR. SWEETLAND:  Yes, Your Honor.

12          THE COURT:  What is the problem that you have

13  with the plaintiff's responses to requests for admissions?

14  It was alluded to earlier I think by Mr. Wilcox.  Is that

15  correct?

16          MR. SWEETLAND:  Yes, Your Honor.  Our problem is

17  they have refused to admit the authenticity of documents

18  that were produced by them and that were derived from their

19  website.  They said that they were unable to admit or

20  respond, for instance, that catalogs that we received from

21  their website downloaded were kept in the ordinary course of

22  business.  These were housekeeping requests for admission.

23          THE COURT:  Hold on.

24          Is that correct, counsel?

25          MR. WILCOX:  Your Honor, we went through those

23

1    requests for admissions, I believe it was 236 of them, very

2    carefully.  They asked whether a catalog was available on

3    the Tesla Industries website as of a particular date.  They

4    asked us to admit that documents produced, created by

5    defendant Waldmann at a time when we think he was working

6    for a third party, was scheming to leave the company, and

7    was, for lack of a better word, stealing the trade secrets,

8    were produced in the ordinary course of business.

9              The first issue is an issue of verification, are

10    we prepared to admit for all purposes the particular dates

11    on which information was available on the website?  No.  As

12    to are we prepared to admit the documents created by an

13    employee who we attribute, shall we say, improper motives to

14    were prepared in the ordinary course of business?  No.

15              THE COURT:  I got your point.  Counsel, that

16    does not seem unreasonable.

17              MR. SWEETLAND:  Your Honor, we thought it was a

18    housekeeping matter when we proposed --

19              THE COURT:  Clearly, now you understand this is

20    not just a housekeeping matter.  Wouldn't some further

21    meet-and-confer help further sharpen the focus on these

22    particular issues, that is the admissions?

23              MR. SWEETLAND:  We are happy to talk further

24    about them if we can come back and talk to you later if it

25    doesn't work out.

1          THE COURT:  You have one more opportunity -- I

2   suggest to all of you you use it wisely -- to come back

3   before me before I send you to a discovery master.

4          MR. SWEETLAND:  I believe with that, Your Honor,

5   the NMT defendants' issues are completed for this call.

6          THE COURT:  Let's go with Tesla.

7          MR. WILCOX:  Thank you, Your Honor.  For Tesla

8   Industries.

9          I am going to try to narrow down our request

10   here.  We asked for copies of patent applications from the

11   NMT defendants.  We believe that those were based in part

12   upon technology that was improperly obtained from our

13   client.  And, quite frankly, we just haven't gotten those

14   yet.  We just think -- I don't understand why we haven't.  I

15   think they are clearly discoverable and should be produced.

16          THE COURT:  How about that?

17          MR. SWEETLAND:  Your Honor, I am holding the

18   Bates-numbered applications of which he speaks.  I am under

19   the impression -- this is at Bates No. NMT NIM2478 to Bates

20   No. 2488.  I believe that they have been produced.  I will

21   re-scan, have them re-scanned and sent to Mr. Wilcox.

22          THE COURT:  Before you do that, why don't we

23   have Mr. Wilcox check and see again whether he has got them.

24          MR. WILCOX:  Your Honor, what I would suggest --

25   I accept Mr. Sweetland's representation as to whether a

1    particular patent application has been produced.  What I

2    would ask is that he agree to produce all the requested

3    patent applications.  If they haven't been produced, then I

4    ask that they be produced.  If they have, I withdraw,

5    obviously, our objection.

6                THE COURT:  Mr. Sweetland, are you making the

7    representation that you have produced all of the requested

8    patent applications?

9                MR. SWEETLAND:  I cannot say that, because I

10   didn't personally make that production.

11               THE COURT:  Then you do need to go back and

12   check with whomever it is that was involved directly in this

13   process.

14               MR. WILCOX:  I will offer to the Court that we

15   will produce any one that remains available.  One of them

16   has been abandoned, (inaudible) original application.  We

17   have the drawings, but we don't have the provisional patent

18   application for the one that was abandoned.  But we will

19   certainly produce all materials that are extant.

20               MR. SWEETLAND:  Your Honor, I am a little

21   concerned about that.  I mean, to the extent -- just because

22   the application was never fully prosecuted doesn't mean that

23   it shouldn't be produced.  It is a matter of -- I cannot say

24   to the Court, Your Honor, that the provisional patent

25   application, it's a lesser process, as Your Honor is aware,

1    than a full-blown one that has been professionally

2    prosecuted.

3             There was a layperson, Mr. Hollingsworth, two

4    applications that I believe he did himself. I know because

5    I am looking at the handwritten cover sheet for one of the

6    applications that exists. I cannot say that the handwritten

7    application in a completed -- although I have the drawing, I

8    don't have the handwritten application, I don't know what

9    its status is. If he has it, we will produce it. If he

10   doesn't have it, I will find out and tell Mr. Wilcox why he

11   doesn't have it, and we will attempt to get it using

12   whatever process is necessary from the PTO, across the river

13   from us.

14             THE COURT: I am satisfied.

15             MR. SWEETLAND: I am, too, Your Honor.

16             THE COURT: Hollingsworth and Minnick responses

17   to interrogatories.

18             MR. WILCOX: If I may address the production of

19   documents issue. Sorry to step back.

20             I made reference earlier to concerns and

21   evidence that one of the defendants has, or at least

22   communicated, told another defendant that he has removed his

23   hard drive from his computer and put it in a place that

24   would be very difficult to find it. That is the kind of --

25   I am sure I don't need to explain to the Court our concerns

1    about that.

2              THE COURT:  Sure.

3              MR. WILCOX:  We vehemently believe that we are

4    entitled to documents from that hard drive and to an

5    explanation of how that happened.

6              THE COURT:  All right.

7              MR. SWEETLAND:  Your Honor, the hard drive in

8    question was a D drive, a backup drive to a computer that

9    was in Mr. Hollingsworth's possession, used for work not

10   with the NMT entity but with his prior employer.  At or

11   about the beginning of this case, that computer -- he ceased

12   work for this prior company, D.C. Power.  The C drive was

13   unsalvageable from the computer, and whatever information on

14   there was lost before the commencement of the case.  The D

15   drive was a backup drive containing system files and images.

16   And the overwhelming majority of the issues, upon review,

17   three attorneys from this office, including myself, have

18   reviewed the contents of that, and those documents, those

19   images were captured, with the exception of approximately

20   seven images, which were pictures of Mr. Hollingsworth's

21   wife and daughter's Halloween costumes and three items which

22   I can only characterize as being off-color jokes.  Those

23   documents were produced electronically yesterday, and should

24   arrive by Federal Express this morning at Mr. Sullivan's

25   office.

1          THE COURT:  Counsel?

2          MR. WILCOX:  That really doesn't address -- I

3    don't want to go into the fact as to when Mr. Hollingsworth

4    was working for other people.  We think that is the computer

5    from which crucial communications took place.  And really,

6    the problem is that the removal of that hard drive -- and I

7    don't understand how any defendant or any party can say to

8    another party legitimately after litigation has begun that

9    he has removed a hard drive and put it in a place where it

10   is very difficult to find.  And when we received a copy of

11   that e-mail, that was designated as attorneys' eyes only.

12   And I will address that concern.  That is a tremendous

13   concern we have here.  We think we are entitled to a greater

14   explanation than we have received to date.

15          MR. SWEETLAND:  Your Honor, that D drive is in a

16   safe place.  It is in my firm's office.  It is installed.

17   We had our computer technician install it, because it was a

18   standalone.  We had it installed.  Not one, but three

19   attorneys have gone through it.  Every e-mail that was on

20   that hard drive was produced yesterday.  The only things

21   that weren't produced were a handful of images that deal

22   with, A, Mr. Hollingsworth's wife and daughter, or, B, the

23   sort of images that get bantered around as jokes.

24          We don't know what more we can do.

25          THE COURT:  Mr. Sweetland, what is it you would

1  have them do?  Are you asking for the production of the

2  drive itself?

3           MR. WILCOX:  Yes, we are, Your Honor.  We have

4  asked for that repeatedly.

5           THE COURT:  Mr. Sweetland.

6           MR. SWEETLAND:  We believe that is unnecessary.

7  Obviously, if Your Honor orders it, we will do it.  But we

8  have conducted what we believe -- other than the systems

9  files on that drive, the things that make different programs

10  work, we have produced what we believe, upon the review of

11  three attorneys, to be everything that exists on there, with

12  the exception of those handful of personal documents.

13           THE COURT:  Under the circumstances, given the

14  contentions that have been exchanged here today, arguments

15  that have been made and allegations, I am going to order the

16  production of the D drive to the other side for use by

17  designated computer experts in the examination of the

18  contents of that drive.  Obviously, anything that is not

19  pertinent, that is not relevant to a claim or defense or

20  likely to lead to reasonably, reasonably calculated to lead

21  to the discovery of admissible evidence should not become a

22  part of the record in this case.  I am talking about

23  personal information, described here at least in part as

24  possibly off-color in nature.

25           This process is not going to be used to

1     embarrass anyone.  Is that clear?

2                   MR. WILCOX:  Your Honor, it is.

3                   The Court had ordered previously, upon the

4     stipulation of parties, that e-mails that were produced from

5     certain computers be turned over to what was called an

6     e-mail account officer who would conduct a relevance review.

7     What we would suggest is that once the forensic analysis is

8     done, that information is sent directly to the third party,

9     who essentially is acting as a magistrate or master, and

10    that he make those determinations.  That protects

11    Hollingsworth, we believe.

12                  MR. SWEETLAND:  Your Honor, may I ask for

13    clarification that the physical turnover be given, too, so

14    we have a chain of custody.  I saw the package come in.

15                  THE COURT:  Counsel, you can work that out.

16                  MR. SWEETLAND:  We will work that out.

17                  THE COURT:  Let's talk about NMT's designation

18    of documents.

19                  MR. WILCOX:  We entered into a stipulated order

20    with the best of intentions that provided that certain items

21    be deemed confidential, could be stamped confidential, and

22    go to a restricted group.

23                  THE COURT:  Is it your contention there has been

24    over-designation?

25                  MR. WILCOX:  Yes, Your Honor.

1          THE COURT:  Counsel, you guys can't talk about

2    this?

3          MR. SWEETLAND:  Your Honor, may I just briefly

4    respond?

5          THE COURT:  Yes.

6          MR. SWEETLAND:  We have received no Bates number

7    identification of -- we have just received a blanket request

8    that we, again, we take a second look at our designations.

9    We have done that.  The protective order in this case, the

10    stipulated protective order, provides under Paragraph 4 that

11    if there is a problem with the designation, then the side

12    that has the problem should tell the other side what the

13    documents are.

14          THE COURT:  That hasn't happened?

15          MR. SWEETLAND:  No.

16          THE COURT:  Then this isn't ripe for discussion

17    today.  Do you agree that hasn't happened, counsel?

18          MR. WILCOX:  Your Honor, I don't agree.  But I

19    will remedy any deficiencies.  I think we have made it

20    extremely clear what items we are talking about.  And they

21    have made a redesignation.  The problem with the

22    redesignation is that now the Bates numbers are all messed

23    up and it's hard to tell.

24          This is probably not something the Court needs

25    to be involved with.  I would be satisfied if the Court

1    would give a sense that he doesn't expect over-designation

2    of the issues.  I don't understand why we can't work this

3    one out.

4                THE COURT:  Clearly, counsel need to be prudent

5    in your designations of documents as confidential.  There is

6    a process that you have outlined for yourselves in the

7    confidentiality agreement you negotiated that is designed to

8    take care of this and keep the Court out.  So I would ask

9    you to adhere to that process, be reasonable about it, not

10   be overly litigious.

11               That is my guidance to you.

12               MR. SULLIVAN:  Your Honor, may I ask, the

13   problem is, we are talking about hundreds and potentially

14   thousands of documents.  To place the burden on us to go

15   through, really, I would suggest that they designated 75

16   percent their documents as attorneys' eyes only...

17               THE COURT:  That doesn't sound right.

18               MR. SULLIVAN:  ...for us to have to go through

19   and tell them what the Bates numbers are, number one, we

20   reviewed it once and then it was sent a second time --

21               THE COURT:  I think what you will ask me to do

22   is instruct them to go back and redesignate.

23               MR. SULLIVAN:  Yes, sir.

24               THE COURT:  So ordered.  That's it.  That is the

25   end of that discussion.

1          Let's go on to the next matter, Waldmann's

2    production of documents.

3          MR. WILCOX:  Thank you, Your Honor.

4          Our concern here is that we have not received

5    substantial documents from Mr. Waldmann relating to

6    electronic mail messages that we believe were sent.  There

7    is instances in which sequences are missing.  We know that

8    Mr. Waldmann sent a tremendous number of e-mails.  I really

9    think this also covers some of the NMT defendants.  We have

10   situations in which, just in a logical sense, there had to

11   have been a responsive e-mail.  With regard to Mr. Minnick,

12   we were promised those would be produced and have been

13   produced.

14          As to Mr. Waldmann, we just have not received

15   e-mails, copies of e-mails, copies of his communications

16   with other parties.  We think we are entitled to them.  If

17   counsel says they don't exist, I guess they don't exist.

18          MR. ADAMS:  Your Honor, I wrote them a letter

19   and told them we produced everything we have.  I don't know

20   what they want me to do.  I did tell them when I spoke to my

21   client last there were some documents that were created

22   after the last document production, which is sometime in

23   November, which we will supplement because there had been

24   some communications after that.  We will supplement that.

25   We are in the process of doing that right now.

1          THE COURT: All right. That is where it will

2    have to stay for now.

3          What about the interrogatories?

4          MR. ADAMS: The supplementation should be done

5    by tomorrow. I told them last week I would supplement the

6    interrogatories.

7          MR. WILCOX: We need the documents relating -- I

8    am sorry. We need the documents that form the basis for the

9    interrogatory answers as well.

10         MR. ADAMS: We have produced everything we have.

11   There is some documents newly created. We will produce

12   those, which I agreed to do by a letter.

13         MR. WILCOX: As far as documents relating to

14   communications with third parties and former customers of my

15   client, that seems to be a major source of, a major weakness

16   in the discovery request. I accept Mr. Adams'

17   representations.

18         THE COURT: All right. Thank you, counsel.

19         As far as Waldmann's issues are concerned, did

20   we take them up when we were discussing NMT's issues or are

21   there separate issues?

22         MR. ADAMS: There is a couple left. Number one,

23   Your Honor, point one, document requests. Their response is

24   that they will allow me to come and look and review the

25   documents. They have not done so.

1          MR. SULLIVAN:  We are not sure what your issues

2     are there.  We probably need to talk to you about it.  We

3     think we have produced documents --

4          THE COURT:  Address your comments to the Court.

5          MR. SULLIVAN:  I am sorry, Your Honor.  This is

6     Brian Sullivan speaking.

7          We are willing to speak to Mr. Adams about that.

8     We think we have produced everything that he is entitled to

9     see.  We are not quite sure what his complaint is.  We are

10    willing to talk to him about it.  I don't think we are

11    withholding anything we haven't produced.

12         MR. WILCOX:  We are not asking to come to some

13    warehouse somewhere.  There is nothing for him to see that

14    we haven't produced.  In other words, it's not like we have

15    got a box of documents here that we will only produce if he

16    comes to our offices.  That is not what we are doing.

17         MR. ADAMS:  Your Honor, why didn't they say that

18    in the response?

19         THE COURT:  I don't have time to go into that,

20    counsel.

21         Let's talk about deficiencies in plaintiff's

22    response to interrogatories.

23         MR. ADAMS:  Your Honor, the deficiencies I am

24    specifically looking at, Interrogatories No. 125 and 126,

25    which deal with their damages calculations.

1                    THE COURT:  Have you and your opponent talked

2       about this?

3                    MR. ADAMS:  I sent them a letter and they never

4       responded to me.

5                    THE COURT:  I asked have you talked about it?

6                    MR. ADAMS:  We talked on the phone in general,

7       yes, we have.  And they keep telling us they will get back

8       to it, and he never gives me an answer.

9                    MR. WILCOX:  Your Honor, I may.  We told -- I am

10      not sure that this is a different issue than the -- all I

11      can tell the Court is we will provide whatever documents --

12                    THE COURT:  It sounds like the same issue we

13      discussed with NMT.

14                    MR. WILCOX:  It does, Your Honor.

15                    MR. ADAMS:  Your Honor, this is an interrogatory

16      request.  It is not a production of documents.  If they want

17      to supplement the interrogatories by the documents produced

18      to answer that, that is fine with me.

19                    THE COURT:  Is that fine with you, counsel, on

20      the other side?

21                    UNIDENTIFIED SPEAKER:  Does this have to do with

22      damages?

23                    MR. WILCOX:  Yes.

24                    MR. SULLIVAN:  We provided an expert report.  We

25      provided the documents that have been provided to the

1    expert.

2              MR. ADAMS:  None of the documents have been

3    provided to the expert, number one.  No. 2 --

4              THE COURT:  Counsel, clearly, this is something

5    that you don't disagree about in terms of whether the items

6    should be provided.  You disagree about whether they were in

7    fact provided.  So that you need to work out.  Okay?

8              MR. WILCOX:  Your Honor, I will make the same

9    representation that we made with regard to the other -- to

10   the documents related to the other damages issues.  To the

11   extent that the interrogatory also needs to be supplemented,

12   we will do that as well, after consulting with Mr. Adams,

13   which I would suggest we do.

14             THE COURT:  Acceptable, Mr. Adams?

15             MR. ADAMS:  Yes, sir.

16             THE COURT:  What about this contention about the

17   plaintiff's designation of documents?  What is that all

18   about?

19             MR. ADAMS:  I am not complete with my other

20   items, sir.

21             THE COURT:  Yes, you are, because I got to go.

22             MR. ADAMS:  I got some very important things,

23   Your Honor.

24             THE COURT:  I have a criminal matter where the

25   parties are out in the courtroom right now waiting for my

1   arrival.

2                MR. ADAMS:  I am sorry.

3                THE COURT:  Your matter is more important, is

4   that what you are telling me?

5                MR. ADAMS:  No.

6                THE COURT:  There is somebody out there waiting

7   to go to jail.

8                MR. ADAMS:  I used to be a criminal attorney.  I

9   understand.

10               THE COURT:  I don't used to be a judge.  I am a

11  judge today.  You are finished with the other item.  You

12  have a few minutes on this last one.

13               MR. ADAMS:  I ask for the same thing that Tesla

14  asked for, they have over-designated virtually every

15  document in this case.  No document is confidential and no

16  document is attorney-client.

17               THE COURT:  Counsel, you have got to be more

18  professional in the conduct of this matter generally.  That

19  comment goes to all of you.  Cut it out.  You have got one

20  more opportunity with me, and if I have to hear crap like

21  this, and I do mean crap, there is going to be a problem.

22               Counsel, we are done.

23               (Conference concluded at 10:05 a.m.)

24  Reporter:  Kevin Maurer

25

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| TESLA INDUSTRIES, INC., a Delaware Corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 06-55-GMS |
| DAVID C. WALDMANN, LYNDOL W. HOLLINGSWORTH, CHARLES MINNICK a/k/a CHUCK MINNICK, and NEW MILLENNIUM TOOLS, INC., an Oregon Corporation, | ) ) ) ) ) ) | |
| Defendants. | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on April 19, 2007, a true and correct copy of the foregoing MEMORANDUM IN OPPOSITION TO DEFENDANT WALDMANN'S MOTION IN LIMINE TO PRECLUDE TESLA FROM REFERRING TO "LOST" OR "STOLEN" PROPERTY -DOCKET ITEM NO. 142 was caused to be served on the following via CM/ECF filing:

VIA HAND DELIVERY AND
ELECTRONIC MAIL
John D. Demmy
Stevens & Lee
1105 North Market Street
7th Floor
Wilmington, Delaware 19801
jdd@stevenslee.com

VIA HAND DELIVERY AND
ELECTRONIC MAIL
Steven J. Balick
John G. Day
Ashby & Geddes
222 Delaware Avenue
P.O. Box 1150
Wilmington, Delaware 19899
sbalick@ashby-geddes.com

VIA ELECTRONIC MAIL
John A. Adams
Adam C. Gerber
Susanin, Widman & Brennan, P.C.
South Gulph Road, Suite 240
King of Prussia, PA 19406
jaadams@swbcounsellors.com

VIA ELECTRONIC MAIL
Louis S. Mastriani
Rodney R. Sweetland, III
David F. Nickel
Adduci, Mastriani & Schaumberg, L.L.P.
1200 Seventeenth Street, N.W., Fifth Floor
Washington, District of Columbia 20036-3006
nickel@adduci.com

_/s/ Robert Wilcox_____
Robert D. Wilcox, Esquire (#4321)
rwilcox@werbsullivan.com