## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TESLA INDUSTRIES, INC., a Delaware Corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 06-55-GMS |
| DAVID C. WALDMANN, LYNDOL W. HOLLINGSWORTH, CHARLES MINNICK a/k/a CHUCK MINNICK, and NEW MILLENNIUM TOOLS, INC., an Oregon Corporation, | ) ) ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFF, TESLA INDUSTRIES INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANTWALDMANN'S MOTION IN LIMINE TO PRECLUDE REFERENCE TO ITS PRODUCTS AS "CLASSIFIED" OR "TOP SECRET"-DOCKET ITEM NO. 141**

Brian A. Sullivan (#2098)
Robert D. Wilcox (#4321)
Amy D. Brown (#4077)
WERB & SULLIVAN
300 Delaware Avenue, 13th Floor
P.O. Box 25046
Wilmington, Delaware 19899
Telephone: 302-652-1100
bsullivan@werbsullivan.com

Paul E. Crawford (#493)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 N. Orange Street
P.O. Box 2207
Wilmington, Delaware 19899
Telephone: 302-888-6262
pcrawford@cblh.com

April 19, 2007

Attorneys for Plaintiff
Tesla Industries Inc.

**TABLE OF CONTENTS**

I.    Nature and Stage of Proceedings ........................................................................... 1

II.   Summary of Argument ........................................................................................... 1

III.  Counterstatement of Facts..................................................................................... 1

IV.   Argument ................................................................................................................ 2

V.    Conclusion .............................................................................................................. 4

# TABLE OF AUTHORITIES

**Rules**

Fed. R. of Evid. 403……………………………………………………………….…..4

This Memorandum is submitted by Plaintiff, Tesla Industries Inc. ("Tesla"), in opposition to Defendants Waldmann's "Motion in Limine To Preclude Tesla From Referring To Its Products As 'Classified', 'Top Secret' Or Any Such Other Similar Designation" (DI 141). As it is the third of four such motions, it will be referred to herein as "Waldmann MIL 3".

## I.    NATURE AND STAGE OF PROCEEDINGS

The Verified Complaint for, inter alia, "Theft of Trade Secrets" and "Conversion" in this action was filed January 27, 2006.  Defendant Waldmann has filed Waldmann MIL 3 to preclude ant reference to such property as being "Classified" or "Top Secret" or similarly designated. This is Tesla's response in opposition to Waldmann MIL 3.

## II.    SUMMARY OF ARGUMENT

Fundamentally, the Waldmann MIL 3 motion misstates the facts as developed in the case when it states that there is no evidence that Tesla's information and products are "classified". It ignores the fact that there is deposition testimony from two witnesses on that point. As a result, the blanket prohibition Defendant Waldmann seeks is not necessary and is inappropriate.

## III.    COUNTERSTATEMENT OF FACTS

The Verified Complaint in this action was filed January 27, 2006 with attached affidavits and exhibits (A-I) chronicling the systematic transfer of Tesla's confidential information and Trade Secrets to Defendants. The majority of Tesla's products, and the products at issue in this litigation, are used by the United States Department of Defense in situations where a remote power source is required for military operations. The Trade Secrets at issue relate to the uniqueness of the design, materials, construction, functionality and durability of Tesla's products. Many of those Trade Secrets are incorporated in the Tesla products used by the

Department of Defense in classified military settings, as will be testified to at trial by, inter alia, Donald Stewart, United States Military (Ret.).

## IV.    ARGUMENT

Defendant Waldmann argues in essence that the notion that Tesla's products have military sensitivity, and that the documents and other items he is accused of wrongfully removing from Tesla are confidential or classified, is a figment of Mr. Masilotti's imagination. Mr. Waldmann alleges that "Mr. Masilotti was unable to identify any product, component, or other piece of information embodying the alleged trade secrets at is issue in this case that is designated as 'classified,' 'top secret, or some other such similar designation". Waldmann MIL 3, page 5.

The fundamental premise of Waldmann MIL 3 is manifestly false, and is directly contradicted by the testimony of both Mr. Masilotti and Mr. Stewart.  In the "Expert Testimony of Donald P. Stewart" ("Expert Report") attached as Exhibit "1", Mr. Stewart states as follows:

> "I will discuss my concern about the sensitive military information obtained by Mr. Waldmann which was resident on his home computer. The customer file information on his personal computer is considered sensitive and confidential by the US Army and the Department of Defense".

Expert Report, page 1.

> "Also while reviewing documents in preparation for this report, I came across a listing out of a military database called LOGSA (Logistics Report Agency), This info is confidential to government employees only. In particular it gives the requesting unit and the unit's current location which is secure and

classified data. I was extremely surprised that Mr. Waldmann had forwarded this

from a Tesla email account to his home email account which is prohibited

conduct".

Expert Report, page 5.

"Among the documents I reviewed are those attached to the complaint

which, in part, comprise spreadsheet listings containing DODDAC (sic) numbers

for a particular Tesla product….This listing, that Mr. Waldmann received from

Mr. Cassity, contains classified military data…"

Id.

It is abundantly clear that the military importance of the items at issue in this lawsuit is

real and not an invention of Mr. Masilotti.

Mr. Masilotti has also testified, as is noted in Waldmann MIL 3, that some of the

information Plaintiff believes one or more Defendants improperly came to possess, including the

list of recent and pending sales to the Department of Defense, was classified. That same sales

information is described as "Tesla Industries Pending Sales and Customer Lists" in the Verified

Complaint, and is alleged to have been stolen. *See,* Complaint, attached as Exhibit "2",

paragraph 14, sub B.

Mr. Stewart's deposition testimony further undermines Waldmann MIL 3. He testified

that "And in my time in the government, putting a DODAAC with a supplementary address and

quantities is classified information". Transcript of Deposition of Donald Paul Stewart, Exhibit 3,

p. 147:17-19.

At trial Tesla should be allowed to present evidence concerning about its products and the trade secrets they contain. It must also be able to describe accurately the type of information, including its "Pending Sales and Customer Lists" that it alleges Defendant Waldmann misappropriated. Tesla has an obligation to present that information accurately to the trier of fact, and as further protection the Defendants have the right of cross-examination. Defendant Waldmann's position that such information is inherently prejudicial and must be barred under Fed. R. Evid. 403 is unsupported by the facts of the case.

## V.    CONCLUSION

For the foregoing reasons, this Court should deny Waldmann MIL 3.

Respectfully submitted,

Dated: April 19, 2007

/s/ Robert D. Wilcox
Robert D. Wilcox (#4321)
Brian A. Sullivan (#2098)
Amy D. Brown (#4077)
WERB & SULLIVAN
300 Delaware Avenue, 13th Floor
P.O. Box 25046
Wilmington, Delaware 19899
Telephone: 302-652-1100

Paul E. Crawford (#493)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 N. Orange Street
P.O. Box 2207
Wilmington, Delaware 19899
Telephone: 302-888-6262

Attorneys for Plaintiff
Tesla Industries Inc.

EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| TESLA INDUSTRIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-055-GMS |
| | ) | |
| DAVID C. WALDMANN, LYNDOL W. | ) | |
| HOLLINGSWORTH, CHARLES | ) | |
| MINNICK a/k/a CHUCK MINNICK, and | ) | |
| NEW MILLENNIUM TOOLS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## EXPERT TESTIMONY OF DONALD P. STEWART

### I.    Introduction

I have been retained by Plaintiff, Tesla Industries, to provide information relating to some of the issues which I understand will be tried in the above-captioned litigation. I expect to provide this testimony in conjunction with one or more of the following issues: First, I understand that there are issues in this litigation relating to the identification of, and access to, personnel within the military procurement system who can make decisions regarding purchase of equipment offered by outside contractors.

I will discuss my concern about the sensitive military information obtained by Mr. Waldmann which was resident on his home computer. The customer file information on his personal computer is considered sensitive and confidential by the US Army and the Department of Defense.

It is the purpose of this report to outline my expected testimony on these and other issues and the basis of any opinions rendered in connection with that testimony.

### II.    Pertinent Experience, Knowledge And Training

Attached is my resume describing relevant experience and various military related positions including acquisition of tool sets and tool optimization for approximately seven years prior to my retirement in September 2006. Throughout my 26 year career with the military, I have been stationed at the Rock Island Arsenal in Rock Island, Illinois. This facility has responsibility for development and procurement of a broad range of military hardware ranging from tank turrets to tools and tool sets. Over the past 7 years I have been actively involved in military procurement and worked closely with Procurement Contracting Officers (PCO) responsible for obtaining these tools. My role in procurement was primarily in the evaluation of tools. My main function was to coordinate the research of new and emerging tool initiatives and work hand in hand with a procurement official to have these items acquired by the military.

### III.    Pertinent Materials Reviewed

I have reviewed the following materials in preparation for rendition of testimony in this matter. These materials include:

1. Stipulated Protective Order Regarding Confidentiality

2. Complaint and attachments

3. A group of documents which appear to be emails relating to the tool or proposed tool that I understand is one of the items at issue in this matter.

4. A listing of Tesla Industries' customers which I understand was available to one or more of the Defendants in this matter. These customer lists include document number 357-475, 478, and 484-579 as well as P Supp 1692-1712.

5. Document described as Plaintiff's Supplemental Response to Interrogatory No. 9 of Defendants which I understand contains a listing of Tesla Industries' confidential/trade secret information including that pertaining to the afore-mentioned tools.

7. Defendants document number NMT-MIN 003

8. Tesla Industries document numbers 290-316

In addition to the above I understand there are numerous other documents which I may review in the future pending approval of my access to same by Defendants. I understand that this access may be requested.

### IV.    Statement Of Expected Opinions And Reasons

As mentioned above, I am familiar with the military procurement system and particularly the steps necessary to introduce new equipment to the military. Any new product must pass through several stages of review and approval before being considered applicable for military use. One of the first prerequisites is an existing reputation for quality, durability and reliability. Thus, it is difficult for new companies to sell into the military procurement system without a prior reputation or history with the military procurement system. In retrospect this explains why one or more of the above defendants relied upon an association with an established and well regarded supplier of military equipment, Tesla Industries. This will be discussed in more detail below.

Returning to the steps to be followed in the military procurement system, the first of those steps is an initial evaluation of the equipment. The primary facilities for screening such equipment are Aberdeen Proving Grounds in Aberdeen, Maryland and Fort Leonard Wood in Missouri. I am personally aware that a so-called powered wrench was tested by one or more of the defendants at Aberdeen Proving Grounds and that testing failed because of overheating of components in the wrench.

If a product passes initial muster at the engineering school level, the product and the product manufacturer would then be referred to a major supporting command for the purpose of integrating the product into military systems. The principal supporting commands that I worked with were TACOM (Tank and Automotive Command) and CECOM (Communication and Electronics Command).

The next step in the military procurement system is acquisition of a national stock number (NSN). If a product is approved by the above organizations it will then, and only then, be given an NSN which is an essential predicate to selling any product to the military. The NSN then becomes the ordering serial number for all future purchases by the military and identifies the manufacturer of that product.

I personally helped the defendants obtain an NSN for their DC Impact Wrench. That was done based on an understanding, heavily promoted by Mr. Waldmann, that this was a product of Tesla Industries. I learned at a later date, much to my surprise, that the DC Impact Wrench was neither manufactured, promoted, authorized nor associated with Tesla Industries. My assumption that this was a Tesla Industries product was predicated on fliers sent to me by Mr. Waldmann containing reference to Tesla Industries and by the fact that email about the DC Impact Wrench came by way of a Tesla email address. Had it come to my attention that the DC Impact Wrench was not a Tesla Industries product, it is highly unlikely that the item would have been accepted for testing and review on the expedited basis that it was and ultimately given an NSN. It is now my understanding that the entity developing the DC Impact Wrench at the time the NSN was obtained was a new organization called NMT (New Millennium Tools). I now understand this was a start up company which had no track record or history of business with the military. By contrast, Tesla Industries is well known to me as a premier provider of quality equipment. It is my opinion that acquisition of a NSN for the DC Impact Wrench, had the true facts been disclosed to me, would have been difficult to acquire.

To further explain my opinion regarding the unlikelihood of granting NMT an NSN it is helpful to explain the following sequence of events.

1.      The initial device proposed to me by Mr. Waldmann was identified as the DC Impact Wrench and included a device with a NATO connector which enabled powering of the wrench directly from a 24-volt source or a Tesla power supply. The promotion of this wrench as being usable with a Tesla power supply unit further reinforced my (mistaken) belief that the power wrench was a Tesla product. The DC Impact Wrench, when tested with a Tesla power unit at Aberdeen Proving Grounds, failed because of excess power which caused a meltdown of the wrench. At that point in time there was no possibility of Mr. Waldmann/NMT obtaining an NSN for their tool.

2.      To overcome this obstacle, Mr. Waldmann/NMT returned to me with a different arrangement for powering the tool, namely, a portable rechargeable battery pack. This changed powering system eliminated the overheating experience with the first version of the DC impact wrench and thereby facilitated acquisition of an NSN for the battery powered DC impact wrench.

Once a potential vendor receives an NSN for a product it wishes to sell to the military, the next hurdle in implementing those sales is gaining interest of procurement officials at

-3-

military installations. There also has to be a requirement and/or initial need for the item. Military bases in the Continental United States (CONUS) number in the thousands. In addition to the actual military installations there are multiple facilities such as TACOM, Aberdeen Proving Grounds that employ personnel who have purchasing decision capabilities and would be of importance to a potential vendor, especially with respect to a new product or product system. None of the individuals at the military installations or locations like TACOM who would have purchasing or technical review responsibilities are readily identifiable to any vendor unless that vendor has access or prior knowledge of the point of contact persons (POC) at these facilities.

None of the names and duties of military or civilian personnel having purchasing responsibility or interest is generally known either inside or outside of the military. There is no directory of such personnel to my knowledge. Thus, any knowledge of POC at any installation would have had to be known to Mr. Waldmann before his contacts or visits to a facility. That knowledge would be obtained through his prior contact with such personnel in his position at Tesla Industries. Only through actively working with government employees, usually for a long period of time, can a potential vendor develop a business relationship necessary to promote and sell items to the military.

One example of the difficulty getting access to pertinent personnel at a military installation would be the practical difficulties of contacting pertinent personnel at TACOM. Having worked at TACOM for 26 years, I know first hand that ready access to pertinent personnel is extremely difficult. Cold calls on a base would be next to impossible. Security since 9/11 has been heightened to a point that only people with authorized access can gain access to the facility. For a vendor to enter an installation like TACOM the vendor must be invited by a member of that installation who would then request from security a pass for them to enter a certain portion of the installation. The vendor, the company's name, their area of origination be it U.S. or overseas must be verified and vendors would only be allowed on TACOM's installation with an escort and then only allowed into a limited area of the installation. Given these restrictions, and the fact that there are over 6,000 personnel in TACOM facilities (Rock Island and Warren), the chances of a cold call linking a vendor with the right person responsible for purchasing decisions is remote or nil.

For all of the above reasons, it is my opinion that Mr. Waldmann would have to rely upon customers identified during his employment at Tesla Industries to effectively promote and sell any products on behalf of New Millennium Tools or like organizations.

I understand that a suggestion has been made that access to appropriate military personnel with purchasing authority can be acquired through attending trade shows and/or by general visits to facilities offering demonstration of equipment to base personnel in general. With regard to trade shows, most personnel from military facilities at such shows are not the purchasing agents for that facility or actively pursuing procurements at these trade shows. In fact they are there to display the current military hardware available through their facility. They are there to conduct sales rather than purchases.

With regard to another alleged avenue of access to military procurement asserted by the defendants, namely, general demonstrations at bases, it has been my experience that cold calls are not accepted; much prior communication would have had transpired before anybody

-4-

demonstrates at an installation. At no point can anybody drive up to an installation without prior point of contact (POC) for a demonstration.

Also while reviewing documents in preparation for this report, I came across a listing out of a military database called LOGSA (Logistics Report Agency). This info is confidential to government employees only. In particular it gives the requesting unit and the unit's current location which is secure and classified data. I was extremely surprised that Mr. Waldmann had forwarded this from a Tesla email account to his home email account which is prohibited conduct. I was also surprised to see that Mr. Waldmann requested this information from an active duty solider, Mr. Cassity, who was deployed in Southeast Asia. I expect the deployed solider, seeing an "army.mil" email address for Mr. Waldmann, assumed that the sender using the military email address was authorized to receive this information. The "army.mil" email extension is reserved for active duty military and certified government employees. Only a contractor doing direct business with the military may be granted access to an "army.mil" email account.

I have also seen documentation indicating that Mr. Waldmann used a "army.mil" account to forward info about potential funding sources for NMT to Mr. Hollingsworth and/or Mr. Minnick while still employed by Tesla Industries. These sources included funding from the Army's Small Business Innovation Research (SBIR) and the Special Operations Command (SOCOM).

Among the documents I reviewed are those attached to the complaint which, in part, comprise spreadsheet listings containing DODDAC numbers for a particular Tesla product (NSN 6130014755321). This listing, that Mr. Waldmann received from Mr. Cassity, contains classified military data such as the correct locations of deployed military units. This is confidential information and a possible security violation of military policies and procedures. I was distressed that this information was sent to Mr. Waldmann's personnel email address.

I have been informed that Mr. Waldmann has indicated that the aforementioned DODDAC reports were sent to his home email for the purposes of preparing a quarterly sales report for his employer, Tesla Industries. Aside from the aforementioned impropriety of his having the DODDAC information, in my opinion this information would not enable him to prepare current quarterly sales report for his then employer Tesla Industries. I say this in part because it is unlikely that Mr. Waldmann had sufficient information available to him to cross reference DODDAC numbers to specific units to whom he sold Tesla products. Cross referencing of DODDAC to individual military units is available only government computers and is classified information. If Mr. Waldmann had such information, he or the person providing such information is guilty of a serious security breach. If he does not have this information there is no way in which he could convert the DODDAC information to the specific units which is what he contends.

## V.    Exhibits To Be Used at Trial

I expect that some of the documents referenced above, plus demonstrative exhibits, may be used in conjunction with my trial testimony.

**V.    Listing of Pertinent Publications and Other Expert Testimony**

There are no publications in my name in the last ten years.  I have not testified (by deposition or trial) as an expert in the last four years.

My compensation in connection with this matter is $55.00 per hour plus reimbursement of expenses.

I subscribe to the content of the above report.


_Donald P. Stewart_                          _Dec 28 2006_
Donald P. Stewart                            Date

2619 14th Ave, Moline Il 61265        309-762-9862

Donald Stewart

| Experience | 2000-2006    Tools Modernization Group  Rock Island Arsenal, Rock Island, Il |

**Team Leader for Tool sets and management expert for tool optimization**

- Reviewed new tools and their applicability to the Army mission..
- Provided detailed analysis for the current tool sets, kits, and outfits to determine if they met the current need.
- Work closely with the Engineering school as they determine emerging Army requirements.
- Coordinated program management, inventory, and acquisition functions. This included procurement, distribution, production, scheduling, requirements determination, and provisioning.
- Reviewed and provided analysis to higher management of all new Army systems to ensure that no special tools were required if similar tools were available to the public

1995–2000

**Mobile Shop Set Team Leader**

- Managed all mobile shop shelters. These included the Shop equipment, contact maintenance. This is a HUMMVV conversion with a full tool load, air compressor and welder.
- I also had the Shop Equipment Welding. This is a trailer mounted weld shop with tools and all welding equipment.
- I was the Army Diving Team Leader and we managed and maintained over 20 different types of diving tool sets. This included the underwater construction set with 3 containers of underwater tools including welders and various "jaws of life" type equipment.

1989–1995

**Team Leader, Chemical Defense Equipment**

- I served as the team leader in the chemical division focusing on defense against chemical, biological and nuclear weapons.
- I was the director of support for the Service Response Force. This is an ad-hoc group of experts from the government and Army, trained to respond to any accident or incident world wide.
- Served in operation Desert Shield and Desert Storm as the Army's chemical liaison officer. The only civilian to do so.

EXHIBIT 2

ORIGINAL

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TESLA INDUSTRIES, INC., a Delaware      :
Corporation,      :
     :
              Plaintiff,      :     C.A. No. 06-55 GMS
     :
v.      :
     :
DAVID C. WALDMANN,      :
LYNDOL W. HOLLINGSWORTH,      :
CHARLES MINNICK a/k/a CHUCK MINNICK, and      :
NEW MILLENNIUM TOOLS, INC., an Oregon      :
Corporation,      :
     :
              Defendants.      :
     :

VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES FOR
THEFT OF TRADE SECRETS, BREACH OF CONTRACT, CONVERSION,
<u>TORTIOUS INTERFERENCE, AND CONSPIRACY</u>

**CONFIDENTIAL-FILED UNDER SEAL**

Brian A. Sullivan (#2098)
Robert D. Wilcox (#4321)
Amy D. Brown (#4077)
WERB & SULLIVAN
300 Delaware Ave., 13th Floor
Wilmington, DE 19801
(302) 652-1100

Date: January 27, 2006

pursuant to 10 Del. C. § 3104. Waldmann's last known residence is located at 6 Robin Road, Malvern, PA 19355. Waldmann is an employee of Tesla Industries, and has been under administrative suspension for the acts complained of in this Verified Complaint.

3.      Lyndol W. Hollingsworth ("Hollingsworth") is an adult individual residing in the State of Texas and may be served by effecting service upon the Secretary of the State of Delaware pursuant to 10 Del. C. § 3104. Hollingsworth last know residence is 923 Timber Trail, Cedar Park, Texas 78613-3437. Hollingsworth is a business associate of Waldman.

4.      Charles Minnick, a/k/a Chuck Minnick ("Minnick") is an adult individual residing in the State of Oregon and may be served by effecting service upon the Secretary of the State of Delaware pursuant to 10 Del. C. § 3104. Minnick's last known residence is 8420 SW 89th Ave., Portland, OR 97223. Minnick is a business associate of Hollingsworth and Waldmann.

5.      New Millennium Tools, Inc. ("New Millennium Tools") is an Oregon corporation with a registered office and principal place of business at 8420 SW 89th Avenue, Portland, Oregon, 97223. Hollingsworth and Minnick are principals of New Millennium Tools and at relevant times Waldmann acted as an agent of New Millennium Tools. Millennium Tools may be served by effecting service upon the Secretary of the State of Delaware pursuant to 10 Del. C. § 3104.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction, inter alia, pursuant to 28 U.S.C. 1332(a). Plaintiff Tesla Industries is a citizen of Delaware, and no Defendant is a citizen of Delaware. Defendant Waldmann is a citizen of Pennsylvania, Defendants Hollingsworth and DC Power Tools are citizens of Texas, and Defendants Minnick and New Millenium Tools are citizens of Oregon. The amount in controversy exceeds $75,000.00. The Defendants each are

3

subject to the jurisdiction of this Court by virtue of their intentional, tortious, and otherwise
wrongful conduct in the State of Delaware giving rise to the claims stated herein and causing
injury and damage to Tesla Industries.

       7.     Venue is proper in the District of Delaware pursuant to 28 U.S.C. Section
1391(a)(2) because the acts giving rise to the Plaintiff's claim occurred in this district.

**TESLA INDUSTRIES' BUSINESS**

       8.     Tesla Industries is in the business of designing, manufacturing, and selling
portable ground power units ("GPU's), hookups, and other electronic equipment, for military
and commercial applications. Tesla Industries markets its products extensively and is extremely
well-known in the defense contracting and aviation industries as a quality manufacturer and
provider. Its largest customer is the United States Department of Defense ("DOD"), which
purchases through the Defense Logistics Agency. Very generally, its products provide electrical
power to start and power personnel carriers, tanks, helicopters, airplanes and other vehicles in
remote and battlefield locations. As a Department of Defense approved military contractor, it is
assigned a CAGE Code (0VWE2), which indicates Tesla Industries and its marketed products
are registered with the Defense Logistics Agency ("DLA") and assigned a National Stock
Number ("NSN"). The DLA has assigned the highest "Triple 9" (999 out of 1000) priority
rating to certain of Tesla Industries' products, including the NATO Plug. The prototype for the
NATO Receptacle (which is the counterpart to the NATO Plug and which is as yet to be
marketed) is among the products Tesla Industries alleges was stolen by Defendant Waldmann
and distributed to other Defendants. Tesla Industries also has the highest security clearance for
the shipment of its products to sensitive military sites, including those supplying military action
in Iraq. See generally and paragraphs 10 and 14 of the Affidavit of David J. Masilotti, President
of Tesla Industries, attached hereto as Exhibit "A".

4

employee only has access to that narrow bit of information necessary to do his or her job for the
company. That policy is reflected in the Tesla Industries Interoffice Memo entitled "Access to
Tesla Industries Technology Resources" (hereinafter referred to as "Confidentiality Memo"),
attached as Exhibit "B" and required to be agreed to by every new Tesla Industries employee. It
states at especially relevant part "*Generally, employees are given access to Tesla Industries'
various technologies based on their job functions…AT NO TIME are any documents, floppy
disks CAD drawings, emails, electronic parts or any TESLA INDUSTRIES properties; to be
REMOVED from the TESLA INDUSTRIES' building's* (sic) *without the approval of the
President of TESLA Industries…*" (emphasis in original). Waldmann agreed to that policy by
signing that Confidentiality Memo on December 16, 2002, his first day as a Tesla Industries
employee.

       12.     Tesla Industries also requires each employee to sign an "Agreement of Non-
Disclosure" ("Non-Disclosure Agreement") as part of the contract of employment. Waldmann's
signed Agreement of Non-Disclosure is dated December 16, 2002 and attached as Exhibit "C". It
states in relevant part "… **David C. Waldmann agrees that any information pertaining to Tesla
Industries' s products such as drawings, manufacturing materials, processes, components,
devices, prototypes or any other object used in or for the development or manufacture of Tesla
Industries products, purchasing information, vendor names, customer data, personnel files,
and any accounting or internal business information is PROPRIETARY and shall not be
removed from Tesla Industries' possession without written permission from the President of
Tesla Industries** " and that "….**Waldmann recognizes that the information to be disclosed to
him/her by Tesla Industries is secret and confidential and agrees to keep in confidence all
such information disclosed to him/her.  David C. Waldmann also agrees not to provide other
individuals, groups, or business entities information specific to Tesla Industries products, …or**

6

*to any way assist, support or provide information to others, whether directly or indirectly by or through subsidiaries, affiliates, employees or acquaintances. ...*". Exhibit C, paragraphs 5 and 3, respectively.  The Non-Disclosure Agreement provides for specific remedies in the event it is breached, including the recovery of reasonable attorney fees. Id., paragraph 4.

13.    Additionally, Tesla Industries uses a sophisticated security system for its company computers to protect itself from unauthorized access to, or distribution of, company information. In July, 2005, Tesla Industries installed an upgraded firewall security system, and as described in more detail below.  See Exhibit A., Masilotti Affidavit, Section 7, it that was that system that led to the discovery of Waldmann's unauthorized e-mails containing proprietary information to, from and among Waldmann, Hollingsworth, Minnick, and New Millennium Tools.

## WALDMANN'S THEFTS FROM TESLA INDUSTRIES

14.    After conducting an internal investigation and retaining a security consultant in anticipation of this litigation, Tesla Industries discovered and asserts herein that Waldmann engaged in wide-ranging efforts to misappropriate and steal product prototypes, confidential information, and trade secrets from Tesla Industries.  Acting in concert with all Defendants and as a part of a fraudulent scheme, Waldmann has stolen the following information and items from Tesla Industries:

(A)    NATO Receptacle: At substantial costs in research and development, Tesla Industries developed a prototype of a high-performance NATO Receptacle designed to facilitate the connection of Tesla Industries' GPU's to military equipment. Tesla Industries' NATO Receptacle was only recently developed and provides significantly higher performance than previous receptacles, and its existence is a closely guarded secret. Only two such prototype NATO Receptacles are in existence.  It is not

7

listed for sale on Tesla Industries' website, and has not received a security rating or NSN

from the DLA. On August 18, 2005, Waldmann wrongfully removed a prototype NATO

Receptacle from Tesla Industries' New Castle facility and shipped it to Hollingsworth.

Affidavit of David J. Masilotti, paragraph 14(a). Copies of the electronic mail

transmissions between Hollingsworth and Waldmann confirming Hollingsworth's request

for delivery of the prototype and his subsequent receipt of it are attached as Exhibits "D"

and "E". New Millennium Tools, acting under the direction of Hollingsworth and

Minnick, then incorporated Tesla Industries' proprietary NATO Receptacle into a

product New Millennium Tools offered for sale. Copies of the New Millennium Tools

product catalogue incorporating the NATO Receptacle are attached as Exhibit "F".

Upon information and belief, Hollingsworth sent the NATO Receptacle

Prototypes to Minnick. Minnick subsequently sent the prototype to China in order to

determine if they could be reduced. See Affidavit of Kent F. Huffman, attached hereto as

Exhibit "G".

(B)    Tesla Industries' Pending Sales and Customer Lists: Like most businesses,

Tesla Industries' lists of customers are company assets and confidential information.

Unlike most businesses, Tesla Industries' list of pending sales is Department of Defense

Classified. On July 1, 2005, and again on October 5, 2005 and in concert with the other

Defendants, Waldmann sent a Tesla Industries customer list and a list of pending military

sales from his work computer to his home computer in direct violation of his Non-

Disclosure Agreement with Tesla Industries and the Confidential Memo. Copies of those

July 1, 2005 and October 5, 2005 electronic mail transmissions are attached as Exhibit

"H". In further violation of his Non-Disclosure Agreement and his employment contract,

and in concert with the other Defendants, Waldmann at various times after June in 2005

8

marketed New Millennium Tools products to existing Tesla Industries customers. Waldmann demonstrated and attempted to sell those products while ostensibly on business trips for Tesla Industries. A composite of the many e-mails from Waldmann confirming those marketing efforts to the other Defendants and Tesla Industries' customer contacts is attached as Exhibit "I".

(C)    Tesla Industries' Vendor Information:  Because of its role in the defense industry and because the material it purchases is incorporated into proprietary products, Tesla Industries' list of vendors is confidential.  As a sales representative, Waldmann had no reason to remove that vendor list from Tesla Industries and had no authorization to do so.  Waldmann was also without authorization to provide that vendor list to any third party.  On July 28, 2005, Waldmann transmitted electronically  Tesla Industries' vendor information to Hollingsworth concerning the manufacturer of  Tesla Industries UAV casings/powder coated steel boxes.  Further, Plaintiff believes that Waldmann provided information to Hollingsworth concerning one of Tesla Industries' key manufacturers of highly specialized dry cell components.

(D)    Unmanned Aviation Vehicle  Battery Assembly:  This proprietary Battery System is intended to provide power for the U.S Military's Unmanned Aviation Vehicle ("UAV") surveillance planes. The UAV BATTERY Assembly carries the DLA highest priority security rating of "Triple 9". It was developed by Tesla Industries at substantial cost specifically for use in UAV surveillance planes, which fly in areas where the risks of a piloted plane are unacceptably high.  Waldmann did not properly have access to that information.  As set forth in more detail below, on September 8, 2005, Waldmann used his position at Tesla Industries to wrongly convince through trickery a Tesla Industries engineering employee to provide Waldmann with detailed close up photographs of the

UAV Battery Assembly. Without authorization, Waldmann transmitted the photographs by electronic mail to his personal e-mail account. Copies of those photographs and the transmitting e-mail message to Waldmann are attached as Exhibit "J".

(E)    5400 Global Hawk Assembly: This proprietary unit was developed by Tesla Industries specifically for use in the Northrop Grumman Global Hawk UAV. It consists of an engineered and wired battery box using Tesla Industries proprietary connectors to provide power to the Global Hawk, which is used for high-altitude reconnaissance and combat missions by the U.S. Air Force. As set forth in more detail below, on August 30, 2005, Waldmann used his position at Tesla Industries to wrongly convince through trickery a Tesla Industries engineering employee to provide Waldmann with detailed close up photographs of the 5400 Global Hawk Assembly. Without authorization, Waldmann emailed the photographs to his personal email account. Those photographs provide the viewer with a detailed view of the wiring and connection systems inside the box and could potentially allow the system to be duplicated. Copies of those photographs and the transmitting e-mail message to Waldmann are attached as Exhibit "E".

## THE DEFENDANTS' FRAUDULENT SCHEME

15.    On January 27, 2005, Waldmann presented his 2004 "Year in Review Memorandum" to Frank Mooney, Tesla Industries' General Sales Manager. In his Memorandum and in a series of meetings and conversations with Mooney, Waldmann sought substantial increases in salary and commissions. Because Waldmann was already receiving a substantial salary, sales commissions, benefits, and use of a company-provided vehicle, neither Mooney nor the President of the Company approved of Waldmann's request. Although he expressed disappointment at the denial of his request, Waldmann subsequently continued during

2005, at least to the appearance and understanding of Tesla Industries, to represent it in his capacity as a Military Sales Representative.

16.    On or before June 8, 2005, Waldmann began communicating with Defendant Hollingsworth in what was the precursor of the scheme to damage Tesla Industries and steal its products.

17.    Hollingsworth is a developer and licensor of electronic cable equipment and power tools for his associate, DC Power Equipment LLC, Austin, Texas.

18.    At some point after June 8, 2005, Hollingsworth and Waldmann developed a relationship and an interest in developing new products and a new business, in competition with Tesla Industries. Although at all relevant times Waldmann was a Tesla Industries employee, Hollingsworth and Waldmann agreed to develop a new business and new products in direct competition with Tesla Industries. In order to do so, Hollingsworth needed Tesla Industries' prototypes, parts, part numbers, military contacts, vendor lists, and customer lists.

19.    Hollingsworth also had a preexisting business relationship with Chuck Minnick. Through a variety of businesses he controls, Minnick is an importer of products manufactured in Asia to the United States. Plaintiff believes that Hollingsworth, Minnick, and Waldmann conspired about working together on New Millennium Tools, Inc. New Millennium Tools was formed by Hollingsworth and Minnick for the purposes of developing and selling power tools, cables, and other equipment, which require products such as those manufactured by Tesla Industries, including its cables, plugs, and ground power units. New Millennium Tools primary new product was the "DC Impact Wrench".

20.    The DC Impact Wrench and its associated kit were being developed for sale as a self- contained and self-powered electric wrench for use in changing tires and tracks on military vehicles in the field. It could also be modified to serve as a "jaws of life" power tool in order to,

for example, shear the doors off of a damaged Humvee vehicle.

21.        The correspondence and electronic mail transmissions which Tesla Industries has obtained during its investigation show that each of the Defendants conspired continually between June 2005 and November 2005 to convert Tesla Industries' NATO Receptacle, related designs, prototypes, parts, supplies, customer and vendor lists for the Defendants' improper use, including but not limited to selling the DC Impact Wrench incorporating the NATO Receptacles.  See Exhibit "A", Masilotti Affidavit, Section 14(f).  Such acts were intentional, fraudulent and were intended by Defendants to injure Tesla Industries.

22.    In furtherance of the scheme, Waldmann, while in the employ of Tesla Industries, traveled to numerous military bases in order to demonstrate and market the DC Impact Wrench, including Delaware National Guard; Aberdeen, Maryland; Fort Knox, Kentucky; the 101st Airborne Division at Fort Campbell, Kentucky; the 25th I.D. Schofield Barracks, Hawaii; and the 82nd Airborne at Fort Bragg, North Carolina.  See Exhibit "A", Masilotti Affidavit, Section 14(f).

23.    Defendants, in an effort to trade upon Tesla Industries reputation and its existing business relationships, and without Tesla Industries' authorization, created an unauthorized and fraudulent Tesla Industries Product Catalog which included the DC Impact Wrench.

24.    Defendants used interstate wire communications facilities as an integral part of their wrongful acts and communicated by electronic mail and telephone communication Tesla Industries' confidential information and trade secrets.

25.    Defendants conspired about and misappropriated from Tesla Industries, prototypes, parts, drawing, photographs, vendor lists, and customer lists in violation of Tesla Industries' policies and Waldmann's Agreement of Non-Disclosure.

26.    Waldmann sent to Hollingsworth without authorization samples of a confidential Tesla Industries supply part known as Nylon Acetate, which is fabricated by Tesla Industries and

used as an electrical separator in its NATO Plug.  See Exhibit "A", Masilotti Affidavit, Section

14 (a).  Significant amounts of Nylon Acetate are missing from Tesla Industries' inventory.

      27.     Without authorization, Waldmann ordered  Tesla Industries' employee

Joseph Talbot to download and transmit to Waldmann many of Tesla Industries' confidential

information and trade secrets, including but not limited to, photographs, drawings, and

information concerning the NATO Receptacle.  See Talbot Affidavit attached hereto as Exhibit

"K".

      28.     On or about September 7, 2005, Frank Furrie, a subcontractor of the Federal

Emergency Management Agency ("FEMA") made an inquiry by electronic transmissions to

Tesla Industries concerning the purchase by FEMA of GPU's as part of the disaster relief effort

in the wake of Hurricane Katrina. Furrie also inquired about the availability of small portable

battery packs as a power supply for medical heating blankets. In furtherance of Defendant's

conspiracy, Waldmann diverted the FEMA  e-mails concerning possible orders for Tesla

Industries' products to Hollingstworth, causing financial loss and damages to Tesla Industries.

      29.     Waldmann, without authorization, transferred Tesla Industries' confidential

information and trade secrets to his personal laptop computer, including but not limited to Tesla

Industries' customer lists and vendor lists.  Plaintiff believes that Waldmann transmitted this

information to the Defendants.

      30.     Without Tesla Industries' authorization, Waldmann used Tesla Industries' status

as a military contractor to establish an improper military e-mail account,

dwaldmann@us.army.mil, in order to transmit and obtain information concerning Tesla

Industries and its military customers.  See Exhibit "A", Masilotti Affidavit, Section 14 (c).

Waldmann used this e-mail account to pursue sales of New Millennium Tools products that

improperly used Tesla Industries' NATO Receptacle.

31.     On November 19, 2005, Waldmann sent an electronic message to a Tesla

Industries' customer contact with the United States Military, stating as follows:

> I've got an update for you on the DC Tool System we discussed.  I can only discuss this
> with you on this email or my or my home – dcwaldmann@hotmail.com as Tesla does not
> know my complete involvement with this. . . .

A copy of that electronic transmission is attached as Exhibit "L".

## COUNT I

## VIOLATION OF UNIFORM TRADE SECRETS ACT - WALDMANN

32.     Tesla Industries incorporates the allegations of paragraphs 1 through 31 inclusive

as though fully set forth herein.

33.     The confidential information, including Tesla Industries' prototypes, lists of

current customers and  prospective customers, vendors, suppliers, drawings, photographs, parts

and other confidential information are trade secrets of Tesla Industries as defined by 6 Del. C. §

2001(4);

34.     The Non-Disclosure Agreement, at paragraphs 1, 2, and 3, contains express terms

that the trade secret customer information and the trade secret product information and any

developments thereto was to be kept secret by Waldmann and was not for general public

knowledge. The Confidentiality Memo also prohibits the removal or dissemination of that

information.

35.     The Non-Disclosure Agreement and the Confidentiality Memo were reasonable

steps on the part of Tesla Industries to maintain the secrecy of its trade secret information.

36.     Waldmann has misappropriated the trade secrets of Tesla Industries for his own

benefit, and in doing so has violated the Delaware Uniform Trade Secrets Act.

37.     By transmitting some or all such trade secrets to Hollingsworth, Minnick, and New Millennium Power Tools, Waldmann has misappropriated and misused trade secrets of Tesla Industries, and in doing so has violated the Delaware Uniform Trade Secrets Act.

38.     As a result of Waldmann's violations of the Delaware Uniform Trade Secrets Act, Tesla Industries has suffered damages, including but not limited to out-of-pocket expenses, the incurrence of attorney fees, lost sales, and lost profits.

**COUNT II**

**VIOLATION OF UNIFORM TRADE SECRETS ACT – HOLLINGSWORTH,
MINNICK, AND NEW MILLENIUM POWER TOOLS**

39.     Tesla Industries incorporates the allegations of paragraphs 1 through 38 inclusive as if fully set forth herein.

40.     Hollingsworth received Tesla Industries' Confidential Information and Trade Secrets from Waldmann. In doing so, Hollingsworth knew or should have known that some or all of the information he was receiving from Waldmann was a trade secret of Tesla Industries.

41.     Minnick received Tesla Industries' Confidential Information and Trade Secrets from Waldmann. In doing so, Minnick knew or should have known that some or all of the information he was receiving from Waldmann was a trade secret of Tesla Industries.

42.     New Millennium Tools received Tesla Industries' Tesla Industries' Confidential Information and Trade Secrets from Waldmann. In doing so, New Millennium Tools knew or should have known that some or all of the information it was receiving from Waldmann was a trade secret of Tesla Industries.

43.     Hollingsworth, Minnick, and New Millennium Tools have each violated the Delaware Uniform Trade Secrets Act by their actions.

44.     As a result of violations of the Delaware Uniform Trade Secrets Act by Hollingsworth, Minnick, and New Millennium Tools, Tesla Industries has suffered damages,

including but not limited to out-of-pocket expenses, the incurrence of attorneys fees, lost sales and lost profits.

**COUNT III**

**BREACH OF CONTRACT – WALDMANN**

45.    Tesla Industries incorporates the allegations of paragraphs 1 through 44 inclusive as though fully set forth herein.

46.    Tesla Industries and Waldmann had a contract of employment, under which Tesla Industries employed Waldmann as a military sales representative. The Confidentiality Memo and the Agreement of Non-Disclosure were part of that employment contract, under which Waldmann agreed to devote his full-time business efforts to Tesla Industries and to maintain the confidentiality of its information.

47.    Waldmann repeatedly breached in material ways his contract with Tesla Industries. Inter alia, Waldmann (a) failed to devote his full-time business efforts to Tesla Industries, (b) misappropriated Tesla Industries' confidential information concerning Tesla Industries' products, including the UAV NATO Receptacle and customer lists; (c) removed Tesla Industries property from Tesla Industries' premises (d) sent Tesla Industries' customer list to his home computer, (e) used Tesla Industries' customer lists to sell non-Tesla Industries products to existing and prospective Tesla Industries' customers, (f) established an e-mail address outside of Tesla Industries that he used to divulge and transmit Tesla Industries' confidential information, (g) failed to properly and exclusively sell Tesla Industries' products, and (h) converted Tesla Industries' prototypes, information and business opportunities for his own unauthorized purposes use.  In doing so, Waldmann breached the express and implicit terms of his contract of employment, the Agreement of Non-Disclosure and the Confidentiality Memo.

48.    Waldmann's breaches are the direct and proximate cause of damages to Tesla

16

Industries, including but not limited to direct losses, out-of-pocket expenses including the expense of its investigation and of bringing this action, lost sales and lost profits

## COUNT IV

### CONVERSION BY ALL DEFENDANTS

49.    Tesla Industries incorporates the allegations in paragraph 1 through 48 inclusive as though fully set forth herein.

50.    Waldmann, Hollingsworth, Minnick, and New Millennium Tools each converted Tesla Industries' property with the intent to permanently deprive Tesla Industries of that property.

51.    As a result of the conversion of its property by Waldmann, Hollingsworth, and New Millennium Tools, Tesla Industries has suffered damages including but not limited to out-of-pocket expenses, lost sales, and lost profits.

## COUNT V

### TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS BY WALDMANN

52.    Tesla Industries incorporates the allegations of paragraphs 1 through 51 as if fully set forth herein.

53.    On or about September 7, 2005, and as described in more detail above, Waldmann intercepted the FEMA inquiry concerning the purchase by FEMA of Tesla Industries products. Waldmann wrongfully intercepted the email message containing FEMA's request and diverted it to Hollingsworth. A copy of the electronic mail message is attached hereto as Exhibit "M".

54.    As a result of Waldmann's actions, Tesla Industries was deprived of a substantial prospective contact and suffered damages, including but not limited to out-of-pocket expenses, lost sales, and lost profits.

## COUNT VI

## CONSPIRACY BY WALDMANN, HOLLINGSWORTH, MINNICK, AND NEW MILLENNIUM TOOLS

55.     Tesla Industries incorporates the allegations of paragraphs 1 through 54 as if fully set forth herein.

56.     At various times Defendants Waldmann, Hollingsworth, and Minnick have tortiously and illegally agreed among themselves to form and operate a conspiracy designed to, inter alia:

A.     fraudulently deprive Tesla Industries of its property, including Tesla Industries' Confidential and Proprietary Information;

B.     fraudulently convince Tesla Industries's existing and prospective customers that New Millennium Tools may legitimately sell products incorporating Tesla Industries' NATO Receptacle; and,

C.     convert Tesla Industries' Confidential and Proprietary Information for their benefits and uses.

Such conspiracy, and the actions Defendants Waldmann, Hollingsworth and Minnick have taken in furtherance with that conspiracy, have caused damages to Tesla Industries including but not limited to out-of-pocket expenses, lost sales and lost profits..

WHEREFORE, Tesla Industries, Inc. respectfully requests that this Honorable Court enter an Order granting the following relief:

Upon Counts I, II, III, IV, V, and VI:

1.     Enter a temporary restraining order prohibiting Defendant Waldmann from utilizing confidential and/or proprietary information of Tesla Industries that Waldmann obtained

18

as a Tesla Industries employee;

      2.      Enter a temporary restraining order prohibiting Defendants from utilizing confidential and/or proprietary information of Tesla Industries that Waldmann obtained as a Tesla Industries employee;

      3.      After a hearing, enter preliminary and permanent injunctions awarding same;

      4.      Award Tesla Industries its compensatory damages caused by Defendants and hold Defendants jointly and severally liable therefore;

      5.      Award Tesla Industries punitive damages against each Defendant and hold each Defendant jointly and severally liable therefore;

      6.      Award Tesla Industries its reasonable attorney fees as provided by the Delaware Uniform Trade Secrets Act and other authority;

      7.      Award prejudgment and post judgment interest as appropriate; and

      8.      Grant such other relief as the Court deems appropriate.


Dated: 1/22/06

                      WERB & SULLIVAN


                      Brian A. Sullivan, Esquire (DSB #2098)
                      Robert D. Wilcox, Esquire (DSB #4321)
                      Amy D. Brown, Esquire (DSB #4077)
                      300 Delaware Avenue, 13th Floor
                      Wilmington, DE  19899
                      (302) 652-1100 (telephone)
                      (302)652-1111 (facsimile)

                      Attorneys for Tesla Industries

STATE OF DELAWARE     )
                      ) SS:
COUNTY OF NEW CASTLE )

### **VERIFICATION**

David J. Masilotti, in his capacity as President of Tesla Industries,

Inc., the Tesla Industries in this action, being duly sworn, hereby verifies that he has read

the foregoing complaint, and that the facts recited therein are true and correct to the best of

his knowledge, information and belief.

By: _____
      David J. Masilotti

On this, the 27th day of January, 2006, before me, the
undersigned officer, personally appeared acknowledged himself to be the President of
Tesla Industries, Inc. and that he, being authorized to do so, executed the foregoing
instrument for the purposes therein contained.

IN WITNESS WHEREOF, I hereunder set my hand and official
seal.

_____
          Notary Public

Name Printed: Amy D. Brown, Esq.

My Commission Expires: n/a

AMY D. BROWN
Attorney at Law
Notary Public pursuant to
29 Del.C. § 4323(a)(3)

# EXHIBIT 3

DEPOSITION OF DONALD PAUL STEWART
CONDUCTED ON THURSDAY, FEBRUARY 15, 2007

1 (Pages 1 to 4)

1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF DELAWARE
 3   TESLA INDUSTRIES, INC.   :
 4        Plaintiff      :
 5   v.            : C.A. No. 06-055-GMS
 6   DAVID C. WALDMANN,        :
 7   LYNDOL W. HOLLINGSWORTH, :
 8   CHARLES MINNICK a/k/a     :
 9   CHUCK MINNICK, and NEW    :
10   MILLENNIUM TOOLS, INC.   :
11        Defendants      :
12        -----------
13      Deposition of DONALD PAUL STEWART
14         Wilmington, Delaware
15         Thursday, February 15, 2007
16         9:38 a.m.
17   Job No.: 1-96913
18   Pages: 1 - 160
19   Reported By: Dawn M. Hart, Notary Public, RPR/RMR
20
21
22
```

2

```
 1
 2      Deposition of Donald Paul Stewart, held at the
 3   law offices of:
 4        ASHBY & GEDDES
 5        500 Delaware Avenue, 8th Floor
 6        Wilmington, Delaware  19889
 7        (302) 654-1888
 8
 9
10      Pursuant to Notice, before Dawn M. Hart,
11   RPR/RMR and Notary Public in and for the State of
12   Maryland.
13
14
15
16
17
18
19
20
21
22
```

3

```
 1           A P P E A R A N C E S
 2   ON BEHALF OF THE PLAINTIFF:
 3      PAUL E. CRAWFORD, ESQUIRE
 4      CONNOLLY BOVE LODGE & HUTZ, LLP
 5      The Nemours Building
 6      1007 North Orange Street
 7      Wilmington, Delaware  19899
 8      (302) 658-9141
 9
10   ON BEHALF OF THE DEFENDANTS HOLLINGSWORTH,
11   MINNICK AND NEW MILLENNIUM TOOLS, INC.:
12      DAVID F. NICKEL, ESQUIRE
13      ADDUCI MASTRIANI & SCHAUMBERG, LLP
14      1200 17th Street, Northwest
15      5th Floor
16      Washington, D.C.  20036
17      (202) 467-6300
18
19
20
21
22
```

4

```
 1           C O N T E N T S
 2   EXAMINATION OF DONALD PAUL STEWART    PAGE
 3   By Mr. Nickel          5
 4        E X H I B I T S
 5   (Exhibits were attached to the transcript.)
 6   DEPOSITION EXHIBITS            PAGE
 7   150  Expert Testimony re Stewart      5
 8   151  Retainer Letter 12/28/06        42
 9   152  Invoices re Stewart         53
10   153  Withdrawn            --
11   154  E-mail 2/9/05 Waldmann from
12      Mooney           139
13   155  E-mail 10/7/05 Waldmann from
14      Mooney           141
15   156  DODAAC Web Site Excerpt      148
16
17
18
19
20
21
22
```

Case 1:06-cv-00055-GMS   DEPOSITION OF DONALD R. STEWART   Document 57   Filed 04/19/2007   Page 37 of 37
CONDUCTED ON THURSDAY, FEBRUARY 15, 2007

37 (Pages 145 to 148)

145

1    Q    All right. And after reviewing those two
2 E-mails forwarding DODAAC information from Mr. Mooney
3 to Mr. Waldmann, is it still your testimony that
4 Mr. Waldmann received DODAAC information from
5 Mr. Cassidy?
6    A    Again, as I testified before, it appeared to
7 me it had through the E-mail transactions I had seen.
8 I had not seen this document before.
9    Q    Does --
10    A    And so now apparently Mr. Mooney gave
11 Mr. Waldmann the DODAAC information.
12    Q    All right. And so to the extent that you
13 make representations Mr. Waldmann received from
14 Mr. Cassidy, those representations you believe are now
15 incorrect?
16        MR. CRAWFORD: Objection. No foundation for
17 belief until there's a correspondence or correlation
18 of information referenced in Exhibit 155 to the
19 information referred to in Mr. Stewart's report.
20        MR. NICKEL: I'll consider that a speaking
21 objection, Mr. Crawford.
22    Q    But may you please answer?

146

1    A    The information I had at the time of this
2 report, I believed at that point that he received it
3 from Mr. Cassidy.
4    Q    And as you sit here now, what is your
5 belief?
6    A    That it was obtained through his employment.
7    Q    And what is your understanding as to the
8 reason why he obtained it, the DODAAC information
9 from --
10        MR. CRAWFORD: Objection to form.
11    Q    -- as part of his employment?
12        MR. CRAWFORD: Foundation. Calls for
13 speculation.
14    A    At this point I'm unsure other than warranty
15 tracking, the information in these reports, in my
16 opinion, would not have furnished the salesmen
17 information as stated.
18    Q    So as you sit here today do you still
19 consider yourself an expert in DODAAC?
20    A    Yes.
21    Q    And according to your understanding, is the
22 correct acronym DODAAC, or as you've written it in

147

1 your report, DODDAC?
2    A    Well, it appears to be a DODAAC, keeping in
3 mind that very seldom working for the Government do
4 you spell out acronyms.
5    Q    So you agree that every reference in your
6 expert report to DODDAC is incorrect?
7    A    Right. It should be DODAAC.
8    Q    Okay. And it's your testimony that the
9 DODAAC information is confidential; isn't that
10 correct?
11    A    It's confidential when it is combined with
12 other information, yes.
13    Q    What do you mean by that?
14    A    If your DODAAC is shown with your
15 supplementary address, that will show where a unit is
16 deployed and it can also reflect the number of assets
17 a unit has on hand. And in my time in the Government,
18 putting a DODAAC with a supplementary address and
19 quantities is classified information.
20    Q    If one wanted to track DODAAC information to
21 prepare quarterly sales reports or figure out
22 commissions, what information would one need?

148

1    A    I'm not sure in this instance how we could
2 track it to sales information. The report that is in
3 here, that is, is a result of a bulk sale and
4 individual orders drawn off of that bulk sale. So
5 these were, it appears, in an inventory and were
6 released and these were not actually individual sales
7 generated by a contractor visit, but more just
8 somebody dropping a funded requisition or simply
9 ordering the item.
10    Q    I'm going to hand you a document that was
11 printed off the publicly available
12 DODAAC.WPAFB.AF.MIL web site and ask that it be marked
13 as Exhibit 156.
14        (Exhibit No. 156 was marked for identification
15 and was attached to the transcript.)
16    A    (Reviewing.)
17 BY MR. NICKEL:
18    Q    Let me know when you've had a chance to
19 review it.
20    A    Yes, I have.
21    Q    Okay. On Page 2 of the document -- well,
22 first, we're in agreement that the correct acronym is

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TESLA INDUSTRIES, INC., a Delaware Corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 06-55-GMS |
| DAVID C. WALDMANN, LYNDOL W. HOLLINGSWORTH, CHARLES MINNICK a/k/a CHUCK MINNICK, and NEW MILLENNIUM TOOLS, INC., an Oregon Corporation, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on April 19, 2007, a true and correct copy of the foregoing PLAINTIFF, TESLA INDUSTRIES INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANTWALDMANN'S MOTION IN LIMINE TO PRECLUDE REFERENCE TO ITS PRODUCTS AS "CLASSIFIED" OR "TOP SECRET" was caused to be served on the following via CM/ECF filing and electronic mail:

| | |
|---|---|
| John D. Demmy | Steven J. Balick |
| Stevens & Lee | John G. Day |
| 1105 North Market Street | Ashby & Geddes |
| 7th Floor | 222 Delaware Avenue |
| Wilmington, Delaware 19801 | P.O. Box 1150 |
| jdd@stevenslee.com | Wilmington, Delaware 19899 |
| | sbalick@ashby-geddes.com |
| | |
| John A. Adams | Louis S. Mastriani |
| Adam C. Gerber | Rodney R. Sweetland, III |
| Susanin, Widman & Brennan, P.C. | David F. Nickel |
| South Gulph Road, Suite 240 | Adduci, Mastriani & Schaumberg, L.L.P. |
| King of Prussia, PA 19406 | 1200 Seventeenth Street, N.W., Fifth Floor |
| jaadams@swbcounsellors.com | Washington, District of Columbia 20036-3006 |
| | nickel@adduci.com |

_/s/ Robert D. Wilcox_
Robert D. Wilcox, Esquire (#4321)