IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TESLA INDUSTRIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 06-055-(GMS) |
| v. | ) | |
| | ) | |
| DAVID C. WALDMANN, | ) | |
| LYNDOL W. HOLLINGSWORTH, | ) | FILED UNDER SEAL |
| CHARLES MINNICK a/k/a CHUCK MINNICK, and | ) | |
| NEW MILLENNIUM TOOLS, INC., | ) | CONFIDENTIAL |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF TESLA INDUSTRIES, INC.'S RESPONSE TO NMT
DEFENDANTS' MOTION *IN LIMINE* NO. 5: TO EXCLUDE
UNVERIFIABLE FINANCIAL DOCUMENTS**

WERB & SULLIVAN

Brian A. Sullivan (2098)
Robert D. Wilcox (4123)
Amy D. Brown (4077)
300 Delaware Ave., 13th Floor
PO Box 25046
Wilmington, DE 19801
Telephone: (302) 652-1100

and

CONNOLLY BOVE LODGE & HUTZ

Paul E. Crawford (493)
1107 N. Orange Street
P.O. Box 2207
Wilmington, DE 19899-2207
Telephone: (302)658.9141

*Attorneys for Plaintiff Tesla Industries, Inc.*

Dated: April 19, 2007

1

## PRELIMINARY STATEMENT

Through yet another Motion in Limine, NMT now seeks to exclude certain of Tesla Industries financial documents. NMT alleges that Tesla's sales reports are not supported by underlying materials, are inconsistent; and that its tax returns are "unsigned and incomplete."[1]

## ARGUMENT

Tesla Industries is perfectly within its rights to have its expert analyze its monthly and yearly sales summaries.  F.R.E. 1006 requires the proponent of a summary to establish that: (1) the documents are so voluminous that the trier of fact cannot conveniently examine them in court; (2) the documents have been made available to the opponent for examination or copying; (3) the original documents are admissible into evidence; (4) the summary is accurate and does not prejudice the other side; and (5) a proper foundation will be laid before admitting the summaries into evidence. Fed. R. Evid. 1006; United States v. Pharis, 2000 U.S. Dist. LEXIS 14514, 2-3 (E.D. Pa. 2000).  The NMT Parties have been provided copies of all documents used by Tesla's expert as required by FRE 1006, but now attempt to circumvent that rule and throw out the basis of Tesla's expert witness report and testimony, complaining that whatever information they have received is simply not enough.

However, the NMT Defendants fail to acknowledge that they deemed acceptable the very documents they were provided  during a January 18, 2007 Teleconference with the Court:

> MR. SWEETLAND: "….if we get the tax returns and the underlying data for the tax returns, then there is no issue."
> THE COURT:   Any difficulty with that, Mr. Wilcox?

---

[1] While Tesla originally did not believe the tax returns were relevant in this case, it complied with this courts order to produce them. Now, the NMT Defendants seek to exclude the very tax returns they demanded Tesla produce, demonstrating their ongoing antics in this case.

MR. WILCOX:  No your Honor. The question, of course, becomes as to what are underlying documents.  Theoretically, every financial document, every invoice, every sale becomes party of the underlying documents. I would hope we could resolve that issue.  We will give the tax returns and the stuff—the documents that were given to the expert.
THE COURT:  Is that sufficient for your needs, Mr. Sweetland?
MR. SWEETLAND:  It is, your Honor.

See Page 6 Transcript of January 18, 2007 Teleconference, attached hereto as Exhibit "A".

Tesla finds incredible that the NMT Defendants are seeking to exclude the admission of reliable financial documents which were produced during the course of Discovery and relied upon by Tesla's expert in this case in preparing its report of damages.  These tactics again show the desperation of these Defendants and again, unfortunately, require the waste of this Court's precious time and Tesla's  resources. Nevertheless, Tesla will address the documents in the order presented by the complaining NMT Defendants as follows.

1.   Tesla Industries, Inc.'s List of Annual Sales Since 2000 (Exhibit 1 to NMT  MIL No.5).

This document is a summary list of Tesla's Annual Sales from 2000 through 2006, which was prepared by Tesla (the "Annual Sales Summary").  It was reviewed by Account John Sullivan in the preparation of his Expert Report, dated December 21, 2006, Calculation of Lost Profits (the "Sullivan Expert Report")(copy attached hereto as Exhibit "B") and for this reason alone, the document should not be excluded from evidence.

Further, the document matches the Chart of Annual Sales, which includes a Summary List of Annual Sales, from 1995 through 2006, which was also reviewed and relied upon by Accounting Expert Sullivan.  The Sullivan Expert Report contains attachment "C", *Documents Considered,* which describes the documents reviewed and relied upon by Account Sullivan in preparing his report.  The first entry is:

- Monthly Sales of Tesla Industries, Inc. from July 1995 to September 2006 as provided by Office of Brian A. Sullivan via email on 10/23/2006.

A copy of this e-mail dated 10/23/2006 is attached hereto as Exhibit "C".

These documents were also produced to the NMT Defendants as part of the documents package reviewed by Tesla's damages expert, Mr. Sullivan in preparing his Report. Furthermore, Tesla provided to the NMT Defendants the data underlying the Summary. The NMT Defendants acknowledged that the Tesla Monthly Sales Ledger was provided to them (it is attached as Exhibit 2 to MIL No. 5). Accordingly, the data which forms the basis of the Summary and Chart was provided to the NMT Defendants.

2. The Tesla Industries, Inc.'s Monthly Sales Ledger (Exhibit 2 to NMT MIL No. 5)

This document is maintained by Tesla Industries, Inc. in the ordinary course of its business and is its Monthly Sales Ledger from June 1995 through December 2006. The document was provided to the Defendants, but is the subject of some dispute concerning its readability as mentioned above, which Tesla will endeavor to correct for the NMT Defendants.[2] Tesla will verify and lay the foundation for this document at trial. Since it is the document from which the above-referenced Summaries and Charts were prepared, it should not be excluded from evidence.

3. The Accountant's Compilation Report, prepared by Ridgeway Accounting Services, dated January 5, 2007 (Exhibit 3 to NMT MIL N.5)

Dee Ridgeway of Ridgeway Accounting Services is the licensed public accountant

---

[2] There is some difficulty in reading the Monthly Sales Ledger when it is printed from a computer, because it prints in very small type and does not copy very well. The undersigned attorneys have had no difficulty in reading the data on their computer (even though it prints in extremely small type). We believe that this data was also already provided to the NMT Defendants in electronic format which should have enabled them to also read and understand the data.

who has prepared the tax returns for Tesla for approximately the last 10 years. The Affidavit of

Dee Ridgeway is attached hereto as Exhibit "D." The Accountant's Compilation Report

complained of by the NMT Defendants states that:

> We have compiled the accompanying balance sheet of Tesla Industries, Inc., (a c-corporation) for the period ending June 30, 2005, and related statement of income, in accordance with the Standards for Accounting and Review Services as issued by the AICPA.. . . . . A compilation is limited to presenting in the form of financial statements, information that is the representation of management.

While this document was not relied upon by Tesla's expert, Mr.Sullivan, in preparing his Expert

Report, the document was provided to the NMT Defendants at the same time the tax returns of

Tesla were produced. While Tesla has not yet determined whether this document will be relied

upon at trial, its authenticity is of little question.

4.    Tesla Industries, Inc. Tax Return (Exhibits 4 through 12 to NMT MIL No. 5)

The NMT Defendants next complain of Tesla's tax returns which were produced for

fiscal years 1996 through 2005. Incredibly, the NMT Defendants have the temerity to complain

to this Court that the documents are not signed copies, even though the tax returns are stamped,

"This is a true and correct copy of the original" (or sometimes "true copy" or "copy") and

obviously signed and prepared by Accountant Dee Ridgeway. To resolve this non-issue, the

Affidavit of Dee Ridgeway attached hereto as Exhibit "D" verifies in Paragraph 7 that they are

true and correct copies of the original filed returns.

The NMT Defendants complain that the tax returns and the Summary of Annual Sales

should be excluded, due to inconsistencies. Most of the inconsistencies complained of by the

NMT Defendants are de minimis. [3] and will be fully addressed and explained at trial by Tesla and

---

[3] For example, comparing gross sales in the year 2000 from their $1,131,038.70 as compared to $1,140,363.80, or less than a $10,000.00 discrepancy when it comes to gross sales in excess of $1M; or $3,037,467.99 as compared to $3,040,589.74 (approximately a $3,000 discrepancy when it comes to gross sales in excess of $3M). See MIL No 5

its Expert. This is absolutely no basis to exclude either the Summaries or tax returns. While the

NMT Defendants have pointed out a previously unknown discrepancy in the Tesla tax return for

fiscal year 2001 to 2002., this allegation has recently been reviewed by Accountant Dee

Ridgeway who has concluded that a mistake was made in the preparation of this  and that he and

Tesla intend to amend its return in order to correct the mistake. See Affidavit of Dee Ridgeway,

Exhibit _D_ Sections 4 through 5.[4] Nevertheless, this mistake does not affect the Sullivan Expert

Report or the Lost Sales and Profits claimed by Tesla. It is simply an accounting error, which

has been acknowledged by the accountant and will be corrected by Tesla and its accountant.

Nor should the returns be excluded because they contain redactions relative to Tesla's

depreciation, total assets, building and other depreciable assets and officers salaries. None of

these entries relate to the issues in this case and the Expert does not need them for his

determination and calculation of lost profits and sales. This is not a tax audit. It is a serious case

of theft of trade secrets. Furthermore, the Sullivan Expert Report indicates in Attachment "C"

that it has reviewed and relied upon the Federal Income Tax Returns of Tesla prepared by

Ridgeway Tax Accounting. Accordingly, this Court should not countenance the NMT

Defendants' complaints and the tax returns of Tesla should not be excluded from evidence.

## CONCLUSION

Defendant's Motion in Limine should be denied it its entirety, as it lacks both the factual

and legal support to warrant the suppression and exclusion of Plaintiff Tesla Industries' crucial

evidence in this case regarding damages.

---

at page 4. Tesla undoubtedly does not need to burden this Court with the difficulties associated with accounting compilations and the inevitable slight discrepancies

[4] Upon his preliminary review and assessment, Accountant Ridgeway is optimistic that this correction will not result in increased tax liability for Tesla because the business has been legitimately taking advantage of tax loss carry forwards during the tax year affected. Exhibit C, Section 6.

Dated: April 19, 2007                    Respectfully submitted,


/s/ Brian A. Sullivan
Brian A. Sullivan  (DE No. 2098)
Robert D. Wilcox  (DE No. 4321)
Amy D. Brown      (DE No. 4077)
300 Delaware Avenue, 13th Floor
P. O.  Box 25046
Wilmington, DE  19899
Telephone:  (302) 652-1100
Facsimile:   (302) 652-1111

and


Paul E. Crawford (I.D. # 493)
CONNOLLY BOVE LODGE & HUTZ LLP
1107 N. Orange Street
P.O. Box 2207
Wilmington, DE 19899-2207
302.658.9141
pcrawford@cblh.com


Attorneys for Tesla Industries, Inc.

# EXHIBIT A

1

1          IN THE UNITED STATES DISTRICT COURT

2          IN AND FOR THE DISTRICT OF DELAWARE

3                    -   -   -

4   TESLA INDUSTRIES, INC,              :      Civil Action
                                        :
5              Plaintiff,               :
                                        :
6                                       :
                                        :
7        v.                             :
                                        :
8   DAVID C. WALDMANN, LYNDOL W.        :
    HOLLINGSWORTH, CHARLES              :
9   MINNICK a/k/a CHUCK MINNICK,        :
    and NEW MILLENNIUM TOOLS, INC.,     :
                                        :
10             Defendants.              :      No. 06-055-GMS

11                   -   -   -

12              Wilmington, Delaware
              Thursday, January 18, 2007
13                   9:15 a.m.
              Telephone Conference

14                   -   -   -

15
    BEFORE: HONORABLE GREGORY M. SLEET,
16
    APPEARANCES:
17
          BRIAN A. SULLIVAN, ESQ.,
18        ROBERT D. WILCOX, ESQ., and
          AMY RAEANN WARNER, ESQ.
19        Werb & Sullivan

20                          Counsel for Plaintiff

21        JOHN D. DEMMY, ESQ.
          Stevens & Lee
22             -and-
          JOHN A. ADAMS, ESQ.
23        Susan Widman & Brennan, P.C.
          (King of Prussia, PA)

. 24
                            Counsel for Defendant
25                          Waldmann

EXHIBIT
15

2

1   APPEARANCES CONTINUED:

2       LAUREN E. MAGUIRE, ESQ.
        Ashby & Geddes
3              -and-
        RODNEY R. SWEETLAND, III, ESQ., and
4       IAN TARONJI, ESQ.
        Adduci, Mastriani & Schaumberg, LLP
5       (Washington, D.C.)

6                           Counsel for Defendants
                            New Millennium Tools, Inc.,
7                           Hollingsworth, and Minnick

8                   -   -   -

9       THE COURT:  Good morning.

10      UNIDENTIFIED SPEAKER:  Good morning, Your Honor.

11      THE COURT:  Who is on the line for plaintiff,

12   counsel?

13      MR. WILCOX:  Robert Wilcox for the plaintiff

14   Tesla Inc.  I am joined by Brian Sullivan and Raeann Warner,

15   both attorneys at Werb & Sullivan.

16      THE COURT:  For defendant.

17      MR. ADAMS:  John Adams for defendant Waldmann.

18      MS. MAGUIRE:  Lauren Maguire in Wilmington for

19   the NMT defendants.

20      MR. SWEETLAND:  This is Rodney Sweetland and Ian

21   Taronji in Washington, D.C. for the EMT defendants.

22      THE COURT:  Did we get everybody?

23      So this is the second conference for the purpose

24   of taking up discovery disputes.  We have some 12 or 13

25   items here.  It appears the parties are not getting along

3

1    very well.  Is that a correct assumption here?

2              UNIDENTIFIED SPEAKER:  I believe, Your Honor.

3              THE COURT:  Are not getting along or are getting

4    along?

5              UNIDENTIFIED SPEAKER:  Are not.

6              THE COURT:  We are going to take these matters

7    up.  First I want to inquire as to whether any of them have

8    been resolved.

9              MR. SWEETLAND:  I believe that the summary that

10   went to Your Honor, which was a very broad overview, is

11   still extant.  There were subsidiary issues that have been

12   resolved between the parties prior to this call, I

13   understand.

14             THE COURT:  Okay.  I gather everyone concurs in

15   that view?

16             MR. WILCOX:  Your Honor, we did receive some

17   documents late yesterday afternoon.  We don't believe they

18   really address most of our concerns.  But I did want to

19   acknowledge that we received them.

20             THE COURT:  Let's take up NMT's issues.

21             MR. SWEETLAND:  Your Honor, we have eight

22   issues, the first of which is a continuation of an issue

23   that was raised during our initial conference on October

24   20th.

25             THE COURT:  You have eight issues.  I see four

4

1    bullets.

2             MR. SWEETLAND:  Right.  But within those four,

3    some are interrogatories, some are requests for production.

4    This is by topic.

5             THE COURT:  Counsel, we are not going to stay on

6    the phone all morning on this.  Do you understand?

7             MR. SWEETLAND:  I understand.  I will be --

8             THE COURT:  That --

9             MR. SWEETLAND:  -- very brief.

10            THE COURT:  That is not directed at you --

11   counsel, listen for my voice.  Okay?  When you hear my

12   voice, shut up.  All right?  Is that understood?

13            MR. SWEETLAND:  Yes, Your Honor.

14            MR. SULLIVAN:  Yes, Your Honor.

15            Paul Crawford, one of the attorneys for the

16   plaintiffs, unfortunately, is sick.  And he was going to

17   join the conference this morning.  Given, Your Honor,

18   really, the number of issues, discovery issues that are

19   pending, Mr. Crawford's suggestion would have been that each

20   party ought to take two or three primary ones and really

21   stick to those and bring them before Your Honor.

22            THE COURT:  Thank you, Mr. Sullivan.  We will

23   see.

24            I intended to be just as rude as I just sounded,

25   because I am not happy.

5

1          MR. SULLIVAN:  Understood, Your Honor.

2          THE COURT:  Let's go, counsel.

3          MR. SWEETLAND:  The first issue, Your Honor, is

4    damages during the October 20th conference.  Your Honor

5    ordered Tesla to produce discovery in response to our

6    damages request.  To date, we have yet to receive any

7    documents that support the damages allegations.

8              We received an expert witness report on December

9    29th that alleges over a million dollars in lost sales.  And

10   it references as a base computation such items as tax

11   returns.  We have yet to receive a single tax return.  We

12   have yet to receive any profit-and-loss statements.  We have

13   yet to receive any internal accounts receivable.

14             THE COURT:  I got your point, counsel.  Let's

15   get a response.

16             MR. ADAMS:  Defendant Waldmann joins in that

17   request.

18             THE COURT:  Let's get a response.  Who will

19   respond?

20             MR. WILCOX:  Your Honor, we certainly are

21   willing to provide everything that was provided to the

22   expert.  We recognize they are entitled to the documents

23   that, every document that the expert reviewed.  I will make

24   sure that gets done in the next three or four days.

25             As far as the tax returns, the same is true.  We

1   will produce them.

2         We think to the extent there is personal

3   information, it should be redacted. We would expect we can

4   resolve that with counsel. I am not sure we have an issue

5   here.

6         MR. SWEETLAND: Your Honor, if we get all tax

7   returns, including ones -- recent ones -- for whatever

8   reason, the expert didn't rely on the four most recent years

9   of tax returns -- we believe that we need those as well.

10  Those are the years in which Tesla has made an allegation

11  there has been lost sales. If we get the tax returns and

12  the underlying data for the tax returns, then there is no

13  issue.

14        THE COURT: Any difficulty with that, Mr.

15  Wilcox?

16        MR. WILCOX: No, Your Honor. The question, of

17  course, becomes as to what are underlying documents.

18  Theoretically, every financial document, every invoice,

19  every sale becomes part of the underlying documents. I

20  would hope we could resolve that issue.

21        We will give the tax returns and the stuff --

22  the documents that were given to the expert.

23        THE COURT: Is that sufficient for your needs,

24  Mr. Sweetland?

25        MR. SWEETLAND: It is, Your Honor.

1          THE COURT: Okay. Next issue.

2          MR. SWEETLAND: The second item is an

3     interrogatory answer, it is No. 22. It is information

4     relating to allegations that Tesla has made in the

5     marketplace concerning any misconduct by my clients. This

6     is in support of our Lanham Act allegation. During Mr.

7     Masilotti's, the principal of Tesla, deposition, he

8     indicated he was unable to recall all the people that he had

9     talked to about what our client, my clients have allegedly

10    done.

11         Last week we received in discovery a document

12    that was apparently sent out via e-mail to some unidentified

13    number of Tesla contacts in the government contracting

14    industry. We just want to know -- we need to know who that

15    went to, because it makes allegations of misconduct in the

16    marketplace by our clients, which goes to the Lanham Act

17    claim. We believe the only way to answer that, because

18    during the deposition Mr. Masilotti was unable to recall the

19    full extent of it, is in the context of an interrogatory

20    response.

21         MR. ADAMS: Mr. Waldmann joins in that request,

22    Your Honor.

23         THE COURT: Can I assume that Waldmann joins in

24    each of the KMT requests?

25         MR. ADAMS: I believe, Your Honor.

8

1              THE COURT:  You don't have to chirp up each

2      time, counsel.

3              MR. WILCOX:  Your Honor, we will certainly

4      identify the one communication in question.  We just don't

5      think there are a lot of communications of the type that the

6      defendants are looking for.  But obviously, I wasn't aware

7      that the information they got did not include the name of

8      the recipient.  We will get that to them.

9              THE COURT:  Within the same three-day time frame

10     that the other information is going to be provided.

11             MR. WILCOX:  Absolutely, Your Honor.

12             THE COURT:  Mr. Sweetland.

13             MR. SWEETLAND:  That is fine, if we have that

14     proffer, Your Honor.

15             THE COURT:  Next item.

16             MR. SWEETLAND:  The third item, Your Honor,

17     relates to, in the complaint, there is referenced a private

18     investigation that occurred at the inception or prior to the

19     litigation.  In the affidavit of Mr. Masilotti attached to

20     the complaint, in support of their request for preliminary

21     injunction, there were 14 items that were identified as

22     having been obtained as a result of the investigation.  We

23     also know that included in that investigation was a

24     tape-recorded conversation with David Waldmann.

25             We are requesting that the private

9

1    investigator's report include the tape-recorded statement,

2    not the transcript but the tape-recorded statement itself

3    with our co-defendant be provided.  Our basis for that is,

4    of course, under Rule 26 any statement of a party is

5    discoverable, and based upon the revelation of the result of

6    the private investigator's investigation, we believe that

7    there has been a subject matter and issue waiver of all that

8    material.

9            MR. ADAMS:  Your Honor, Waldmann would add to

10   that my client was terminated due to the investigation,

11   which we think therefore we are entitled to it.  That was

12   the basis of the termination.

13           Number two, that there has been allegations that

14   my client destroyed e-mails that was made in the deposition

15   at the end of the discovery period.  We believe this issue

16   will show that e-mails were not destroyed by my clients.  He

17   was gone by the time the e-mails were destroyed.  They were

18   in fact destroyed by Mr. Masilotti.

19           THE COURT:  Counsel, your name?

20           MR. ADAMS:  John Adams for defendant Waldmann,

21   Your Honor.

22           MR. WILCOX:  Your Honor, I think there are a

23   couple of different issues there.  I think we are kind of

24   getting off the primary issue.

25           As far as the allegation as far as the

1    disruption of e-mails, I mean, that's a question of -- you

2    know, an issue of fact.  We are at this point undertaking an

3    extensive and very expensive review of the hard drive of Mr.

4    Waldmann's computer.  We expect to be producing documents

5    that we believe will strongly support our suggestion that

6    those documents, there was a tremendous amount of material

7    deleted.  I don't know where the allegation comes from, that

8    my client was deleting information from the defendants'

9    computer.  That's to me just a bald allegation.

10                  As far as the investigation report, we think

11   it's protected under Rule 26.  It's an investigation done at

12   the direction of attorneys, and, you know, it was prepared

13   in anticipation of litigation.

14                  Now, the answer may be different with regard to

15   the witness statement, the recorded statement of the

16   witness.  And we are willing to take, obviously, the Court's

17   guidance on that.

18                  The real issue here, if we are talking about

19   documents on a hard drive, one of the defendants in this

20   case has acknowledged that his hard drive, he removed it

21   from his computer and put it in a place he referred to as

22   very difficult to find.  We think we are entitled to get all

23   the documents off that hard drive and find out what's going

24   on with that.

25                  That's the kind of issue we have been dealing

1    with, Your Honor.

2         MR. SWEETLAND: Your Honor, I thought I would

3    respond to that when it was -- I can address that now.

4         THE COURT: You can address that later, when we

5    come to it.

6         MR. ADAMS: Your Honor, I would like to add,

7    when he was terminated, they had an e-mail in his possession

8    that came from an account. It was not a Tesla e-mail

9    account. It was one of his (inaudible) account. We believe

10   there is an allegation --

11        THE COURT: Counsel, I have no idea what you are

12   talking about. Let me be real frank: As I understand it,

13   when we started, this portion of the discussion has to do

14   with the results of a private investigation that was

15   commissioned. Is that correct?

16        MR. ADAMS: Yes, Your Honor, that is correct.

17        THE COURT: And there is a desire on behalf of

18   the NMT defendants to have produced to them the report

19   concerning a particular witness who was the subject of this

20   investigation. Is that correct?

21        MR. ADAMS: No, Your Honor. We want the entire

22   report.

23        THE COURT: It appears that counsel for

24   plaintiff is prepared to provide the report of the witness.

25   That is not at issue. Is that correct?

1          MR. WILCOX:  There is a recorded witness

2     statement, Your Honor.

3          THE COURT:  In whatever form, you indicated, I

4     think, that you were prepared to accept the guidance of the

5     Court on that.

6          MR. WILCOX:  Yes, Your Honor.

7          THE COURT:  What is the basis or would be the

8     basis for withholding the recorded witness statement?

9          MR. WILCOX:  That it was prepared as part of a

10    pre-litigation investigation, Your Honor.

11         THE COURT:  Do you wish to assert that position

12    this morning?  Or are you prepared to provide the other side

13    with the report or the statement, the recorded statement?

14         MR. WILCOX:  That is still our position, Your

15    Honor, with the guidance of the Court.

16         THE COURT:  You have raised the general issue or

17    the general objection to providing the work of the

18    investigator generally.  Is that correct?  You claim that it

19    is work product.

20         MR. WILCOX:  That's correct.

21         THE COURT:  So I don't know why we wouldn't

22    include the witness statement, why you wouldn't include that

23    within your contentions regarding work product.

24         MR. WILCOX:  We are including that, Your Honor.

25         THE COURT:  You essentially contend that an

13

1    investigator was hired.

2              MR. WILCOX:  That's correct.

3              THE COURT:  And that the fruits of that

4    investigators's labors are somehow protected by Rule 26.

5              MR. WILCOX:  That's correct.

6              THE COURT:  Elaborate on that a little bit more

7    for me.

8              MR. WILCOX:  Your Honor, that was done in

9    connection with retention -- you know, the plaintiff was

10   shocked to realize there was a problem, and realized early

11   on that there was likely to be some litigation.  There was a

12   suspension of one of the defendants here.  A law firm was

13   retained, and under the guidance of the law firm an

14   investigator did an internal review of various materials.

15             Now, the witness statement in question, the

16   recorded statement, was taken not by the outside

17   investigator but by an in-house security guy who had been

18   brought on.  I don't want to mislead the Court on that.  It

19   was not recorded by the investigator, the outside

20   investigator.  It was taken by an in-house security

21   consultant.

22             THE COURT:  Okay.

23             MR. SWEETLAND:  Your Honor, if I may, whenever

24   the Court has concluded, address one of these issues.

25             THE COURT:  Yes.

14

1          MR. SWEETLAND:  From our perspective, again,

2     Your Honor is correct there are really two subsidiary issues

3     to this.  There is the issue of a tape-recorded statement of

4     a party defendant, which we believe under black-letter law

5     is discoverable under any circumstances, regardless of who

6     obtained it or why.  He is a party defendant.  That is not,

7     we don't believe, a significant legal issue.

8          The second issue, as to the discoverability of

9     the fruits of the private investigator, we believe that

10    there has been a waiver because at least 14 separate items

11    that were discovered by that private investigator were

12    explicitly referenced in the complaint and the affidavit

13    that was attached in support of it.  Even if the work

14    product privilege did apply, and it may very well have

15    initially, when the plaintiffs chose to include the fruits

16    of the investigator's research in the moving documents that

17    initiated the case, they put that issue in this litigation.

18          THE COURT:  Okay.  So Mr. Sweetland has put a

19    finer point on the discussion.  Mr. Wilcox, why don't you

20    address first the contention that this is, after all, the

21    statement of a party, albeit the product of an in-house

22    investigation, nonetheless, a statement of a party and

23    therefore subject to production.

24          MR. WILCOX:  I don't agree with Mr. Sweetland

25    that it is necessarily black-letter law that it somehow cuts

1     through the privilege. We are all aware that work product

2     is a qualified privilege.

3              Again, I would kind of seek the guidance of the

4     Court on that. Obviously, I don't feel as strongly about

5     that particular issue, about the tape recording, as I do

6     about the --

7              THE COURT: Let me interrupt, because this is

8     the kind of thing that judges find time-wasteful. I think

9     that this is something, this particular, very narrow issue,

10     is something that should have been capable of being worked

11     out by the parties. Whether it is black-letter law or not,

12     it is a statement of a party. You might have imagined that

13     I was probably, most judges would probably say, you have got

14     to give that over. Wouldn't you reasonably anticipate that

15     kind of ruling?

16              MR. WILCOX: That is fine, Your Honor. We

17     accept that ruling, and we will turn it over.

18              THE COURT: What I am asking for is a little

19     better exercise of your discretion as lawyers in the future

20     on these kinds of matters.

21              So let's talk about the waiver. Why don't you

22     respond to the contentions that you have waived work

23     product.

24              MR. WILCOX: I don't believe we have waived work

25     product, Your Honor. There were references to the fact that

1   there was an investigation report.  The report clearly

2   itself was not attached to the complaint and has not been

3   disclosed anywhere in there.  The fact that an investigation

4   itself was done doesn't, in my view and under our review of

5   the law, constitute a waiver of the contents of the report

6   itself.

7           MR. ADAMS:  Your Honor, I would say, if they are

8   going to take that position, they can't say at trial that

9   they did an investigation of my client, they terminated him

10  based on the investigation, and they are not going to turn

11  it over.

12          THE COURT:  I agree with you.

13          MR. WILCOX:  We don't need the investigative

14  report at trial to prove the reason --

15          MR. ADAMS:  You are going to have a hard time

16  saying why he was terminated, what is the reason why you let

17  him go.

18          THE COURT:  Counsel, you will address your

19  remarks to the Court and you won't interrupt your opponent

20  like that.

21          Had you finished, counsel?

22          MR. ADAMS:  Yes, Your Honor.

23          THE COURT:  Had you finished, Mr. Wilcox?

24          MR. WILCOX:  Your Honor, I don't believe we

25  intend to introduce the report at trial.  Obviously, if we

1    intended to introduce it at trial, we would have already

2    produced it.

3                MR. ADAMS: Your Honor, as far as referencing,

4    if they want to tell the jury they did an investigation and

5    based on that investigation they didn't pay my client the

6    money he was owed and they terminated employment, they

7    weren't entitled to the investigation.

8                THE COURT: Is that the intended use of this

9    material?

10                MR. WILCOX: We are not -- we don't need the

11    investigative report at trial, Your Honor.

12                THE COURT: Not the report. He contends that

13    you might desire to reference the report before the jury and

14    that should be precluded as well if you are not going to

15    turn it over and give them a fair opportunity to challenge

16    the report.

17                MR. WILCOX: That seems to strike me as an issue

18    for a motion in limine, Your Honor.

19                THE COURT: Probably right. But you must

20    understand that he is probably going to have a fairly strong

21    position in limine should you at this point determine that

22    you are not going to turn this over.

23                MR. WILCOX: I am aware of that, Your Honor.

24                THE COURT: I am not going to order that you

25    turn it over at this point. But remember the discussion

18

1    here today.  Of course, we are having it transcribed.

2                    The next matter.

3                    MR. SWEETLAND:  Your Honor, I will wrap up with

4    two more issues.

5                    The first is, we believe that e-mails have been

6    withheld in response to numerous interrogatories.

7    Approximately nine Tesla employees identified at the

8    inception of the case who had discoverable information

9    relate to this.  Of those nine, only two have had a

10   substantial number of e-mails supplied.  Three have had no

11   e-mails, and Mr. Masilotti, who describes himself as the

12   chief cook and bottle washer of Tesla, the plaintiff, there

13   is only two e-mails from him.  We find it inexplicable as to

14   the absence of e-mails.

15                   THE COURT:  Where are the e-mails?

16                   MR. WILCOX:  Your Honor, we have been through

17   this issue multiple times.  There has been much testimony

18   about it at the depositions of any witnesses that the

19   defendants wanted to take.  Everything has been produced

20   that's out there.  The company did not -- I mean, it seems

21   to me that a lot of the issues that are being raised by the

22   defendants, and I think it is especially true with regard to

23   what they regard as insufficient responses to requests for

24   admissions, which has been a huge issue regarding

25   authenticity of various types of documents, they just don't

1    like the answer.  They are somehow asking the Court to

2    direct us to give a particular answer that doesn't square

3    with the facts, as we see them.

4              THE COURT:  So your point is you have produced

5    all the e-mails that ought to be produced.

6              MR. WILCOX:  That's correct.

7              THE COURT:  Counsel, what else would you have

8    him do?

9              MR. SWEETLAND:  If he is willing to represent

10   that to Your Honor, he set that in stone, and I will move

11   along.

12             THE COURT:  He is an officer of the Court.  We

13   will have to accept that recommendation.  I will accept it.

14   I have no reason not to.  I don't think you do, either.

15             There is a desire to extend the time to complete

16   expert discovery.  I don't have an objection to that

17   necessarily.  Does the other side?  Is this a joint request?

18   Whose request is this?

19             MR. SWEETLAND:  This was the NMT defendants,

20   Your Honor.

21             THE COURT:  Is there an objection from Tesla?

22             MR. WILCOX:  To the extent there is a short

23   extension, Your Honor, that would be fine.  But we have

24   asked for cooperation on a number of discovery issues and we

25   haven't gotten any extensions -- well, I won't say we

1    haven't gotten any.  But I guess we should have asked the

2    Court for all our extensions.

3              THE COURT:  The only entity that is empowered to

4    grant an extension or amendment to the schedule is the

5    Court.  I want you all to keep that in mind.

6              MR. WILCOX:  Yes, Your Honor.  We accept the

7    Court's guidance on this again, of course.  We would consent

8    to a short extension of the time for discovery.  We don't

9    believe it is necessary.  I think the Court is making it

10   very clear it wants us to be cooperative.

11             THE COURT:  What is the reason for NMT's

12   request?

13             MR. SWEETLAND:  We are unable to even initiate

14   the deposition of the plaintiff's experts because we haven't

15   received this underlying information.  We, for instance, had

16   discovery requests asking for any documents provided to or

17   received from expert witnesses.  We received none of that.

18   At the beginning of this call --

19             THE COURT:  Some of the information that we

20   discussed earlier in the call would fall into that category.

21             MR. SWEETLAND:  Yes, Your Honor.

22             MR. ADAMS:  Our deadline for producing experts

23   is tomorrow.

24             THE COURT:  For producing expert reports and/or

25   deposing them as well?

21

1          MR. ADAMS:  To produce reports.  We can't do

2   that because we don't even know all this information.

3          THE COURT:  So you are requesting an extension

4   of the entire expert process, the production of opening

5   reports, rebuttals, then the time to complete expert

6   discovery.  Is that correct?

7          MR. SWEETLAND:  No, Your Honor.  We would only

8   request time to do the defendants' rebuttal reports to the

9   plaintiff's reports.  We do not, the NMT defendants do not

10  anticipate providing affirmative evidence for the

11  counterclaims reports.  We only need the time, some period

12  of time after this production is effected in which to depose

13  their experts and determine whether or not we are going to

14  provide counter-experts.

15          MR. WILCOX:  Your Honor, Mr. Sweetland is

16  correct.  The plaintiff has produced the reports in a timely

17  fashion as directed by the Court previously.  We said we

18  would give them the documents in three days.

19          THE COURT:  How much time do you need, counsel?

20          MR. SWEETLAND:  Twenty days for us to do our

21  rebuttals.

22          THE COURT:  Any difficulty with that, counsel?

23          MR. WILCOX:  No.  That is fine, Your Honor.  But

24  I do want to make it clear why I don't accept that we

25  haven't produced any of the documents.

22

1                THE COURT:  I understand your position.

2                What would that be, Ms. Walker?

3                MS. WALKER:  February 7.

4                THE COURT:  We will grant until February 7 for

5    the purpose of producing the NMT rebuttal reports.  What is

6    the current cutoff for expert discovery?

7                MR. SWEETLAND:  I believe it's the 27th or 28th.

8                THE COURT:  Okay.  I skipped over deficiencies

9    in admissions.  Is this on both, all three parties' -- no,

10   it is not.  It is just on NMT's list of issues.

11               MR. SWEETLAND:  Yes, Your Honor.

12               THE COURT:  What is the problem that you have

13   with the plaintiff's responses to requests for admissions?

14   It was alluded to earlier I think by Mr. Wilcox.  Is that

15   correct?

16               MR. SWEETLAND:  Yes, Your Honor.  Our problem is

17   they have refused to admit the authenticity of documents

18   that were produced by them and that were derived from their

19   website.  They said that they were unable to admit or

20   respond, for instance, that catalogs that we received from

21   their website downloaded were kept in the ordinary course of

22   business.  These were housekeeping requests for admission.

23               THE COURT:  Hold on.

24               Is that correct, counsel?

25               MR. WILCOX:  Your Honor, we went through those

23

1   requests for admissions, I believe it was 236 of them, very

2   carefully.  They asked whether a catalog was available on

3   the Tesla Industries website as of a particular date.  They

4   asked us to admit that documents produced, created by

5   defendant Waldmann at a time when we think he was working

6   for a third party, was scheming to leave the company, and

7   was, for lack of a better word, stealing the trade secrets,

8   were produced in the ordinary course of business.

9          The first issue is an issue of verification, are

10   we prepared to admit for all purposes the particular dates

11   on which information was available on the website?  No.  As

12   to are we prepared to admit the documents created by an

13   employee who we attribute, shall we say, improper motives to

14   were prepared in the ordinary course of business?  No.

15          THE COURT:  I got your point.  Counsel, that

16   does not seem unreasonable.

17          MR. SWEETLAND:  Your Honor, we thought it was a

18   housekeeping matter when we proposed --

19          THE COURT:  Clearly, now you understand this is

20   not just a housekeeping matter.  Wouldn't some further

21   meet-and-confer help further sharpen the focus on these

22   particular issues, that is the admissions?

23          MR. SWEETLAND:  We are happy to talk further

24   about them if we can come back and talk to you later if it

25   doesn't work out.

24

1          THE COURT:  You have one more opportunity -- I

2     suggest to all of you you use it wisely -- to come back

3     before me before I send you to a discovery master.

4          MR. SWEETLAND:  I believe with that, Your Honor,

5     the NMT defendants' issues are completed for this call.

6          THE COURT:  Let's go with Tesla.

7          MR. WILCOX:  Thank you, Your Honor.  For Tesla

8     Industries.

9          I am going to try to narrow down our request

10    here.  We asked for copies of patent applications from the

11    NMT defendants.  We believe that those were based in part

12    upon technology that was improperly obtained from our

13    client.  And, quite frankly, we just haven't gotten those

14    yet.  We just think -- I don't understand why we haven't.  I

15    think they are clearly discoverable and should be produced.

16          THE COURT:  How about that?

17          MR. SWEETLAND:  Your Honor, I am holding the

18    Bates-numbered applications of which he speaks.  I am under

19    the impression -- this is at Bates No. NMT NIM2478 to Bates

20    No. 2488.  I believe that they have been produced.  I will

21    re-scan, have them re-scanned and sent to Mr. Wilcox.

22          THE COURT:  Before you do that, why don't we

23    have Mr. Wilcox check and see again whether he has got them.

24          MR. WILCOX:  Your Honor, what I would suggest --

25    I accept Mr. Sweetland's representation as to whether a

1   particular patent application has been produced.  What I

2   would ask is that he agree to produce all the requested

3   patent applications.  If they haven't been produced, then I

4   ask that they be produced.  If they have, I withdraw,

5   obviously, our objection.

6           THE COURT:  Mr. Sweetland, are you making the

7   representation that you have produced all of the requested

8   patent applications?

9           MR. SWEETLAND:  I cannot say that, because I

10  didn't personally make that production.

11          THE COURT:  Then you do need to go back and

12  check with whomever it is that was involved directly in this

13  process.

14          MR. WILCOX:  I will offer to the Court that we

15  will produce any one that remains available.  One of them

16  has been abandoned, (inaudible) original application.  We

17  have the drawings, but we don't have the provisional patent

18  application for the one that was abandoned.  But we will

19  certainly produce all materials that are extant.

20          MR. SWEETLAND:  Your Honor, I am a little

21  concerned about that.  I mean, to the extent -- just because

22  the application was never fully prosecuted doesn't mean that

23  it shouldn't be produced.  It is a matter of -- I cannot say

24  to the Court, Your Honor, that the provisional patent

25  application, it's a lesser process, as Your Honor is aware,

1   than a full-blown one that has been professionally

2   prosecuted.

3              There was a layperson, Mr. Hollingsworth, two

4   applications that I believe he did himself.  I know because

5   I am looking at the handwritten cover sheet for one of the

6   applications that exists.  I cannot say that the handwritten

7   application in a completed -- although I have the drawing, I

8   don't have the handwritten application, I don't know what

9   its status is.  If he has it, we will produce it.  If he

10  doesn't have it, I will find out and tell Mr. Wilcox why he

11  doesn't have it, and we will attempt to get it using

12  whatever process is necessary from the PTO, across the river

13  from us.

14             THE COURT:  I am satisfied.

15             MR. SWEETLAND:  I am, too, Your Honor.

16             THE COURT:  Hollingsworth and Minnick responses

17  to interrogatories.

18             MR. WILCOX:  If I may address the production of

19  documents issue.  Sorry to step back.

20             I made reference earlier to concerns and

21  evidence that one of the defendants has, or at least

22  communicated, told another defendant that he has removed his

23  hard drive from his computer and put it in a place that

24  would be very difficult to find it.  That is the kind of --

25  I am sure I don't need to explain to the Court our concerns

1    about that.

2              THE COURT:  Sure.

3              MR. WILCOX:  We vehemently believe that we are

4    entitled to documents from that hard drive and to an

5    explanation of how that happened.

6              THE COURT:  All right.

7              MR. SWEETLAND:  Your Honor, the hard drive in

8    question was a D drive, a backup drive to a computer that

9    was in Mr. Hollingsworth's possession, used for work not

10   with the NMT entity but with his prior employer.  At or

11   about the beginning of this case, that computer -- he ceased

12   work for this prior company, D.C. Power.  The C drive was

13   unsalvageable from the computer, and whatever information on

14   there was lost before the commencement of the case.  The D

15   drive was a backup drive containing system files and images.

16   And the overwhelming majority of the issues, upon review,

17   three attorneys from this office, including myself, have

18   reviewed the contents of that, and those documents, those

19   images were captured, with the exception of approximately

20   seven images, which were pictures of Mr. Hollingsworth's

21   wife and daughter's Halloween costumes and three items which

22   I can only characterize as being off-color jokes.  Those

23   documents were produced electronically yesterday, and should

24   arrive by Federal Express this morning at Mr. Sullivan's

25   office.

1          THE COURT:  Counsel?

2          MR. WILCOX:  That really doesn't address -- I

3    don't want to go into the fact as to when Mr. Hollingsworth

4    was working for other people.  We think that is the computer

5    from which crucial communications took place.  And really,

6    the problem is that the removal of that hard drive -- and I

7    don't understand how any defendant or any party can say to

8    another party legitimately after litigation has begun that

9    he has removed a hard drive and put it in a place where it

10   is very difficult to find.  And when we received a copy of

11   that e-mail, that was designated as attorneys' eyes only.

12   And I will address that concern.  That is a tremendous

13   concern we have here.  We think we are entitled to a greater

14   explanation than we have received to date.

15          MR. SWEETLAND:  Your Honor, that D drive is in a

16   safe place.  It is in my firm's office.  It is installed.

17   We had our computer technician install it, because it was a

18   standalone.  We had it installed.  Not one, but three

19   attorneys have gone through it.  Every e-mail that was on

20   that hard drive was produced yesterday.  The only things

21   that weren't produced were a handful of images that deal

22   with, A, Mr. Hollingsworth's wife and daughter, or, B, the

23   sort of images that get bantered around as jokes.

24          We don't know what more we can do.

25          THE COURT:  Mr. Sweetland, what is it you would

29

1    have them do?  Are you asking for the production of the

2    drive itself?

3              MR. WILCOX:  Yes, we are, Your Honor.  We have

4    asked for that repeatedly.

5              THE COURT:  Mr. Sweetland.

6              MR. SWEETLAND:  We believe that is unnecessary.

7    Obviously, if Your Honor orders it, we will do it.  But we

8    have conducted what we believe -- other than the systems

9    files on that drive, the things that make different programs

10   work, we have produced what we believe, upon the review of

11   three attorneys, to be everything that exists on there, with

12   the exception of those handful of personal documents.

13              THE COURT:  Under the circumstances, given the

14   contentions that have been exchanged here today, arguments

15   that have been made and allegations, I am going to order the

16   production of the D drive to the other side for use by

17   designated computer experts in the examination of the

18   contents of that drive.  Obviously, anything that is not

19   pertinent, that is not relevant to a claim or defense or

20   likely to lead to reasonably, reasonably calculated to lead

21   to the discovery of admissible evidence should not become a

22   part of the record in this case.  I am talking about

23   personal information, described here at least in part as

24   possibly off-color in nature.

25              This process is not going to be used to

1    embarrass anyone.  Is that clear?

2              MR. WILCOX:  Your Honor, it is.

3              The Court had ordered previously, upon the

4    stipulation of parties, that e-mails that were produced from

5    certain computers be turned over to what was called an

6    e-mail account officer who would conduct a relevance review.

7    What we would suggest is that once the forensic analysis is

8    done, that information is sent directly to the third party,

9    who essentially is acting as a magistrate or master, and

10   that he make those determinations.  That protects

11   Hollingsworth, we believe.

12             MR. SWEETLAND:  Your Honor, may I ask for

13   clarification that the physical turnover be given, too, so

14   we have a chain of custody.  I saw the package come in.

15             THE COURT:  Counsel, you can work that out.

16             MR. SWEETLAND:  We will work that out.

17             THE COURT:  Let's talk about NMT's designation

18   of documents.

19             MR. WILCOX:  We entered into a stipulated order

20   with the best of intentions that provided that certain items

21   be deemed confidential, could be stamped confidential, and

22   go to a restricted group.

23             THE COURT:  Is it your contention there has been

24   over-designation?

25             MR. WILCOX:  Yes, Your Honor.

1          THE COURT:  Counsel, you guys can't talk about

2    this?

3          MR. SWEETLAND:  Your Honor, may I just briefly

4    respond?

5          THE COURT:  Yes.

6          MR. SWEETLAND:  We have received no Bates number

7    identification of -- we have just received a blanket request

8    that we, again, we take a second look at our designations.

9    We have done that.  The protective order in this case, the

10   stipulated protective order, provides under Paragraph 4 that

11   if there is a problem with the designation, then the side

12   that has the problem should tell the other side what the

13   documents are.

14         THE COURT:  That hasn't happened?

15         MR. SWEETLAND:  No.

16         THE COURT:  Then this isn't ripe for discussion

17   today.  Do you agree that hasn't happened, counsel?

18         MR. WILCOX:  Your Honor, I don't agree.  But I

19   will remedy any deficiencies.  I think we have made it

20   extremely clear what items we are talking about.  And they

21   have made a redesignation.  The problem with the

22   redesignation is that now the Bates numbers are all messed

23   up and it's hard to tell.

24         This is probably not something the Court needs

25   to be involved with.  I would be satisfied if the Court

1  would give a sense that he doesn't expect over-designation

2  of the issues.  I don't understand why we can't work this

3  one out.

4         THE COURT:  Clearly, counsel need to be prudent

5  in your designations of documents as confidential.  There is

6  a process that you have outlined for yourselves in the

7  confidentiality agreement you negotiated that is designed to

8  take care of this and keep the Court out.  So I would ask

9  you to adhere to that process, be reasonable about it, not

10 be overly litigious.

11        That is my guidance to you.

12        MR. SULLIVAN:  Your Honor, may I ask, the

13 problem is, we are talking about hundreds and potentially

14 thousands of documents.  To place the burden on us to go

15 through, really, I would suggest that they designated 75

16 percent of their documents as attorneys' eyes only...

17        THE COURT:  That doesn't sound right.

18        MR. SULLIVAN:  ...for us to have to go through

19 and tell them what the Bates numbers are, number one, we

20 reviewed it once and then it was sent a second time --

21        THE COURT:  I think what you will ask me to do

22 is instruct them to go back and redesignate.

23        MR. SULLIVAN:  Yes, sir.

24        THE COURT:  So ordered.  That's it.  That is the

25 end of that discussion.

1          Let's go on to the next matter, Waldmann's

2     production of documents.

3          MR. WILCOX:  Thank you, Your Honor.

4          Our concern here is that we have not received

5     substantial documents from Mr. Waldmann relating to

6     electronic mail messages that we believe were sent.  There

7     is instances in which sequences are missing.  We know that

8     Mr. Waldmann sent a tremendous number of e-mails.  I really

9     think this also covers some of the NMT defendants.  We have

10    situations in which, just in a logical sense, there had to

11    have been a responsive e-mail.  With regard to Mr. Minnick,

12    we were promised those would be produced and have been

13    produced.

14          As to Mr. Waldmann, we just have not received

15    e-mails, copies of e-mails, copies of his communications

16    with other parties.  We think we are entitled to them.  If

17    counsel says they don't exist, I guess they don't exist.

18          MR. ADAMS:  Your Honor, I wrote them a letter

19    and told them we produced everything we have.  I don't know

20    what they want me to do.  I did tell them when I spoke to my

21    client last there were some documents that were created

22    after the last document production, which is sometime in

23    November, which we will supplement because there had been

24    some communications after that.  We will supplement that.

25    We are in the process of doing that right now.

1          THE COURT: All right. That is where it will

2    have to stay for now.

3               What about the interrogatories?

4          MR. ADAMS: The supplementation should be done

5    by tomorrow. I told them last week I would supplement the

6    interrogatories.

7          MR. WILCOX: We need the documents relating -- I

8    am sorry. We need the documents that form the basis for the

9    interrogatory answers as well.

10         MR. ADAMS: We have produced everything we have.

11   There is some documents newly created. We will produce

12   those, which I agreed to do by a letter.

13         MR. WILCOX: As far as documents relating to

14   communications with third parties and former customers of my

15   client, that seems to be a major source of, a major weakness

16   in the discovery request. I accept Mr. Adams'

17   representations.

18         THE COURT: All right. Thank you, counsel.

19              As far as Waldmann's issues are concerned, did

20   we take them up when we were discussing NMT's issues or are

21   there separate issues?

22         MR. ADAMS: There is a couple left. Number one,

23   Your Honor, point one, document requests. Their response is

24   that they will allow me to come and look and review the

25   documents. They have not done so.

1          MR. SULLIVAN:  We are not sure what your issues

2    are there.  We probably need to talk to you about it.  We

3    think we have produced documents --

4          THE COURT:  Address your comments to the Court.

5          MR. SULLIVAN:  I am sorry, Your Honor.  This is

6    Brian Sullivan speaking.

7          We are willing to speak to Mr. Adams about that.

8    We think we have produced everything that he is entitled to

9    see.  We are not quite sure what his complaint is.  We are

10    willing to talk to him about it.  I don't think we are

11    withholding anything we haven't produced.

12          MR. WILCOX:  We are not asking to come to some

13    warehouse somewhere.  There is nothing for him to see that

14    we haven't produced.  In other words, it's not like we have

15    got a box of documents here that we will only produce if he

16    comes to our offices.  That is not what we are doing.

17          MR. ADAMS:  Your Honor, why didn't they say that

18    in the response?

19          THE COURT:  I don't have time to go into that,

20    counsel.

21          Let's talk about deficiencies in plaintiff's

22    response to interrogatories.

23          MR. ADAMS:  Your Honor, the deficiencies I am

24    specifically looking at, Interrogatories No. 125 and 126,

25    which deal with their damages calculations.

1             THE COURT: Have you and your opponent talked

2    about this?

3             MR. ADAMS: I sent them a letter and they never

4    responded to me.

5             THE COURT: I asked have you talked about it?

6             MR. ADAMS: We talked on the phone in general,

7    yes, we have. And they keep telling us they will get back

8    to it, and he never gives me an answer.

9             MR. WILCOX: Your Honor, I may. We told -- I am

10   not sure that this is a different issue than the -- all I

11   can tell the Court is we will provide whatever documents --

12            THE COURT: It sounds like the same issue we

13   discussed with NMT.

14            MR. WILCOX: It does, Your Honor.

15            MR. ADAMS: Your Honor, this is an interrogatory

16   request. It is not a production of documents. If they want

17   to supplement the interrogatories by the documents produced

18   to answer that, that is fine with me.

19            THE COURT: Is that fine with you, counsel, on

20   the other side?

21            UNIDENTIFIED SPEAKER: Does this have to do with

22   damages?

23            MR. WILCOX: Yes.

24            MR. SULLIVAN: We provided an expert report. We

25   provided the documents that have been provided to the

1    expert.

2                MR. ADAMS:   None of the documents have been

3    provided to the expert, number one.  No. 2 --

4                THE COURT:   Counsel, clearly, this is something

5    that you don't disagree about in terms of whether the items

6    should be provided.  You disagree about whether they were in

7    fact provided.  So that you need to work out.  Okay?

8                MR. WILCOX:   Your Honor, I will make the same

9    representation that we made with regard to the other -- to

10   the documents related to the other damages issues.  To the

11   extent that the interrogatory also needs to be supplemented,

12   we will do that as well, after consulting with Mr. Adams,

13   which I would suggest we do.

14               THE COURT:   Acceptable, Mr. Adams?

15               MR. ADAMS:   Yes, sir.

16               THE COURT:   What about this contention about the

17   plaintiff's designation of documents?  What is that all

18   about?

19               MR. ADAMS:   I am not complete with my other

20   items, sir.

21               THE COURT:   Yes, you are, because I got to go.

22               MR. ADAMS:   I got some very important things,

23   Your Honor.

24               THE COURT:   I have a criminal matter where the

25   parties are out in the courtroom right now waiting for my

38

1    arrival.

2                    MR. ADAMS:  I am sorry.

3                    THE COURT:  Your matter is more important, is

4    that what you are telling me?

5                    MR. ADAMS:  No.

6                    THE COURT:  There is somebody out there waiting

7    to go to jail.

8                    MR. ADAMS:  I used to be a criminal attorney.  I

9    understand.

10                   THE COURT:  I don't used to be a judge.  I am a

11   judge today.  You are finished with the other item.  You

12   have a few minutes on this last one.

13                   MR. ADAMS:  I ask for the same thing that Tesla

14   asked for, they have over-designated virtually every

15   document in this case.  No document is confidential and no

16   document is attorney-client.

17                   THE COURT:  Counsel, you have got to be more

18   professional in the conduct of this matter generally.  That

19   comment goes to all of you.  Cut it out.  You have got one

20   more opportunity with me, and if I have to hear crap like

21   this, and I do mean crap, there is going to be a problem.

22                   Counsel, we are done.

23                   (Conference concluded at 10:05 a.m.)

24   Reporter:  Kevin Maurer

25

# EXHIBIT B

# CALCULATION OF LOST PROFITS

## Tesla Industries, Inc.

v.

## David Waldmann, Et Al.

(C.A. 06-55)

*Report Date: December 21, 2006*

# Cordua & Company, P.C.

Certified Public Accountants

## CALCULATION OF LOST PROFITS

### TESLA INDUSTRIES, INC. v. DAVID WALDMANN, ET AL. (C.A. 06-55)

*Report Date: December 21, 2006*

## TABLE OF CONTENTS

| | |
|---|---|
| PURPOSE AND SCOPE OF ENGAGEMENT | 1 |
| OPINIONS | 1 |
| DOCUMENTS CONSIDERED | 1 |
| LIMITING CONDITIONS | 2 |
| QUALIFICATIONS | 2 |
| COMPENSATION | 2 |
| ATTACHMENT A - OPINIONS | 3 |
| ATTACHMENT B - ANALYSIS OF THE EVIDENCE | 6 |
| ATTACHMENT C – DOCUMENTS CONSIDERED | 8 |
| ATTACHMENT D - CURRICULUM VITAE - JOHN P. SULLIVAN, CPA, CVA | 9 |
| ATTACHMENT E – FIRM RESUME / CURRICULUM VITAE – PETER J. CORDUA, CPA, FIRM PRINCIPAL | 10 |

# Cordua & Company, P.C.

Certified Public Accountants

December 21, 2006

Werb & Sullivan
300 Delaware Avenue
P.O. Box 25046
Wilmington, DE 19899
Attn: Brian A Sullivan

RE:    **Calculation of Lost Profits**
    **Tesla Industries, Inc. v. David Waldmann, et al. (C.A. 06-55)**

### Purpose and Scope of Engagement

The attached report was prepared for the specific purpose of determining the lost profits suffered by Tesla Industries, Inc (hereinafter, the "Company") in connection with the above referenced litigation and is intended for no other purpose.

### Opinions

My opinions on matters relevant to this case and the basis and reasons for those opinions are described in Attachment A. My supporting calculations and analysis of the evidence including a table of the Company's monthly sales is provided in Attachment B. As I am still awaiting additional information from the Company, this report describes my preliminary opinion on the lost profits of the Company. Based on the information we have considered as of the date of this report, I believe that our approach yields a reasonable estimate, yet not conclusive opinion, of lost profits from the projections and assumptions described in Attachment A.

### Documents Considered

In preparing this report and forming the opinions expressed in Attachment A, I have considered the items of information disclosed in Attachment C. While additional information was requested from the client, it has not been provided as of the date of this report. Had the additional information been provided, this could result in a materially different calculation of lost profits.

I have also considered my knowledge, training and professional experience as a certified public accountant and certified valuation analyst.

1650 Suckle Highway                                    300 Delaware Avenue, Suite 1300
Office Complex, Suite 3                                         Wilmington, DE 19801
Pennsauken, NJ 08110                                              Mailing Address:
(856) 486-2299 • Fax (856) 486-2038                                  P.O. Box 25046
email: CorduaAndCo@pjc-cpa.com                            Wilmington, DE 19899-5046

# Cordua & Company, P.C.

Certified Public Accountants

*Limiting Conditions*

Cordua & Company, P.C. has relied on financial information and tax returns as provided by the Company and its attorney as being accurate and a fair representation of the financial status and operations of the Company. We have not applied any independent investigative procedures to assure their accuracy. Rather, we have relied upon the Company's representation that this financial information, as well as other information and documentation, provided to us by them or their agents is true and correct to the best of their knowledge and belief. This report is not to be copied or made available to any persons other than those indicated in this report without the express written consent of Cordua & Company, P.C. We have no responsibility to update this report for events and circumstances occurring subsequent to the date of this report.

*Qualifications*

A summary of my qualifications, as detailed in the curriculum vitae (C.V.) is presented in Attachment D.

REDACTED

Sincerely,

John P Sullivan, CPA, CVA
December 21, 2006

# Cordua & Company, P.C.

Certified Public Accountants

## ATTACHMENT 'A'

### OPINIONS

REDACTED

Due to lack of information to make an informed opinion, this report does not address the other allegations of Tesla Industries, Inc regarding the damages related to:

- Lost value of prototypes, drawings, technical data, and supplies
- Legal fees incurred related to prosecuting and defending this litigation
- Security and investigative expenses incurred
- Lost employee and officer time and productivity
- Lost time to recruit and train replacement salesman
- Upon receiving additional information we will consider these damages in an addendum to this report.

### *Target Period Chosen*

According to Tesla Industries, Inc, the Defendant, sales employee David Waldmann, began ignoring his duties as a salesman of the Company at the beginning of June 2005. The Defendant took paid leave beginning November 25, 2005 and was terminated December 30, 2005.

Due to the life cycle of the company's sales, these actions affected the Company's sales figures approximately six months after the damages occurred. After a salesman visits a typical government contract customer, it takes one month for a purchase requisition, one more month for approvals to go to bid, one more month to order the product, and finally three months turnaround time for Tesla to manufacture the product. Using this assumption, we have determined that the target period of affected sales was December 2005 through May 2006.

REDACTED

REDACTED

# Cordua & Company, P.C.

Certified Public Accountants

**ATTACHMENT "B"**

**ANALYSIS OF THE EVIDENCE**

REDACTED

# Cordua & Company, P.C.

Certified Public Accountants

## ATTACHMENT 'C'

### DOCUMENTS CONSIDERED

- Monthly Sales of Tesla Industries, Inc. from July 1995 to September 2006 as provided by Office of Brian A Sullivan via email on 10/23/2006;

- Federal Income Tax Returns of Tesla Industries, Inc. prepared by Ridgeway Tax Accounting[1] for the fiscal years ended June 30, 1997 through June 30, 2001;

- Email correspondence between the Office of Brian A Sullivan and Tesla Industries between the dates of 10/18/2006 and 10/24/2006

- Tesla Industries, Inc.'s Sixth Supplemental Production of Documents in Response to Defendants Lyndol W Hollingsworth, Charles Minnick a/k/a Chuck Minnick and New Millennium Tools, Inc's Request For Production of Documents as dated November 30, 2006

- Plaintiff Tesla Industries, Inc.'s Supplemental Answer to Defendants Lyndol W Hollingsworth, Charles Minnick a/k/a Chuck Minnick and New Millennium Tools, Inc's Interrogatory No. 3 dated 10/27/2006

- Plaintiff Tesla Industries, Inc.'s Answers and Objections to Interrogatories No. 1, 2, 3, and 4 dated 11/27/2006

---

[1] Ridgeway Tax Accounting Services, Shoppes of Red Lion Road, New Castle, DE 19720

# Cordua & Company, P.C.

Certified Public Accountants

## ATTACHMENT 'D'

## CURRICULUM VITAE

### John P Sullivan, CPA, CVA

CURRICULUM VITAE

# JOHN P. SULLIVAN, CPA, CVA

| | |
|---|---|
| **BUSINESS CONTACT INFORMATION** | Cordua & Company, P.C.<br>1650 Suckle Highway<br>Office Complex, Suite 3<br>Pennsauken, NJ 08110<br>Phone:    (856) 486-2299<br>Fax:      (856) 486-2038<br>e-mail:    jsullivan@pjc-cpa.com |

**EDUCATION**

**Villanova University**, Villanova, Pennsylvania
Bachelor of Science in Accounting, May 1998
*Graduated Magna Cum Laude*
Beta Gamma Sigma – National Business Honor Society

**CERTIFICATIONS**

- Certified Valuation Analyst (CVA) – December 2004
- Certified Public Accountant (CPA) – January 2000

**EMPLOYMENT HISTORY**

**Cordua & Company, P.C.**, 2003 to Present
- *Valuation Consultant* - business valuation services for merger and acquisition purposes, marital reasons, business succession plans, shareholder agreements, and other litigation support services
- *Audit Director* – supervises audits, reviews, and compilations for privately-held companies in diversified industries including Construction, Manufacturing, Mortgage Banking, and Internet Services as well as Non-Profit Organizations
- Tax Compliance and M&A Due Diligence Services

**Campbell Sales Company,** 2001 to 2002
- *Financial Analyst* – Controlled $560MM U.S. trade budget by brand for Fortune 500 soup manufacturer

**Ernst & Young, LLP,** 1997 to 2000
- *Senior Auditor* – audits of private and publicly held corporations; focus on entrepreneurial services group

CURRICULUM VITAE – CONTINUED

# JOHN P. SULLIVAN, CPA, CVA

**BUSINESS VALUATION EXPERIENCE**

Services Provided to Entities in the Following Industries:
- Food and Beverage Services
- Commodities Dealer
- Video Stores
- Construction
- Professional Practice

**PROFESSIONAL ASSOCIATIONS**

- American Institute of Certified Public Accountants (AICPA)
- Pennsylvania Institute Certified Public Accountants (PICPA)
- National Association of Certified Valuation Analysts (NACVA)
- Association of Certified Fraud Examiners (ACFE)

**CONTINUING EDUCATION**

- PICPA - Accounting Issues in Divorce Litigation, 2006
- PA Bar Institute - Your Role in Business Valuations, 2006
- NACVA - 12th Annual Consultants' Conference, 2005
  - Drafting a Good Report – Your Professional Signature
  - Emerging Industries in Valuation
  - Valuation of Pass-Through Entities: The Plot Thickens
  - Valuation of Privately Held Businesses: A Comparison of the Pricing Accuracy of Common Methods
  - Valuation Policies and Procedures at the IRS
  - Non-Confrontational Approach to Interviewing
  - Deficiencies in Current Valuation Research
  - Calculation of Lost Profits Damages
  - Fair Value in Shareholder Cases
  - The Market Method – New Ideas for the Use of Public Company Guidelines
  - Case Analysis in Person
- NACVA - Business Valuation Certification and Training Center, 2004
  - Fundamentals, Techniques & Theory
  - Applications and Calculations of the Income and Asset Approaches
  - Case Analysis - The Market Approach
  - Case Analysis – Application of Discounts & Premiums
  - Case Study – Facts to Conclusion
  - Corporate Valuation – Theory & Application
- PICPA - FASB/SAS Updates, Tax Updates, etc, 1998-2006

PAGE 2 of 2

# Cordua & Company, P.C.

Certified Public Accountants

**ATTACHMENT 'E'**

**FIRM RESUME**

Cordua & Company, P.C.

**CURRICULUM VITAE**

Peter J. Cordua, CPA

Peter J. Cordua
Certified Public Accountant
Cordua & Company, P.C.
1650 Suckle Highway
Office Complex
Suite 3
Pennsauken, New Jersey  08110
(856) 486-2299
pcordua@pjc-cpa.com

**EDUCATION:**

Graduate of St. Joseph's college with a Bachelor's Degree in accounting

**BUSINESS QUALIFICATIONS:**

- Licensed as a Certified Public Accountant since 1975

- Licensed as a Certified Public Accountant in New Jersey and Pennsylvania

- Began accounting practice in 1976 in which he is sole shareholder

- Member of American Institute of Certified Public Accountants

- Member of New Jersey Society of Certified Public Accountants

- Member of Pennsylvania Institute of Certified Public Accountants

- Has testified as an expert witness in Federal, Commonwealth and City courts

- Has testified for arbitration committee related to business valuation issues

**CORDUA & COMPANY, P.C.:**

- Firm employs eight full time professionals with three full time paraprofessionals.

- Firm is experienced in preparing audited, reviewed and compiled financial statements.

- Firm prepares tax returns for businesses and individuals located in sixteen states and Canada.

Peter J. Cordua
Certified Public Accountant
Cordua & Company, P.C.
1650 Suckle Highway
Office Complex
Suite 3
Pennsauken, New Jersey  08110
(856) 486-2299
pcordua@pjc-cpa.com

CORDUA & COMPANY, P.C. (Continued):

- Firm has prepared business valuations and represented clients in domestic issues.

PERSONAL:

- Resident of Marlton, New Jersey

- Trustee of Creative Arts Alliance of New Jersey

- Trustee of The Leukemia & Lymphoma Society of Southern New Jersey

- Previously Treasurer of Northeast Philadelphia Chapter of Optimist Club

- Previously member of Philadelphia Chapter of Jaycees, named Jaycee of the month – July 1973

# EXHIBIT C

REDACTED

REDACTED

REDACTED

REDACTED

# EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TESLA INDUSTRIES, INC., a Delaware          :
Corporation,                                :
                                            :
                        Plaintiff,          :        C.A. No.06-55 (GMS)
                                            :
        v.                                  :
                                            :
DAVID C. WALDMANN,                          :
LYNDOL W. HOLLINGSWORTH,                     :
CHARLES MINNICK a/k/a CHUCK MINNICK, and    :
NEW MILLENNIUM TOOLS, INC., an Oregon       :
Corporation,                                :
                                            :
                        Defendants.         :

## AFFIDAVIT OF DEE RIDGEWAY

STATE OF DELAWARE        )
                         )        to wit:
COUNTY OF NEW CASTLE     )

DEE RIDGEWAY, being first duly sworn on oath, deposes and says as follows:

1. I am an adult competent to testify to the matters stated herein.

2. I have personal knowledge of the matters stated herein.

3. I am a licensed public accountant and have prepared tax returns for Tesla Industries
   for at least the past 8 years. It has recently been brought to my attention that there is
   an alleged discrepancy in the corporate tax return for Tesla Industries which I
   prepared and filed for tax year 2002.

4. My review indicates that the mistake was caused by one of my assistants. While
   assisting me in preparing Tesla's tax return for the fiscal year ending June, 2002, one
   of my employees inadvertently listed the previous year's sales as the tax return

amount.   This mistake occurred because in reviewing returns and sales data for

several years, my assistant inadvertently used the monthly sales report for tax year

2001 instead of for the 2002 return.  In fact, the exact entries from year 2001 were

mistakenly entered on this 2002 return.

5.   The recent realization of this mistake will cause me to prepare an amended 2002 tax

return in order to correct the error.

6.   Upon my preliminary review and assessment,  I am optimistic that this correction

will not result in increased tax liability for Tesla Industries because this business has

been legitimately taking advantage of tax loss carry forwards during the tax year

affected .

7.   I am familiar with the tax returns for Tesla Industries, Inc. that were produced by

Tesla in response to discovery requests in this case.  These copies are stamped "THIS

IS A TRUE AND CORRECT COPY OF THE ORIGINAL"  (or "Copy" or

"Customer Copy") by my office and are in fact  true and correct copies of the actual

returns filed by our office.

8.   The Accountant Compilation Report,  dated January 5, 2007, designated as PSup

1896 through 1900, attached as Exhibit 3 to the NMT Defendants' MIL 5 is a true

and accurate copy of my Report.

I hereby declare and affirm under the penalties of perjury that the matters and facts set

forth or alleged herein are true and correct to the best of my knowledge, information and

belief.

DEE RIDGEWAY :

SUBSCRIBED and SWORN TO before me this _____ day of _____, 2007.


_____
NOTARY PUBLIC

My Commission Expires:

## CERTIFICATE OF SERVICE

I hereby certify that on April 19, 2006, I caused a copy of the foregoing

document to be served upon the persons listed below in the manner indicated:

**VIA E-MAIL & FIRST CLASS MAIL**                **VIA HAND DELIVERY**

John A. Adams, Esq.                              John D. Demmy, Esq.
Susanin Widman & Brennan, P.C.                   Stevens & Lee, P.C.
455 S. Gulph Road, Suite 240                     1105 North Market Street, 7th Floor
King of Prussia, PA 19406                        Wilmington, DE 19801

Louis S. Mastriani, Esq.                         Steven J. Balick, Esq.
Rodney R. Sweetland, III, Esq.                   John G. Day, Esq.
David F. Nickel, Esq.                            Lauren E. Maguire, Esq.
Adduci,Mastriani & Schaumberg, LLP               Ashby & Geddes
1200 Seventeenth Street, N.W.                     500 Delaware Avenue, 8th Floor
Fifth Floor                                      Wilmington, DE 19801
Washington, DC 20036-3006


/s/ Brian A. Sullivan
Brian A. Sullivan (#2098)

## CERTIFICATE OF SERVICE

I hereby certify that on April 26, 2007, I caused a copy of the foregoing

document to be served upon the persons listed below in the manner indicated:

**VIA E-MAIL & FIRST CLASS MAIL**

John A. Adams, Esq.
Susanin Widman & Brennan, P.C.
455 S. Gulph Road, Suite 240
King of Prussia,  PA  19406

Louis S. Mastriani, Esq.
Rodney R. Sweetland, III, Esq.
David F. Nickel, Esq.
Adduci,Mastriani & Schaumberg, LLP
1200 Seventeenth Street, N.W.
Fifth Floor
Washington,  DC  20036-3006

**VIA HAND DELIVERY**

John D. Demmy, Esq.
Stevens & Lee, P.C.
1105 North Market Street, 7th Floor
Wilmington,   DE  19801

Steven J. Balick, Esq.
John G. Day, Esq.
Lauren E. Maguire, Esq.
Ashby & Geddes
500 Delaware Avenue, 8th Floor
Wilmington,  DE  19801

/s/ Brian A. Sullivan
Brian A. Sullivan (#2098)