# SCHEDULE B-1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| TESLA INDUSTRIES, INC., a Delaware Corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 06-55-GMS |
| DAVID C. WALDMANN, LYNDOL W. HOLLINGSWORTH, CHARLES MINNICK a/k/a CHUCK MINNICK, and NEW MILLENNIUM TOOLS, INC., an Oregon Corporation, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## SCHEDULE B-1

### PLAINTIFF'S STATEMENT OF CONTESTED FACTS

I.     PARTIES

    A.     <u>Plaintiff Tesla Industries, Inc.</u>

        1.     Tesla Industries, Inc ("Tesla") employs approximately 60 persons at its facility.

        2.     Tesla is a developer and manufacturer of improved products primarily for the United States Armed Forces. Its primary product offering to the military is Ground Power Units (GPU's) which are portable power supplies used by the military to power its military vehicles and aircraft. It also sells GPU's to various governmental and private parties for use when portable high electrical power is required.

        3.     Tesla also develops specialty products for the military which are classified as "Confidential" or "Secret" by the Armed Forces pursuant to government regulations.

        4.     Prior to June, 2005, Tesla had initiated development of a hand held power tool for sale to the Armed Forces and for civilian use.

B.    <u>Defendant Waldmann</u>

1.    Defendant Waldmann's assigned duties as a Tesla employee were to promote and sell Tesla Products, and only Tesla Products, to the Armed Forces of the United States.

2.    When hired, Waldmann signed an "Agreement of Non-Disclosure" as a condition of his employment.

3.    That Agreement explained to Waldmann that he would receive Tesla information including "certain identity of customers, products and technical and manufacturing information" that was "Secret and Confidential business information" of Tesla.

4.    The Agreement of Non-Disclosure signed by Waldmann further stated that this information, if not kept secret and confidential "may cause damage to Tesla".

5.    The Agreement further alerted Waldmann that "By signing this Agreement David C. Waldmann recognizes that the information to be disclosed to him/her by Tesla is secret and confidential…"

6.    The Agreement Non-Disclosure specifically prohibited Waldmann from:

a.  providing such information to others;

b.  competing with Tesla in the power products marketplace or to any way assist, support or provide information to others…"; and

c.  removing any information about Tesla's products, customers or Tesla's business "without written permission from the President of Tesla Industries".

7.    The Agreement of Non-Disclosure also alerted Waldmann that if he breached any of these contractual obligations, he would be liable for all damages arising from

that breach, "plus reasonable attorney fees and costs incurred in the litigation arising from the breach of this Agreement".

8.    At the time he was hired by Tesla, he also signed an "Employee Awareness Agreement" stating that "any object used in or for development or manufacture of Tesla products", including but not limited to, "customer data", "customer information", "documentation", "sales information" was "considered proprietary and at no time shall be removed from Tesla Industries, Inc. without written permission from only the President of Tesla (Mr. David M. Masilotti)". When hired, Waldmann signed this Agreement thereby agreeing that "removal of such items shall be considered theft of proprietary information".

9.    At the time of his hiring, Waldmann also acknowledged receipt and understanding of the following policy and procedure of Tesla regarding access to Tesla's technologies (emphasis in original).

> At no time are any documents, floppy disks, CAD drawings, e-mails, electronic parts or any Tesla properties; to be REMOVED from the TESLA building without the approval of the President of TESLA .

10.    At the time of the hiring, Waldmann also authorized and consented to conduct of background inquiries concerning prior employment references, credential verification "and other reports".

11.    Prior to his hiring by Tesla, Waldmann had no experience as a salesman. He had no prior experience with selling products to the United States Armed Forces. He had developed no contacts with potential purchasers of military equipment prior to being hired by Tesla. Prior to being hired by Tesla, Waldmann was a golf pro at a Massachusetts country club.

12.    Waldmann accepted employment with Tesla indicating he was "very thankful for being put into a position where I can provide for and take good care of my family".

13.     In the last full year of employment at Tesla (2004), Waldmann earned over $100,000 in salary and commission.  Despite these substantial earnings, Waldmann demanded more and when not promised by Tesla, in 2005 he started to lay the foundation for other employment as described below.

14.     He was suspended from employment on November 29, 2005 based on an internal (to Tesla) investigation showing that he may have disclosed or diverted Tesla documents to others in violation of the Agreements he signed at the outset of his employment.  He was formally terminated as an at-will employee effective as of January 1, 2006.

C.     Defendant Hollingsworth

1.     Lyndol Hollingsworth ("Hollingsworth") is currently an officer of defendant, New Millenium Tools, Inc. (NMT).  Prior to joining NMT in 2006, he had a variety of jobs including working with his father, selling real estate, etc.  In 1998, he co-founded with Kent Huffman, a company called D.C. Power Equipment LLC (D.C. Power Equipment) to promote a direct current (DC) impact wrench which he had patented ("D.C. Impact Wrench").

2.     In 2005, Hollingsworth had differences of opinion with his partner, Mr. Huffman, over the lack of progress in selling and promoting the D.C. Impact Wrench.  He also faulted Mr. Huffman for failing to pay certain fees to the U.S. Government need to keep his patent in force that resulted in the expiration of the patent in 2003.  He received less than $10,000 a year in income from D.C. Power Equipment.

3.     By mid-2005, Mr. Hollingsworth accepted the fact that his patented D. C. Impact Wrench was not "practical" (Dep. Tr. 38) and had developed a modified version thereof that added a battery power pack and improved switching devices (solenoids) to handle high current spikes. (Dep. Tr. 35-37).

4.    Mid-2005 also marks Hollingsworth initial contact with the two other individual defendants, David Waldmann and Chuck Minnick. Mr. Minnick was contacted by Hollingsworth to assist in promotion of the D.C. Impact Wrench. (Dep. Tr. 38-39). David Waldmann was asked by Hollingsworth to supply a so called "NATO Connector" that could be used on a military version of Hollingsworth's DC Impact Wrench.

D.    Defendant Minnick

1.    Mr. Minnick had found and headed up a number of companies since 1990 including a consulting company called Chuck Minnick & Associates. In October 2005, he incorporated New Millenium Tools, Inc.

2.    His only income in the period 2001 through 2006 was revenue from Chuck Minnick and Associates averaging about $25,000 per year, and social security disability.

II.    DEFENDANTS MISAPPROPRIATION OF
       TESLA'S CONFIDENTIAL INFORMATION

1.    When David Waldmann joined Tesla at the end of 2002, he had little, or no, knowledge of selling products to the military. He had few, if any customer contacts. Throughout his 3 years of employment, Tesla gave Mr. Waldmann lists of military customers generated at considerable cost to Tesla. Waldmann also generated additional customer contacts using the good will and financial resources of Tesla.

2.    Details of potential military customers' identification are necessary to effectively sell to the military or civilian personnel having purchasing responsibility or interest in a product offered to the Armed Services is not generally known outside the military. This is particularly true since 9/11.

3.    Waldmann was fully aware that Tesla's customer information was confidential. He acknowledged this in writing when he was hired.

530837                                    5

4.      Waldmann nevertheless used confidential information about Tesla customers to promote defendants' products. This was done without Tesla's approval and in direct violation of his written employment agreements forbidding *inter alia* his provision or use of Tesla information for the benefit of others.

5.      An example of Waldmann's use of Tesla customer information for the benefit of defendants include, diversion to defendants of a Tesla customer, Frank Furrie, interested in supplying Tesla equipment for the post-Katrina relief effort.

6.      Waldmann attempted to interest Mr. Furrie in a highly secret battery pack then being developed by Tesla for the U.S. Navy, called the UAV battery. UAV refers to Unmanned Aviation Vehicle. Tesla had been contacted by the Navy to develop a better battery pack for its UAV. Waldmann had a Tesla employee forward pictures of his battery pack to him which pictures were then sent to Mr. Waldmann's home computer – again in direct violation of his employment agreements forbidding removal of emails from Tesla's building. These pictures were then sent to defendants.

7.      Waldmann also sent detailed Tesla customer lists to his home computer on at least two occasions in 2005 in direct violation of his employment agreements. These lists are not generally available to others than military contractors and military personnel.

8.      Waldmann used this and other information about Tesla's customers to promote defendants DC Impact Wrench during the second half of 2005 and into 2006. This promotion of defendants' product in 2005 was done while Waldmann was supposed to be promoting Tesla products.

9.     These contacts within the military made by Waldmann on behalf of defendants were Tesla customers whose identity Waldmann acquired from his work at Tesla. These contacts appear on a list of Tesla customers for whom Waldmann had sales responsibility.

10.     By late September 2005, Waldmann had decided to leave Tesla. From that time forward he devoted substantial time to promotion of defendants' products and very little to Tesla products.

11.     Defendants Hollingsworth and Minnick, and through them, NMT, were aware of Waldmann's misappropriation of Tesla's confidential information. In August 2005, Hollingsworth had forwarded an agreement between an entity he controlled and Tesla Industries which he asked to have approved by Tesla's president, David Masilotti. By early September, Waldmann had informed defendants that he was unable – or unwilling – to convince Mr. Masilotti to work with defendants. From that time forward defendants were fully aware that Waldmann's activities on their behalf were done without Tesla's approval.

12.     In October 2005, Waldmann bragged to defendants Hollingsworth and Minnick about using his "contacts" in the military to promote defendants Impact Wrench. Defendants were aware by then that Waldmann was working against Tesla's interests by using Tesla customer contacts to promote defendants products.

13.     By late November, 2005, Waldmann was already discussing his employment with defendants, yet continued use of Tesla Confidential Information on defendants' behalf. In late November 2005, Hollingsworth was excited about Waldmann working for defendants full time because he would "be worth his weight in gold to NMT because he can accompany us to meet the military people we need to see."

14.    Another item of Tesla confidential information misappropriated by defendants was a NATO connector that Waldmann provided to defendants for use on control box for the military version of the DC Impact Wrench.    This device was a prototype under development by Tesla and was not then on sale.    Waldmann sent this prototype to defendants who used it on the control box of their military version of the DC Impact Wrench so it could be powered by 24 volt military power sources.    This NATO device provided by Waldmann without approval from Tesla had several proprietary features including use of a unique alloy and other features that assured high performance in the field.

15.    Defendants actively deceived the military into accepting the DC Impact Wrench by misrepresenting it as a Tesla product.    This deception included a brochure prepared by Hollingsworth which included Tesla's name in a way that conveyed the message that Tesla had developed or was associated with DC Impact Wrench.    Thru this deception, and only thru this deception, defendants were able to obtain a National Stock Number (NSN) for their wrench. A NSN is a prerequisite for sales to the military.

16.    Another piece of Tesla proprietary information improperly provided by Waldmann to defendants Hollingsworth and Minnick (and by them to NMT) was information regarding electronic controls, specifically MOSFETS, used by defendants to improve torque of the DC Impact Wrench.    Defendants, Minnick, used information about MOSFET controls supplied by Waldmann to improve the torque of the DC Impact Wrench.    He then filed a provisional patent application on that feature of the Wrench improperly listing himself as inventor of a concept developed by Tesla.

17.    Tesla used reasonable measures to protect its Confidential Information from disclosure.    These measures include: Protecting against access to Tesla's facility with a

security door having an electric combination lock and armed security guards; forbidding cellular telephones or cameras to be brought into the facility, and requiring the express consent of Tesla management before any Tesla Industries product, product design, or written or computerized information may be removed. For security reasons, Tesla Industries' website (www.teslaind.com) did not list all the products it sells. Tesla Industries compartmentalized its sensitive and confidentiality information among its employees, and requires each new employee to recognize its confidential policy. Tesla only permits each employee to have access to that narrow bit of information necessary to do his or her job for the company. Tesla also requires each employee to sign a "Confidentiality Memo" and an "Agreement of Non-Disclosure" ("Non-Disclosure Agreement") as part of the contract of employment. Additionally, Tesla uses a sophisticated security system for its company computers to protect itself from unauthorized access to, or distribution of, company information. In addition, Tesla manufactures and fabricates many of its own components for its products. Further, Tesla protects the confidentiality of its components and its products by removing any identifying marks or part numbers and uses in-house part numbers to identify parts to protect this information on all parts which it purchases from its vendors.

18.    Defendants' misuse of Tesla's Confidential Information, particularly that developed for military applications, is the subject of a pending grand jury investigation.

III.   DEFENDANTS VIOLATIONS OF RESTRAINING
       ORDERS ENTERED BY THE COURT

1.    After institution of this suit, Defendant Waldmann entered into a Restraining Order dated February 22, 2006 specifically prohibiting violation of his December 16, 2002 Agreement of Non-Disclosure he signed when hired by Tesla. That Agreement specifically prohibits the acts noted above including an obligation not to disclose or use Tesla confidential

information thereafter. Despite this judicial prohibition, Waldmann continues to contact Tesla's customers whose identity he learned while employed by Tesla.

2.      This prohibition is reinforced in the provisions of paragraphs 2 and 3 of the Restraining Order.

3.      Defendants, Hollingsworth, Minnick and New Millennium Tools, entered into a Stipulated Restraining Order on February 3, 2006 which prohibited them from using or disclosing Tesla Confidential Information including Tesla contact lists with the U.S. Military. Despite this prohibition these Defendants continue to use Tesla customer information supplied by Waldmann in furtherance of the promotion and sale of NMT products.

4.      This February 3, 2006 Restraining Order (¶2) also prohibits Hollingsworth, Minnick and New Millennium Tools from deleting, destroying, transferring any email accounts over which they have control. Despite this prohibition, defendant Hollingsworth voluntarily gave his computer containing potentially incriminating information to a family friend in early 2006. His intention to destroy incriminating evidence is reinforced by a 02/01/06 email to Minnick noting that he had effectively avoided examination of his computer hardware by "wrapping his hard drives in plastic and hiding them in a really hard to find spot".

IV.    BREACH OF CONTRACT

1.      Waldmann signed the abovementioned agreements and acknowledgements when he was hired by Tesla.

2.      Waldmann repeatedly breached in material ways his contract with Tesla Industries. Inter alia, Waldmann (a) failed to devote his full-time business efforts to Tesla Industries, (b) misappropriated Tesla Industries' confidential information concerning Tesla Industries' products, including the UAV battery, NATO Receptacle and customer lists; (c) removed Tesla property from Tesla's premises (d) sent Tesla's customer list to his home

computer, (e) used Tesla's customer lists to sell non-Tesla products to existing and prospective Tesla customers, (f) established an e-mail address outside of Tesla that he used to divulge and transmit Tesla's Confidential Information, (g) failed to properly and exclusively sell Tesla products, and (h) converted Tesla Industries' prototypes, information and business opportunities for his own and other defendants purposes. In doing so, Waldmann breached the express and implicit terms of his contracts of employment.

V.    CONVERSION OF TESLA PROPERTY

1.    Waldmann was given access to Tesla confidential information ("Tesla property") for the sole purpose of using that information in the promotion and sale of Tesla products.

2.    Waldmann improperly converted Tesla property for his own benefit including but not limited to, laying the groundwork for defendants' promotion of its Impact Wrench and Lug Wrench as described above.

VI.    DEFENDANTS' CONSPIRACY

1.    Defendants have conspired between and among themselves to deprive Plaintiff of the normal fruits of Plaintiff's technological and business property.

2.    With the other Defendants' encouragement Waldmann used Tesla's good will to establish contacts with prospective customers for defendants' products. He diverted Tesla customers to Defendants and their business.

VII.    DAMAGES

1.    Defendants' diversion of business from Plaintiff caused a serious downturn in Plaintiff's business resulting in a loss of over $1 million in projected earnings.

2. Tesla Industries has lost the value of prototypes, drawings, technical data, and supplies at least in the estimated amount of $250,000. Also, Tesla Industries has suffered lost

employee and officer time and productivity in the amount of at least $500.000. Tesla is also entitle to punitive damages.

## PLAINTIFF'S STATEMENT OF CONTESTED ISSUES OF LAW

1.      Whether Defendants misappropriated trade secrets pursuant to Delaware UTSA (6 Del. C. 2003(a)) and 2001(4).  Mr. Waldmann and the NMT Defendants entered into a collaborative effort in mid 2005 to utilize the reputation and confidential information of Tesla to promote the welfare of themselves and NMT. Misappropriation giving rise to Tesla's claim for damages and other relief is defined in 6 Del. C. § 2001 as, *inter alia*, "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means".

2.      Whether Waldmann breached his employment contract with Tesla.  Waldmann (a) failed to devote his full-time business efforts to Tesla Industries, (b) misappropriated Tesla Industries' confidential information concerning Tesla Industries' products, including the UAV battery, NATO Receptacle and customer lists; (c) removed Tesla property from Tesla's premises (d) sent Tesla's customer list to his home computer, (e) used Tesla's customer lists to sell non-Tesla products to existing and prospective Tesla customers, (f) established an e-mail address outside of Tesla that he used to divulge and transmit Tesla's Confidential Information, (g) failed to properly and exclusively sell Tesla products, and (h) converted Tesla Industries' prototypes, information and business opportunities for his own and other defendants purposes.  In doing so, Waldmann breached the express and implicit terms of his contracts of employment.

3.      Whether Defendants converted Tesla Property.  Waldmann was given access to Tesla confidential information ("Tesla property") for the sole purpose of using that information

in the promotion and sale of Tesla products. Waldmann and the NMT Defendants improperly converted Tesla property for their own benefit as described above.

4.      Whether Defendants conspired between and among themselves to deprive Tesla of the normal fruits of its technological and business property. With NMT Defendants encouragement, Waldmann used Tesla's good will to establish contacts with prospective customers for the NMT Defendants' products. He diverted Tesla customers and technology to Defendants and their business.

5.      Whether Tesla is entitled to Damages as provided by the UTSA and the provisions of the Agreement of Non-Disclosure signed by Waldmann.

6.      Whether Tesla is entitled to Attorneys Fees under the UTSA (6 Del. C. § 2004). The actions of Waldmann and NMT Defendants in using Tesla information to promote their own business interests was willful and malicious.

7.      Whether Defendants should be permanently enjoined from the use or disclosure of Tesla confidential information, including, without limitation, contact with any Tesla customer whom Waldmann had contact with during his employment by Tesla.

8.      Whether discretionary bonuses constitute "wages" under Delaware's Wage Payment and Collection Act ("WPCA" -- 19 Del. Code Section 1101 et seq)

9.      Whether the anti-retaliation penalties  provision ( 19 Del. Code Section 1112 ( d)) of the WPCA permits a  private cause of action  for recovery of the  "penalties" set forth in that statute,  or any other damages for alleged retaliation .

10.    Whether the penalty provisions of the "Right To Inspect Personnel Files Act" ( 19 Delaware Code Section 735) permits a private cause of action for recovery of the "penalties" set forth in that statute or any other damages for alleged denial of access to personnel files.

11.    Whether 10 U.S.C. 2409, which forms the basis of Count XI of Waldmann's Counterclaim, permits a private cause of action for alleged retaliation.

12.    Whether the claims of Waldmann for allegedly improper access to his emails are barred by his acceptance of the Stipulated Restraining providing for court sanctioned access to such emails.