# SCHEDULE B-2

## UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF DELAWARE

TESLA INDUSTRIES, INC. a Delaware
Corporation,

        Plaintiff,

    v.

DAVID C. WALDMANN, LYNDOL W.
HOLLINGSWORTH, CHARLES MINNICK
a.k.a. CHUCK MINNICK, and NEW
MILLENNIUM TOOLS, INC., an Oregon
Corporation,

        Defendants.

C.A. No.  06-55-GMS

## SCHEDULE B-2

### THE NMT DEFENDANTS'
### STATEMENT OF CONTESTED ISSUES OF FACT AND LAW

The following is Defendants Minnick's, Hollingsworth's, and New Millennium Tools, Inc.'s ("NMT") (collectively, the "NMT Defendants") Statement of Contested Issues of Fact and Law as of April 30, 2007. The NMT Defendants' Statement begins with Contested Facts and then concludes with Contested Issues of Fact and Law.

Except where indicated otherwise, the following issues are submitted as issues for the jury. To the extent that any issues of law may be considered as issues of fact, the NMT Defendants incorporate by reference such issues.

1

## CONTESTED FACTS

### I.    THE PARTIES

#### A.    Defendant Waldmann

1.    Mr. Waldmann was an employee and military sales representative for Tesla from December 2002 until January 2006.

#### B.    Defendant Hollingsworth

2.    Mr. Hollingsworth is a developer of electrical equipment and power tools.

### II.    RELEVANT FACTUAL BACKGROUND

3.    DC Power Equipment, LLC ("DCPE") is a manufacturer of 12 volt direct current power tools. The company began operation in February 1999. DC Power Equipment, LLC is closely associated with Phoenix-Lamar Corporation, a manufacturer of specialty cables for the computer and high tech industry. Phoenix-Lamar Corporation has been in business in Austin, Texas for nearly 30 years. (*See* http://www.dcimpact.com)

4.    One of DCPE's products is a 12-volt DC Impact Wrench, which was developed and patented by Mr. Hollingsworth. (*Id.*)

5.    The DCPE DC Impact Wrench is a wrench that utilizes 12-volt DC power to, *inter alia*, assist in changing tires on an automobile by loosening/removing its lug nuts.

6.    Throughout 2005, Mr. Hollingsworth and Mr. Minnick, on behalf of Chuck Minnick & Associates, were consultants for DCPE. (*See* Huffman Dep. Tr. 19:18-22, 42:15-43:17, 46:25-47:5, 50:15-57:10; Hollingsworth Dep. Tr. 18:8-20, 32:3-9, ; and Minnick Dep. Tr. 41:17-43:3, 44:1-46:20, 49:21-52:15, 54:21-55:3, 55:19-56:20.)

7.      As part of their consulting agreement, Mr. Hollingsworth and Mr. Minnick were authorized to design and develop new products, purchase parts for all of DCPE's product lines and to promote and sell DCPE's products.

8.      As part of his authorized arrangement with DCPE, Mr. Hollingsworth developed for DCPE a 24-volt impact wrench that could be used by the military to, *inter alia*, change tires on military vehicles.

9.      The 24-volt DC Impact Wrench that Mr. Hollingsworth developed for DCPE was called the DCIM-1.

10.     The DCIM-1 was similar in some respects to the 12-volt DC Impact Wrench already sold by DCPE.

11.     The three main differences between DCPE's 12-volt DC Impact Wrench and DCPE's 24 volt DCIM-1 was that the DCIM-1 utilizes 24-volt power, instead of 12-volt power, the DCIM-1 was not rechargeable and, accordingly, needed an alternate power source, such as from a vehicle or a GPU, and the DCIM-1 was intended for military use.

12.     In order to harness the extra power needed for DCPE's 24-volt DCIM-1 and to ensure that it could draw enough power from alternate sources like a vehicle or GPU, Mr. Hollingsworth determined to utilize a standard female NATO receptacle.

13.     Military forces of the United States and other NATO nations have used a uniform receptacle design for nearly 50 years. (Tesla Supp. Resp. to Rog 9 at 2.)

14.     Female NATO receptacles have been standard products sold by multiple companies for nearly 50 years.

15.    The first DCIM-1 developed by Mr. Hollingsworth in late 2004/early 2005, incorporated a standard female NATO receptacle manufactured by Gateway Cable, through a public military surplus store, Saturn Cable.

16.    In early-to-mid 2005, on behalf of DCPE, Mr. Hollingsworth and Mr. Minnick sought alternate sources for the standard female NATO receptacle that would be used on DCIM-1.

17.    Mr. Hollingsworth knew that standard female NATO receptacle were publicly available through many companies over the internet and, thus, began his search for alternate sources for this part by using the internet.

18.    In search the internet for possible sources for a standard female NATO receptacle, Mr. Hollingsworth came across Tesla Industries, Inc.'s ("Tesla") website, www.teslaind.com. (Hollingsworth Dep. Tr. 44:1-46:9.)

19.    In early June 2005, after reviewing Tesla's website, Mr. Hollingsworth decided that Tesla may be an alternative source for the standard female NATO receptacle and called Tesla using the telephone number listed on its website, ((302) 324-8910). (*Id.*)

20.    A Tesla representative answered Mr. Hollingsworth's telephone call and Mr. Hollingsworth explained to the representative that he was working with DCPE on a tool to be used by the military that needed a standard female NATO receptacle. Mr. Hollingsworth asked the representative if they could help him. (*Id.*)

21.    The Tesla representative transferred Mr. Hollingsworth's call to Tesla's sales group and Mr. Waldmann answered the telephone call. (*Id.*)

22.    Mr. Hollingsworth explained to Mr. Waldmann that he was working for DCPE on a tool that could be used by the military to, *inter alia*, change tires on military

vehicles quickly, especially when they were in harm's way. He explained that the tool would use a standard female NATO receptacle that could be hooked into a military vehicle or GPU for its power source. (*Id.*)

23.    Mr. Hollingsworth asked Tesla whether they sold such parts and whether they would be interested in providing him pricing information for large orders of the product. Mr. Hollingsworth also requested to purchase one standard female NATO receptacle for testing purposes. (*Id.*)

24.    Mr. Waldmann responded that Tesla had standard female NATO receptacles and that Tesla would be interested in selling it to Mr. Hollingsworth. Mr. WaldmannC promised to send a standard female NATO receptacle to DCPE and that he would provide pricing information. (*Id.*)

25.    Mr. Waldmann realized that selling the standard female NATO receptacle to DCPE would be a good opportunity for Tesla to sell its product in mass quantities to DCPE, in the event that the DCIM-1 was successful. Mr. Waldmann also realized that DCPE's DCIM-1 would be a good way to market Tesla's GPUs, as the tool could be hooked into a Tesla GPU for power. Mr. Waldmann believed that the military would ultimately buy more GPUs from Tesla, if it realized that Tesla's GPUs had alternate uses.

26.    Mr. Waldmann and Mr. Hollingsworth continued speaking together regarding the possibility of DCPE purchasing standard female NATO receptacles from Tesla and of other potential business transactions between Tesla and DCPE.

27.    After his telephone conversation with Mr. Hollingsworth, Mr. Waldmann wrote in his weekly Call Report: "June 8, 2005: "Spoke with Lyn regarding connectors for his DC powered tools as well as opportunities between companies." (Tesla's

5

Response to RFA Nos. 34, 40 and 41; P SUPP 1497)  As part of his duties as a sales representative of Tesla, Mr. Waldmann handed this Call Report to his supervisor at Tesla, Mr. Frank Mooney.  (Mooney Dep. Tr. at 90:1- 102:22, 106:2-108:4, 111:3-116:22 (testimony regarding Mr. Waldmann's Call Reports.)  Mr. Mooney kept this Call Report in his files.

28.    In his June 9, 2005, Call Report, Mr. Waldmann summarized a conversation with Mr. Hollingsworth by writing: "Spoke with Lyn about applications for our technologies."    (Tesla's Response to RFA Nos. 42, 48, 49; P SUPP 1498)  As part of his duties as a sales representative of Tesla, Mr. Waldmann handed this Call Report to his supervisor at Tesla, Mr. Frank Mooney.  (Mooney Dep. Tr. at 90:1- 102:22, 106:2-108:4, 111:3-116:22 (testimony regarding Mr. Waldmann's Call Reports.)  Mr. Mooney kept this Call Report in his files.  (*Id.*)

29.    In his June 10, 2005, Call Report, Mr. Waldmann summarized another conversation he had with Mr. Hollingsworth, as follows: "Called regarding 24 V impact tool." (Tesla's Response to RFA Nos. 42, 56 and 57; P SUPP 1498)  As part of his duties as a sales representative of Tesla, Mr. Waldmann handed this Call Report to his supervisor at Tesla, Mr. Frank Mooney.  (Mooney Dep. Tr. at 90:1- 102:22, 106:2-108:4, 111:3-116:22 (testimony regarding Mr. Waldmann's Call Reports.)  Mr. Mooney kept this Call Report in his files.  (*Id.*)

30.    After his conversations with Mr. Hollingsworth, Mr. Waldmann sent a standard female NATO receptacle to DCPE.

31.    Upon receiving the standard female NATO receptacle at DCPE, Mr. Hollingsworth attached it to DCPE's DCIM-1 that he was working on and prepared to send it back to Tesla for review and testing.

32.    Prior to sending DCPE's DCIM-1 to Tesla, however, Mr. Hollingsworth approached his boss at DCPE, Mr. Kent Huffman, to have him sign a "Non-Disclosure Agreement."

33.    As the DCIM-1 was a prototype tool, DCPE required that Tesla sign the "Non-Disclosure Agreement" before DCPE would send the tool back to Tesla for its review and testing.

34.    Mr. Hollingsworth sent the signed "Non-Disclosure Agreement" back to Tesla for its signature before he would send DCPE's DCIM-1.

35.    Mr. Waldmann signed the "Non-Disclosure Agreement" on behalf of Tesla and sent it back to DCPE for its files.

36.    After the "Non-Disclosure Agreement" was signed and Mr. Hollingsworth shipped DCPE's DCIM-1 back to Tesla for its review and testing, Mr. Hollingsworth called Mr. Waldmann to see whether the product arrived.

37.    In his June 15, 2005, Call Report, Mr. Waldmann summarized his conversation with Mr. Hollingsworth as follows: "[Mr. Hollingsworth] Called to see if we received system – we have.  I haven't seen it yet."  (Tesla's Response to RFA Nos. 58, 64 and 65; P SUPP 1499) As part of his duties as a sales representative of Tesla, Mr. Waldmann handed this Call Report to his supervisor at Tesla, Mr. Frank Mooney. (Mooney Dep. Tr. at 90:1- 102:22, 106:2-108:4, 111:3-116:22 (testimony regarding Mr. Waldmann's Call Reports.) Mr. Mooney kept this Call Report in his files. (*Id.*)

38.      After DCPE's DCIM-1 arrived at Tesla on June 15, 2005, Mr. Waldmann took the tool around the office and showed it to, at least, Messrs. Masilotti, Mooney, Roscioli and Talbott. (Masilotti Dep. Tr. at 150:21-151:13; Mooney Dep. Tr. at 143:1-15, 122:10-20; Roscioli Dep. Tr. at 34:19-36:2; Talbott Dep. Tr. at 63:15-66:12, 69:2-19.) Mr. Waldmann also showed Messrs. Masilotti, Mooney, Roscioli and Talbot how DCPE's DCIM-1 worked by hooking the tool up to a Tesla GPU. (*Id.*)

39.      On or before June 16, 2005, Mr. Waldmann, along with his co-sales representative at Tesla, Mr. Roscioli, took the DCIM-1 and a Tesla GPU to the Delaware National Guard to demonstrate the tool, as it was hooked into a Tesla GPU. Messrs. Waldmann and Rosciloi asked Mr. Mooney if he wanted to attend but Mr. Mooney declined. Mr. Mooney did not forbid Messrs. Waldmann or Roscioli from going to the Delaware National Guard to demonstrate DCPE's DCIM-1.

40.      In his June 16, 2005, Call Report, Mr. Waldmann wrote: "We received and taking it to Delaware National Guard tomorrow." (Tesla's Response to RFA Nos. 66, 72 and 73; P SUPP 1501) As part of his duties as a sales representative of Tesla, Mr. Waldmann handed this Call Report to his supervisor at Tesla, Mr. Frank Mooney. (Mooney Dep. Tr. at 90:1- 102:22, 106:2-108:4, 111:3-116:22 (testimony regarding Mr. Waldmann's Call Reports.) Mr. Mooney kept this Call Report in his files. (*Id.*)

41.      On June 17, 2005, Mr. Waldmann wrote in his Call Report: "Emailed regarding status of demo – told him it would be Tuesday with Delaware Guard." (Tesla's Response to RFA Nos. 66, 74 and 75; P SUPP 1501) As part of his duties as a sales representative of Tesla, Mr. Waldmann handed this Call Report to his supervisor at Tesla, Mr. Frank Mooney. (Mooney Dep. Tr. at 90:1- 102:22, 106:2-108:4, 111:3-116:22

(testimony regarding Mr. Waldmann's Call Reports.) Mr. Mooney kept this Call Report in his files. (*Id.*)

42.    In his June 21, 2005, entry for his Weekly Itinerary, Mr. Waldmann wrote: "Demonstrate the feasibility of DC impact wrench using Cobra NATO Plug and cables" to the "Delaware National Guard." (Tesla's Response to RFA Nos. 76 and 82.) As part of his duties as a sales representative of Tesla, Mr. Waldmann handed this Weekly Itinerary to his supervisor at Tesla, Mr. Frank Mooney. Mr. Mooney kept this Call Report in his files.

43.    Due to a problem with the motor in DCPE's DCIM-1, the DCIM-1 overheated during the demonstration at the Delaware National Guard. Mr. Waldmann and Mr. Roscioli brought DCPE's DCIM-1 back to Tesla after the demonstration at the Delaware National Guard.

44.    The DCIM-1 stayed at Tesla, in plain view, for approximately two months before Mr. Waldmann sent it back to DCPE to be fixed. At least, Messrs. Masilotti, Mooney, Roscioli and Talbot saw the DCIM-1 while at Tesla.

45.    In mid-August 2005, Mr. Waldmann sent the DCIM-1, with Tesla's standard female NATO receptacle attached, to DCPE to be fixed.

46.    In summarizing his August 19, 2005, telephone conversation with Mr. Hollingsworth, Mr. Waldmann wrote in his Call Report: "Lyn called to see if NDA came through. He received NATO Receptacle." (Tesla's Response to RFA Nos. 83, 89 and 90; P SUPP 1500) As part of his duties as a sales representative of Tesla, Mr. Waldmann handed this Call Report to his supervisor at Tesla, Mr. Frank Mooney. (Mooney Dep. Tr.

at 90:1- 102:22, 106:2-108:4, 111:3-116:22 (testimony regarding Mr. Waldmann's Call Reports.) Mr. Mooney kept this Call Report in his files. (*Id.*)

47.    After DCPE received the DCIM-1 from Tesla in mid-August 2005, Mr. Hollingsworth attempted to fix the problems experienced during the demonstration at the Delaware National Guard.   Once Mr. Hollingsworth finished modifying the DCIM-1, DCPE sent the DCIM-1 back to Tesla for further testing.

48.    In summarizing his August 26, 2005, telephone conversation with Mr. Hollingsworth, Mr. Waldmann wrote in his Call Report: "Lyn called – he has the model for test.  He will send it back."  (Tesla's Response to RFA Nos. 98, 104 and 105; P SUPP 1504)  As part of his duties as a sales representative of Tesla, Mr. Waldmann handed this Call Report to his supervisor at Tesla, Mr. Frank Mooney.  (Mooney Dep. Tr. at 90:1- 102:22, 106:2-108:4, 111:3-116:22 (testimony regarding Mr. Waldmann's Call Reports.) Mr. Mooney kept this Call Report in his files. (*Id.*)

49.    In his August 29, 2005, Call Report summarizing his communication with Mr. Hollingsworth, Mr. Waldmann wrote: "Lyn sent email with photos of finished tool and connector.  He is sending it to me for our thoughts."  (Tesla's Response to RFA Nos. 106, 112 and 113; P SUPP 1503)  As part of his duties as a sales representative of Tesla, Mr. Waldmann handed this Call Report to his supervisor at Tesla, Mr. Frank Mooney. (Mooney Dep. Tr. at 90:1- 102:22, 106:2-108:4, 111:3-116:22 (testimony regarding Mr. Waldmann's Call Reports.) Mr. Mooney kept this Call Report in his files. (*Id.*)

50.    In his August 30, 2005, Call Report summarizing a telephone conversation between Mr. Waldmann and MAJ Rew, Mr. Waldmann wrote: "Left message with Don Stewart regarding systems and impact wrench."  (Tesla's Response to RFA Nos. 106,

114 and 115; P SUPP 1503) As part of his duties as a sales representative of Tesla, Mr. Waldmann handed this Call Report to his supervisor at Tesla, Mr. Frank Mooney. (Mooney Dep. Tr. at 90:1- 102:22, 106:2-108:4, 111:3-116:22 (testimony regarding Mr. Waldmann's Call Reports.) Mr. Mooney kept this Call Report in his files. (*Id.*)

51.    In a recorded conversation with Mr. Masilotti on or about September 8, 2005, Mr. Waldmann described his interactions with the NMT Defendants.

52.    In his September 16, 2005, entry for his Weekly Itinerary, Mr. Waldmann wrote that he will travel to Aberdeen Proving Ground in Maryland because "Chief Asavedo wants to see impact wrench." (Tesla's Response to RFA No. 124, 130 and 131; P Supp 1512.) As part of his duties as a sales representative of Tesla, Mr. Waldmann handed this Weekly Itinerary to his supervisor at Tesla, Mr. Frank Mooney. Mr. Mooney kept this Call Report in his files.

53.    Mr. Mooney did not stop Mr. Waldmann from traveling to Aberdeen Proving Ground to demonstrate the DCIM-1.

54.    In his October 7, 2005, Call Report summarizing his conversation with Mr. Hollingsworth, Mr. Waldmann wrote: "Lyn called to bring me up to date on New Millennium Tool's business plan." (Tesla's Response to RFA Nos. 146, 152 and 153; P SUPP 1507) As part of his duties as a sales representative of Tesla, Mr. Waldmann handed this Call Report to his supervisor at Tesla, Mr. Frank Mooney. (Mooney Dep. Tr. at 90:1- 102:22, 106:2-108:4, 111:3-116:22 (testimony regarding Mr. Waldmann's Call Reports.) Mr. Mooney kept this Call Report in his files. (*Id.*)

### III.    JUDICIAL ADMISSIONS / STATEMENTS AGAINST INTEREST

55.    Military forces of the United States and other NATO nations have used a uniform receptacle/plug design for many years to facilitate joint exercises. (Tesla's Supp. Response to Interrogatory No. 9.)

56.    Military forces have used a female NATO receptacle for many years in mating engagement with the NATO plug.

57.    Tesla's "2003 Product Catalog" is and has been publicly available. (Response to RFA No. 161,162 and 165.)

58.    Tesla's 2003 Product Catalog (Bates Numbers 924-940) identifies "Some government bases currently using Tesla ®™ products." (Response to RFA No. 166).

59.    Tesla's 2003 Product Catalog (Bates Numbers 924-940) identifies "APG, MD" as a "government base" that uses Tesla's products. (Response to RFA No. 167).

60.    Tesla's 2003 Product Catalog (Bates Numbers 924-940) identifies "TACOM Warren" as a "government base" that uses Tesla's products. (Response to RFA No. 168).

61.    Tesla's 2003 Product Catalog (Bates Numbers 924-940) identifies "TACOM-Rock Island" as a "government base" that uses Tesla's products. (Response to RFA No. 169).

62.    Tesla's 2003 Product Catalog (Bates Numbers 924-940) identifies "Delaware" [SIC] National Guard as a "government base" that uses Tesla's products. (Response to RFA No. 170).

63.    Tesla's 2003 Product Catalog (Bates Numbers 924-940) contains a letter from CW4 Gilbert Phifer, US Army Ordnance Center and School, Aberdeen Proving Ground, MD. (Response to RFA No. 171).

64.    The letter from CW4 Gilbert Phifer, US Army Ordnance Center and School, Aberdeen Proving Ground, MD, which is shown in Tesla's 2003 Product Catalog (Bates Numbers 924-940), states that Aberdeen Proving Ground purchased a ground power unit (NSN 6130-01-475-5321) from Tesla. (Response to RFA No. 172).

65.    Tesla's 2003 Product Catalog (Bates Numbers 924-940) offers for sale "The Cobra NATO Connector." (Response to RFA No. 173)

66.    Tesla's 2003 Product Catalog (Bates Numbers 924-940) advertises "The Cobra NATO Connector." (Response to RFA No. 174).

67.    "The Cobra NATO Connector" is also known as "The Cobra NATO Plug." (Response to RFA No. 175).

68.    Tesla's 2004 Product Catalog (Bates Numbers 960-978) is and has been publicly available. (Response to RFA No. 178, 180 and 183).

69.    Tesla's 2004 Product Catalog (Bates Numbers 960-978) identifies "Some government bases currently using Tesla ®™ products." (Response to RFA No. 185).

70.    Tesla's 2004 Product Catalog (Bates Numbers 960-978) identifies "APG, MD" as a "government base" that uses Tesla's products. (Response to RFA No. 186).

71.    Tesla's 2004 Product Catalog (Bates Numbers 960-978) identifies "TACOM Warren" as a "government base" that uses Tesla's products. (Response to RFA No. 187)

72.    Tesla's 2004 Product Catalog (Bates Numbers 960-978) identifies "TACOM-Rock Island" as a "government base" that uses Tesla's products. (Response to RFA No. 188).

73.    Tesla's 2004 Product Catalog (Bates Numbers 960-978) identifies "Delaware" National Guard as a "government base" that uses Tesla's products. (Response to RFA No. 189)

74.    Tesla's 2004 Product Catalog (Bates Numbers 960-978) contains a letter from CW4 Gilbert Phifer, US Army Ordnance Center and School, Aberdeen Proving Ground, MD. (Response to RFA No. 190).

75.    The letter from CW4 Gilbert Phifer, US Army Ordnance Center and School, Aberdeen Proving Ground, MD, which is shown in Tesla's 2004 Product Catalog (Bates Numbers 960-978), states that Aberdeen Proving Ground purchased a ground power unit (NSN 6130-01-475-5321) from Tesla. (Response to RFA No. 191).

76.    Tesla's 2004 Product Catalog (Bates Numbers 960-978) offers for sale "The Cobra NATO Connector." (Response to RFA No. 192).

77.    Tesla's 2004 Product Catalog (Bates Numbers 960-978) advertises "The Cobra NATO Connector." (Response to RFA No. 193).

78.    Tesla's 2005 Product Catalog (Bates Numbers 979-997) is and has been publicly available. (Response to RFA No. 196, 198 and 201).

79.    Tesla's 2005 Product Catalog (Bates Numbers 979-997) identifies "Some government bases currently using Tesla ®™ products." (Response to RFA No. 202).

80.    Tesla's 2005 Product Catalog (Bates Numbers 979-997) identifies "APG, MD" as a "government base" that uses Tesla's products. (Response to RFA No. 203).

81.    Tesla's 2005 Product Catalog (Bates Numbers 979-997) identifies "TACOM Warren" as a "government base" that uses Tesla's products. (Response to RFA No. 204).

82.    Tesla's 2005 Product Catalog (Bates Numbers 979-997) identifies "TACOM-Rock Island" as a "government base" that uses Tesla's products. (Response to RFA No. 205).

83.    Tesla's 2005 Product Catalog (Bates Numbers 979-997) identifies "Delaware" National Guard as a "government base" that uses Tesla's products. (Response to RFA No. 206).

84.    Tesla's 2005 Product Catalog (Bates Numbers 979-997) offers for sale "The Cobra NATO Connector." (Response to RFA No. 207).

85.    Tesla's 2005 Product Catalog (Bates Numbers 979-997) advertises "The Cobra NATO Connector." (Response to RFA No. 208).

86.    Tesla's 2006 Product Catalog (Bates Numbers 998-1018) is and has been publicly available. (Response to RFA No. 215).

87.    Tesla's 2006 Product Catalog (Bates Numbers 998-1018) states that Tesla's customers are "United States military, federal, state and local agencies, medevac units, law enforcement, the aviation community and OEM's (Original Equipment Manufacturers)." (Response to RFA No. 216).

88.    In additional selling it as a separate product, Tesla includes a its NATO plug with the purchase of the following products: TIMV1000GPU-24; TIMV2000GPU-24; TIMV2500GPU-24; TIMV3000GPU-24; TIMV3500GPU-24; TIMV41000GPU-24;

TIMV4200GPU-24; TIMV4400GPU-24; TIMV5100GPU-24; TIMV5200GPU-24; and TIMV5400GPU-24. (Response to RFA No. 217).

89.    On November 14, 2005, Mr. Hollingsworth wrote to Mr. Waldmann at Tesla and stated: "The guys here at DC Power Equipment have decided to shelve the DCIM-1 indefinitely. They instructed my to alert you and Tesla of this decision. If there is anything that DCPE owes Tesla at this point please create a bill and send it to my attention @ DC Power Equipment, LLC, 8868 Research Blvd., Suite 505, Austin, Texas 78758. Best regards, Lyn." (Response to RFA No. 227).

90.    In many instances, Tesla has no competitors. Tesla is the sole source supplier for many of its products that it sells to the United States armed forces. (D.I. 154 at 2.)

91.    Through its anticompetitive practices, Tesla Industries is attempting intentionally to monopolize the relevant product and geographical markets. (Tesla Answer to Counterclaims at ¶ 36.)

92.    Rather than competing by designing, producing and selling a superior product, Tesla Industries has instead attempted to monopolize the market by improper and unlawful actions. For example, by filing this sham lawsuit, Tesla Industries threaten improperly to destroy competition in the relevant market from which the United States military, including those members serving in combat, benefit through better products and support. (Tesla Answer to Counterclaims at ¶ 37.)

93.    The acts of Tesla Industries represent an attempt to monopolize the trade in violation of the Sherman Act, 15 U.S.C. § 2. (Tesla Answer to Counterclaims at ¶ 38.)

94.     As a direct and proximate result of Tesla Industries' attempt at monopolization, the NMT Parties suffered and continue to suffer injuries and damages to its business and property as set forth in the Clayton Act, 15 U.S.C. § 15(a).  (Tesla Answer to Counterclaims at ¶ 39.)

95.     As a direct and proximate result of Tesla Industries' conduct as described herein, the NMT Parties has or will suffer damages including, but not limited to, lost sales or sales opportunities for its products, lost capital infusion, expenses related to defending against this litigation including, *inter alia*, attorneys fees and costs.  (Tesla Answer to Counterclaims at ¶ 40.)

96.     During the February 3, 2006, hearing regarding Tesla's request for a temporary restraining order, when the Court inquired about why the NMT Defendants were not represented by counsel, Mr. Sullivan interjected that "we believe we have reached a proposed stipulated order."  (February 3, 2006, Hearing Tr. at 3:23-4:6.)

<u>**CONTESTED ISSUES OF FACT AND LAW**</u>

I.  <u>**ALLEGED MISAPPROPRIATION OF TRADE SECRETS BY THE NMT DEFENDANTS**</u>

**A. Tesla's Female NATO Receptacle**

1.  Whether Mr. Hollingsworth, Mr. Minnick and/or NMT obtained Tesla's Female NATO Receptacle.

2.  In the event that it is found Mr. Hollingsworth, Mr. Minnick and/or NMT obtained Tesla's Female NATO Receptacle, whether such receptacle is a trade secret.

3.  Whether Tesla's Female NATO Receptacle derives economic benefit from not being generally known.

4.  Whether Tesla failed to make reasonable efforts to protect the secrecy of the Tesla Female NATO Receptacle that was allegedly misappropriated from Tesla.

5.  Whether Mr. Hollingsworth, Mr. Minnick and/or NMT learned that the Tesla Female NATO Receptacle was allegedly misappropriated from Tesla by improper means, or obtained the Tesla Female NATO Receptacle from someone they knew or had reason to know had used improper means.

6.  Whether Mr. Waldmann had apparent or actual authority to act of behalf of Tesla.

7.  Whether Mr. Hollingsworth, Mr. Minnick and/or NMT believed that Mr. Waldmann had actual or apparent authority to sell the Tesla Female NATO Receptacle.

8.  Whether Tesla consent, either expressly or by implication, to Mr. Minnick's, Mr. Hollingsworth's and/or NMT's alleged acquisition and use of Tesla's purported trade secret.

9.      Whether Tesla's claim for misappropriation of trade secrets is barred, in whole or in part, by the doctrines of waiver, estoppel and/or acquiescence.

10.      Whether Tesla is barred from recovery due to unclean hands.

**B. Tesla's Male NATO Plug**

1.      Whether Mr. Hollingsworth, Mr. Minnick and/or NMT obtained Tesla's Male NATO Plug.

2.      In the event that it is found Mr. Hollingsworth, Mr. Minnick and/or NMT obtained Tesla's Male NATO Plug, whether such receptacle is a trade secret.

3.      Whether Tesla's Male NATO Plug derives economic benefit from not being generally known.

4.      Whether Tesla failed to make reasonable efforts to protect the secrecy of the Tesla's Male NATO Plug that was allegedly misappropriated from Tesla.

5.      Whether Mr. Hollingsworth, Mr. Minnick and/or NMT learned that the Tesla Male NATO Plug was allegedly misappropriated from Tesla by improper means, or obtained the Tesla Male NATO Plug from someone they knew or had reason to know had used improper means.

6.      Whether Mr. Waldmann had apparent or actual authority to act of behalf of Tesla.

7.      Whether Mr. Hollingsworth, Mr. Minnick and/or NMT believed that Mr. Waldmann had actual or apparent authority to sell the Tesla Male NATO Plug.

8.      Whether Tesla consent, either expressly or by implication, to Mr. Minnick's, Mr. Hollingsworth's and/or NMT's alleged acquisition and use of Tesla's purported trade secret.

9.     Whether Tesla's claim for misappropriation of trade secrets is barred, in whole or in part, by the doctrines of waiver, estoppel and/or acquiescence.

10.     Whether Tesla is barred from recovery due to unclean hands.

**C. Tesla's Alleged Cylindrical Connector**

1.     Whether Mr. Hollingsworth, Mr. Minnick and/or NMT obtained Tesla's Cylindrical Connector and/or information related thereto.

2.     In the event that it is found Mr. Hollingsworth, Mr. Minnick and/or NMT obtained Tesla's Cylindrical Connector or information related thereto, whether such connector is a trade secret.

3.     Whether Tesla's Cylindrical Connector derives economic benefit from not being generally known.

4.     Whether Tesla failed to make reasonable efforts to protect the secrecy of the Tesla's Cylindrical Connector that was allegedly misappropriated from Tesla.

5.     Whether Mr. Hollingsworth, Mr. Minnick and/or NMT learned that the Tesla Cylindrical Connector was allegedly misappropriated from Tesla by improper means, or obtained the Tesla Cylindrical Connector from someone they knew or had reason to know had used improper means.

6.     Whether Mr. Waldmann had apparent or actual authority to act of behalf of Tesla.

7.     Whether Mr. Hollingsworth, Mr. Minnick and/or NMT believed that Mr. Waldmann had actual or apparent authority to sell the Tesla Cylindrical Connector.

8.     Whether Tesla consent, either expressly or by implication, to Mr. Minnick's, Mr. Hollingsworth's and/or NMT's alleged acquisition and use of Tesla's purported trade secret.

9.     Whether Tesla's claim for misappropriation of trade secrets is barred, in whole or in part, by the doctrines of waiver, estoppel and/or acquiescence.

10.     Whether Tesla is barred from recovery due to unclean hands.

**D.  Tesla's Alleged Dual Output Connector**

1.     Whether Mr. Hollingsworth, Mr. Minnick and/or NMT obtained Tesla's alleged Dual Output Connector and/or information relating thereto.

2.     In the event that it is found Mr. Hollingsworth, Mr. Minnick and/or NMT obtained Tesla's alleged Dual Output Connector, whether such connector or information relating thereto is a trade secret.

3.     Whether Tesla's alleged Dual Output Connector derives economic benefit from not being generally known.

4.     Whether Tesla failed to make reasonable efforts to protect the secrecy of the Tesla's alleged Dual Output Connector that was allegedly misappropriated from Tesla.

5.     Whether Mr. Hollingsworth, Mr. Minnick and/or NMT learned that the Tesla alleged Dual Output Connector was allegedly misappropriated from Tesla by improper means, or obtained the Tesla Dual Output Connector from someone they knew or had reason to know had used improper means.

6.     Whether Mr. Waldmann had apparent or actual authority to act of behalf of Tesla.

21

7.     Whether Mr. Hollingsworth, Mr. Minnick and/or NMT believed that Mr. Waldmann had actual or apparent authority to sell the Tesla Dual Output Connector.

8.     Whether Tesla consent, either expressly or by implication, to Mr. Minnick's, Mr. Hollingsworth's and/or NMT's alleged acquisition and use of Tesla's purported trade secret.

9.     Whether Tesla's claim for misappropriation of trade secrets is barred, in whole or in part, by the doctrines of waiver, estoppel and/or acquiescence.

10.     Whether Tesla is barred from recovery due to unclean hands.

**E.   Tesla's Alleged Dual Output Power Supply**

1.     Whether Mr. Hollingsworth, Mr. Minnick and/or NMT obtained Tesla's alleged Dual Output Power Supply, or any information related thereto.

2.     In the event that it is found Mr. Hollingsworth, Mr. Minnick and/or NMT obtained Tesla's alleged Dual Output Power Supply, whether such power supply or information related thereto is a trade secret.

3.     Whether Tesla's alleged Dual Output Power Supply or information related thereto derives economic benefit from not being generally known.

4.     Whether Tesla failed to make reasonable efforts to protect the secrecy of the Tesla's Dual Output Power Supply that was allegedly misappropriated from Tesla.

5.     Whether Mr. Hollingsworth, Mr. Minnick and/or NMT learned that the Tesla alleged Dual Output Power Supply was allegedly misappropriated from Tesla by improper means, or obtained the Dual Output Power Supply from someone they knew or had reason to know had used improper means.

6.     Whether Mr. Waldmann had apparent or actual authority to act of behalf of Tesla.

7.     Whether Mr. Hollingsworth, Mr. Minnick and/or NMT believed that Mr. Waldmann had actual or apparent authority to provide information relating to the Tesla Dual Output Power Supply.

8.     Whether Tesla consent, either expressly or by implication, to Mr. Minnick's, Mr. Hollingsworth's and/or NMT's alleged acquisition and use of Tesla's purported trade secret.

9.     Whether Tesla's claim for misappropriation of trade secrets is barred, in whole or in part, by the doctrines of waiver, estoppel and/or acquiescence.

10.     Whether Tesla is barred from recovery due to unclean hands.

**F. Tesla's Alleged AC and DC Power/Inverter Systems and Custom Tool System**

1.     Whether Mr. Hollingsworth, Mr. Minnick and/or NMT obtained Tesla's alleged AC and DC Power/Inverter Systems and Custom Tool System, or any information related thereto.

2.     In the event that it is found Mr. Hollingsworth, Mr. Minnick and/or NMT obtained Tesla's alleged AC and DC Power/Inverter Systems and Custom Tool System, whether such system or information related thereto is a trade secret.

3.     Whether Tesla's alleged AC and DC Power/Inverter Systems and Custom Tool System or information related thereto derives economic benefit from not being generally known.

4.      Whether Tesla failed to make reasonable efforts to protect the secrecy of the Tesla's AC and DC Power/Inverter Systems and Custom Tool System that was allegedly misappropriated from Tesla.

5.      Whether Mr. Hollingsworth, Mr. Minnick and/or NMT learned that the Tesla alleged AC and DC Power/Inverter Systems and Custom Tool System was allegedly misappropriated from Tesla by improper means, or obtained the AC and DC Power/Inverter Systems and Custom Tool System from someone they knew or had reason to know had used improper means.

6.      Whether Mr. Waldmann had apparent or actual authority to act of behalf of Tesla.

7.      Whether Mr. Hollingsworth, Mr. Minnick and/or NMT believed that Mr. Waldmann had actual or apparent authority to provide information relating to the Tesla AC and DC Power/Inverter Systems and Custom Tool System.

8.      Whether Tesla consent, either expressly or by implication, to Mr. Minnick's, Mr. Hollingsworth's and/or NMT's alleged acquisition and use of Tesla's purported trade secret.

9.      Whether Tesla's claim for misappropriation of trade secrets is barred, in whole or in part, by the doctrines of waiver, estoppel and/or acquiescence.

10.     Whether Tesla is barred from recovery due to unclean hands.

**G.  Tesla's Alleged UAV Power Unit Assembly**

1.      Whether Mr. Hollingsworth, Mr. Minnick and/or NMT obtained Tesla's alleged Alleged UAV Power Unit Assembly, or any information related thereto.

2.    In the event that it is found Mr. Hollingsworth, Mr. Minnick and/or NMT obtained Tesla's alleged Alleged UAV Power Unit Assembly, whether such assembly or information related thereto is a trade secret.

3.    Whether Tesla's alleged Alleged UAV Power Unit Assembly or information related thereto derives economic benefit from not being generally known.

4.    Whether Tesla failed to make reasonable efforts to protect the secrecy of the Tesla's Alleged UAV Power Unit Assembly that was allegedly misappropriated from Tesla.

5.    Whether Mr. Hollingsworth, Mr. Minnick and/or NMT learned that the Tesla alleged Alleged UAV Power Unit Assembly was allegedly misappropriated from Tesla by improper means, or obtained the Alleged UAV Power Unit Assembly from someone they knew or had reason to know had used improper means.

6.    Whether Mr. Waldmann had apparent or actual authority to act of behalf of Tesla.

7.    Whether Mr. Hollingsworth, Mr. Minnick and/or NMT believed that Mr. Waldmann had actual or apparent authority to provide information relating to the Tesla Alleged UAV Power Unit Assembly.

8.    Whether Tesla consent, either expressly or by implication, to Mr. Minnick's, Mr. Hollingsworth's and/or NMT's alleged acquisition and use of Tesla's purported trade secret.

9.    Whether Tesla's claim for misappropriation of trade secrets is barred, in whole or in part, by the doctrines of waiver, estoppel and/or acquiescence.

10.    Whether Tesla is barred from recovery due to unclean hands.

**H. Tesla's Alleged Global Hawk Power System**

1.      Whether Mr. Hollingsworth, Mr. Minnick and/or NMT obtained Tesla's alleged Global Hawk Power System, or any information related thereto.

2.      In the event that it is found Mr. Hollingsworth, Mr. Minnick and/or NMT obtained Tesla's alleged Global Hawk Power System, whether such system or information related thereto is a trade secret.

3.      Whether Tesla's alleged Global Hawk Power System or information related thereto derives economic benefit from not being generally known.

4.      Whether Tesla failed to make reasonable efforts to protect the secrecy of the Tesla's Global Hawk Power System that was allegedly misappropriated from Tesla.

5.      Whether Mr. Hollingsworth, Mr. Minnick and/or NMT learned that the Tesla alleged Global Hawk Power System was allegedly misappropriated from Tesla by improper means, or obtained such Global Hawk Power System from someone they knew or had reason to know had used improper means.

6.      Whether Mr. Waldmann had apparent or actual authority to act of behalf of Tesla.

7.      Whether Mr. Hollingsworth, Mr. Minnick and/or NMT believed that Mr. Waldmann had actual or apparent authority to provide information relating to Tesla's alleged Global Hawk Power System.

8.      Whether Tesla consent, either expressly or by implication, to Mr. Minnick's, Mr. Hollingsworth's and/or NMT's alleged acquisition and use of Tesla's purported trade secret.

9.     Whether Tesla's claim for misappropriation of trade secrets is barred, in whole or in part, by the doctrines of waiver, estoppel and/or acquiescence.

10.     Whether Tesla is barred from recovery due to unclean hands.

**I.     Tesla's Alleged Interface Box for UAV Unit of U.S. Navy Pioneer**

1.     Whether Mr. Hollingsworth, Mr. Minnick and/or NMT obtained Tesla's alleged Interface Box for UAV Unit of U.S. Navy Pioneer, or any information related thereto.

2.     In the event that it is found Mr. Hollingsworth, Mr. Minnick and/or NMT obtained Tesla's alleged Interface Box for UAV Unit of U.S. Navy Pioneer, whether such box or information related thereto is a trade secret.

3.     Whether Tesla's alleged Interface Box for UAV Unit of U.S. Navy Pioneer or information related thereto derives economic benefit from not being generally known.

4.     Whether Tesla failed to make reasonable efforts to protect the secrecy of the Tesla's Interface Box for UAV Unit of U.S. Navy Pioneer that was allegedly misappropriated from Tesla.

5.     Whether Mr. Hollingsworth, Mr. Minnick and/or NMT learned that Tesla's alleged Interface Box for UAV Unit of U.S. Navy Pioneer was misappropriated from Tesla by improper means, or obtained such Interface Box for UAV Unit of U.S. Navy Pioneer from someone they knew or had reason to know had used improper means.

6.     Whether Mr. Waldmann had apparent or actual authority to act of behalf of Tesla.

7.    Whether Mr. Hollingsworth, Mr. Minnick and/or NMT believed that Mr. Waldmann had actual or apparent authority to provide information relating to Tesla's alleged Interface Box for UAV Unit of U.S. Navy Pioneer.

8.    Whether Tesla consent, either expressly or by implication, to Mr. Minnick's, Mr. Hollingsworth's and/or NMT's alleged acquisition and use of Tesla's purported trade secret.

9.    Whether Tesla's claim for misappropriation of trade secrets is barred, in whole or in part, by the doctrines of waiver, estoppel and/or acquiescence.

10.    Whether Tesla is barred from recovery due to unclean hands.

**J.    Tesla's Alleged FEMA Power Unit**

1.    Whether Mr. Hollingsworth, Mr. Minnick and/or NMT obtained Tesla's alleged FEMA Power Unit, or any information related thereto.

2.    In the event that it is found Mr. Hollingsworth, Mr. Minnick and/or NMT obtained Tesla's alleged FEMA Power Unit, whether such unit or information related thereto is a trade secret.

3.    Whether Tesla's alleged FEMA Power Unit or information related thereto derives economic benefit from not being generally known.

4.    Whether Tesla failed to make reasonable efforts to protect the secrecy of the Tesla's FEMA Power Unit that was allegedly misappropriated from Tesla.

5.    Whether Mr. Hollingsworth, Mr. Minnick and/or NMT learned that Tesla's alleged FEMA Power Unit was misappropriated from Tesla by improper means, or obtained such FEMA Power Unit from someone they knew or had reason to know had used improper means.

6.      Whether Mr. Waldmann had apparent or actual authority to act of behalf of Tesla.

7.      Whether Mr. Hollingsworth, Mr. Minnick and/or NMT believed that Mr. Waldmann had actual or apparent authority to provide information relating to Tesla's alleged FEMA Power Unit.

8.      Whether Tesla consent, either expressly or by implication, to Mr. Minnick's, Mr. Hollingsworth's and/or NMT's alleged acquisition and use of Tesla's purported trade secret.

9.      Whether Tesla's claim for misappropriation of trade secrets is barred, in whole or in part, by the doctrines of waiver, estoppel and/or acquiescence.

10.     Whether Tesla is barred from recovery due to unclean hands.

**K. Tesla's Customer, Vendor and/or Parts Lists**

1.      Whether Mr. Hollingsworth, Mr. Minnick and/or NMT obtained Tesla's Customer, Vendor and/or parts lists, or any information related thereto.

2.      In the event that it is found Mr. Hollingsworth, Mr. Minnick and/or NMT obtained Tesla's Customer, Vendor and/or parts lists, whether such lists are a trade secret.

3.      Whether Tesla's Customer, Vendor and/or parts lists derive any economic benefit from not being generally known.

4.      Whether Tesla failed to make reasonable efforts to protect the secrecy of the Tesla's Customer, Vendor and/or parts lists that were allegedly misappropriated from Tesla.

5.      Whether Mr. Hollingsworth, Mr. Minnick and/or NMT learned that Tesla's Customer, Vendor and/or parts list were misappropriated from Tesla by improper

means, or obtained such Customer, Vendor and/or parts lists from someone they knew or had reason to know had used improper means.

      6.      Whether Mr. Waldmann had apparent or actual authority to act of behalf of Tesla.

      7.      Whether Mr. Hollingsworth, Mr. Minnick and/or NMT believed that Mr. Waldmann had actual or apparent authority to provide information relating to Tesla's Customer, Vendor and/or parts lists.

      8.      Whether Tesla consent, either expressly or by implication, to Mr. Minnick's, Mr. Hollingsworth's and/or NMT's alleged acquisition and use of Tesla's purported trade secret.

      9.      Whether Tesla's claim for misappropriation of trade secrets is barred, in whole or in part, by the doctrines of waiver, estoppel and/or acquiescence.

      10.      Whether Tesla is barred from recovery due to unclean hands.

## II.    ALLEGED CONVERSION OF TESLA PROPERTY BY THE NMT DEFENDANTS

      1.      Whether the Delaware Trade Secrets Act preempts Tesla's Conversion Claim.

      2.      Whether Mr. Minnick, Mr. Hollingsworth and/or NMT improperly converted any property of Tesla.

      3.      Whether Mr. Minnick, Mr. Hollingsworth and/or NMT wrongfully deprived Tesla of ownership over its property.

## III.    ALLEGED CIVIL CONSPIRACY AMONG DEFENDANTS

      1.      Whether the Delaware Trade Secrets Act preempts Tesla's Civil Conspiracy Claim.

2.     Whether Defendants had an agreement to participate in an unlawful act.

3.     Whether Tesla was injured and suffered damages as a result of Defendants unlawful act.

4.     Whether Defendants performed an unlawful overt act in furtherance of the agreement.

## IV.   TESLA'S ABUSE OF PROCESS

1.     Whether Tesla caused legal process to issue against Defendants Hollingsworth, Minnick and New Millennium Tools, Inc. in the nature of a Stipulated Restraining Order, a third-party Subpoena on D.C. Power Equipment in Texas, Requests for Production, Interrogatories and Depositions.

2.     Whether Tesla commenced this legal process to accomplish a purpose for which the system is not designed.

3.     Whether Tesla commenced this legal process to harass Defendants Minnick, Hollingsworth and New Millennium Tools, Inc. or solely to obtain information for use in its claims against Defendant Waldmann.

4.     Whether Tesla commenced this legal process to stifle legitimate competition that does not involve actual trade secrets and/or to vex or harass Defendants Hollingsworth, Minnick and New Millennium Tools, Inc.

5.     Whether as a direct and proximate result of the Tesla's abuses of process, Mr. Minnick, Mr. Hollingsworth and/or NMT have suffered property damage and economic losses, loss of income, loss of capital infusion, loss of business, loss of prospective business, emotional distress, attorneys fees and court costs.

**V.    TESLA'S VIOLATION OF ANTI-TRUST LAWS (SHERMAN and CLAYTON ACTS)**

Tesla has already admitted liability under the Sherman and Clayton Acts. *See* D.I. 32 at ¶¶ 36-40. Accordingly, the only contested issue of fact and law is the amount of Tesla's liability. *See* D.I. 106 (NMT Defendants' MOTION for Partial Summary Judgment on the Pleadings or, in the Alternative, Partial Summary Judgment).

1.    Whether as a direct and proximate result of Tesla's admittedly sham litigation, Mr. Minnick, Mr. Hollingsworth and/or NMT have or will suffer damages including, but not limited to, lost sales or sales opportunities for its products, lost capital infusion, expenses related to defending against this litigation including, *inter alia*, attorneys fees and costs.

**VI.    TESLA'S UNFAIR COMPETITION**

1. Whether Tesla knew or should have known that Mr. Minnick, Mr. Hollingsworth and/or NMT did not misappropriate trade secrets.

2. Whether Tesla knew or should have known that its alleged trade secrets are not trade secrets.

3. Whether Tesla is engaging in unfair competition in the marketplace by filing and/or maintaining the present action without a good faith basis for believing that Mr. Minnick, Mr. Hollingsworth and/or NMT misappropriated any trade secrets.

4. Whether Mr. Minnick, Mr. Hollingsworth and/or NMT are entitled to their reasonable attorney's fees and other compensatory damages as a measure of damages for Tesla's acts of unfair competition.