IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TESLA INDUSTRIES, INC., | ) | **REDACTED** |
| | ) | **PUBLIC VERSION** |
| Plaintiff, | ) | |
| | ) | C.A. No. 06-055-GMS |
| v. | ) | |
| | ) | |
| DAVID C. WALDMANN, | ) | |
| LYNDOL W. HOLLINGSWORTH, | ) | |
| CHARLES MINNICK a/k/a CHUCK MINNICK, and | ) | |
| NEW MILLENNIUM TOOLS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE NMT DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE PLAINTIFF'S PROPOSED EXPERT WITNESSES

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
Telephone: (302) 654-1888
Facsimile: (302) 654-2067

*Attorneys for Defendants Lyndol W. Hollingsworth, Charles Minnick and New Millennium Tools, Inc.*

*Of Counsel:*

Louis S. Mastriani
Rodney R. Sweetland, III
David F. Nickel
ADDUCI, MASTRIANI & SCHAUMBERG, L.L.P.
1200 Seventeenth Street, N.W., Fifth Floor
Washington, DC 20036
Telephone: (202) 467-6300
Facsimile: (202) 466-2006

Dated: April 27, 2007
180053.1

## **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................. 1

II.   FACTS ................................................................................................................. 1

III.  LEGAL STANDARD.......................................................................................... 1

IV.  ARGUMENT ...................................................................................................... 2

    A.    Clyde T. Carter.......................................................................................... 2

        1.    Mr. Carter's Proposed Testimony on the Superiority of Tesla's NATO Connector Is Irrelevant Under Trade Secrets Law ................................................................................... 3

        2.    The Methodology Supporting Mr. Carter's Proposed Testimony Is Defective Because He Performed No Measurements or Tests ............................................................ 4

        3.    Jurors Are Capable of Conducting the Visual Inspection and Comparison That Was the Extent of Mr. Carter's Review ............................................................................. 6

        4.    Mr. Carter Is Unqualified to Render the Electrical Engineering, Metallurgical and Materials Science Opinions in His Report .......................................................... 7

    B.    Roger Guillemette ..................................................................................... 8

        1.    Mr. Guillemette's Proposed Testimony Is Duplicative of Mr. Carter's Proposed Testimony .................................................... 8

        2.    Mr. Guillemette's Proposed Testimony Is Irrelevant and Unsupported by Any Testing................................................ 8

        3.    Mr. Guillemette's Proposed Testimony Is Prohibited by the Code of Federal Regulations................................................. 9

    C.    Donald T. Stewart ................................................................................... 11

        1.    Mr. Stewart's Proposed Testimony Is Inadmissible Because It Does Not Fit the Facts of the Case........................... 11

        2.    Mr. Stewart's Testimony Is Inadmissible Because It Is Premised Upon Mistakes of Fact That Render It Unreliable.................... 13

    D.    John P. Sullivan ...................................................................................... 16

1.  Mr. Sullivan Did Not Render an Opinion Because He Did Not Receive the Information He Requested from Tesla Necessary to Complete His Analysis ........................................................ 16

2.  Mr. Sullivan Lacks any Education, Education, Experience or Research in the Specific Industry at Issue ............................................. 17

3.  The Information Upon Which Mr. Sullivan Relied Is Unreliable, Without Foundation and Inadmissible .................................... 17

4.  Mr. Sullivan's Opinion Embodies Flawed Methodology.......................... 19

E.  David Masilotti ..................................................................................... 22

V.  CONCLUSION............................................................................................ 24

## **TABLE OF AUTHORITIES**

**Cases**

*Alphamed Pharm. Corp. v. Arriva Pharm., Inc.,*
    432 F. Supp. 2d 1319 (S.D. Fla. 2006) ........................................................................ 21

*Asplundh Mfg. Div. of Asplundh Tree Expert Co. v. Benton Harbor Eng'g.,*
    57 F.3d 1190 (3d Cir. 1995) ........................................................................................ 23

*Aubrey Rogers Agency, Inc. v. AIG Life Ins. Co.,*
    No. Civ. A.97-529 MMS, 2000 WL 135129 3-4 (D. Del. Jan. 13, 2000) .................. 11

*Burkett-Wood v. Haines,*
    2006 WL 1579770 (Del. Super. May 2, 2006) ............................................................ 7

*Byrne v. Liquid Asphalt Sys., Inc.,*
    238 F. Supp. 2d 491 (E.D.N.Y. 2002) ......................................................................... 7

*Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.,*
    350 F. Supp. 2d 582 (D. Del. 2004) ....................................................................... 7, 21

*Cooper Distrib. Co., Inc. v. Amana Refrigeration, Inc.,*
    63 F.3d 2628 (3d Cir. 1995) ....................................................................................... 13

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579 (1993) ................................................................................................. 1, 2

*Diehl v. Xerox Corp.,*
    933 F. Supp. 1157 (W.D.N.Y. 1996) ......................................................................... 22

*Elcock v. Kmart Corp.,*
    233 F.3d 734 (3d Cir. 2002) .................................................................................. 17, 23

*First Sav. Bank, F.S.B. v. U.S. Bancorp,*
    117 F. Supp. 2d 1078 (D. Kan. 2000) ........................................................................ 21

*Flick v. James Monfredo, Inc.,*
    356 F. Supp. 1143 (E.D. Pa. 1973) .............................................................................. 7

*Gannett Co., Inc. v. Kanaga,*
    750 A.2d 1174 (Del. 2000) .................................................................................. 19, 21

*Heller v. Shaw Indus., Inc.,*
    167 F.3d 146 (3d Cir. 1999) ....................................................................................... 17

*Hibiscus Assoc., Ltd. v. Bd. of Tr. of the Policemen and Firemen Ret. Sys. of Detroit,*
    50 F.3d 908 (11th Cir. 1995) ....................................................................................... 6

*In re Paoli R.R. Yard PCB Litig.,*
    35 F.3d 717 (3d Cir. 1994) ........................................................................................... 2

*In re Unisys Savings Plan Litig.,*
    173 F.3d 145 (3d Cir. 1999) ....................................................................................... 12

*Izumi Prod. Co. v. Koninklijke Philips Elec. N.V.*,
   315 F. Supp. 2d 589 (D. Del. 2004).............................................................9

*JMJ Enters. v. Via Veneto Italian Ice, Inc.*, No. Civ. A. 97-CV-0652,
   1998 WL 175888 (E.D. Pa. April 15, 1998)..........................................19

*Johnson Elec. North Am. Inc. v. Mabuchi Motor Am. Corp.*,
   103 F. Supp. 2d 268 (S.D.N.Y. 2000)....................................................19

*Klaczak v. Consol. Med. Transp.*,
   458 F. Supp. 2d 622 (D. Del. 2006)......................................................7, 8

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)..................................................................................2

*Lifewise Master Funding v. Telebank*,
   374 F.3d 917 (10th Cir. 2004)................................................................24

*Minnesota Mining & Mfg. Co. v. Pribyl*,
   259 F.3d 587 (7th Cir. 2001)....................................................................3

*Nora Beverages, Inc. v. Perrier Group of Am., Inc.*,
   164 F.3d 736 (2d Cir. 1998)......................................................................3

*Oddi v. Ford Motor Co.*,
   234 F.3d 136 (3d Cir. 2000)......................................................................3

*Padillas v. Stork-Gamco, Inc.*,
   186 F.3d 412 (3d Cir. 1999)....................................................................17

*Pell v. E.I. DuPont De Nemours & Co., Inc.*,
   231 F.R.D. 186 (D. Del. 2005)................................................................17

*Real Estate Value Co. v. USAir, Inc.*,
   979 F. Supp. 731 (N.D. Ill. 1997)..........................................................21

*Static Control Components, Inc. v. Darkprint Imaging, Inc.*,
   240 F. Supp. 2d 465 (M.D.N.C. 2002)..................................................23

*Stecyk v. Bell Helicopter Textron, Inc.*,
   295 F.3d 408 (3d Cir. 2002)....................................................................18

*Tokio Marine & Fire Ins. Co. v. Norfolk & W. Ry. Co.*,
   172 F.3d 44 4 (4th Cir. 1999) ................................................................10

*United States v. Velasquez*,
   64 F.3d 844 (3d Cir. 1995)........................................................................1

*Webb v. The Fuller Brush Co.*,
   378 F.3d 500 (3d Cir. 1967)......................................................................6

*Weisgram v. Marley Co.*,
   528 U.S. 440 (2000)..................................................................................2

*Wilson v. Muckala, MD*,
   303 F.3d 1207 (10th Cir. 2002) ................................................................6

*Zenith Elec. Corp. v. WH-TV Broad. Corp.*,
   395 F.3d 416 (7th Cir. 2005) ................................................................................ 23

**Other Authorities**

Daniel L. Rubinfield, Reference Guide on Multiple Regression at 181
   (Reference Guide on Scientific Evidence) Federal Judicial Center (2d. Ed. 2000) ................ 22

**Rules**

32 C.F.R. 516.42 ................................................................................................. 9

32 C.F.R. 97.6(e) ................................................................................................ 9

Fed. R. Evid. 701 ............................................................................................... 1

Fed. R. Evid. 702 ............................................................................................... 1

## I.    **INTRODUCTION**

None of the five proposed expert witnesses in the case made any measurements of the products, conducted any tests or performed any research of any kind whatsoever. Instead, they relied entirely upon the carefully restricted information provided to them by Plaintiff Tesla Industries, Inc. ("Tesla"). None of the five proposed experts has ever been qualified as an expert witness, and apparently only one has a college degree. Simply put, there is nothing about these proposed witnesses or their respective conclusions that remotely satisfies the reliability standards under Fed. R. Evid. 702 (or, in the case of Tesla's President, Fed. R. Evid. 701).

## II.    **FACTS**

This is a trade secrets case. Tesla claims that Defendant Waldmann misappropriated trade secrets while he was an employee of Tesla and transmitted those trade secrets to the NMT Defendants (i.e., Minnick, Hollingsworth and their company, New Millennium Tools, Inc.). *See* Verified Complaint (D.I. 2) ¶ 19. The trade secrets that Tesla claims were stolen are information concerning a standardized NATO receptacle, lists of Tesla's government customers, Tesla's vendor information, photographs of an unmanned aviation vehicle battery assembly and photographs of a 5400 Global Hawk Assembly. *Id.* ¶ 14(A)-(E).

## III.    **LEGAL STANDARD**

The party offering the expert testimony has the ultimate burden of proving admissibility. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 n.10 (1993). As explained below, Tesla has failed to meet this burden.

Fed. R. Evid. 702 imposes three basic requirements as to expert opinions: (1) the witness must be an expert; (2) the witness must testify as to scientific, technical or other specialized knowledge; and (3) the testimony must assist the trier of fact. *See United States v. Velasquez*, 64 F.3d 844, 849 (3d Cir. 1995) (citations omitted). Fed. R. Evid. 702 also imposes an overlying

mandate that judges ensure that any scientific or technical testimony admitted is reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-49 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). The test for reliability is an "exacting" one (*Weisgram v. Marley Co.*, 528 U.S. 440, 451 (2000)) and the expert will be held to the intellectual rigor of his or her field. *See Kumho Tire Co.*, 526 U.S. at 152.

Although these factors do not constitute a "definitive checklist or test,"[1] the Supreme Court and the Third Circuit have, combined, established eight criteria to determine the reliability of expert testimony:  (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 n.8 (3d Cir. 1994).

## IV.    ARGUMENT

### A.    Clyde T. Carter

The substance of Mr. Carter's proposed expert testimony is that "Tesla Industries' NATO Connector is unique and has superior features as compared to other NATO Connectors in the marketplace." *See* Carter Supplemental Report (Ex. 1) at 2. When asked at his deposition, he could only identify one competitor, a Belgian company the name of which he could not recall. *See* Carter Tr. (Ex. 2) 49:3-21. Prior to this case, Mr. Carter had never had the opportunity to

---

[1] *Kumho Tire*, 526 U.S. at 150 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)).

examine a NATO connector. His only exposure to the one competing product he identified at his deposition was at a visit to Tesla's plant. *Id.* at 51:2-20. He was not able to take it with him when he left, but he did "bend it up and examine it thoroughly to see how it worked." *Id.* at 52:5-12.

It is not clear from either Mr. Carter's initial or Supplemental reports as to the precise discipline in which he is being offered as an expert (*viz.*, electrical engineering, metallurgy or materials science). His testimony covers all three of these disciplines, but he is a mechanical engineer by training. *See* Ex. 1 at 1.

### 1.    Mr. Carter's Proposed Testimony on the Superiority of Tesla's NATO Connector Is Irrelevant Under Trade Secrets Law

Expert evidence must first be relevant to be admissible. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144-45 (3d Cir. 2000). Whether or not Tesla's NATO Connector is or is not superior to others on the market, however, is necessarily irrelevant to the issues in the case because the commercial availability of Tesla's NATO Connector vitiates any claim of trade secret protection. It is a universally accepted proposition of trade secret law that a product that is offered for sale loses all trade secret protection.[2]

The fact that Tesla's NATO Connector is unique, or possesses qualities superior to that of its major competitor in the marketplace, does not establish that Tesla's publicly available version of a "generic" product is a trade secret or whether or not any of the defendants misappropriated Tesla's publicly available product. Mr. Carter testified at his deposition that the configuration of a NATO connector "is determined by some NATO committee saying, we need a connector to do such and such." *See* Ex. 2 at 109:13 – 110:21. The fact that Tesla's iteration of the standardized

---

[2] *See, e.g., Minnesota Mining & Mfg. Co. v. Pribyl*, 259 F.3d 587, 604 (7th Cir. 2001); *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 750 (2d Cir. 1998).

NATO design for a connector may be superior to a Belgian manufacturer's iteration of this very same standardized product is not relevant to the issues in this case. A commercially available version of a standardized product simply cannot constitute a trade secret.

### 2. The Methodology Supporting Mr. Carter's Proposed Testimony Is Defective Because He Performed No Measurements or Tests

Mr. Carter's conclusion that Tesla's publicly available NATO Connector is superior to its commercial competitor is based upon his opinion that the Tesla product is more carefully made of better materials than other NATO connectors in the marketplace. *See* Ex. 1 at 2-3. The central defect of his opinion is that it is based upon speculation and not testing. When asked what testing he performed, Mr. Carter testified "I didn't need to do testing . . . I performed no tests." *See* Ex. 2 at 58:14 – 59:3. Instead, Mr. Carter simply watched a limited portion of the manufacturing process at Tesla. *Id.* at 58:17 – 59:10 ("I did examine their manufacturing facility, saw the way they were made, the precision with which they were made . . . I didn't go through an entire manufacturing cycle.").

Mr. Carter was not even permitted to see all of the manufacturing process. He testified that "I didn't ask nor was I privy to the electronic assembly areas . . . ." *Id.* at 63:11-18.

Mr. Carter's evaluation of the differences between the Tesla standardized NATO connector and the Belgian version of the standardized NATO connector was limited to a disassembly of Tesla's commercially available product and a visual inspection of the Belgian product. *Id.* at 64:22 – 65:17. ("I didn't fully disassemble the Belgian connector, but I did take parts out. I physically bent the component parts."). He testified that he did not measure the tolerances of either the Tesla product or the Belgian product. *Id.* at 67:13-17 (Q: Were you able to determine the tolerances in your analysis. A: Only to the extent of observing the

4

manufacturing process."). Mr. Carter testified that he was not given the precise tolerances. *Id.* at 94:17-19.

Mr. Carter's conclusion that the Tesla connector was more robust than its Belgian competitor was based upon "[p]hysically holding it in [his] hand" and "dropping it." *Id. at* 88:4-12.

Mr. Carter's Supplemental Report contains a discussion of the superiority of the materials used by Tesla in the manufacture of its standardized NATO connector. *See* Ex. 1 at 2-3. He states that

**REDACTED**

During his deposition, however, it was revealed that Mr. Carter was never informed by Tesla of the precise composition of these materials for which he has such praise. For example, Mr. Carter was told by Tesla that **REDACTED**

*See* Ex. 2 at 71:2 – 76:12.

Mr. Carter's inability to provide testimony concerning the                                    y

**REDACTED**

*See* Supplemental Response to Interrogatory No. 9, attached hereto as Ex. 4. Mr. Carter's opinion that Tesla's alloy is better than the Belgian product because of its superior conductivity is unaccompanied by any scientific measure of conductivity (such as siemens per meter or ohms) in either Tesla's product or that of its Belgian competitor and bereft of any analysis of                                    of the Belgian product. His opinion that **REDACTED**
**REDACTED**                    is unaccompanied by any scientific measure of the tensile, compressive or shear strength (in newtons per square meter/pascals or pounds per square inch) of Tesla's **REDACTED**

Mr. Carter was not even told of the nature of the **REDACTED** used by Tesla that he claims is superior, and he conducted no independent analysis to ascertain its composition.

**REDACTED**

Mr. Carter's opinion that the Tesla **REDACTED** is superior to that utilized in the Belgian product is unaccompanied by an identification of the composition of the Belgian resin, a comparison of the tensile, compressive or shear strengths of the two products (or even a measure of the tensile, compressive or shear strength of Tesla's product).

In short, Mr. Carter has no scientifically cognizable bases for his conclusions. This is the precise variety of junk science the *Daubert/Kumho* line of decisions requires excluded.

### 3.    Jurors Are Capable of Conducting the Visual Inspection and Comparison That Was the Extent of Mr. Carter's Review

Expert testimony is unnecessary and improper where normal experiences and qualifications of laymen jurors are sufficient for them to draw a proper conclusion from given facts and circumstances. *Webb v. The Fuller Brush Co.*, 378 F.3d 500, 502 (3d Cir. 1967); *Wilson v. Muckala, MD*, 303 F.3d 1207, 1219 (10th Cir. 2002); *Hibiscus Assoc., Ltd. v. Bd. of Tr. of the Policemen and Firemen Ret. Sys. of Detroit*, 50 F.3d 908, 917 (11th Cir. 1995). Here, Mr. Carter's methodology of simple visual examination of Tesla's product and its leading Belgian competitor demonstrates that his evaluation is within the capabilities of any juror. The Tesla product could be put side-by-side with the Belgian product and the two compared by jurors in precisely the same manner as Mr. Carter compared them, to the extent any such comparison is even relevant to the issues in the case. Expert testimony does not assist the trier of fact when the jury is capable of drawing its own conclusions. *Klaczak v. Consol. Med. Transp.*, 458 F. Supp. 2d 622, 665-66 (D. Del. 2006).

4.    **Mr. Carter Is Unqualified to Render the**
**Electrical Engineering, Metallurgical and**
**Materials Science Opinions in His Report**

24 Del. C. § 2802 makes it unlawful for any person to practice engineering in Delaware unless they are registered as an engineer. The practice of engineering includes consultation, investigation or evaluation of machines, equipment and processes where such professional services require the application of engineering principles and data. *Id.* § 2803(20). Federal courts[3] and at least one Delaware state court[4] have articulated absence of licensure as a professional engineer as a basis for excluding a proposed expert's testimony.

Here, Mr. Carter is not a registered engineer in the State of Delaware. Nonetheless, Mr. Carter seeks to opine on matters clearly defined under Delaware law as practicing engineering. This circumvention of substantive Delaware standards of reliability for engineering should not be permitted. Even were the Court to qualify an engineer unlicensed in Delaware, Mr. Carter should not be qualified because he lacks the electrical engineering, metallurgical or materials science education, training and experience to support his conjectures.

A party may only elicit expert testimony from someone who has specialized knowledge or training sufficient to qualify him or her to opine on an issue within their field of expertise, and the expert's opinion must be confined to that field. *Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.*, 350 F. Supp. 2d 582, 588 (D. Del. 2004) (citations omitted). Stated differently, an expert's competence in the general field at issue must extend to his or her specific testimony on the matter before the court to render his or her opinion reliable. *Klaczak v. Consol. Med. Transp.*,

---

[3] *See, e.g., Byrne v. Liquid Asphalt Sys., Inc.*, 238 F. Supp. 2d 491, 494 (E.D.N.Y. 2002); *Flick v. James Monfredo, Inc.*, 356 F. Supp. 1143, 1149 (E.D. Pa. 1973).

[4] *See Burkett-Wood v. Haines*, 2006 WL 1579770 (Del. Super. May 2, 2006).

7

458 F. Supp. 2d at 665. Whatever education or training Mr. Carter had in mechanical engineering, his failure to administer tests for electrical connectivity and strength to the components on which he opined underscores his lack of sophistication in the fields of electrical engineering, metallurgy and materials science necessary to support the guesswork embodied in his opinions.

**B.**    **Roger Guillemette**

The essence of Mr. Guillemette's proposed testimony is that the NATO Connector manufactured by Tesla is superior to any other NATO Connectors used by the Army. *See* Guillemette Tr. (Ex. 5) at unnumbered page 3. Tesla provides no field in which Mr. Guillemette is qualified as an expert.

**1.**    **Mr. Guillemette's Proposed Testimony Is**
**Duplicative of Mr. Carter's Proposed Testimony**

The NMT Defendants do not believe that either Mr. Carter or Mr. Guillemette should be permitted to provide opinion testimony under Fed. R. Evid. 701 or 702. Should the Court overrule the NMT Defendants' objections to both of these proposed experts, however, the NMT Defendants respectfully submit that their testimony is duplicative. The Court's standing Final Pretrial Order provides that "Only one expert witness on each subject for each party will be permitted to testify absent good cause shown." *See* 3/29/2007 Rev. at 2 n.5. Here, Messrs. Carter and Guillemette both seek to opine that Tesla's NATO Connector is superior to its commercial competitors.

**2.**    **Mr. Guillemette's Proposed Testimony Is**
**Irrelevant and Unsupported by Any Testing**

Just as it is duplicative in substance of Mr. Carter's proposed testimony, Mr. Guillemette's proposed testimony shares all of the technical shortcomings of Mr. Carter's proposed testimony. Mr. Guillemette is not an engineer of any variety. His opinion is supported by nothing more than

his observations of Tesla's NATO Connectors in use. *See* Guillemette Report (Ex. 6) at unnumbered pages 2-3. Furthermore, his testimony is limited to Tesla's standardized NATO Connector as compared to only one other standardized NATO connector. *See* Ex. 5 at 26:15-23. An expert's subjective belief, unsupported by any testing or citations to scientific literature, is insufficiently reliable to be admissible. *Izumi Prod. Co. v. Koninklijke Philips Elec. N.V.*, 315 F. Supp. 2d 589, 602 (D. Del. 2004).

### 3.    Mr. Guillemette's Proposed Testimony Is Prohibited by the CFR

Roger Guillemette is a uniformed Warrant Officer in the United States Army on active duty. *See* Ex. 6 at 4. As such, he is specifically prohibited from providing expert witness testimony, except under extraordinary circumstances. *See* 32 C.F.R. 97.6(e), 32 C.F.R. 516.42. Counsel for Tesla was apprised by a legal representative of the U.S. Army that its attempt to use Mr. Guillemette as an expert witness was improper. *See* March 14, 2007, letter from Lieutenant Colonel Don F. Pollack to Brian Sullivan, attached hereto as Ex. 7. Lieutenant Colonel Pollack explained to counsel for Tesla the reasons for this prohibition:

> When a witness with an official connection with the Army testifies, a natural tendency exists to assume that the testimony represents the official view of the Army, despite express disclaimers to the contrary . . . the Army is concerned about the potential for conflict of interest inherent in the unrestricted appearance of its personnel as expert witnesses on behalf of parties other than the United States. Even the appearance of such conflicts seriously undermines the public trust and confidence in the integrity of our Government.

*Id.*

Tesla already demonstrated during Mr. Guillemette's deposition that it intended to wrap his testimony in the flag of his military service, one of the precise public policy reasons articulated by Lieutenant Colonel Pollack for the prohibition on testimony by uniformed military

personnel.   When Mr. Guillemette was questioned concerning the impropriety of an Army

officer providing expert witness testimony, counsel for Tesla made a speech on the record about

Mr. Guillemette's record of military service and the life-saving features of his client's products in

Iraq:

> I am somewhat distressed by the insinuations in questions that this
> gentleman acting as a civilian solely to promote the –not promote,
> but to explain the advantages to soldiers of a better item that might
> save lives is being insinuated as some kind of ethical violation.  I
> find this highly regrettable, insinuations directed at a gentleman
> who spent 20 years of very commendable service in the Army, has
> served in Iraq under obviously difficult circumstances.

*See* Ex. 5 at 62:21 – 63:8.

To evade the CFR's prohibitions, Tesla has indicated that it will attempt to introduce Mr.

Guillemette's deposition testimony into evidence.   *See* Tesla's draft Witness List for Joint Pretrial

Order, attached hereto as Ex. 8 ("Plaintiff reserves the right to use the deposition of these

witnesses that do not voluntarily appear at trial or are outside the subpoena power of the Court.").

Tesla's scheme should be flatly rejected.   An expert witnesses' report is inadmissible hearsay.

*See Tokio Marine & Fire Ins. Co. v. Norfolk & W. Ry. Co.*, 172 F.3d 44 *4 (4th Cir. 1999) (Table)

citing *Forward Commc'n. Corp. v. United States*, 608 F.2d 485, 511 (Ct. Cl. 1979).   Furthermore,

a party cannot plausibly claim that its own expert is "unavailable" under Rule 32(a)(3) and,

therefore, admit that expert's deposition testimony in lieu of live testimony.   *See, e.g., Aubrey*

*Rogers Agency, Inc. v. AIG Life Ins. Co.*, No. Civ. A.97-529 MMS, 2000 WL 135129 *3-4 (D.

Del. Jan. 13, 2000).   Tesla selected a proposed expert who is legally prohibited from providing

expert testimony.   It cannot now argue that he is "unavailable" under Rule 32(a)(3) because of

this legal prohibition and, thereby, sneak into evidence the deposition testimony the NMT

Defendants were forced to obtain as a prophylactic measure.

C.   **Donald T. Stewart**

As with its other experts, Tesla has not identified the field in which Mr. Stewart is being offered as an expert. A review of his resume reveals no education (*see* Stewart Report (Ex. 9) at 1-6), and no document served by Tesla states Mr. Stewart's purported field of specialty. It appears, however, that Tesla may be offering Mr. Stewart as a purported expert in the field of United States military procurement system at a single military installation that is not even at issue. Based on erroneous factual assumptions, Mr. Stewart speculates that the NMT Defendants would not have been able to obtain a National Stock Number ("NSN") without utilizing Tesla's contacts, that Mr. Waldmann would have to "rely upon" Tesla's customers in order to promote and sell products, and that certain information in Mr. Waldmann's possession (that was not transmitted to any NMT Defendant) was allegedly classified.

The fallibility of Mr. Stewart's expert report and opinion is explained by the fact that: (1) Tesla selectively decided what documents Mr. Stewart could and could not see; (2) Mr. Stewart did not do any independent research or request any additional documents; (3) that he waited until the day his report was due to dictate it to Tesla's counsel's secretary; and (4) that he only spent one to two hours dictating his report. (*See* Stewart Tr. (Ex. 10) 50:17-51:13, 56:7-13, 60:16-20, 62:15-17, 64:12-65:66:5 and 75:1-3.)

### 1.   Mr. Stewart's Proposed Testimony Is Inadmissible Because It Does Not Fit the Facts of the Case

To be admissible, the testimony of a proposed expert must "fit," that is, assist the trier of fact. *In re Unisys Savings Plan Litig.*, 173 F.3d 145, 155 (3d Cir. 1999). Mr. Stewart's testimony does not fit the facts of the instant action because, as he testified at deposition, his statements are restricted to scenarios that are not present in the case.

Mr. Stewart's expert opinion is limited to the *U.S. Army Tank-Automotive Command at Rock Island* ("TACOM Rock Island") only, and not any other military facility or installation. (*See* Ex. 10 at 46:16-47:5, 79:19-21, 89:20-22, 90:1-92:21, 101:11-102:2, 104:6-8.) Mr. Stewart admitted that he is not an expert as to procurement process at any other military installations, including Aberdeen Proving Ground in Maryland. *Id.* at 90:1-18, 91:19-92:12. While he supposes that other military installations *may* have a procurement process similar to TACOM Rock Island, Mr. Stewart admits that he is not qualified as an expert regarding any other military facility. *Id.* at 92:17-21 ("But since I didn't actually work there, *I don't feel I'm qualified to*, to *say that one installation does it the same as we do, there are always variations*, but generally they're all the same.") (emphasis added). The NMT Defendants, however, seek to sell their products to the entire United States military, not just TACOM Rock Island.

Mr. Stewart's opinion is further limited to long-term government contracts. *Id.* at 83:17-84:9, 88:11-18. Mr. Stewart does not opine as to other forms of procurement, including purchases made by International Merchant Purchase Authorization Card[5] ("IMPAC cards") or any other method of acquisition utilized by the United States military. *Id.* at 83:17-84:9, 88:11-18. This is significant because NMT's prospective U.S. military sales will be by IMPAC card and not the long-term government contracts about which Mr. Stewart opines.

Mr. Stewart also admits that his testimony is limited to obtaining an NSN through TACOM Rock Island and not obtaining such number from any other United States governmental or military office. Although there are many ways in which to obtain an NSN, Mr. Stewart's

---

[5] IMPAC Cards are, in essence, credit cards issued to all personnel in any U.S. government agency, including the military. Initially, the single-purchase IMPAC limit was $2,500, but several agencies have raised their thresholds to $25,000. (*See* http://www.oig.doc.gov/oig/reports/other_publications/credit-cards-06-002.pdf.)

opinion is solely limited to obtaining an NSN through TACOM Rock Island. *Id.* at 101:11-102:2 (Q: So you then qualify yourself as an expert in obtaining an NSN in any avenue, through any office? A: No, I'd have to say not through any office. Different offices work in different ways . . . this is how we did it in our office."). Such putative expertise on obtaining an NSN through TACOM Rock Island, however, is not relevant because, as stated previously, the NMT Defendants expect to sell their tools by IMPAC card, which does not require an NSN. *Id.* at 88:5-18.

Thus, Mr. Stewart's opinion is limited to one specific type of procurement process (long-term three, five or ten-year contracts) at one military installation (TACOM Rock Island). This narrow field of alleged expertise and opinion is neither relevant nor probative of the facts or issues of this case, as the NMT Defendants seek to sell their products to the entire United States military and expect that such sales will be made by IMPAC cards, which do not require an NSN.

### 2. Mr. Stewart's Testimony Is Inadmissible Because It Is Premised Upon Mistakes of Fact That Render It Unreliable

Where an expert's opinion is based upon a mistaken factual assumption, that mistake renders the expert's opinion unreliable and, hence, insufficient. *See Cooper Distrib. Co., Inc. v. Amana Refrigeration, Inc.*, 63 F.3d 262, 278 (3d Cir. 1995) (reversing district court's refusal to grant a new trial where expert made mistaken assumption of act). Here, Mr. Stewart made two mistaken assumptions in his Report. These mistaken assumptions vitiate the reliability of his conclusions.

First, Mr. Stewart represents that he "personally helped the defendants obtain an NSN for their DC Impact Wrench." *See* Ex. 9 at 3. He further claims that the "entity developing the DC Impact Wrench at the time the NSN was obtained was a new organization called NMT (New

Millennium Tools)." *Id.* As Mr. Stewart acknowledged during his deposition, however, this representation and, thus, the foundation for his report, is not grounded in fact.

The NSN about which Mr. Stewart opines was actually acquired for DC Power Equipment (a company which is not a party in this case) and not Messrs. Hollingsworth or Minnick or NMT. *See* Ex. 10 at 38:1-7, 39:6-8, 106:2-107:5, 114:1-10. Furthermore, Mr. Hollingsworth and DC Power Equipment's President, Mr. Huffman, specifically informed Mr. Stewart on multiple occasions that the NSN was for DC Power Equipment and not for NMT. *Id.* To date, NMT still does not have an NSN for any of its products. Thus, Mr. Stewart's assumption that the NSN was for the NMT Defendants' DC Impact Wrench is plainly erroneous.

Next, Mr. Stewart's opinion relating to the confidential nature of a "LOGSA" (Logistics Report Agency) listing containing "DODDAC (sic) numbers for a particular Tesla product" is predicated on mistaken assumptions of fact. *See* Ex. 9 at 5. Mr. Stewart claims that Mr. Waldmann requested and obtained the listing from an active duty soldier, Mr. Cassity. *Id.* Assuming that Mr. Waldmann received this information from Mr. Cassity, Mr. Stewart further represents that this information is "classified military information and a possible security violation of military policies and procedures." *Id.* Mr. Stewart concludes by opining that Mr. Waldmann could not use this information to prepare quarterly sales reports for Tesla. *Id.*

As a threshold matter, Mr. Stewart's credibility in this area is severely undercut by the fact that he could not provide the correct acronym ("DODAAC") or the name for which the acronym applied ("Department of Defense Activity Address Code") either in his expert report or during his deposition. *See* Ex. 10 at 72:13-73:5 and 147:5-7 ("Q: So you agree that every reference in your expert report to 'DODDAC' is incorrect? A: Right. It should be 'DODAAC'."). Mr. Stewart's putative expertise is further weakened by his unfamiliarity with Air Force or other

14

sources of DODAAC, which are publicly available over the Internet. *Id.* at 151:5-152:5; Dep. Ex. 156. Rather, Mr. Stewart asserts that he is only familiar with how the Army treats DODAAC. Tellingly, however, he was not aware of the fact that the Army has a public website dedicated to providing DODAAC contact information. (*See, e.g.*, http://www.amc.army.mil /amc/rda/rda-ap/aqnnews.html (link for "Army DODAAC/Location Cross Reference.).)

Mr. Stewart also admitted that his report incorrectly claims that Mr. Cassity provided the DODAAC listings to Mr. Waldmann. After examination and a review of some of the documents Tesla intentionally withheld from him, Mr. Stewart finally conceded that it was Mr. Frank Mooney[6] who obtained the DODAAC reports and forwarded them to Mr. Waldmann. *See* Ex. 10 at 145:1-146:6. Moreover, Mr. Stewart agreed that Mr. Mooney obtained the reports so that Tesla's sales representatives could "track orders for warranty, support, training and commission to [Tesla's] sales people." *Id.* at 142:17-143:8; Ex. 155 (P Supp 1414). Notwithstanding Mr. Stewart's claims, none of the email correspondence from the military to Mr. Mooney or from Mr. Mooney to Mr. Waldmann identified the documents as "Confidential" or "Classified." In fact, Mr. Stewart could not identify any security code or regulation relating to the confidentiality of DODAAC listings, such as the two attached as Ex. H to the Verified Complaint. *Id.* at 153:22-154:7.

These mistaken factual assumptions, when combined with Mr. Stewart's overly limited area of putative expertise, render his entire opinion unreliable and inadmissible.

---

[6] Mr. Mooney was Mr. Waldmann's supervisor at Tesla.

**D.    John P. Sullivan**

Mr. Sullivan, Tesla's proposed damages expert, is a CPA from the firm that handles Tesla's tax problems (D.I. 163 at 1-2 and Ex. B thereto.) and, coincidentally, does the accounting work for Tesla's law firm, Werb & Sullivan. *See* Sullivan Tr. (Ex. 11) 11:10-13:6; 74:20-75:7.

### 1.    Mr. Sullivan Did Not Render an Opinion Because He Did Not Receive the Information He Requested from Tesla Necessary to Complete His Analysis

Mr. Sullivan's proposed expert report contains the following fatal caveat: "As I am still awaiting additional information from the Company, this report describes my *preliminary opinion* on the lost profits of the company . . . I believe that our approach yields a *reasonable estimate, yet not conclusive opinion* . . . ." *See* Sullivan Report, Ex. 12 at 2 (emphasis added). Mr. Sullivan's proposed testimony, thus, is inadmissible because he did not receive the information that he himself deemed necessary to complete his analysis.

Mr. Sullivan made two requests for information from Tesla in order to complete his evaluation. *See* Ex. 13 and 14. A significant number of those requests went unanswered. For example, Mr. Sullivan did not receive copies of Tesla's sales, capital or operating budgets. *See* Ex. 11 at 61:13-62:2. He did not receive a list of Tesla's customers for whom Mr. Waldmann was responsible. *Id.* at 63:17-64:13. He did not receive a copy of Tesla's sales tax returns. *Id.* at 66:20-67:3. He did not receive the requested copy of Tesla's periodic financial statements. *Id.* at 68:7-14. He has never received any of Tesla's customer lists. *Id.* at 69:14-16. He did not receive information on the compensation of Tesla's officers, which he testified would be useful in his analysis. *Id.* at 70:21-77:15; 86:11-87:6. Mr. Sullivan forthrightly testified that his conclusions might have been different if he had received the information that he requested. *Id.* at 103:9-13.

16

### 2.    Mr. Sullivan Lacks any Education, Education, Experience or Research in the Specific Industry at Issue

Expert testimony can only be received from someone who has specialized knowledge or training sufficient to qualify him to opine on an issue within his field of expertise, and the expert's opinions must be confined to that field.  *Pell v. E.I. DuPont De Nemours & Co., Inc.*, 231 F.R.D. 186, 192 (D. Del. 2005) (citations omitted).  Mr. Sullivan is unqualified to render a lost profits damages opinion in this case.  He characterizes Tesla's business as the manufacture of electrical components for sale to the government, yet he has never provided valuation services to a government contractor or business involved in electrical engineering or electrical components, he has never received education or training in the field of government contracting or the manufacture of electrical components, he has never conducted research in these fields and he has no specialized knowledge in the field.  *See* Ex. 11 at 46:14-48:12; 111:19-112:10.

### 3.    The Information Upon Which Mr. Sullivan Relied Is Unreliable, Without Foundation and Inadmissible

The Court "must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used."  *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999).  While the proponent of an expert need not prove that his or her opinions are correct, it must prove that they are reliable.  *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999).  The opinion must have a proper foundation (*Elcock v. Kmart Corp.*, 233 F.3d 734, 756 n.13 (3d Cir. 2002)), and it is an abuse of discretion to admit expert testimony that is based upon assumptions lacking any foundation in the record.  *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002).  Here, Mr. Sullivan's proposed testimony is premised entirely upon unsupported information.

The factual basis for Tesla's damages claim is a hotly contested issue in the case.  The NMT Defendants filed a Motion in Limine to exclude Tesla's sales summaries and truncated

corporate income tax returns because the two do not match, and are unaccompanied by any underlying information. *See* D.I. 137 (Motion in Limine No. 5: To Exclude Unverifiable Financial Information). In its Response to the NMT Defendants' Motion in Limine No. 5, Tesla concedes the inaccuracy of its information. *See* D.I. 148 at 5-6. Tesla's concession dooms Mr. Sullivan's testimony: he relied upon admittedly inaccurate and unreliable information.

Buried at the last pages of their Opposition to the NMT Defendants' Motion *in Limine* No. 5 (D.I. 148), Tesla attempts to explain away the pervasive inaccuracies in the financial information upon which Mr. Sullivan relied. Tesla characterizes "[m]ost of the inconsistencies complained of by the NMT Defendants" as "*de minimus.*" *See* D.I. 148 at 5. It states that it "undoubtedly does not need to burden this Court with the difficulties associated with accounting compilations and the inevitable slight discrepancies. *Id.* at 5-6 n.3. Unfortunately, Tesla burdened the Court, Defendants, and its proposed damages expert, with inaccurate data.

Tesla implicitly acknowledges that one of the errors identified by the NMT Defendants is highly significant: *Id.* at 6 ("the NMT Defendants have pointed out a previously unknown discrepancy in the Tesla tax return for fiscal year 2001 to 2002."). This "discrepancy" is an approximately**REDACTED**difference between what Tesla declared to the Internal Revenue Service ("IRS") and what it provided to its proposed damages expert as sales data in support of its damages claim. Tesla, thus, is either underreporting its income to the IRS or inflating its damages figures in this case. Defendants are completely unable to determine which is the case because Tesla has contumaciously refused to produce any source data for its sales figures and had its counsel instruct its outside accountant not to respond to a subpoena from the NMT Defendants. *See* D.I. 137 at 2, n.2; Ex. 17-21.

Tesla attempts to explain away this **REDACTED** error with an Affidavit from the very same accountant from which Tesla's counsel prevented the NMT Defendants from obtaining any documentation for Tesla's financial claims. *See* Ex. D to D.I. 148. Tesla's accountant claims that the genesis of the disparity was that an assistant inadvertently listed a previous year's sales in Tesla's corporate income tax return. *Id.* ¶ 4. That mistake, however, was not caught by the CPA who prepared the return, Tesla's President who was responsible for signing, or Tesla's proposed damages expert, who relied upon both the erroneous return and the sales figures reflecting radically different figures. *See* Ex. 12 at 8 ("Documents Considered"). Incredibly, Tesla's CPA states in his Affidavit that he believes that this **REDACTED** underreporting, in a business that only declared **REDACTED** in gross sales (*see* D.I. 137, Ex. 9 at P Supp 1940), "will not result in increased Tax liability to Tesla . . . ." *See* Ex. D to D.I. 148 ¶ 6.

If an expert opinion is not based upon relevant and reliable data, it will be inadmissible. *Johnson Elec. North Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 283 (S.D.N.Y. 2000). Mr. Sullivan's failure to independently verify any of the data upon which he relied renders his opinions unreliable and inadmissible. *See JMJ Enters. v. Via Veneto Italian Ice, Inc.*, No. Civ. A. 97-CV-0652, 1998 WL 175888, at *7 (E.D. Pa. April 15, 1998) (excluding expert testimony where the expert relied upon tax returns without independent verification where it was clear the tax returns were inaccurate). *See also Gannett Co., Inc. v. Kanaga*, 750 A.2d 1174, 1186-87 (Del. 2000) (economist's testimony lacked required factual basis where it was based on income tax returns that were not admitted into evidence).

### 4. Mr. Sullivan's Opinion Embodies Flawed Methodology

The final fatal defect in Mr. Sullivan's proposed expert testimony is his flawed methodology. Mr. Sullivan used what he termed the "compound annual growth rate." *See* Ex. 12 at 5. Mr. Sullivan calculated the annual future rate of growth for Tesla by averaging its past

growth. *Id.* Undersigned counsel was unable to find a single court that had accepted compounded annual growth rate as an admissible methodology for a damages calculation.

There are at least two analytical flaws with Mr. Sullivan's methodology. First, Mr. Sullivan's opinions do not adequately control for the wild sales fluctuations in Tesla's sales from year-to-year or on a product-by-product basis. The gross sales figures relied upon by Mr. Sullivan are reproduced in the following chart:

**REDACTED**

*Id.* at Attachment B.

From these figures, Mr. Sullivan assumes that Tesla's growth rate should have been **REDACTED**
. *See* Ex. 12. The assumptions by Mr. Sullivan as to Tesla's future sales increases are not born out by the data, and this failure to make a valid scientific connection between a potential growth rate and any specific product renders a proposed expert's conclusions inadmissible. *See, e.g., Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.*, 350 F. Supp. 2d 582, 592-93 (D. Del. 2004). In Delaware, the nature and extent of future consequences must be

established with reasonable probability or there can be no recovery for that item of damages. *Gannett Co., Inc. v. Kanaga*, 750 A.2d 1174, 1188 (Del. 2000).

Furthermore, Mr. Sullivan assumed that misconduct by Defendant Waldmann was the sole cause of lost sales to Tesla. *See* Ex. 11 at 112:11-18. This assumption on proximate cause, without any analysis of other factors, also renders Mr. Sullivan's conclusions unreliable. *See Alphamed Pharm. Corp. v. Arriva Pharm., Inc.*, 432 F. Supp. 2d 1319, 1344 (S.D. Fla. 2006); *First Sav. Bank, F.S.B. v. U.S. Bancorp*, 117 F. Supp. 2d 1078, 1084-1086 (D. Kan. 2000). Mr. Sullivan did not consider the possibility than any other factor may have accounted for a dip in sales during the time period he examined. *Id.*

The second analytical flaw with Mr. Sullivan's methodology is that he fails to account for external, market forces that may affect Tesla's sales. Mr. Sullivan agreed with the propositions that a company in an industry is affected by the general marketplace and that Tesla's performance would have been affected by the industry in which it operated and economy in general, yet he conceded that he did not take into account any market or economic factors external to Tesla. *See* Ex. 14 at 112:22-116:10. He did not have any information about Tesla's competitors or customers, so he did not evaluate any influence their actions may have had. *Id.* at 116:11-117:11. He made no study of any external factors during the time period reflected by his analysis. *Id.* at 117:12-16. A failure to account for markets renders a proposed opinion unreliable. *See, e.g., Real Estate Value Co. v. USAir, Inc.*, 979 F. Supp. 731, 744 (N.D. Ill. 1997).

Mr. Sullivan's opinion is ultimately unsound because he failed to use the single analytical method most appropriate to the facts alleged in the case: multiple regression analysis. Multiple regression analysis is a statistical tool for understanding the relationship between two or more variables. *See* Daniel L. Rubinfield, Reference Guide on Multiple Regression at 181 (Reference

Guide on Scientific Evidence) Federal Judicial Center (2d. Ed. 2000). In the conceptually analogous situation of a patent infringement case, for example, a multiple regression analysis could be used to determine whether the acts of an accused infringer affected the price of the patented product and the size of any effect. *Id.* at 181-82. Failure to utilize a regression analysis to control for the presence of multiple variables is grounds for exclusion of proposed excerpt testimony. *See Diehl v. Xerox Corp.*, 933 F. Supp. 1157, 1169 (W.D.N.Y. 1996).

Mr. Sullivan testified that he did not perform a regression analysis in this case because he did not feel it was necessary. *See* Ex. 11 at 139:20-140:21. He did, however, agree that it is generally accepted in the field of damages analysis. *Id.* at 140:7-10. He stated that he was trained in regression analysis in college calculus, but that he had not used it recently. *Id.* at 140:3-6.

There are other types of statistical analysis involving multiple variables, including matching analysis, stratification, analysis of variance, probit analysis, logit analysis, discriminant analysis and factor analysis. *See* Reference Guide on Multiple Regression, *supra* at 181 n.3. Tesla's proposed damages expert utilized none of these other multi-variant statistical tools to test whether the purported loss of profits claimed by Tesla was attributable to some factor other than Defendant Waldmann's alleged malfeasance. A failure to use *any* statistical tool set forth in the Reference Guide on Multiple Regression for analyzing the effect of multiple variables is an appropriate basis for excluding the proposed testimony of a damages expert. *See Zenith Elec. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 418-20 (7th Cir. 2005).

## E. David Masilotti

A week after its deadline under the Court's standing Final Pretrial Order, the NMT Defendants received Tesla's proposed "Statement of Special Damages" for the Final Pretrial Order. *See* Ex. 15. The perfectly rounded numbers reflected in this statement do not reflect the

proposed expert opinion of Mr. Sullivan discussed above; but rather, *ipse dixit* figures from Tesla's President David Masilotti.  *See* Masilotti Tr. (Ex. 16) 208-216; Tesla's Supplemental Answer to Interrogatory No. 3, attached hereto as Ex. 17.

A nonexpert is not permitted to give expert testimony.  *Pearson v. Ramos*, 237 F.3d 881, 886 (7th Cir. 2001).  Before an expert may offer an opinion, he must first be qualified by virtue of specialized expertise.  *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000).  Here, Tesla is apparently seeking to use expert testimony from its non-expert President as a back-door means of propping up its damages calculation.  This is impermissible because Mr. Masilotti was not named as an expert (and is unqualified to give expert financial testimony), and the damages figures Tesla is promoting would represent improper lay testimony under Fed. R. Evid. 701.

The requirement that lay opinion be rationally based on the perception of the witness demands more than that the witness perceived something first hand; it requires that the witness' perception provide a truly rational basis for his or her opinion.  *Asplundh Mfg. Div. of Asplundh Tree Expert Co. v. Benton Harbor Eng'g.*, 57 F.3d 1190, 1201 (3d Cir. 1995).  To testify as a lay witness about damages calculations, the business owner must possess personal knowledge of the lost profits and damages and may not rely upon hearsay.  *Static Control Components, Inc. v. Darkprint Imaging, Inc.*, 240 F. Supp. 2d 465, 481 (M.D.N.C. 2002) (citations omitted).  During his deposition, Mr. Masilotti was unable to identify the records that supported his claims.  *See* Ex. 16 at 208-216.

The most important reason to preclude Mr. Masilotti from offering damages testimony is that his beliefs are purely fantastic.  Mr. Masilotti testified that he believed that Tesla's sales were poised to double every year until they reached the billions of dollars.  *See* Ex. 16 at 217-219. This takes Mr. Sullivan's "compound annual growth rate" method to a plateau of absurdity.  In

*Lifewise Master Funding v. Telebank*, 374 F.3d 917 (10th Cir. 2004), the U.S. Court of Appeals for the Tenth Circuit affirmed the exclusion of the damages testimony of a company's CEO where, as here, the CEO had no familiarity with damages analysis.

Tesla has indicated that it intends to present Mr. Masilotti as some kind of savant. *See* Tesla's Response to (D.I. 154 at 1) ("Mr. Masilotti, like Bill Gates, does not have a college degree. Both have been highly successful businessmen . . . Mr. Masilotti, like Mr. Gates, is a self-taught genius in the field of electronics . . . ."). While the jury is perfectly capable of penetrating the absurdity of Tesla's claims of the personal qualities of its President/sole shareholder/sole board member, the Federal Rules of Evidence provide limitations on Tesla's ability to confuse the jury with unreliable testimony from Mr. Masilotti concerning damages, masquerading as lay opinion or expert testimony.

## V.  **CONCLUSION**

For the reasons set forth above, the NMT Defendants respectfully request that this Honorable Court exclude the proposed testimony of Plaintiff's identified experts, as well as any unqualified lay opinion by Mr. Masilotti. In the alternative, the NMT Defendants request the opportunity to voir dire the proposed experts, and Mr. Masilotti, prior to them presenting any testimony under Fed. R. Evid. 701 or 702. Further in the alternative, the NMT Defendants request that, if Roger Guillemette is permitted to provide testimony, he be prevented from appearing in court in his military uniform and that counsel for Tesla be prohibited from discussing his status as a combat veteran.

ASHBY & GEDDES

*/s/ John G. Day*

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
Telephone:  (302) 654-1888
Facsimile:  (302) 654-2067
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Defendants Lyndol W.
Hollingsworth, Charles Minnick and New
Millennium Tools, Inc.*

*Of Counsel:*

Louis S. Mastriani
Rodney R. Sweetland, III
David F. Nickel
ADDUCI, MASTRIANI & SCHAUMBERG, L.L.P.
1200 Seventeenth Street, N.W., Fifth Floor
Washington, DC  20036
Telephone:  (202) 467-6300
Facsimile:  (202) 466-2006

Dated:  April 27, 2007
180053.1

# EXHIBIT 1

# REDACTED

# EXHIBIT 2

**REDACTED**

# EXHIBIT 3

**REDACTED**

# EXHIBIT 4

# REDACTED

# EXHIBIT 5

**REDACTED**

# EXHIBIT 6

# REDACTED

# EXHIBIT 7



**DEPARTMENT OF THE ARMY**
US ARMY GARRISON ABERDEEN PROVING GROUND
2201 ABERDEEN BOULEVARD
ABERDEEN PROVING GROUND, MD 21005-5001



REPLY TO
ATTENTION OF

March 14, 2007

Office of the Staff Judge Advocate

Mr. Brian Sullivan, Esquire
Werb & Sullivan
300 Delaware Avenue, 13th Floor
Post Office Box 25046
Wilmington, Delaware 19899

Dear Mr. Sullivan:

    We recently learned that you may subpoena Chief Warrant Officer Roger Guillemette to testify as an expert witness in private litigation: *Tesla Industries v. David Waldmann, et al,* currently filed in United States District Court for the District of Delaware.

    Army Regulation 27-40 forbids Army personnel from providing expert testimony in private litigation, with or without compensation, except under the most extraordinary circumstances. See 32 CFR 97.6(e), 516.42. Several reasons support the exercise of strict control over such witness appearances.

    The Army policy is one of strict impartiality in litigation in which the Army is not a named party, a real party in interest, or in which the Army does not have a significant interest. When a witness with an official connection with the Army testifies, a natural tendency exists to assume that the testimony represents the official view of the Army, despite express disclaimers to the contrary.

    The Army is also interested in preventing the unnecessary loss of the services of its personnel in connection with matters unrelated to their official responsibilities. If Army personnel testify as expert witnesses in private litigation, their official duties are invariably disrupted, often at the expense of the Army's mission and the Federal taxpayer.

    Finally, the Army is concerned about the potential for conflict of interest inherent in the unrestricted appearance of its personnel as expert witnesses on behalf of parties other than the United States. Even the appearance of such conflicts of interest seriously undermines the public trust and confidence in the integrity of our Government.

    Our sole concern in this matter is to protect the interests of the United States Army; the Army will not block access to witnesses or documents to which you are lawfully entitled. If you believe Chief Guillemette's testimony meets the "extraordinary circumstances" test, you must



EXHIBIT
7

-2-

contact the Office of the Judge Advocate General, U.S. Army Litigation Division, 901 N. Stuart Street, Suite 400, Arlington, VA 22203-1837 immediately.  You must request in writing Chief Guillemette's appearance and production of any files in accordance with Department of Defense directives, 32 CFR 97.6(c), and Army regulations, 32 CFR 516-34 - 516.40. The request must include the nature of the proceeding, 32 CFR 516.34(b), and the nature and relevance of the official information sought. *Id.*516.35(d). We cannot act on your request until we receive the required information. *See, for example, United States ex rel. Touhy v. Ragen,* 340 U.S. 462 (1951); *Boron Oil Co. v.Downie,* 873 F.2d 67 (4th Cir. 1989); *United States v. Bizzard,* 674 F.2d 1382 (11th Cir.1982); *United States v. Marino,* 658 F.2d 1120 (6th Cir. 1981); *United States v. Allen,* 554 F.2d 398 (10th Cir. 1977).

     If you have any questions, please contact Captain Jason Barocas at 410-278-2112.

                              Sincerely,

                              Don F. Pollack
                              Lieutenant Colonel, JA
                              Staff Judge Advocate


Copy Furnished

Commander, 61st Ordnance Brigade
Commander, HHC, 61st Ordnance Brigade
Inspector General, Aberdeen Proving Ground
CW3(P) Roger Guillemette
US Army Litigation Division, General Litigation Branch
Mr. Louis Mastriani, Esq

# EXHIBIT 8

## SCHEDULE D

### Witness List

#### I. Witnesses Plaintiff Intends to Call at Trial

| Name and Address | Objections (if any) |
|---|---|
| David Masilotti<br>Tesla Industries, Inc.<br>New Castle, DE | |
| Truee Dorsey<br>Tesla Industries, Inc.<br>New Castle, DE | |
| Frank Mooney<br>Tesla Industries, Inc.<br>New Castle, DE | |
| David Waldmann*<br>Malvern, PA | |
| Lyndol Hollingsworth*<br>Austin, TX | |
| Charles Minnick*<br>Portland, OR | |
| Donald Stewart<br>2619 14th Avenue<br>Moline, IL | |
| John Sullivan<br>1650 Suckle Highway<br>Pennsauken, NJ | |



---

\* Plaintiff reserves the right to use the deposition of these witnesses that do not voluntarily appear at trial or are outside the subpoena power of the Court.

II. Witnesses Plaintiff May Call at Trial

| Name and Address | Objection (if any) |
|---|---|
| Clyde Carter<br>604 Lash Road<br>Shermansville, PA | |
| Roger Guilemette[*]<br>11 Gull Circle<br>Northeast, MD 21901 | |
| Daniel Rosciolli<br>Tesla Industries, Inc.<br>New Castle, DE | |
| Kent Huffman[*]<br>Phoenix Lamar Corp.<br>8868 Research Blvd<br>Austin, TX | |

---

[*] Plaintiff reserves the right to use the deposition of these witnesses if they do not voluntarily appear at trial or are outside the subpoena power of the Court.

# EXHIBIT 9

**REDACTED**

# EXHIBIT 10

**REDACTED**

# EXHIBIT 11

**REDACTED**

# EXHIBIT 12

**REDACTED**

# EXHIBIT 13

# REDACTED

# EXHIBIT 14

**REDACTED**

# EXHIBIT 15

## SCHEDULE G

## STATEMENT OF SPECIAL DAMAGES

The Plaintiff seeks recovery of the following special damages, in addition to

punitive damages and its attorneys' fees and costs:

1.      Tesla Industries has suffered over $1,000,000.00 in damages including, but not limited to, lost sales and profits, lost production, delays in deliveries, and loss of normal growth opportunities.

2.      Additionally, Tesla Industries has lost the value of prototypes, drawings, technical data, and supplies at least in the estimated amount of $250,000.00.

3.      Tesla Industries has suffered lost employee and officer time and productivity in the amount of at least $500,000.00.

4.      Tesla Industries has also incurred substantial attorney fees in its effort to prevent defendants' misuse of its property.



EXHIBIT
15

# EXHIBIT 16

# REDACTED

# EXHIBIT 17

# REDACTED