# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

TESLA INDUSTRIES, INC., a Delaware
Corporation,

        Plaintiff,

v.

DAVID C. WALDMANN, LYNDOL W.
HOLLINGSWORTH, CHARLES
MINNICK a/k/a CHUCK MINNICK, and
NEW MILLENNIUM TOOLS, INC., an
Oregon Corporation,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 06-55

**REDACTED VERSION**
**MAY 18, 2007**

## PLAINTIFF, TESLA INDUSTRIES INC'S, MEMORANDUM
## IN OPPOSITION TO DEFENDANTS' DAUBERT MOTION

Brian A. Sullivan (#2098)
Robert D. Wilcox (#4321)
Amy D. Brown (#4077)
WERB & SULLIVAN
300 Delaware Avenue, 13th Floor
P.O. Box 25046
Wilmington, Delaware 19899
Telephone: 302-652-1100
bsullivan@werbsullivan.com

Paul E. Crawford (#493)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 N. Orange Street
P.O. Box 2207
Wilmington, Delaware 19899
Telephone: 302-888-6262
pcrawford@cblh.com

Dated: May 11, 2007

*Attorneys for Plaintiff*
*Tesla Industries Inc.*

# TABLE OF CONTENTS

Introduction ........................................................................................................... 1

Argument .............................................................................................................. 2

  1.  Mr. Carter Has Over Forty (40) Years Experience with Electrical Connectors and Is Otherwise Well Qualified to Render an Opinion on the Unique Properties of Tesla's NATO Receptacle. .................................................................................. 2

  2.  The Challenge to Mr. Guillemette's Expert Testimony Has Been Mooted by a Recent Army Ruling. ......................................................................................... 5

  3.  Mr. Stewart is Uniquely Qualified to Opine Whether Defendants' Deceptive Actions Mislead Him. .......................................................................................... 5

  4.  Mr. Sullivan Has the Credentials and Knowledge to Render his Opinion Regarding Damages .............................................................................................................. 7

    a)  Mr. Sullivan Received Accurate Information to Complete His Analysis ............. 7

    b)  Mr. Sullivan is Not Required to be an Expert In the Field of Mechanical Engineering in Order to Render an Expert Opinion as to Financial Projections and Lost Profits .................................................................................................. 8

    c)  The Information on which Mr. Sullivan Relied is Reliable and Has Adequate Foundation ......................................................................................................... 9

    d)  Mr. Sullivan's Opinion is Not Based Upon Flawed Methodology ..................... 10

  5.  Mr. Masilotti is Uniquely Qualified to Offer Testimony on Tesla's Financial History. .............................................................................................................. 11

Conclusion ......................................................................................................... 13

# TABLE OF AUTHORITIES

## Cases

Bleacher v. Bristol-Meyers Company,
   163 A. 2d 526 (Del. Super. 1960) ................................................................................. 3

Coca-Cola Bottling Company of Shreveport, Inc. v. The Coca-Cola Company,
   107 F.R.D. 288 (D. Del. 1985) ..................................................................................... 3

Daubert v. Merrell Dow Pharms, Inc.,
   509 U.S. 579 (1993) ................................................................................................. 1, 5

DSMC, Incorporated v. Convera Corporation,
   2007 WL 902034 (D.D.C. March 27, 2007) ................................................................. 3

Feit v. Great-West Life and Annuity Ins. Co.,
   460 F. Supp. 2d 632 (D.N.J. 2006) .............................................................................. 8

In Elm City Cheese Co. v. Federico,
   752 A. 2d 1037 (Conn. 1999) ....................................................................................... 3

In re Paoli R.R. Yard PCB Litigation,
   35 F. 3d 717 (3d Cir. 1994) ..................................................................................... 1, 8

In re TMI Litigation,
   193 F. 3d 613 (3d Cir. 1999) ...................................................................................... 1

In re Unisys Savings Plan Litigation,
   173 F.3d 145 (3d Cir. 1999) ........................................................................................ 8

Lifewise Master Funding v. Telebank,
   374 F 3d 917 (10th Cir. 2004) ................................................................................... 12

Lightening Lube, Inc. v. Witco Corp.,
   4 F 3d 1153 (3d Cir. 1993) ................................................................................... 11, 12

Minnesota Mining & Manufacturing Co. v. Pribyl,
   259 F. 3d 587 (7th Cir. 2001) ...................................................................................... 4

R.I. Spiece Sales Company, Inc. v. Bank One, NA,
   2005 WL 3005484 (N.D. Ind. Nov. 9, 2005) ............................................................. 12

Syntex Ophthalmics Inc. v. Tsuetaki,
   701 F. 2d 677 (7th Cir. 1983) ...................................................................................... 4

U.S. v. Mitchell,
   365 F. 3d 215 (3d Cir. 2004) ....................................................................................... 5

U.S. v. Velasquez,
   64 F.3d 844 (3d Cir. 1995) ........................................................................................... 9

U.S. v. Watson,
   260 F. 3d 301 (3d Cir. 2001) ....................................................................................... 1

**Statutes**

28 Del. C. §2804 ................................................................................................... 2

28 Del. C. §2807 ................................................................................................... 2

6 Del. C. §2001 et seq............................................................................................ 3

**Other Authorities**

28 U.S.C.A. Advisory Committee Notes, 2000 Amendments........................................... 11

**Rules**

Fed. R. Evid. 701 ............................................................................................... 11

# INTRODUCTION

This is Plaintiff, Tesla Industries Inc.'s ("Tesla"), Memorandum in Opposition to the NMT Defendants' April 27, 2007 Daubert Motion (D.I. 170). The NMT Defendant's Memorandum of Points and Authorities in Support of Their Daubert Motion (D.I. 171; hereinafter "Daubert Motion") overstates the limits on expert testimony stated in the seminal *Daubert* decision.[1]

*Daubert* is not a rule of exclusion. The Third Circuit has repeatedly admonished that the requirements for tendering expert opinions under the Rules of Evidence should be liberally construed. *U.S. v. Watson*, 260 F. 3d 301, 307 (3d Cir. 2001) ("We have interpreted Rule 702's qualifications requirement liberally"). *In re TMI Litigation*, 193 F. 3d 613, 807 (3d Cir. 1999) ("Rule 702, which governs the admissibility of expert testimony, has a liberal policy of admissibility").

The Daubert Motion attempts to overcome Defendants inability to find any experts to testify on their behalf by lobbing a fusillade of challenges against Tesla's four expert witnesses. This attack on credible witnesses to offset the NMT Defendants' inability to find its own experts should not be countenanced.

The Daubert Memo (pages 1, 11) also misstates the level of education needed to give expert testimony. The Third Circuit has explained that exclusion of an expert is not appropriate "simply because the experts did not have the degree or training which the district court apparently thought would be most appropriate." *In re Paoli R.R. Yard PCB Litigation*, 35 F. 3d 717, 741 (3d Cir. 1994).

Turning from the general to the specific, addressed below are counterpoints to the NMT Defendants' attack on each of Tesla's witnesses.

---

[1] *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579 (1993).

## ARGUMENT

1. Mr. Carter Has Over Forty (40) Years Experience with Electrical Connectors and Is Otherwise Well Qualified to Render an Opinion on the Unique Properties of Tesla's NATO Receptacle.

Mr. Carter's credentials are impeccable. His resume notes that "He is a mechanical engineer with 40+ years design experience". During those years he worked for the Who's Who of technology companies: General Electric, Bell Telephone, Goodyear, AMP and others.[2] (See Carter resume at page 3 of his expert report attached as Exhibit A hereto).

Despite these impressive credentials, the Daubert Memo (page 7) portrays him as a technical dolt because *inter alia* he is not a registered professional engineer (P.E.) in Delaware. The NMT Defendants' representation that registration as a Delaware P.E. is a necessary predicate for expert witnesses does a disservice to this Court. Attached as Exhibit B is a letter from the Executive Director of the Delaware Association of Professional Engineers (DAPE) directly refuting this representation.[3] It states that "expert witness testimony does not require licensure. The Courts will determine who may be deemed an expert within the court system".

The Daubert Motion then misstates Tesla's trade secrets in an effort to keep his strong opinion about the superiority of Tesla's products from the jury. For example, the Daubert Memo (page 3) asserts that "a product that is offered for sale loses all trade secret protection." That grossly oversimplifies trade secret law. COCA-COLA® is a product offered for sale yet its formula and the way the ingredients are combined have

---

[2] "AMP is the world's leading name in electrical and electronic connectors and interconnection systems" (excerpt from AMP's website – www.amp.com). By itself, Mr. Carter's work for the world's leader in electronic connectors confirms his qualifications to opine on Tesla's NATO connector.

[3] The Council (governing body) of DAPE is the exclusive entity authorized by Delaware Law to regulate the "practice of engineering" in this state. 28 Del. C. §2804; 2807.

been repeatedly recognized as a trade secret.  In *Coca-Cola Bottling Company of Shreveport, Inc. v. The Coca-Cola Company*, 107 F.R.D. 288, 289 (D. Del. 1985), Judge Schwartz noted that "although most of the ingredients are public knowledge, the ingredient that gives Coca-Cola its distinctive taste is a secret combination of flavoring oils and ingredients…".  *See also Bleacher v. Bristol-Meyers Company*, 163 A. 2d 526 (Del. Super. 1960) (acknowledging the formula of Ban deodorant is a trade secret).

REDACTED


These particular features used by Tesla not generally known and not readily ascertainable by proper means.  They are thus legitimate trade secrets under 6 Del. C. §2001 et seq.

Moreover, even if individual features were known, trade secrets can exist in a "unique combination of those otherwise publicly available elements."  *DSMC, Incorporated v. Convera Corporation*, 2007 WL 902034, at *6 (D.D.C. March 27, 2007) (attached as Exhibit C hereto) (citing *In Elm City Cheese Co. v. Federico*, 752 A. 2d 1037, 1047 (Conn. 1999) finding that "plaintiff's ability to combine these elements into a successful…process like the creation of a recipe from common cooking ingredients is a trade secret entitled to protection.").

Even one of the cases cited in the Daubert Memo (page 3) recognized that a "trade secret can exist in a combination of characteristics and components, each of which,

---

[4]  Tesla's definition of its trade secrets (pages 3-8 of Exhibit 4 to the Daubert Memo) explains the numerous secret features of Tesla's NATO connector.

REDACTED

3

by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret". *Minnesota Mining & Manufacturing Co. v. Pribyl*, 259 F. 3d 587, 596 (7th Cir. 2001) (citing *Syntex Ophthalmics Inc. v. Tsuetaki*, 701 F. 2d 677, 683 (7th Cir. 1983)).

The Daubert Memo (page 5) also challenges Mr. Carter's proposed testimony because he allegedly could not "opine on the precise ratio of [Tesla's] alloy". See Exhibit 2 to Daubert Memo at 71:2-76:12. The referenced portion of Mr. Carter's deposition (pages 71-76) is the very antithesis of the NMT Defendants' assertion! Mr. Carter testified that the **public**, not him, would be unable to determine the precise ratio of this alloy.[5]

The Daubert Memo also incorrectly asserts that the ratio of alloyed metals has not been supplied to Defendants.

REDACTED

Lastly, the Daubert Memo (pages 4-5) tries to block Mr. Carter's trial testimony with the argument he didn't do any testing. But Mr. Carter said he didn't need to do testing. He carefully compared the features of the Tesla NATO connector with like connectors made by at least one other company and watched the high precision Tesla machinery used to make its connector. Based on those studies he concluded "I didn't need to do testing" (Carter Dep. Tr., page 58, line 17, Exhibit 2 to Daubert Memo). If the NMT Defendants believe he is vulnerable on this issue (testing) that is the subject of

---

[5]

REDACTED

cross examination, not a preemptory exclusion of his testimony. *U.S. v. Mitchell*, 365 F. 3d 215, 245 (3d Cir. 2004). (Trial practices such as cross-examination "rather than wholesale exclusion under an uncompromising…test, are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702." (citing *Daubert*, 509 U.S. at 596).

<ol start="2">
<li>The Challenge to Mr. Guillemette's Expert Testimony<br>
<u>Has Been Mooted by a Recent Army Ruling.</u></li>
</ol>

The Army recently resolved this issue of Mr. Guillemette's trial testimony (See April 26, 2007 letter from Army to Tesla's counsel attached as Exhibit E hereto). The Army concluded that he may not "provide expert or opinion testimony". But he can provide factual testimony about "his experiences with the product" as well as "the product's durability, ease of probe replacement and safety features". His factual testimony at trial will be limited to these topics.

<ol start="3">
<li>Mr. Stewart is Uniquely Qualified to Opine Whether<br>
<u>Defendants' Deceptive Actions Mislead Him.</u></li>
</ol>

Before turning to Defendants' attack on Mr. Stewart a short background of his connection with the matter is warranted. Mr. Stewart recently retired after a 26 year career in military procurement at the Rock Island Arsenal in Rock Island, Illinois. That facility has primary responsibility within the Army for evaluation and purchase approval of a wide range of military hardware, including power tools (See page 1 of Stewart Expert Report attached as Exhibit 9 to Daubert Memo). One tool that passed his desk for review and approval was a so-called DC Impact Wrench. As explained in paragraphs 19 to 23 of the Verified Complaint (DI 2), the DC Impact Wrench was promoted to the Army by defendant, Waldmann, in collusion with one or more of the NMT Defendants

5

while Waldmann was still an employee of Tesla. This rogue activity by Waldmann was never approved, sanctioned or even known to Tesla.

As explained in Mr. Stewart's Expert Report (page 3) he will offer his opinion that he would not have approved the DC Impact Wrench for purchase by the Army but for the representation by Waldmann, and one or more of the NMT Defendants, that the Wrench was made or offered by Tesla. That representation was fostered by an unauthorized use of Tesla's name and Waldmann's Tesla contact information in promotional material for the Wrench. A copy of this promotional material used by Waldmann and others without Tesla's approval or knowledge is attached as Exhibit F hereto. It prominently displays Tesla's name and lists Waldmann's Tesla contact information.

Notwithstanding all the barbs launched at Mr. Stewart's credentials (Daubert Memo, page 11) he, and he alone, is the best person to render an opinion whether he was hoodwinked by the above deception regarding Tesla's (non) association with the DC Impact Wrench.[6]

Another opinion to be rendered by Mr. Stewart is described in his expert report as follows (page 4 of Exhibit 9 to the Daubert Memo).

> For all of the above reasons, it is my opinion that Mr.
> Waldmann would have to rely upon customers identified
> during his employment at Tesla Industries to effectively
> promote and sell any products on behalf of [the NMT
> Defendants].

Contrary to Defendants' assertion (Daubert Memo, pages 11-12), Mr. Stewart unequivocally stated that this opinion is not based solely on his experience at the Rock

---

[6] The fact that Mr. Stewart only spent a few hours preparing his report (Daubert Memo, page 11) reinforces this conclusion. He didn't have to spend a lot of time searching treatises, reviewing tests, etc. to form an opinion based on intimate personal association with the facts underlying that opinion.

Island Arsenal.[7] At pages 122-123 of his deposition (Attached as Exhibit G hereto), he specifically refuted the impression sought to be created by selective quotes in the Daubert Memo (pages 12-13) suggesting that he had no idea what was happening in the purchasing world outside of Rock Island (TACOM). He noted, *inter alia*, that "TACOM is a microcosm of all Army installations ***. We all operate under basically the same procurement guidance." He further noted that (page 123, lines 14-17)

> "A. I'm testifying about TACOM and the fact that other installations are very similar to TACOM and that procurement officials names are not published Army-wide".

This, and other testimony of Mr. Stewart, therefore refutes the argument (Daubert Memo, page 12) that Mr. Stewart's experience at TACOM is so unique that he has no basis to opine on military procurement policies and practices in other facilities.[8]

    4.  Mr. Sullivan Has the Credentials and Knowledge
        to Render his Opinion Regarding Damages

        a)  Mr. Sullivan Received Accurate
            Information to Complete His Analysis

Mr. Sullivan's deposition testimony is that he received sufficient information to calculate lost profits: "Based on the information we have considered as of the date of this report, I believe that our report – our approach yields a reasonable estimate of lost profits" (Sullivan Dep. Tr. 115, lines 12-16, Exhibit 11 to Daubert Memo). That opinion was not based on thin air. It was based on Tesla's tax returns, its accounts compilation report (Sullivan Dep. Tr. 70) and monthly sales figures (Sullivan Dep. Tr. 87). NMT

---

[7] This Arsenal at which he worked is also referred to as the Tank Automotive Command (TACOM). The latter acronym is used throughout his deposition to describe the Arsenal where he worked.
[8] Defendants also attempted to artificially circumscribe his knowledge base because of alleged ignorance about IMPAC cards (Daubert Memo, page 12). His deposition testimony proves otherwise. He repeatedly described the IMPAC purchase section in depth at his deposition (see pages 83-89, 102-104 of Mr. Stewart's deposition attached at Exhibit G hereto).

Defendants suggest that he should have looked at other information such as sales tax returns and customer lists (Daubert Memo, page 16).

But what an expert doesn't use in his analysis is not the issue in a Daubert Motion. Any alleged weakness in the factual foundation of an expert opinion is the proper subject of cross-examination, not exclusion via a Daubert Motion. See *In re Unisys Savings Plan Litigation*, 173 F.3d 145, 167 (3d Cir. 1999) (recognizing that "juries generally have the ability to accurately weight and evaluate witness credibility" and that "[a]ccordingly, the most common judicial response to attacks on the reliability of expert testimony is that such matters go to weight, not admissibility."); and *Feit v. Great-West Life and Annuity Ins. Co.*, 460 F. Supp. 2d 632, 636-37 (D.N.J. 2006) ("[T]he court's role as a gatekeeper is not intended to serve as a replacement for the adversary system").

> b) Mr. Sullivan is Not Required to be an Expert In the Field of
>    Mechanical Engineering in Order to Render an Expert Opinion
>    as to Financial Projections and Lost Profits

Mr. Sullivan, is more than qualified to render a lost profits opinion in this case. He is a Board Certified Public Accountant and Valuation Analyst with almost ten (10) years of pertinent experience. (See page 9 et seq of Sullivan Expert Report – Exhibit 12 to Daubert Memo). Mr. Sullivan's expertise is in the field of accounting, valuation and finance. The specific knowledge the Defendants' incorrectly allege he should posses with regard to engineering is simply not required under Daubert and the line of cases that follow. The Third Circuit has explained that exclusion of an expert is not appropriate "simply because the experts did not have the degree or training which the district court apparently thought would be most appropriate." *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 741 (3d Cir. 1994). Further, A "broad range of knowledge, skills, and training

8

qualify an expert as such." *U.S. v. Velasquez*, 64 F.3d 844, 849 (3d Cir. 1995). In fact,

the requirement has been liberally construed by the Third Circuit which has "eschewed

imposing overly rigorous requirements of expertise." *U.S. v. Velasquez*, at 849.[9]

The fact that Mr. Sullivan is a Certified Valuation Analyst and Certified Public

Accountant with almost ten years experience in the field of business valuations and

finance makes him qualified to conduct his lost profits analysis and render the report he

prepared. His report will undoubtedly be of assistance to the jury and the Court in

understanding Tesla's claims for damages in this case.

> c) The Information on which Mr. Sullivan Relied
> is Reliable and Has Adequate Foundation

The NMT Defendants incorrectly argue "Mr. Sullivan's proposed testimony is

premised entirely upon unsupported information." (Daubert Memo, page 17). Nothing

could be further from the truth. Attachment C to the Sullivan Expert Report lists the

information and documents considered by Mr. Sullivan, which include:

> 1.    Monthly Sales of Tesla Industries from 1995 to 2006.
>
> 2,    Tesla Industries' Tax Returns.
>
> 3.    Tesla Industries' Production of Documents in this case.
>
> 4.    Tesla Industries' Supplemental Interrogatory Answers and
>       Supplement Answer to Interrogatories concerning damages.

Defendants' arguments concerning alleged errors in Tesla's tax returns are a

regurgitation of their arguments in the NMT Defendant's Motion in Limine No. 5: To

---

[9] Defendants' reliance upon the *Pell* case (Daubert Memo, page 17) is completely misplaced. In fact, Judge Jordan there ruled that expert testimony can be received from someone who has specialized knowledge or training sufficient to quality him to opine on the issue "within his field of expertise." *Pell v. E. I. du Pont De Nemours & Co., Inc.*, 231 F.R.D. 186. 192 (D. Del. 2005). In that case, the Plaintiff totally failed to disclose any of the proposed experts' qualifications. Further, the expert did not provide any basis for his estimates of the Plaintiff's pension and contained glaring analytical gaps, which is clearly not the case here. Mr. Sullivan is qualified to render an opinion concerning his field of expertise in accounting and valuations, i.e. damages.

Exclude Unverifiable Financial Documents (D.I. 137). Rather than again burden this Court with Tesla's and its accountants response by way of affidavits to those arguments, Tesla incorporates by reference its Response to NMT Defendants' Motion in Limine No. 5: To Exclude Unverifiable Financial Documents (D.I. 148), including the affidavit of Dee Ridgeway (Tesla's accountant). The bottom line is that, despite the NMT's hyper-aggressive efforts to attack virtually every expert witness and piece of evidence in this case, the Sullivan Expert Report is based upon reliable information. It goes without question that the NMT Defendants will have the right to cross-examine both Mr. Sullivan and Tesla Industries in order to raise and address their concerns.

### d) Mr. Sullivan's Opinion is Not Based Upon Flawed Methodology

The Daubert Memo's mischaracterization of Tesla's sales as wildly fluctuating (page 20) and Mr. Sullivan's analysis of its sales history as "assumptions" are unfounded. Since the year 2000, with the exception of one year, Tesla's profits have increased steadily. Sales increased by 80% in 2004 and 50% in 2005. An accountant and valuation analyst is trained to spot trends, and his estimate of projected growth of 32% for 2006 is reliable (and conservative) and based on sound accounting principles.

The NMT Defendants' position is that regression analysis is the only acceptable methodology for calculation of damages in this case (Daubert Memo, page 21-22). This position is supported by nothing but lawyer's rhetoric.[10] Conversely, Mr. Sullivan testified at his deposition that his compound annual growth rate methodology was more appropriate than regression analysis (Sullivan Dep. Tr. 140, lines 12-14; Exhibit 11 to Daubert Memo). As between Certified Valuation Analyst (Mr. Sullivan) and the NMT

---

[10] The NMT Defendants also try to substitute a hearsay treatise by Daniel L. Rubenfield for a live expert who could be cross examined (Daubert Memo, page 21).

Defendants' counsel, it is respectfully submitted that the Court accept the former's opinion as the proper lost profits analysis to be used in this case.

5. Mr. Masilotti is Uniquely Qualified to Offer Testimony on Tesla's Financial History.

Pages 22-24 of the Daubert Memo attacks Mr. Masilotti's probable trial testimony regarding Tesla's financial misfortunes as a result of Defendants' misdeeds. This is nothing more than a repeat of like attacks in "Defendants Motion in Limine No. 4 to Preclude Certain Types of Testimony by Tesla's President David Masilotti" (D.I. 136). Tesla's Memorandum in Opposition to Motion in Limine No. 4 (D.I. 154) addresses many of the parallel arguments made in the Daubert Memo. For the convenience of the Court, Tesla's Memorandum (D.I. 154) is attached hereto as Exhibit H.

As explained in Tesla's earlier Memorandum (pages 1-2 of Exhibit H) Mr. Masilotti is the prime mover behind Tesla. He is the president and principal stockholder. As such, he is uniquely qualified to testify about the damages his company suffered at the hands of the Defendants. An opinion by a business owner or officer is "admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business." Fed. R. Evid. 701, 28 U.S.C.A. Advisory Committee Notes, 2000 Amendments.

The Third Circuit recognizes that "the modern trend favors the admission of lay opinion testimony, provided that it is well founded on personal knowledge and susceptible to specific cross-examination." *Lightening Lube, Inc. v. Witco Corp.*, 4 F 3d 1153, 1175 (3d Cir. 1993) (holding that an owner/officer's partial reliance on third party report does not render testimony inadmissible because of his knowledge and participation

11

in the day-to-day affairs of his company).   In *R.I. Spiece Sales Company, Inc. v. Bank One, NA*, 2005 WL 3005484, at *1 (N.D. Ind. Nov. 9, 2005) (attached as Exhibit I hereto), the court noted that "those who have special knowledge of the business and its operations may also testify as to the facts of the business that underlie profit expectations under Federal Rule of Evidence 701 without qualifying as experts." (citing *Lightening Lube, Inc. v. Witco Corp.*, 4 F 3d 1153 (3d Cir. 1993)).

Owners have been allowed to testify as to lost profits or damages as a lay witness when they have sufficient personal knowledge of their business and of the factors relied upon to estimate lost profits, or when the owners used common sense, straight forward calculations.  *See Lifewise Master Funding v. Telebank*, 374 F 3d 917, 930 (10th Cir. 2004) which noted that the business owner could provide "straightforward opinion as to lost profits using conventional methods based on [company's] actual operating history," but could not testify as to more complicated accounting methods.   The NMT Defendants cite to this case for the broad proposition that a CEO with no familiarity of the damages analysis could not testify.   The facts of the *Lifewise* case, however, involve a CEO trying to testify as to complicated accounting methods (i.e., S-curves, rolling averages, compound growth rates) about which he admittedly had no knowledge.   It was not merely that he was unfamiliar with a particular damages analysis as suggested by the NMT Defendants.

For all of the reasons just noted, Tesla submits the most knowledgeable person, Mr. Masilotti, should be permitted to provide lay opinion about his own business.

## CONCLUSION

NMT Defendants' use of a Daubert Motion to "even the score" on expert

witnesses should not be rewarded.  Any alleged flaws in the expert's testimony are better

handled by appropriate objections at trial rather than outright exclusion of the expert via a

Daubert Motion.

Dated: May 11, 2007

/s/ Paul E. Crawford
Paul E. Crawford (#493)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 N. Orange Street
P.O. Box 2207
Wilmington, Delaware 19899
Telephone: 302-888-6262
pcrawford@cblh.com

Brian A. Sullivan (#2098)
Robert D. Wilcox (#4321)
Amy D. Brown (#4077)
WERB & SULLIVAN
300 Delaware Avenue, 13th Floor
P.O. Box 25046
Wilmington, Delaware 19899
Telephone: 302-652-1100
bsullivan@werbsullivan.com

*Attorneys for Plaintiff*
*Tesla Industries Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on May 11, 2007, a true and correct copy of the foregoing

PLAINTIFF, TESLA INDUSTRIES INC'S, MEMORANDUM IN OPPOSITION TO

DEFENDANTS' DAUBERT MOTION was caused to be served on the following via CM/ECF

filing and electronic mail:

<table>
<tr>
<td>

HAND DELIVERY
John D. Demmy
Stevens & Lee
1105 North Market Street
7th Floor
Wilmington, Delaware 19801
jdd@stevenslee.com

</td>
<td>

HAND DELIVERY
Steven J. Balick
John G. Day
Ashby & Geddes
222 Delaware Avenue
P.O. Box 1150
Wilmington, Delaware 19899
sbalick@ashby-geddes.com

</td>
</tr>
<tr>
<td>

John A. Adams
Adam C. Gerber
Susanin, Widman & Brennan, P.C.
South Gulph Road, Suite 240
King of Prussia, PA 19406
Jaadams@swbcounsellors.com

</td>
<td>

Louis S. Mastriani
Rodney R. Sweetland, III
David F. Nickel
Adduci, Mastriani & Schaumberg, L.L.P.
1200 Seventeenth Street, N.W., Fifth Floor
Washington, District of Columbia 20036-3006
Nickel@adduci.com

</td>
</tr>
</table>

_/s/ Paul E. Crawford_
Paul E. Crawford, Esquire (#493)
pcrawford@cblh.com

14

# Exhibit A

FILE COPY

ATTORNEYS' EYES ONLY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE



PLAINTIFF'S
EXHIBIT
*TX 35*

TESLA INDUSTRIES, INC.,      )
                    )
       Plaintiff,       )
                    )
       v.              )   C.A. No. 06-055-GMS
                    )
DAVID C. WALDMANN, LYNDOL W.  )
HOLLINGSWORTH, CHARLES      )
MINNICK a/k/a CHUCK MINNICK, and  )
NEW MILLENNIUM TOOLS, INC.,    )
                    )
       Defendants.     )

## AMENDED EXPERT TESTIMONY OF CLYDE T. CARTER

### I.    Introduction

I have been retained by Plaintiff, Tesla Industries, to provide information relating to some of the issues which I understand will be tried in the above-captioned litigation. I expect to provide this testimony in conjunction with one or more of the following issues: First, I understand that there are issues in this litigation relating to the uniqueness of Tesla Industries, Inc.'s NATO Connectors as compared to other NATO Connectors in the marketplace.

It is the purpose of this report to outline my expected testimony on these and other issues and the basis of any opinions rendered in connection with that testimony.

### II.    Pertinent Experience, Knowledge And Training

Attached is my resume describing relevant experience as a Mechanical Engineer. I am familiar with connectors as I was Director of Research & Development and General Manager of Wells Electronics where I specialized in Burn-in Connectors.

### III.    Pertinent Materials Reviewed

I have reviewed the following materials in preparation for rendition of testimony in this matter. These materials include:

1. Brush Wellman Engineered Materials' Product Guide and information on Wrought Alloys.

2. Complaint



EXHIBIT
197
ADM·3/12/07
PENGAD 800-631-6989

3. Tesla Industries, Inc.'s NATO Connectors, which includes the NATO Plug and NATO Receptacle.

4. Tesla Industries, Inc.'s Cylindrical Connector

In addition to the above I understand there are numerous other documents which I may review in the future pending approval of my access to same by Defendants. I understand that this access may be requested.

IV.    Statement Of Expected Opinions And Reasons

I will be called upon to render an opinion on Tesla Industries' NATO Connector, its unique material and application, and it's uniqueness in the connector marketplace, which I understand is explained in Plaintiff's Supplemental Response to Interrogatory No. 9 of Defednants Lyndol W. Hollingsworth, Charles Minnick a/k/a Chuck Minnick, and New Millennium Tools, Inc.'s First Set of Interrogatories to Plaintiff Tesla Industries, Inc.

After examining Tesla Industries' NATO Connectors, I have come to the conclusion that Tesla Industries' NATO Connector is unique and has superior features as compared to other NATO Connectors in the marketplace.

REDACTED

REDACTED

Control of Manufacturing Tolerances is critical to the performance of these Connectors. The loading of contact springs as well as the manner in which they deflect is determined by the range of dimensions seen in intermateable parts. If the deflection of a spring is too low as determined by the total cumulative dimensions of the mating parts, the normal force will be low resulting in unacceptably high contact resistance and heating. Conversely, if spring deflection is too high, mating characteristics will suffer. (Either resulting in damage to the contacts or in unacceptably high mating force) A similar relationship applies to contacting surfaces.

REDACTED

Serviceability of design may be considered to be the culmination of all the design characteristics of a product. Key serviceability questions are:

    1. Does the product work?

2. How well does it work?

3. Does the design lend itself to maintenance and repair?

4. Will the product survive adverse environmental conditions?

The answers to all these questions will reflect positively on Tesla Industries, Inc.'s Connectors and will show that the product is superior to the competition.

V.    **Exhibits To Be Used at Trial**

I expect that some of the documents referenced above, plus demonstrative exhibits, may be used in conjunction with my trial testimony.

VI.    **Listing of Pertinent Publications and Other Export Testimony**

There are no publications in my name in the last ten years. I have not testified (by deposition or trial) as an expert in the last four years.

My compensation in connection with this matter is $100.00 per hour plus reimbursement of expenses.

I subscribe to the content of the above report.

Clyde T. Carter                                                      Jan 18, 2007
                                                                     Date

-4-

Exhibit B

STATE OF DELAWARE



**DELAWARE ASSOCIATION OF PROFESSIONAL ENGINEERS**
56 W. Main Street, Suite 208
Christiana, DE  19702

PHONE: 302-368-6708
FAX: 302-368-6710

May 8, 2007

Paul E. Crawford, Esq.
Connolly, Bove, Lodge & Hutz
P.O. Box 2207
Wilmington, DE  19899

Dear Mr. Crawford:

The Council of the Delaware Association of Professional Engineers has determined that expert witness testimony does not require licensure.  The Courts will determine who may be deemed an expert within the court system.  And, Delaware Code Title 24, Chapter 28 §2803 (20) does not include expert witness testimony in its definition of the practice of engineering.

If you require any additional information, please do not hesitate to contact our office.

Sincerely,

Peggy Abshagen
Executive Director

/pa

Exhibit C

*Westlaw.*

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 902034 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

Page 1

**⋈**
DSMC, Inc. v. Convera Corp.
D.D.C.,2007.
Only the Westlaw citation is currently available.
United States District Court,District of Columbia.
DSMC, INCORPORATED, Plaintiff,
v.
CONVERA CORPORATION, Defendant.
**Civil Action No. 01-2284 (EGS).**

March 27, 2007.

**Background:** Software developer brought action against competitor alleging copyright infringement, civil conspiracy, and misappropriation of trade secrets.

**Holdings:** The District Court, Sullivan, J., held that:

(1) fact issue existed as to whether features identified by developer in its media archive system constituted trade secrets;

(2) fact issue existed as to whether competitor misappropriated alleged trade secrets of developer in its media archive system;

(3) database schema was "embodied in" computer program registered with Copyright Office;

(4) fact issue existed as to whether competitor copied developer's database schema;

(5) fact issue existed as to whether expressive elements in developer's media archive system were substantially similar to competitor's replacement program;

(6) competitor's intermediate copying of software developer's database schema in order to write scripts to migrate data into competitor's product was not fair use under copyright laws; and

(7) developer's common law and statutory conspiracy claims that were predicated on misappropriation of trade secrets were preempted by developer's claim under District of Columbia Uniform Trade Secrets Act (DCUTSA).

Motion granted in part and denied in part.

[1] Federal Civil Procedure 170A ⟲2515

170A Federal Civil Procedure
　170AXVII Judgment
　　170AXVII(C) Summary Judgment
　　　170AXVII(C)2 Particular Cases
　　　　170Ak2515 k. Tort Cases in General.
Most Cited Cases
Genuine issue of material fact existed as to whether features identified by software developer in its media archive system constituted trade secrets, precluding summary judgment on developer's misappropriation claim under District of Columbia Uniform Trade Secrets Act (DCUTSA). D.C. Official Code, 2001 Ed. § 36-401 et seq.; Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

[2] Antitrust and Trade Regulation 29T ⟲411

29T Antitrust and Trade Regulation
　29TIV Trade Secrets and Proprietary Information
　　29TIV(A) In General
　　　29Tk411 k. Constitutional and Statutory Provisions. Most Cited Cases

**Federal Courts 170B ⟲1040.1**

170B Federal Courts
　170BXI Courts of District of Columbia
　　170BXI(A) In General; District Court
　　　170Bk1040 Procedure in District Court
　　　　170Bk1040.1 k. In General. Most Cited Cases
When interpreting the District of Columbia Uniform Trade Secrets Act (DCUTSA), district court may consider how other jurisdictions have interpreted their trade secret acts. D.C. Official Code, 2001 Ed. § 36-401 et seq.

When interpreting the District of Columbia Uniform Trade Secrets Act (DCUTSA), district court may consider how other jurisdictions have interpreted their trade secret acts. D.C. Official Code, 2001 Ed. § 36-401 et seq.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 902034 (D.D.C.)
**(Cite as: --- F.Supp.2d ----)**

---

**[3] Antitrust and Trade Regulation 29T ☞413**

29T Antitrust and Trade Regulation
   29TIV Trade Secrets and Proprietary Information
      29TIV(A) In General
         29Tk413 k. What Are "Trade Secrets" or
Other Protected Proprietary Information, in General.
Most Cited Cases
The threshold inquiry in every trade secret case is
whether or not there is a trade secret to be misappro-
priated.

**[4] Antitrust and Trade Regulation 29T ☞413**

29T Antitrust and Trade Regulation
   29TIV Trade Secrets and Proprietary Information
      29TIV(A) In General
         29Tk413 k. What Are "Trade Secrets" or
Other Protected Proprietary Information, in General.
Most Cited Cases
For information to constitute a trade secret under the
District of Columbia Uniform Trade Secrets Act
(DCUTSA), (1) the information must be secret; (2)
its value must derive from its secrecy; and (3) its
owner must use reasonable efforts to safeguard its
secrecy. D.C. Official Code, 2001 Ed. § 36-401 et
seq.

**[5] Antitrust and Trade Regulation 29T ☞433**

29T Antitrust and Trade Regulation
   29TIV Trade Secrets and Proprietary Information
      29TIV(B) Actions
         29Tk433 k. Questions of Law or Fact. Most
Cited Cases
Whether a particular piece of information is a trade
secret is generally a question of fact.

**[6] Antitrust and Trade Regulation 29T ☞413**

29T Antitrust and Trade Regulation
   29TIV Trade Secrets and Proprietary Information
      29TIV(A) In General
         29Tk413 k. What Are "Trade Secrets" or
Other Protected Proprietary Information, in General.
Most Cited Cases
Even if individual elements are known to the public,
a trade secret can exist in a unique combination of
those otherwise publicly available elements.

**[7] Federal Civil Procedure 170A ☞2515**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
        170AXVII(C)2 Particular Cases
           170Ak2515 k. Tort Cases in General.
Most Cited Cases
In order to survive summary judgment, a plaintiff
claiming that its software contains trade secrets must
come forward with evidence sufficiently identifying
those portions of the software or combination of fea-
tures within the software that are not generally
known in the industry. Fed.Rules Civ.Proc.Rule 56,
28 U.S.C.A.

**[8] Antitrust and Trade Regulation 29T ☞414**

29T Antitrust and Trade Regulation
   29TIV Trade Secrets and Proprietary Information
      29TIV(A) In General
         29Tk414 k. Elements of Misappropriation.
Most Cited Cases
In addition to establishing that there is a trade secret,
a plaintiff claiming misappropriation of trade secrets
also must show that the defendant gained access to
the trade secrets through improper means or that the
defendant improperly used or disclosed trade secrets.
D.C. Official Code, 2001 Ed. § 36-401(2).

**[9] Federal Civil Procedure 170A ☞2515**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
        170AXVII(C)2 Particular Cases
           170Ak2515 k. Tort Cases in General.
Most Cited Cases
Genuine issue of material fact existed as to whether
competitor misappropriated alleged trade secrets of
software developer in its media archive system, pre-
cluding summary judgment on developer's claim un-
der District of Columbia Uniform Trade Secrets Act
(DCUTSA). D.C. Official Code, 2001 Ed. §
36-401(2).

**[10] Copyrights and Intellectual Property 99 ☞
75.5**

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 902034 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

99 Copyrights and Intellectual Property
   99I Copyrights
      99I(J) Infringement
         99I(J)2 Remedies
            99k72 Actions for Infringement
               99k75.5 k. Conditions Precedent; Registration. Most Cited Cases
Copyright registration is a jurisdictional prerequisite to a court hearing a copyright infringement action. 17 U.S.C.A. § 411(a).

**[11] Copyrights and Intellectual Property 99 ☞ 75.5**

99 Copyrights and Intellectual Property
   99I Copyrights
      99I(J) Infringement
         99I(J)2 Remedies
            99k72 Actions for Infringement
               99k75.5 k. Conditions Precedent; Registration. Most Cited Cases
Database schema was "embodied in" computer program registered with Copyright Office, and thus claim could be made for copyright infringement of database schema. 17 U.S.C.A. § 411(a).

**[12] Copyrights and Intellectual Property 99 ☞ 10.4**

99 Copyrights and Intellectual Property
   99I Copyrights
      99I(A) Nature and Subject Matter
         99k3 Subjects of Copyright
            99k10.4 k. Other Works. Most Cited Cases
Copyright protection extends not only to the literal elements of a computer program, such as source code and object code, but also to the program's non-literal elements, which are the products that are generated by the code's interaction with the computer hardware and operating programs. 17 U.S.C.A. § 101.

**[13] Copyrights and Intellectual Property 99 ☞ 51**

99 Copyrights and Intellectual Property
   99I Copyrights
      99I(J) Infringement
         99I(J)1 What Constitutes Infringement

            99k51 k. Nature and Elements of Injury. Most Cited Cases
To prevail on a copyright claim, a plaintiff must demonstrate (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original. 17 U.S.C.A. § 101.

**[14] Copyrights and Intellectual Property 99 ☞ 83(3.1)**

99 Copyrights and Intellectual Property
   99I Copyrights
      99I(J) Infringement
         99I(J)2 Remedies
            99k72 Actions for Infringement
               99k83 Evidence
                  99k83(3) Weight and Sufficiency
                     99k83(3.1) k. In General. Most Cited Cases
To show ownership of a valid copyright a plaintiff must prove that the work as a whole is original and that the plaintiff complied with applicable statutory formalities. 17 U.S.C.A. § 101.

**[15] Copyrights and Intellectual Property 99 ☞ 83(3.1)**

99 Copyrights and Intellectual Property
   99I Copyrights
      99I(J) Infringement
         99I(J)2 Remedies
            99k72 Actions for Infringement
               99k83 Evidence
                  99k83(3) Weight and Sufficiency
                     99k83(3.1) k. In General. Most Cited Cases
On a copyright infringement claim, to demonstrate copying of constituent elements of the work that are original, a plaintiff must show that the defendant copied the plaintiff's work as a factual matter and that the copying of copyrighted material was so extensive that it rendered the offending and copyrighted works substantially similar; a plaintiff may prove the first element through either direct or circumstantial evidence which consists of proof that the alleged infringer had access to the copyrighted work and that the offending and copyrighted works are so similar that the court may infer that there was factual copying. 17

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 902034 (D.D.C.)
**(Cite as: --- F.Supp.2d ----)**

U.S.C.A. § 101.

**[16] Copyrights and Intellectual Property 99 ⬅⇒ 89(2)**

99 Copyrights and Intellectual Property
    99I Copyrights
        99I(J) Infringement
            99I(J)2 Remedies
                99k72 Actions for Infringement
                    99k89 Judgment
                        99k89(2) k. Summary Judgment.
Most Cited Cases
Genuine issue of material fact existed as to whether competitor copied software developer's database schema, user interface, and code in its media archive system, precluding summary judgment on developer's copyright infringement claim. 17 U.S.C.A. § 101; Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[17] Copyrights and Intellectual Property 99 ⬅⇒ 89(2)**

99 Copyrights and Intellectual Property
    99I Copyrights
        99I(J) Infringement
            99I(J)2 Remedies
                99k72 Actions for Infringement
                    99k89 Judgment
                        99k89(2) k. Summary Judgment.
Most Cited Cases
Summary judgment for a defendant accused of copyright infringement is appropriate when the plaintiff fails to show a genuine issue regarding whether the ideas and expressive elements of the works are substantially similar. 17 U.S.C.A. § 101; Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[18] Copyrights and Intellectual Property 99 ⬅⇒ 83(1)**

99 Copyrights and Intellectual Property
    99I Copyrights
        99I(J) Infringement
            99I(J)2 Remedies
                99k72 Actions for Infringement
                  99k83 Evidence
                        99k83(1) k. Presumptions and Burden of Proof. Most Cited Cases

On a copyright infringement claim, the plaintiff bears the ultimate burden of proving that the allegedly infringing work is substantially similar to plaintiff's copyrighted work. 17 U.S.C.A. § 101.

**[19] Copyrights and Intellectual Property 99 ⬅⇒ 89(2)**

99 Copyrights and Intellectual Property
    99I Copyrights
        99I(J) Infringement
            99I(J)2 Remedies
                99k72 Actions for Infringement
                    99k89 Judgment
                        99k89(2) k. Summary Judgment.
Most Cited Cases
A genuine issue of material fact exists as to whether the allegedly infringing work is substantially similar to plaintiff's copyrighted work, precluding summary judgment on a copyright infringement claim, when the plaintiff provides indicia of a sufficient disagreement concerning the substantial similarity of two works. 17 U.S.C.A. § 101; Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[20] Copyrights and Intellectual Property 99 ⬅⇒ 89(2)**

99 Copyrights and Intellectual Property
    99I Copyrights
        99I(J) Infringement
            99I(J)2 Remedies
                99k72 Actions for Infringement
                    99k89 Judgment
                        99k89(2) k. Summary Judgment.
Most Cited Cases
Genuine issue of material fact existed as to whether expressive elements in software developer's media archive system were substantially similar to competitor's replacement program, precluding summary judgment on developer's copyright infringement claim. 17 U.S.C.A. § 101; Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[21] Copyrights and Intellectual Property 99 ⬅⇒ 67.3**

99 Copyrights and Intellectual Property
    99I Copyrights

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 902034 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

99I(J) Infringement
   99I(J)1 What Constitutes Infringement
      99k67.3 k. Other Works. Most Cited Cases

Competitor's intermediate copying of software developer's database schema in order to write scripts to migrate data into competitor's product was not fair use under copyright laws, since competitor not only wanted to extract raw data but also wanted to create product similar to developer's media archive system that contained many of same features as that system. 17 U.S.C.A. § 101.

[22] Antitrust and Trade Regulation 29T ☞426

29T Antitrust and Trade Regulation
   29TIV Trade Secrets and Proprietary Information
      29TIV(B) Actions
         29Tk426 k. In General. Most Cited Cases

Software developer's common law and statutory conspiracy claims that were predicated on misappropriation of trade secrets were preempted by developer's claim under District of Columbia Uniform Trade Secrets Act (DCUTSA). D.C. Official Code, 2001 Ed. § 36-401 et seq.; West's V.C.A. §§ 18.2-499, 18.2-500.

[23] Damages 115 ☞63

115 Damages
   115III Grounds and Subjects of Compensatory Damages
      115III(B) Aggravation, Mitigation, and Reduction of Loss
         115k63 k. Reparation by Wrongdoer. Most Cited Cases

Upon award of damages to software developer, competitor was entitled to pro tanto setoff of amount of developer's settlement with settling co-defendant as to claims that had been made against both settling co-defendant and competitor.

Bart T. Valad, The Law Firm of Bart T. Valad, PLLC, Fairfax, VA, James B. Astrachan, Julie Rubin, Peter H. Gunst, Astrachan Gunst & Thomas P.C., Baltimore, MD, for Plaintiff.
James S. Kurz, Virginia Whitner Hoptman, Audra Hale-Maddox, Erin Lewis Roberts, Womble Carlyle

Sandridge & Rice, PLLC, Tysons Corner, VA, for Defendant.

### MEMORANDUM OPINION

SULLIVAN, District Judge.

*1 This cases arises from a dispute between two companies involved in the migration of National Geographic film footage onto a searchable Internet website. Pending before the Court is defendant's motion for summary judgment. Upon consideration of the motion, responses and replies thereto, oral argument during the motions hearing, applicable law, and the entire record, the Court **grants in part and denies in part** defendant's motion.

## I. BACKGROUND[FN1]

NGT Library, Inc. ("NGTL") is a wholly owned subsidiary of National Geographic Television, Inc. NGTL manages, preserves, and distributes film footage produced by National Geographic Television and used on the National Geographic Channel. NGTL developed a plan for moving the films produced for National Geographic Television into a searchable Internet website, which led to the controversy in this case. NGTL adopted a three-phase plan: (1) prepare a database of digitized footage and associated metadata and temporarily host it on the Internet; (2) select and implement permanent video management software; and (3) move the Internet website in-house.

### A. DSMCi's Product

Plaintiff DSMC, Inc. ("DSMCi") developed its first Media Archive System [FN2] ("MAS") in late 1998 while working on contracts with Computer Science Corporation and South Carolina Educational Television. DSMCi released three versions of is MAS Version 1 software. While the basic architecture of the MAS system remained constant in each version, DSMCi customized the product for each client. The third version, MAS Version 1.3, was for NGTL.[FN3] In customizing DMAS for NGTL, DSMCi used and integrated several third-party products including Oracle and Netscape products and Virage VideoLogger. DMAS consists of a series of HTML and JavaScripts that link the searchable NGTL Database to the Netscape web server, allowing users to access the website

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 902034 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

Page 6

from the Internet, search through the database, and view selected video clips. DSMCi claims that its product contains capabilities not found in any other media archive system, including Convera's Screening Room.

Defendant Convera Corporation ("Convera") claims that DSMCi's MAS Version 1 closely resembles a product described in a 1997 Virage publication and a 1997 Oracle software guide. Convera also claims that the methods required to implement a web-based, interactive, video-clip-asset indexing, search, and management system with a graphic user interface were published in thirteen patents prior to November 15, 2000. DSMCi disagrees with these characterizations to the extent it suggests that the trade secrets DSMCi claims exist in DMAS were present in these publications.[FN4]

### B. Convera's Product

Convera developed a video database management product similar to MAS Version 1. Convera's product, Screening Room, is a video cataloging, previewing and retrieval system that manages significant video libraries. Convera began development on Screening Room in 1997 and released the first version of the product in July 1998. As of December 2000, Screening Room included capture, edit, browse, analysis and search capabilities. By 2001, Convera had invested over $30 million in Screening Room and over $30 million in RetrievalWare, which provides the search capability in Screening Room.

*2 Convera used Screening Room for a project with NASA to manage video from space shuttle flights and from the international space station. According to Convera, the Screening Room product customized for NASA allowed NASA to download, digitize and store online video feeds. The entire video library could also be searched and selected clips replayed. Convera claims that the Screening Room/NASA deployment in late 2000 was Convera's first implementation of a clip level search capability.

### C. NGTL's Contract with DSMCi

In November 2000, NGTL signed an Integration Services Agreement ("ISA") with DSMCi, with an ef-

fective date of September 13, 2000. See ISA, Ex. 1 to Def.'s Mot. for Summ. J. Convera was not a party to the ISA and Convera claims that NGTL did not provide Convera a copy of the ISA. Convera further claims that it did not see a copy until this litigation commenced.

Under the ISA, DSMCi was to digitize approximately 2000 hours of NGTL video footage, create a searchable database of the metadata associated with the footage, together with descriptions of video clips, and host the NGTL Database on the Internet from December 6, 2000 until July 9, 2001, unless the hosting term was extended by NGTL.[FN5] In consultation with NGTL, DSMCi also developed the "structure, graphic design elements, and functionality requirements for the user interface." ISA, Ex. A: Integration Services ¶ 1. The ISA also provided that DSMCi was to deliver to NGTL the "final NGTL Database backup" and also deliver to NGTL each month a back-up copy of the database. Def.'s Facts ¶ 12.

The ISA also provides that DSMCi granted a license for DSMCi's software to NGTL during the term of the contract. See ISA ¶ 16(c)(i). Under this licensing agreement, NGTL agreed that it would not authorize any third party to "modify, reproduce, reverse engineer, decompile, cross-compile, disassemble, translate or decode, or otherwise attempt to discover the source code of or any processes or algorithms embodied in" DSMCi's software. Id.

### D. Convera Acquires NGTL Database Migration Project

In Spring 2001, Convera had several meetings with NGTL regarding Convera's video database management capabilities. In April 2001, Convera and NGTL representatives met at a conference and discussed the future requirements of NGTL's media archiving project. NGTL invited Convera to send its engineers to NGTL.

On May 10, 2001, Convera engineers Jim Rose and Brian Archibald met at the NGTL offices with representatives from NGTL and DSMCi. DSMCi CEO Duane Shugars attended at least part of this meeting. Shugars explained the DSMCi system to the Convera

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

engineers. NGTL representative Gary Carter then demonstrated the NGTL website for Rose and Archibald. At the meeting, a Convera representative suggested that Convera and DSMCi sign a nondisclosure agreement. Such an agreement was signed by both companies on May 14, 2001.

The parties dispute a number of the facts surrounding the May 10, 2001 meeting. Convera states that Convera engineer Jim Rose asked Carter of NGTL if Convera could get the NGTL Database schema [FN6] and was told by Shugars that he could get the database schema from NGTL's database backup tapes. However, during his deposition, Shugars indicated that he could not recall whether or not Rose asked to see the schema. Shugars stated that the discussion he would have had with Rose would have been specific to accessing the data, not the entire schema, so that Convera could import the data into its own schema. At the same meeting, Rose asked how Convera could get access to the NGTL website. According to Rose, Shugars told Rose that he would have to go to NGTL for assignment of a username and password. Plaintiff disputes this fact, stating that DSMCi gave no such instructions and would not have given such instructions. Shugars' deposition provides no clarity on this point. *See* Shugars Dep. at 303 (discussing access to website on May 10 but not discussing any other access to website).

*\*3* On May 11, 2001, NGTL assigned Convera a username/password combination for the NGTL website. NGTL assigned Convera the "Wart" username.

That same day, Convera engineer Archibald informed other Convera engineers via email that Convera would have a copy of the "customized Oracle schema" then being used by NGTL so that Convera could "analyze what is necessary to 'massage' it and/ or our SR schema to make SR work with the current NGS data." Email from Brian Archibald to Convera engineers (May 11, 2001), Ex. 11 to Def.'s Mot. for Summ. J. Around the same time, NGTL sent Convera a backup copy of the NGTL database on DLT tape. Convera could not read this backup tape nor could it read a second tape sent by NGTL in June.

In mid-July, Convera project manager Shaun Hender-

son had NGTL load a copy of the NGTL backup for the database onto his laptop and then realized that the database was password protected. He then sent an email to Dean Watts and Gary Carter at NGTL to obtain a password so that Convera could look at the database schema. *See* Email from Shaun Henderson to Dean Watts and Gary Carter (July 17, 2001) ("I'm excited to report that we have got the DSMCi Oracle DB restored, but have found that it is password protected. Can we obtain the password to that DB, so that we can take a look at that schema?"). Two days later, Henderson obtained the "icepick" password from NGTL, allowing Convera access to the database on the backup tape and, as a result, DSMCi's database schema.

### E. NGTL/Convera Contract

On July 20, 2001, DSMCi and NGTL signed a Master Services Agreement ("MSA"). The contract required Convera to migrate and integrate the NGTL Database into Convera's Screening Room software, add NGTL-requested functionality to operate Screening Room, and temporarily host the Screening Room/ NGTL website. In the MSA, NGTL represented to Convera that "all Digital Content, Metadata, and other material provided to Convera by NGTL or on its behalf may be reproduced and otherwise utilized as necessary by Convera" in its work for NGTL. MSA ¶ 6(a), Ex. 2 to Def.'s Mot. for Sum. J. NGTL tasked Convera with acquiring NGTL's data from the existing NGTL Database and transferring it to the Screening Room database. From July 2001 to July 2003, Convera hosted the Screening Room/NGTL website. In July 2003, NGTL transferred the website to its own in-house facilities.

### F. Convera's Migration of the NGTL Database to Screening Room

Convera claims that it used its Screening Room/ NASA product as a base for creating the Screening Room/NGTL Database. Convera also claims that its engineers used the database schema from the NASA project as the base for Screening Room/NGTL. [FN7] Plaintiffs dispute this fact to the extent it suggests that Screening Room/NGTL does not include material copied from the DMAS schema. DSMCi points to

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 902034 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

emails and other documentary evidence that DSMCi claims shows that Convera freely admitted reverse engineering DSMCi's schema. *See, e.g.,* High-Level Delay Analysis, Ex. 43 to Pl.'s Opp'n (indicating an understanding of the "database schema," describing the "[r]eengineering effort," and explaining the need to "reverse engineer the display of the frame images" and "compare how the DSMCi system displays the images to reverse engineer the logic").

**\*4** NGTL claims that it needed to have a detailed knowledge of the existing NGTL Database and the target Screening Room/NGTL database in order to successfully migrate the data. DSMCi disputes that Convera needed detailed knowledge of the schema developed by DSMCi in order to complete the migration. Instead, DSMCi argues that Convera could have developed an independent media archiving system without access to the backup tape or DMAS but DSMCi claims that the cost of doing so would have been more than NGTL was willing to pay and could not have been accomplished within the timeline set by NGTL.

The NGTL Database consisted of approximately 30 million data elements, or approximately 2000 hours of video footage, keyframes (still shots taken from digitized video), and associated metadata. To migrate the database, Convera claims that it wrote program scripts that picked the individual data elements out of the NGTL Database and inserted them into the Screening Room/NGTL database. The DataMover scripts were produced to DSMCi in discovery.

Convera officially started its database conversion work in July 2001 and completed the project nine weeks later. To complete the project, Convera utilized the backup NGTL Database and "icepick" password provided by NGTL, and the full NGTL Database, which included video files and keyframes and was delivered to Convera by DSMCi on a Network Appliance storage device. Convera also used usernames and passwords supplied by NGTL to get basic user access to the NGTL website. NGTL, not DSMCi, had control over the registration of its website users. NGTL was one of only a few hundred registered basic users who had access to the NGTL website while it was being hosted by DSMCi.

Throughout the entire period that Convera had access to the DSMCi-hosted NGTL website, registered basic users could not access the software code on DSMCi's internal network. DSMCi maintained a firewall between the Internet and its internal network. Internet users also could not access DSMCi's MediaArchive.web file that resided outside DSMCi's firewall. Basic users had read-only access, meaning they could see pages, and perform limited functions such as basic searches, advanced searches, search results, and shopping cart. Neither a basic user nor an administrative user had any access to the website's source code. The HTML and client-side JavaScripts used by DSMCi to create webpages ("client-side code") was available to any basic user by right clicking on the webpage and then hitting "View Source."

Convera engineers used the "Wart" username to gain access to the NGTL Database from May 14 to August 16, 2001. The record suggests that, at least in May, DSMCi was aware that Convera had access to the NGTL Database. DSMCi had logs that recorded every action on the website, including the log-ons with the Wart username. On August 15, 2001, after learning that NGTL would not continue its hosting contract, DSMCi deleted Wart as a registered user. When Convera's engineer (Stephen Chen) found out that the Wart username did not work, he selected another username "MRice" [FN8] from the user portion of the database to gain access to the website. DSMCi claims that it was not proper for Convera to use the MRice username to gain access to the NGTL Database. Both the Wart and MRice usernames gave Convera only basic user access. DSMCi claims that Convera also accessed the website on at least one occasion using the "AIQC" username. This username gave administrator access.

**\*5** On August 21, 2001, Convera was told by NGTL that DSMCi and NGTL were involved in a dispute and Convera should stop all access to the NGTL website. Convera claims that it did so. However, even after Convera lost access to the website, DSMCi claims that Convera employees continued to receive critical information about DMAS's functionality by having an NGTL employee ask questions of DSMCi and then report back to Convera. *See* Email from Shaun Henderson to Stephen Chen (Aug. 22, 2001),

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Ex. 45 to Pl.'s Opp'n.

Convera and DSMCi disagree on whether the August 21 conversation was the first time that Convera was aware that it should not access the NGTL website. On May 31, 2001, Convera representative David Teti spoke with DSMCi representative Gary Clarke. Clarke informed Teti that "DSMCi ... had detected an intruder, with a username starting with W, who was illegally accessing specific functionality in the DS-MCi proprietary product developed for Nat Geo and that this was being tracked by an FBI agent." Email from David Teti to Brian Archibald (May 31, 2001), Ex. 32 to Pl.'s Opp'n. On June 13, 2001, NGTL reaffirmed to DSMCi that NGTL would prevent access to DMAS by representatives and agents of competitors like Convera. *See* Letter from Gary Clarke, DSMCi Vice President, to NGTL representatives Chris Liedel and Bernard Callahan (June 13, 2001), Ex. 34 to Pl.'s Opp'n (recapping "[e]xplicit understanding that DS-MCi is open and willing to provide specific and for a fee, professional services to and for Convera or other vendors selected by NGTL, but access to the DMAS by representatives and agents of direct competitors to DSMCi shall be prohibited"). There is some confusion in the deposition testimony of Dean Watts, NGTL's principal contact with Convera, about whether Watts told Convera to discontinue access in June 2001 or if he did not tell Convera until August 2001.

### G. Allegations of Direct Copying of Client-Side Code

In late August 2001, Convera engineer Stephen Chen discovered that one of his engineers had used some client-side code from the NGTL website LOGIN page when developing webpages for the NGTL/Screening Room project. The client-side code included some code for font, colors, general layout and some JavaScript. Chen identified those webpages that possibly included code from the LOGIN page and ordered destruction of those pages. He then assigned a second Convera engineer to re-create the pages from scratch. DSMCi disputes these facts to the extent that Convera suggests that it is certain that it removed all the infringing code, only relying on the deposition testimony of Chen. Convera notes that no DSMCi copyright information appears on the LOGIN

page. Instead, only NGTL copyright information appears there.

## II. DISCUSSION

### A. Standard of Review

This Case is before the Court on defendant's motion for summary judgment. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Waterhouse v. Dist. of Columbia, 298 F.3d 989, 991 (D.C.Cir.2002).* In determining whether a genuine issue of material fact exists, the Court must view all facts in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).*

### B. Misappropriation of Trade Secrets

**\*6** [1][2] DSMCi claims that Convera misappropriated DSMCi's trade secrets in violation of the District of Columbia Uniform Trade Secrets Act ("DCUTSA"), D.C.Code § 36-401, *et seq.*[FN9] To establish a trade secret misappropriation claim, DSMCi must demonstrate (1) the existence of a trade secret; and (2) acquisition of the trade secret by improper means, or improper use or disclosure by one under a duty not to disclose. *See* D.C.Code § 36-401; *Catalyst, 350 F.Supp.2d at 7-8; Computer Mgmt. Assistance Co. v. Robert F. DeCastro, Inc., 220 F.3d 396, 403 (5th Cir.2000).*

#### 1. Trade Secret

[3][4] The "threshold inquiry" in every trade secret case is "whether or not there [is] a trade secret to be misappropriated." *Catalyst, 350 F.Supp.2d at 8* (quoting *Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc., 147 F.Supp.2d 1057, 1065 (D.Kan.2001))* (internal quotation marks and citations omitted). For information to constitute a trade secret under the DCUTSA, (1) the "information must be secret"; (2) "its value must derive from its secrecy";

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 902034 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

and (3) its owner must use reasonable efforts to safeguard its secrecy. *Catalyst,* 350 F.Supp.2d at 8 (quoting *Motor City Bagels, LLC v. Am. Bagel Co., 50 F.Supp.2d 460, 478 (D.Md.1999))* (internal quotations omitted).[FN10]

[5][6] Whether a particular piece of information is a trade secret is generally a question of fact. *Dreamcatcher Software Dev., LLC v. Pop Warner Little Scholars, Inc.,* 298 F.Supp.2d 276, 282 (D.Conn.2004). Courts have held as a matter of law, however, that trade secret law does not protect information that is "easily ascertainable by the public," *LinkCo, Inc. v. Fujitsu, Ltd.,* 230 F.Supp.2d 492, 498-99 (S.D.N.Y.2002), or "generally known within an industry." *Catalyst,* 350 F.Supp.2d at 9. Even if individual elements are known to the public, a trade secret can exist in a unique combination of those otherwise publicly available elements. *Id.; see also Elm City Cheese Co. v. Federico,* 251 Conn. 59, 752 A.2d 1037, 1047 (1999) (finding that "plaintiff's ability to combine these elements into a successful ... process, like the creation of a recipe from common cooking ingredients is a trade secret entitled to protection") (internal quotation marks and citations omitted).

[7] In order to survive summary judgment, a plaintiff claiming that its software contains trade secrets must come forward with evidence sufficiently identifying those portions of the software or combination of features within the software that are not generally known in the industry. *See, e.g., IDX Systems Corp. v. Epic Systems,* 285 F.3d 581, 583-84 (7th Cir.2002) ("[A] plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition [of a trade secret]."); *Imax Corp. v. Cinema Tech., Inc.,* 152 F.3d 1161, 1164-65 (9th Cir.1998) ("The plaintiff 'should describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons ... skilled in the trade.' ") (citation omitted).

*7 Convera argues that it is entitled to summary judgment because DSMCi has not identified with sufficient particularity the portions of its software program that qualify for trade secret protection, i.e., that

were not generally known by those skilled in the video database management industry. DSMCi counters that DMAS contains capabilities not found in any other media archive system, including Convera's Screening Room. Specifically, DSMCi has identified nine different features of DMAS that it argues constitute protectable trade secrets. Unlike the plaintiff in *IDX Systems,* who just identified its entire software product as a trade secret without pointing to specific features that were trade secrets, 285 F.3d at 583-84, DSMCi has sufficiently identified its alleged trade secrets.

The Court notes that a trade secret "is one of the most elusive and difficult concepts in the law to define." *Carbo Ceramics, Inc. v. Keefe,* 166 Fed.Appx. 714, 718 n. 1 (5th Cir.2006) (quoting *Lear Siegler, Inc. v. Ark-Ell Springs, Inc.,* 569 F.2d 286, 288 (5th Cir.1978)) (internal quotation marks omitted). The question of "whether certain information constitutes a trade secret ordinarily is best 'resolved by a fact finder after full presentation of evidence from each side.' " *Id.* (quoting *Lear Siegler,* 569 F.2d at 289). At a minimum, drawing all reasonable inferences in favor of DSMCi, there is a material dispute of fact as to whether the features identified by DSMCi constitute trade secrets.

**2. Misappropriation**

[8] In addition to establishing that there is a trade secret, a plaintiff claiming misappropriation of trade secrets also must show that the defendant gained access to the trade secrets through improper means or that the defendant improperly used or disclosed trade secrets. Under the DCUTSA, "misappropriation" is defined as:

(A) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(i) Used improper means to acquire knowledge of the trade secret; or

(ii) At the time of disclosure or use, knew or had reason to know that the trade secret was:

(I) Derived from or through a person who had utilized improper means to acquire it;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 902034 (D.D.C.)
**(Cite as: --- F.Supp.2d ----)**

(II) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;

(III) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(iii) Before a material change in his or her position, knew or had reason to know that the information was a trade secret and knowledge of the trade secret had been acquired by accident or mistake.

D.C.Code § 36-401(2).

The DCUTSA defines "improper means" as "theft, bribery, misrepresentation, breach or inducement of a breach of duty to maintain secrecy, or espionage through electronic or other means." D.C.Code § 36-401(1). Courts have held, however, that the statute does not provide an exhaustive list of what constitutes improper means. *See, e.g., Reingold v. Swiftships, Inc., 126 F.3d 645, 648 (5th Cir.1997)* ("A complete catalogue of the means which are 'improper' for a person to acquire knowledge of the trade secret is not possible, but [the UTSA] includes a partial listing."); *Systems 4, Inc. v. Landis & Gyr, Inc., 8 Fed.Appx. 196, 200 (4th Cir.2001)* (finding that list of improper means in the UTSA is "not exhaustive" but that all of the examples listed "constitute intentional conduct involving some sort of stealth, deception, or trickery"). More generally, "improper means" has been defined as those means that "fall below the generally accepted standards of commercial morality and reasonable conduct." *E.I. duPont deNemours & Co. v. Christopher, 431 F.2d 1012, 1016 (5th Cir.1970)* (citation omitted).

*8 [9] DSMCi alleges that Convera used stealth, deception and trickery to gain access to DSMCi's trade secrets. Specifically, DSMCi alleges that Convera (1) gained "wrongful" access to "phony" usernames and passwords to access DMAS; (2) used its "improper access" to reverse engineer DMAS in violation of the ISA signed between NGTL and DSMCi; (3) directly copied DSMCi's backup tape; (4) conspired with NGTL to gather additional information by exploiting NGTL's business relationship with DSMCi; and (5) directly copied DSMCi's code for several user interface screens. Pl.'s Opp'n at 30. DSMCi further alleges that Convera breached or induced a breach of a duty

to maintain secrecy because the ISA between NGTL and DSMCi provided for only one backup copy of DSMCi's software and provided that the backup tape was to remain the sole property of DSMCi. The ISA also prohibited NGTL from authorizing anyone to "reproduce, reverse engineer, decompile, cross-compile, disassemble, translate or decode, or otherwise attempt to discover the source code of any processes or algorithms embodied in the Integrator Software." *See* ISA ¶ 16(c)(i), Ex. 1 to Def.'s Mot. for Summ. J.

Convera counters that DSMCi cannot establish improper means because Convera accessed the NGTL website and database with passwords provided by NGTL. Convera further argues that it openly requested access to the NGTL Database at a meeting with NGTL and DSMCi and that Convera and DSMCi executed a nondisclosure agreement covering any confidential information to which Convera gained access during the database migration. Convera also contends that the DSMCi/NGTL ISA directly contemplates migration of the database. Moreover, Convera argues that migration of the NGTL Database into Screening Room required taking approximately 30 million data elements out of the NGTL Database and inserting them into the Screening Room/NGTL database. Convera claims that the NGTL/Convera MSA required NGTL to provide Convera with a copy of the NGTL Database and its schema. Essentially, Convera argues that all access it has to the NGTL Database was with permission of NGTL and that such access is not misappropriation within the meaning of the DCUTSA. Convera also contends that DSMCi produced no evidence that Convera used or disclosed DSMCi's trade secrets in violation of the DCUTSA.

The Court finds that there are genuine issues of material fact as to whether Convera misappropriated DSMCi's alleged trade secrets. To name a few of the material disputes, the parties disagree about whether Convera knew that DSMCi did not want Convera to have access to its database schema, when Convera learned that DSMCi did not want Convera to have access, whether Convera used or disclosed DSMCi's trade secrets, and whether Convera knew or should have known that NGTL owed a duty to DSMCi to maintain the secrecy of DSMCi's intellectual property

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 902034 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

and keep its trade secrets confidential. Because there are genuine disputes of material fact as to the existence of trade secrets and whether those trade secrets were misappropriated, the Court denies summary judgment to Convera on the misappropriation of trade secrets claim.

### C. Copyright Infringement

**\*9** [10] The Copyright Act provides that, ("no action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with [the Copyright Act]"). 17 U.S.C. § 411(a). Copyright registration is a jurisdictional prerequisite to a court hearing a copyright infringement action. *See I.M.S. Inquiry Mgmt. Sys. v. Berkshire Info. Sys.,* 307 F.Supp.2d 521, 526 (S.D.N.Y.2004) ("The registration requirement is jurisdictional; a lack of registration bars an infringement claim.").

[11] On March 1, 2002, DSMCi filed a Certificate of Registration in the United States Copyright Office for the MAS Version 1.3 computer program that it used for NGTL. DSMCi also filed a portion of the MAS Version 1.3 source code with the Copyright Office. DSMCi identifies that registered code as the code in its "source" subfolder in the "ngt_Gold" folder. Def.'s Facts ¶ 43. This electronic folder holds DSMCi's software code for the NGTL website and includes about 240 HTML files containing server-side JavaScript and client-side HTML and JavaScript.

DSMCi and Convera disagree as to whether DSMCi's schema for the NGTL database is part of the materials registered with the Copyright Office. DSMCi argues that the schema is "embodied in" the computer program that was registered in 2002. Pl.'s Opp'n at 31. Convera counters that any claims for copyright infringement of the database schema must be dismissed for lack of subject matter jurisdiction because the registered material does not include the schema. The Court rejects Convera's narrow reading of what is protectable when a company registers a computer program and therefore declines to dismiss the copyright claim based on lack of subject matter jurisdiction.

[12] A computer program is "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result." 17 U.S.C. § 101. Copyright protection "extends to all the copyrightable expression *embodied in* the computer program." United States Copyright Office, Circular 61, *Copyright Registration for Computer Programs* (2006) (emphasis added). Copyright protection extends not only to the literal elements of a computer program-source code and object code [FN11]-but also to the program's nonliteral elements, which are "the products that are generated by the code's interaction with the computer hardware and operating program(s)." *MiTek Holdings,* 89 F.3d at 1555 n. 15; *see also General Universal Sys., Inc. v. Lee,* 379 F.3d 131, 142 (5th Cir.2004) (finding that copyright protection of a computer program extends to nonliteral elements, including "structure, sequence, organization, user interface, screen displays and menu structures"); *Whelan Assoc., Inc. v. Jaslow Dental Lab., Inc.,* 797 F.2d 1222, 1248 (3d Cir.1986) (holding that copyright protection of computer programs "extend beyond the programs' literal code to their structure, sequence, and organization"). Based on this broad understanding of the nonliteral elements of computer programs, the Court finds that the database schema was "embodied in" the computer program registered with the Copyright Office.

**\*10** [13][14] To prevail on a copyright claim, a plaintiff must demonstrate "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *see also Sturdza v. United Arab Emirates,* 281 F.3d 1287, 1295 (D.C.Cir.2002). To show ownership of a valid copyright and therefore satisfy the first *Feist* prong, "a plaintiff must prove that the work as a whole is original and that the plaintiff complied with applicable statutory formalities." *Lotus Dev. Corp. v. Borland Int'l, Inc.,* 49 F.3d 807 (1st Cir.1995). "In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 902034 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

certificate of a registration made thereafter shall be within the discretion of the court." 17 U.S.C. § 410(c); see also Bibbero Sys., Inc. v. Colwell Sys., Inc., 893 F.2d 1104, 1106 (9th Cir.1990) ("In judicial proceedings, a certificate of copyright registration constitutes prima facie evidence of copyrightability and shifts the burden to the defendant to demonstrate why the copyright is not valid."). For purposes of its summary judgment motion, Convera concedes that DSMCi has a valid copyright registration.

[15] To prove the second Feist prong, the plaintiff must show that (1) the defendant copied the plaintiff's work as a factual matter and (2) that "the copying of copyrighted material was so extensive that it rendered the offending and copyrighted works substantially similar." Lotus, 49 F.3d at 813. A plaintiff may prove the first element through either direct or circumstantial evidence. Circumstantial evidence of copying consists of proof that "the alleged infringer had access to the copyrighted work and that the offending and copyrighted works are so similar that the court may infer that there was factual copying (i.e., probative similarity)."[FN12] Id.

[16] DSMCi argues that the record is replete with direct evidence of Convera copying DSMCi's database schema, user interface, and code. DSMCi further argues that Convera had extensive access to its copyrighted material by receiving the backup tape and "icepick" password from NGTL and through alleged wrongful access to the NGTL website. DSMCi also points to email and other documentary evidence in the record from which the Court can draw an inference at this stage that Convera accessed DMAS with the express purpose of examining DSMCi's database schema and copying it. Accordingly, DSMCi has at least raised a genuine issue of fact as to whether there was copying as a factual matter.

[17][18][19] Substantial similarity "is customarily an extremely close question of fact." Sturdza, 281 F.3d at 1296 (internal quotation marks and citations omitted). Accordingly, "summary judgment has traditionally been frowned upon" in copyright litigation. Atkins v. Fischer, 331 F.3d 988, 993 (D.C.Cir.2003) (citing Sturdza, 281 F.3d at 1296). Summary judgment for a defendant accused of copyright infringe-

ment is appropriate, however, "when the plaintiff fails to show a genuine issue regarding whether the ideas and expressive elements of the works are substantially similar." Brown Bag Software v. Symantec Corp., 960 F.2d 1465, 1472 (9th Cir.1992). Plaintiff bears the ultimate burden of proving that the allegedly infringing work is substantially similar to plaintiff's copyrighted work. Id. "A 'genuine issue' exists when the plaintiff provides indicia of 'a sufficient disagreement' concerning the substantial similarity of two works 'to require submission to a jury.' " Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

*11 [20] In this case, DSMCi points to evidence that suggests a "sufficient disagreement" regarding substantial similarity to survive summary judgment. Again, through email evidence and Convera's internal documents, DSMCi argues that Convera accessed DMAS with the express purpose of creating something substantially similar. DSMCi argues that with access to the backup tape, "icepick" password, and user identification "Wart," Convera was able to decipher the inner workings of DMAS. DSMCi also argues that there is substantial similarity between DMAS and the Screening Room/NGTL Database in database schema, user interface, and screen design code. Viewing the facts in the light most favorable to the plaintiff, DSMCi has pointed to enough evidence to demonstrate that there is a genuine issue as to whether the expressive elements in DSMCi's DMAS program are substantially similar to Convera's replacement program.

[21] In allowing the copyright claim to go forward to trial, the Court also rejects Convera's argument that any alleged intermediate copying of the database schema in order to write scripts to migrate the NGTL data into Convera's Screening Room product was fair use under the copyright laws. In support of its claim that any alleged intermediate copying was fair use, Convera cites Assessment Techs. of WI, LLC v. WIREdata, Inc., 350 F.3d 640 (7th Cir.2003). In WIREdata, the Court held that "[f]rom the standpoint of copyright law, all that matters is that the process of extracting the raw data from the database does not involve copying [the computer program] or creating ...

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 902034 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

a derivative work; all that is sought is raw data, data created not by [the plaintiff] but by [a third party], data that are not in the public domain." 350 F.3d at 644. The Seventh Circuit further stated that even if the raw data were so entangled with the computer program that they could not be extracted without copying the program, such "intermediate copying" could be fair use and therefore not infringe a copyright. Id. at 644-45. However, the court also noted that copying of raw data is fair use in those situations where the "only purpose of the copying would be to extract noncopyrighted material, and not to go into competition with" the plaintiff from whom there was intermediate copying. Id. at 645; see also Sega Enterprises, Ltd. v. Accolade, Inc., 977 F.2d 1510, 1520-28 (9th Cir.1992) (finding that copying source code of a game console through reverse engineering by a company who wanted to design computer games compatible with the console was fair use because the alleged infringer was not a competitor trying to create a game console).

In this case, Convera is admittedly a direct competitor of DSMCi. The email evidence and internal documents from Convera discussed above suggest that Convera not only wanted to extract raw data but also wanted to create a product similar to DMAS that contained many of the same features as DMAS. Accordingly, Convera is in a very different posture than the parties in WIREdata and Sega who engaged in "intermediate copying."

**D. Conspiracy Claims**

**\*12** [22] In its Third Amended Complaint, DSMCi alleges violations of the Virginia Business Conspiracy Act ("VBCA"), Va.Code §§ 18.2-499 and 18.2-500, and DC common law on civil conspiracy.FN13 For both claims, DSMCi alleges that NGTL conspired with Convera "to provide Convera with access to the trade secrets and labor of [DSMCi], so that Convera could and did wrongfully engineer, misappropriate, copy, prepare derivatives from and circumvent DSMC's right in its trade secrets and MAS software, and wrongfully avail itself to [DSMCi's] labors." Third Am. Compl. ¶¶ 50, 53. The conspiracy claims in the Third Amended Complaint are clearly focused on misappropriation of

trade secrets.

In MicroStrategy, Inc. v. Business Objects, S.A., 429 F.3d 1344, 1363-64 (Fed.Cir.2005), the Federal Circuit held that the Virginia Uniform Trade Secrets Act ("VUTSA") preempts claims not brought under the VUTSA and predicated on a misappropriation of trade secrets. The court noted that the VUTSA preempts "all claims for relief, including both common law and statutory causes of action, if they provide for a civil remedy for misappropriation of trade secrets, unless they are contractual or criminal in nature." Id.; see also VUTSA, Va.Code § 59.1-341 (stating that the VUTSA "displaces conflicting tort, restitutionary, and other law of this Commonwealth providing civil remedies for misappropriation of a trade secret."). The language in the VUTSA is identical to the language in the DCUTSA. Compare Va.Code § 59.1-341 with D.C.Code § 36-407. Moreover, the DCUTSA was intended to "make uniform the law with respect to trade secrets among the District of Columbia and those states enacting it." D.C.Code § 36-408.

Although DSMCi's conspiracy claims in its Third Amended Complaint are clearly predicated on misappropriation of trade secrets, DSMCi tries to broaden the conspiracy claims in its opposition to Convera's motion for summary judgment. DSMCi argues in its opposition brief that Convera and NGTL conspired to replace DSMCi as NGTL's vendor, issued a press release in which Convera took credit for intellectual property developed by DSMCi, and acted in concert to willfully injure DSMCi's business. DSMCi also argues that Convera and NGTL conspired to violate and did violate a federal criminal computer fraud statute (18 U.S.C. § 1030). The Court rejects DSMCi's attempts to amend its complaint through its opposition to Convera's motion for summary judgment. See Shanahan v. City of Chicago, 82 F.3d 776, 781 (7th Cir.1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."). Because the Court reads the conspiracy claims in the Third Amended Complaint to allege conspiracy to misappropriate trade secrets, both the common law and statutory conspiracy claims are preempted. Accordingly, the Court grants Convera summary judgment

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 902034 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

on the conspiracy claims.

### E. Digital Millennium Copyright Act

*13 DSMCi originally alleged a violation of the Digital Millennium Copyright Act ("DMCA") in its Third Amended Complaint. However, in its opposition brief and at oral argument DSMCi indicated that this claim has been dismissed with the consent of counsel. The Court therefore need not reach the merits of this claim.

### F. Setoff

[23] The Third Amended Complaint alleged claims against both NGTL and Convera. NGTL, however, settled with DSMCi. If any damages are awarded to DSMCi after trial, Convera is entitled to a *pro tanto* setoff of the amount of DSMCi's settlement with NGTL.

### III. CONCLUSION

For the foregoing reasons, the Court **grants in part and denies in part** Convera's Motion for Summary Judgment. The motion is granted as to the DMCA claim (Count III), civil conspiracy claim (Count VII), and VBCA claim (Count VIII). The motion is denied as to the misappropriation of trade secrets claim (Count I) and copyright infringement claim (Count II). An appropriate Order accompanies this Memorandum Opinion.

### ORDER

In accordance with the accompanying Memorandum Opinion, it is by the Court hereby

**ORDERED** that defendant Convera Corporation's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART;** and it is

**FURTHER ORDERED** that summary judgment is granted as to Count III (DMCA), Count VII (civil conspiracy), and Count VIII (VBCA) of the Third Amended Complaint and those claims are **DISMISSED WITH PREJUDICE;** and it is

**FURTHER ORDERED** that summary judgment is denied as to Count I (misappropriation of trade

secrets) and Count II (copyright infringement) of the Third Amended Complaint; and it is

**FURTHER ORDERED** that pretrial proceedings shall commence pursuant to a separate Order issued this same day.

**SO ORDERED.**

FN1. Unless otherwise indicated, all facts and alleged factual disputes noted in this section draw from the parties' Combined Statement of Material Facts ("Combined Facts"), which includes Convera's Statement of Facts Not Genuinely Disputed ("Def.'s Facts"), DSMCi's Statement of Facts Genuinely in Issue ("Pl.'s Facts"), and Convera's Reply ("Def.'s Reply Facts"). *See* Ex. B to Convera's Brief in Response to Sur-Reply of DSMCi.

FN2. "Media archiving systems, also known as media asset management systems, are complex content management systems that enable users to manage terabytes of video." Expert Report of W. David Elliott ("Elliot Rpt.") at 2, Ex. 1 to DSMCi's Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n").

FN3. The media archive system that DSMCi customized for NGTL is referred to as "DMAS" throughout this opinion. In the Integration Services Agreement signed by DSMCi and NGTL, "DMAS" refers to the entire NGTL database created pursuant to the ISA. *See* ISA ¶ 3(b), Ex. 1 to Def.'s Mot. for Summ. J. DMAS includes both "Integrator Software" and "Third Party Software." *Id.* Integrator Software is the "object code versions of the software programs developed by or for [DSMC]." *Id.* ¶ 3(e)(i). Third Party Software refers to other third party software programs necessary to create DMAS, such as Virage VideoLogger, Verity brand search and retrieval software, and Oracle 8i. *Id.* ¶ 3(e)(ii).

FN4. At times, DSMCi also demonstrated its software at National Association of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
Page 16
--- F.Supp.2d ----, 2007 WL 902034 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

Broadcasters ("NAB") conferences and pre-pared demonstration websites to show its product on the Internet. DSMCi claims that these demonstrations did not reveal any trade secrets to the public.

FN5. DSMC and NGTL agreed to two ex-tensions of the hosting term, first to August 15, 2001, then to September 15, 2001. Def.'s Facts ¶ 14.

FN6. The term "database schema" or "schema" "refers to the organization of data within a database." Chen Decl. ¶ 7, Ex. 8 to Def.'s Mot. for Summ. J. The schema "may be represented as a diagram that shows the various tables in a database, and within each table identifies the fields and their defini-tions." *Id.* The "complete schema, however, is typically an electronic file that includes details of all the tables, fields and relation-ships in the database." *Id.*

FN7. Convera's development of the Screen-ing Room/NGTL schema proceeded through multiple iterations and Convera produced all sixteen iterations of this schema to DSMCi in discovery.

FN8. During oral argument, DSMCi's coun-sel indicated the MRice was the username of an NGTL employee.

FN9. The DCUTSA is based on the Uniform Trade Secrets Act ("UTSA"), as are the trade secret statutes of a number of states. *Catalyst & Chem. Serv., Inc. v. Global Ground Support,* 350 F.Supp.2d 1, 8 n. 3 (D.D.C.2004). Moreover, the DCUTSA is intended to "make uniform the law with re-spect to trade secrets" among the District of Columbia and other states adopting the UTSA. *D.C.Code § 36-408.* Accordingly, when interpreting the DCUTSA, it is appro-priate for this Court to consider how courts in other jurisdictions have interpreted differ-ent states' trade secret acts. *Catalyst,* 350 F.Supp.2d at 8 n. 3 (citing cases).

FN10. The DCUTSA defines a trade secret as:

information, including a formula, pattern, compilation, program, device, method, tech-nique, or process that:

(A) Derives actual or potential independent economic value, from not being generally known to, and not being readily ascertain-able by, proper means by another who can obtain economic value from its disclosure or use; and

(B) Is the subject of reasonable efforts to maintain its secrecy.

D.C.Code § 36-401(4).

FN11. "Source code is a symbolic language that humans can read, whereas object code is the translation of the source code into a series of zeros and ones that is readable by a computer." *MiTek Holdings, Inc. v. Arce Eng'g Co.,* 89 F.3d 1548, 1555 n. 15 (11th Cir.1996).

FN12. "This requirement of probative simil-arity is somewhat akin to, but different than, the requirement of substantial similarity that emerges at the second step in the progres-sion." *Johnson v. Gordon,* 409 F.3d 12, 18 (1st Cir.2005).

FN13. The Court questions whether DS-MCi's claims under Virginia statutory law and DC common law violate choice-of-law principles. However, the Court need not reach this issue because, as discussed below, the DCUTSA and Virginia UTSA are identical and both conspiracy claims are preempted.

D.D.C.,2007.

DSMC, Inc. v. Convera Corp.

--- F.Supp.2d ----, 2007 WL 902034 (D.D.C.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit D

CONFIDENTIAL VIDEOTAPED DEPOSITION OF DAVID MASILOTTI
CONDUCTED ON WEDNESDAY, NOVEMBER 22, 2006

1 (Pages 1 to 4)

**Page 1**

```
 1        IN THE UNITED STATE DISTRICT COURT
 2          FOR THE DISTRICT OF DELAWARE
 3   ------------------------X
     TESLA INDUSTRIES, INC.       :
 4                                : Civil Action
         Plaintiff,               : No. 06-055 GMS
 5                                :
           vs.                    :
 6                                :
     DAVID C. WALDMANN, LYNDOL W. :
 7   HOLLINGSWORTH, CHARLES MINNICK :
     a/k/a CHUCK MINNICK, and NEW :
 8   MILLENNIUM TOOLS, INC.,      :
                                  :
 9      Defendants.               :
10   ------------------------X
11
12   Confidential videotaped deposition of DAVID MASILOTTI
13            Wilmington ,Delaware
14         Wednesday, November 22, 2006
15              9:19 a.m.
     Job No.: 24-91258
16   Pages 1 - 303
     Reported by: Gail L.Inghram Verbano, CSR, RMR, CRR
17
18
19
20
21
22
23
24
25
```

CONFIDENTIAL

**Page 3**

APPEARANCES

ON BEHALF OF PLAINTIFF TESLA INDUSTRIES

    ROBERT WILCOX, ESQUIRE
    WERB & SULLIVAN
    300 Delaware Avenue, 13th Floor
    Wilmington, Delaware 19801
    (302)652-1100


    and

    PAUL CRAWFORD, ESQUIRE
    CONNOLLY, BOVE, LODGE & HUTZ
    1220 North Market Street
    Wilmington Delaware 19801
    (302)658-9141

**Page 2**

```
 1
 2      Confidential videotaped deposition of
 3   DAVID MASILOTTI, held at the offices of:
 4
 5
 6      CONNOLLY, BOVE, LODGE & HUTZ
        1220 North Market Street
 7      Wilmington, DE 19801
        (302)658-9141
 8
 9
10
11      Pursuant to agreement, before Gail L.
12   Inghram Verbano, California Certified Shorthand
13   Reporter, Registered Merit Reporter, and Certified
14   LiveNote Reporter.
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

APPEARANCES (Continued):

ON BEHALF OF DEFENDANT DAVID WALDMANN:

    JOHN A. ADAMS, ESQUIRE
    SUSANIN, WIDMAN & BRENNAN, P.C.
    Suite 240, Executive Terrace,
    455 South Gulph Road
    King of Prussia, Pennsylvania 19406
    (610)337-4510


ON BEHALF OF DEFENDANTS LYNDOL HOLLINGSWORTH, CHARLE
MINNICK. AND NEW MILLENNIUM TOOLS, INC.,:

    RODNEY R. SWEETLAND, III, ESQUIRE
    ADDUCI, MASTRIANI & SCHAUMBERG, LLP
    1200 Seventeeth Street, N.W.
    Washington, D.C. 20036
    (202)467-6300


ALSO PRESENT:
    DAVID WALDMANN
    TRUEE DORSEY
    SCOTT PICKERING, VIDEOGRAPHER

REDACTED

REDACTED

REDACTED

Exhibit E

EXHIBIT

Tabbies

TI 228



**DEPARTMENT OF THE ARMY**
UNITED STATES ARMY LEGAL SERVICES AGENCY
901 NORTH STUART STREET
ARLINGTON, VIRGINIA 22203-1837

REPLY TO
ATTENTION OF:                                April 26, 2007

Litigation Division
General Litigation Branch

Brian A. Sullivan
WERB & SULLIVAN
300 Delaware Avenue
P.O. Box 25046
Wilmington, Delaware  19899

SUBJECT:  Request for Expert/Opinion Testimony of Chief Warrant Officer Roger Guillemette, <u>Tesla Industries, Inc. v. David C. Waldmann, et al.</u> (Case No. 06-055-GMS) (D. Del.)

Dear Mr. Sullivan:

I coordinate general litigation issues for the US Army.  I am in receipt of your letter dated April 12, 2007 and a copy of LTC Pollack's response to your request regarding the proposed trial testimony of Chief Warrant Officer Roger Guillemette.

Your request for the expert opinion testimony of Chief Guillemette under 32 C.F.R §516.49 (b) in the above captioned case is denied. However, Chief Guillemette is authorized to testify as a factual witness.  The following parameters apply:

a.    The testimony of Chief Guillemette must be limited to factual matters within his personal knowledge as set forth in your request, and in the Report of Proposed Testimony attached to your request, and may include any prior sworn factual deposition testimony.

b.    Chief Guillemette will not provide information that is classified, privileged, or otherwise protected from public disclosure.

c.    Please provide Chief Guillemette with a copy of this letter to make him aware of his right under 32 C.F.R. § 516.47(d) to consult with Army counsel or with private counsel at no expense to the government with regard to his testimony in this matter.  Please provide this office with a copy of your notification to Chief Guillemette.

Chief Guillemett is not authorized to provide expert or opinion testimony.  32 C.F.R. § 516.49(a) (General rule:  Present DA personnel will not provide, with or without compensation, opinion or expert testimony either in private litigation or in litigation in which the United States has an interest for a party other than the United States.").  An exception to this general rules exists where a requester can show exceptional need or unique circumstances, and the anticipated testimony will not be adverse to the interests of the United States.

You have not shown that exceptional need or unique circumstances exist in this case sufficient to authorize the expert or opinion testimony of Chief Guillemette.  Chief Guillemette's proposed testimony

is based on his use of Tesla's connectors and other connectors over the course of his military career.
Chief Guillemette's proposed testimony is based on his use of Tesla's connectors and other connectors over the course of his military career. Chief Guillemette may testify as to features that your connector possesses that others do not. This testimony is not based on any technical knowledge he possesses; in fact, he is unfamiliar with any of the technical specifications of the Tesla connectors. He may not provide opinion testimony regarding whether those features make the Tesla product superior.

The Army procures these connectors from Tesla (and potentially other contractors) therefore, it would be inappropriate for DA personnel to provide opinion testimony in court that would favor one contractor over others. The Army has an important interest in maintaining its impartiality in litigation and procurements matters. The Army also has an important interest in avoiding any potential conflict of interest inherent in Chief Guillemette's testimony. If Chief Guillemette testifies as an expert for Tesla, he may be unable to serve the Army in any source selection process in future procurements.

It seems apparent from Chief Guillemette's proposed testimony that he could offer factual testimony that would serve your purposes. Without providing an opinion on the power supply units, Chief Guillemette could testify factually about his experiences with the product. In particular, he could testify as to the product's durability, ease of probe replacement, and safety features. He cannot, however, give an opinion of the product.

Should you have any questions or concerns regarding this matter, please contact Major Patrick Gary at (703) 696-1618.

Sincerely,

Kevin K. Robitaille
Lieutenant Colonel, U.S. Army
Chief, General Litigation Branch

CF: Lieutenant Colonel Pollack

# Exhibit F

# The DC Impact





+ a TESLA GPU




= The Power Of A Pneumatic-Minus The Air Compressor!

## Features And Specifications:

- 1/2 or 3/4 Inch Square Drive
- Powerful-Rugged Design
- Military Tested
- Tool Weight- 8.5 pounds
- Onboard Work Light
- Compatible With All NATO Receptacles
- Output Torque (Reverse)= 550 Ft. Lbs.
- TESLA Industries TURBO START GPU

For More Information:

Contact: Dave Waldmann

Tesla Industries

Ph. # (302)-324-8910

## Applications :

Military, Motor Sports, Farming, Oil Field, Construction, Mining, Outdoor Sign, Roadside Assistance, Electric Utility Services, Aviation, Marine And Many More !

If You Have Even Needed The Power Of A Pneumatic Impact Wrench In A Portable Tool....The DC Impact Powered By A TESLA GPU Will Get The Job Done!

Both Products Are Made-In-The USA



Exhibit G

## Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF DELAWARE
 3   TESLA INDUSTRIES, INC.   :
 4        Plaintiff      :
 5   v.              : C.A. No. 06-055-GMS
 6   DAVID C. WALDMANN,       :
 7   LYNDOL W. HOLLINGSWORTH, :
 8   CHARLES MINNICK a/k/a    :
 9   CHUCK MINNICK, and NEW   :
10   MILLENNIUM TOOLS, INC.   :
11        Defendants     :
12        -----------
13        Deposition of DONALD PAUL STEWART
14           Wilmington, Delaware
15           Thursday, February 15, 2007
16           9:38 a.m.
17   Job No.: 1-96913
18   Pages: 1 - 160
19   Reported By: Dawn M. Hart, Notary Public, RPR/RMR
20
21
22
```

COPY

## Page 2

```
 1
 2        Deposition of Donald Paul Stewart, held at the
 3   law offices of:
 4           ASHBY & GEDDES
 5           500 Delaware Avenue, 8th Floor
 6           Wilmington, Delaware  19889
 7           (302) 654-1888
 8
 9
10        Pursuant to Notice, before Dawn M. Hart,
11   RPR/RMR and Notary Public in and for the State of
12   Maryland.
```

## Page 3

```
 1           A P P E A R A N C E S
 2   ON BEHALF OF THE PLAINTIFF:
 3        PAUL E. CRAWFORD, ESQUIRE
 4        CONNOLLY BOVE LODGE & HUTZ, LLP
 5        The Nemours Building
 6        1007 North Orange Street
 7        Wilmington, Delaware  19899
 8        (302) 658-9141
 9
10   ON BEHALF OF THE DEFENDANTS HOLLINGSWORTH
11   MINNICK AND NEW MILLENNIUM TOOLS, INC.:
12        DAVID F. NICKEL, ESQUIRE
13        ADDUCI MASTRIANI & SCHAUMBERG, LLP
14        1200 17th Street, Northwest
15        5th Floor
16        Washington, D.C.  20036
17        (202) 467-6300
18
19
20
21
22
```

## Page 4

```
 1           C O N T E N T S
 2   EXAMINATION OF DONALD PAUL STEWART     PAGE
 3     By Mr. Nickel          5
 4        E X H I B I T S
 5     (Exhibits were attached to the transcript.)
 6   DEPOSITION EXHIBITS            PAGE
 7     150 Expert Testimony re Stewart       5
 8     151 Retainer Letter 12/28/06       42
 9     152 Invoices re Stewart        53
10     153 Withdrawn          --
11     154 E-mail 2/9/05 Waldmann from
12        Mooney            139
13     155 E-mail 10/7/05 Waldmann from
14        Mooney            141
15     156 DODAAC Web Site Excerpt        148
16
17
18
19
20
21
22
```

81

1 and I'm sure they have different product lines there,
2 but they probably have one central point of contact.
3 Almost every web site says to contact us, send E-mail
4 here.
5        And then it get -- once it goes through that
6 side at Fort Leonard Wood, then it will filter down to
7 the right people and they'll reply.
8    Q   Does TACOM Rock Island have a similar E-mail
9 system?
10   A   Yes.
11   Q   And eventually it would filter down to the
12 right person; is that correct?
13   A   Correct.
14   Q   So for example, I'm a -- let's use an impact
15 wrench. I'm an impact wrench manufacturer.
16   A   Right.
17   Q   I could find the proper E-mail to send, I
18 guess you would call it a blanket E-mail --
19   A   Yes.
20   Q   -- describing my product?
21   A   It would give you the office symbol. It
22 would give you an office symbol and probably a

82

1 connection right to the E-mail to that office symbol.
2 Yes, you can give a product description and it will
3 go -- it would go to somebody to review.
4    Q   Okay. And about how often does that happen?
5    A   Maybe -- I can't speak definitively for
6 other divisions. In ours, maybe once every two
7 months.
8    Q   And what would happen?
9    A   Then it would be reviewed. They usually
10 give you an internet site so you can go check out
11 their product. Once you review it and it looks like
12 something you might want, then you determine which
13 engineering school would be better suited for it.
14 Send information to the engineering school and let
15 them review it and say, do you think this has merit?
16 Please contact the people.
17   Q   If I were a new company, would that be one
18 way to get my foot in the door at TACOM Rock Island?
19   A   It would be a way to send your information
20 to TACOM Rock Island.
21   Q   Are people at TACOM Rock Island generally
22 willing to assist a prospective manufacturer/

83

1 distributor of a tool?
2    A   At times, yes, yes. Especially if there's a
3 need for it in the service, yes.
4    Q   And if you were to get a letter or an E-mail
5 about a specific product that didn't fall in your
6 purview so to speak, what would you do with it?
7    A   If it was a commodity other than something
8 that we managed, if I thought maybe it was more
9 applicable to small arms or something, I may forward
10 it to them. But generally I'd send it to the
11 engineering school and say, somebody sent me this on
12 this product. It's not something I can use, and do
13 you know where this might fit into the inventory, or
14 is there a need for this?
15   Q   So you wouldn't just delete the E-mail?.
16   A   No.
17   Q   Now, when you talk about the military
18 procurement system, you are talking for the three- to
19 five- to ten-year contracts; is that correct?
20   A   Yes.
21   Q   Okay. Does the military ever purchase
22 products that aren't necessarily on a three- to five-

84

1 to ten-year contract?
2    A   Yes.
3    Q   Can you describe those situations?
4    A   It would depend. Different units buy items
5 with IMPAC credit cards. For the, for the three- to
6 five- to ten-year contracts, those are things that are
7 going to be stocked, stored and issued and sold for a
8 long time. There may be one-time-need items or a
9 service that doesn't fall under that purview.
10   Q   (Nods head).
11   A   Services can be just about anything. I'm
12 trying to think of any products. You know, some may
13 just have a limited time frame, like containers or
14 something like that, as a one-time shot. You know,
15 you may not go on to a five-year contract with a
16 container manufacturer if you only need ten.
17   Q   And to purchase those ten, would that
18 product need to have an NSN?
19   A   Usually, yes, we would assign it an NSN.
20   Q   That is a requirement in order to buy those
21 ten products to just fill that small little gap?
22   A   Yes. We would, we would give them an NSN.

85

1    A lot of that is for tracking.
2        Q    Okay. What do you mean by tracking?
3        A    It depends on the price of the item, whether
4    or not the Army tracks it for the entire life of the
5    product.
6        Q    Why would you track a product?
7        A    Accountability.
8        Q    Kind of like an inventory so to speak?
9        A    Yes. And if a unit's -- again it goes back
10   to the type of money that's used to procure the item.
11       Q    What do you mean by the type of money?
12       A    There are appropriations that come from
13   Congress. There's a PA, which is a product account,
14   that money is furnished directly from Congress to buy
15   certain items. It's part of our budget. We go
16   through and say, we need X number of these things,
17   here's what it cost, please send us the money.
18   Whenever they do that, those items need to be tracked
19   for accountability, usually because of the cost of the
20   item or the sensitivity of the item. There's an NSN
21   and they're usually serial numbered. If you cull up a
22   unit, you're supposed to have an X number of Product

86

1    A, here's your serial numbers, go find them.
2        Other items are purchased with an Army
3    working capital fund, which is a revolving account.
4    An installation is given so much money a year to buy
5    expendable items. Those aren't tracked. They are
6    NSN'd. But the money -- each installation puts a
7    surcharge on them. So we buy from a contractor, put a
8    surcharge on them, issue them to the field. They
9    submit a requisition, funded requisition, meaning it
10   comes out of unit funds. They send their funds to us
11   with that surcharge on that's a revolving fund, then
12   we just keep reusing that money.
13       Q    And you also mentioned earlier IMPAC Card?
14       A    IMPAC Card.
15       Q    Is that an acronym?
16       A    No, that's the name of it. It's a credit
17   card.
18       Q    How do you spell it?
19       A    I-M-P-A-C.
20       Q    Okay. And what is an IMPAC Card?
21       A    It generally had a $2,500 limit. And if
22   individual units -- it comes out of the unit's funds.

87

1    If the unit needs something that's disposable, they
2    can't wait for the supply system, if it's general
3    hardware, then they can go buy it. They can buy it
4    from off of web sites, over the phone, if they're
5    items they need.
6        Q    So such products do not require an NSN?
7        A    Some of them have NSNs. But if they don't
8    have an NSN, then they're usually office products or
9    washers, nuts, stuff like that, screws, that are going
10   to be disposed of or consumed.
11       Q    So lug wrenches are never purchased on IMPAC
12   Cards?
13       A    They can be if there was an immediate need
14   and that good, that could also have an NSN.
15       Q    It might have an NSN but it is not required;
16   is that correct?
17       A    In that instance of a lug wrench, basically
18   we'd want an NSN for it because there's a lot of lug
19   wrenches out there. We have to look -- whenever you
20   are buying with an IMPAC Card, you have to make sure
21   it's not in Army inventory if you're buying something,
22   other than office supplies. You generally know what

88

1    you're looking for, screwdrivers, wrenches or
2    whatever. You look in Army inventory to see if it is
3    available. If it's not readily available, then you
4    can go to the manufacturer and buy that item.
5        Q    So again my question is, to purchase
6    something on an IMPAC Card, for example a lug
7    wrench --
8        A    Uh-huh.
9        Q    -- does that lug wrench need to have an NSN?
10       A    Not necessarily, no.
11       Q    Okay. Your expert report, when you talk
12   about the military procurement system you are talking
13   about the three- to five- to ten-year contracts; is
14   that correct?
15       A    Correct.
16       Q    You are not talking about purchases on IMPAC
17   Cards; is that correct?
18       A    That's correct.
19       Q    Are there other types of purchasing that the
20   military does that would not fall under an IMPAC Card
21   or the three- to five- to ten-year procurement system
22   that you just described?

89

1    A   There could be, but these are the ones that
2  I know of. The only other thing I can think of is --
3  but it also falls under the five to ten years is the,
4  basically the ordering agreement, which is a contract
5  with, with a producer or manufacturer that you're
6  buying, sort of a blanket open thing with them.
7  You've got a basic order agreement that says if I need
8  20 of these today and 20 tomorrow, then I don't buy
9  anything for a month, I still might need them -- 20
10  more two months down the road, and you're basically
11  agreeing you'll have those available for them.
12    Q   And now the three different types of
13  purchasing agreements that you just described, the
14  procurement system, the IMPAC and the ordering
15  agreement --
16    A   Uh-huh.
17    Q   -- that relates to TACOM Rock Island; is
18  that correct?
19    A   Yes.
20    Q   The substance of your knowledge is with
21  respect to TACOM Rock Island; is that right?
22    A   Yes.

90

1    Q   What about for Aberdeen Proving Ground in
2  Aberdeen, Maryland, does that follow the exact same
3  procedure as TACOM Rock Island?
4    A   Aberdeen Proving Ground was different than
5  TACOM and so I can't really testify on their
6  procurement practices at Aberdeen. Again, they're a
7  proving ground and they're not a major supporting
8  command which TACOM is.
9    Q   Okay.
10    A   Because TACOM is an entity -- we're a
11  commodity business. Aberdeen Proving Ground is a
12  teaching and testing site, so is Fort Leonard Wood.
13  So how their procurement systems operate, I don't
14  know.
15    Q   Okay. So then your expert report relates
16  solely to purchasing at TACOM Rock Island; is that
17  correct?
18    A   Yes.
19    Q   So what about National Guards, are you aware
20  of their purchasing?
21    A   They buy through the Army. They go through
22  the -- a lot of them go through the exact same process

91

1  as the Army. National Guard's allocated so much money
2  and the Army installations are also allocated so much
3  money, again, with the trackable items where the
4  Pentagon provides so much money, some of that is for
5  the National Guard, and so we buy directly and ship
6  directly to the National Guards. The major items as
7  far as their regular purchases, they do funded
8  requisitions like other Army units and they would buy
9  our inventory.
10    Q   They would buy our inventory you said?
11    A   I mean the Government's inventory, yes.
12  Whenever we're on five- to ten-year contracts, a lot
13  of that stuff is sitting in warehouses and so units
14  submit a requisition by NSN. The National Guard and
15  Reserve can do that also.
16    Q   Does the National Guard and Reserve have to
17  purchase products that have NSNs?
18    A   I believe so, yes. Again --
19    Q   Are you an expert in that field?
20    A   Not in the National Guard or Reserve, no.
21    Q   Okay. So your statement, then, was just
22  speculation?

92

1    A   Correct. I don't know the procurement
2  practices of the National Guard.
3    Q   Okay. So just to sum up, then, it is
4  correct that you do not know or you are not sitting
5  here today as an expert with regards to the
6  procurement process for Aberdeen Proving Ground, Fort
7  Leonard Wood, the National Guard or National Reserves?
8    A   Correct.
9    Q   Okay. And your expert testimony relating to
10  the military procurement system solely relates to
11  TACOM Rock Island; is that correct?
12    A   Yes.
13    Q   Okay.
14    A   The other installations are very similar to
15  us. I don't work at them -- I didn't work at them,
16  so -- there are other major subordinate commands. A
17  lot of them are very similar to ours. But since I
18  didn't actually work there, I don't feel I'm qualified
19  to, to say that one installation does it the same as
20  we do, there are always variations, but generally
21  they're all the same.
22    Q   Okay. Now you stated that you are

**101**

1    Q   But you --
2    A   I mean to the point that it's all
3  electronically-generated.  And again in the
4  Government, you go from office to office to office.
5  If there's request for an NSN, then it goes to our
6  provisioner who does all the background information
7  and makes sure all the documents are right, and
8  they -- I mean to fill out into the computer.  And so
9  it goes from office to office to office.  It goes
10  through quite a process.
11    Q   So you then qualify yourself as an expert in
12  obtaining an NSN in any avenue, through any office?
13    A   No, I'd have to say not through any office.
14  Different offices work different ways.  You know, I'm
15  not -- this is how we did it in our office.
16    Q   Okay.  So this is how you did it at TACOM
17  Rock Island --
18    A   Correct.
19    Q   -- how you obtained a NSN at TACOM Rock
20  Island?
21    A   Yes.
22    Q   So again, your expert testimony is limited

**102**

1  to solely TACOM Rock Island?
2    A   Right.
3    Q   Okay.  Thank you.
4        Now you state in that paragraph on Page 3
5  that an NSN, and then quote, is an essential predicate
6  to selling any product to the military.  Do you see
7  that?
8    A   Yes.
9    Q   Is that correct?
10    A   Yes, it is.
11    Q   I thought you testified earlier that --
12    A   It's essential to have a NSN.  You can buy
13  stuff without an NSN if it's an expendable item,
14  something that's going to be consumed and you have an
15  IMPAC Card.  But to do business on a continuing basis
16  with the Government, to have your product stocked,
17  stored and issued for an indeterminate amount of time,
18  yes, an NSN is required.  We will not stock -- we
19  don't stock, store and issue assets without an NSN.
20  If you don't have an NSN, you're probably at a one- or
21  two-time shot -- basically a one-time shot, somebody
22  is just buying your product for right now.  To be a

**103**

1  viable product with a long line in history in the
2  Government, an NSN is required.
3    Q   Okay.  So your statement here relates to
4  trying to get a product stocked in other words a three
5  to five to ten year contract; is that correct?
6    A   Correct.
7    Q   So, it is not necessarily an essential
8  predicate to selling any product to the military; is
9  that correct.  Sorry, strike that double negative.
10  Confusing I understand.
11        With that background our discussion just
12  now, is it correct that a NSN is an essential
13  predicate to selling quote/unquote any product to the
14  military end quote?
15    A   No, if you're buying on a one-time shot.
16    Q   And again, this is with reference to TACOM
17  Rock Island?
18    A   Correct.
19    Q   Okay.  In other words, it is limited to
20  TACOM Rock Island?
21    A   For --
22        MR. CRAWFORD:  Objection.  Foundation.  This

**104**

1  is limited to TACOM.
2    A   If the military, if -- the military runs on
3  NSNs, and so the fact that you need an NSN on stock,
4  store and issue items is not solely TACOM.  That's the
5  Army.
6    Q   Right.  But, but again, your experience
7  relates to TACOM?
8    A   Yes.
9    Q   First sentence of the third paragraph on
10  Page 3 states --
11    A   Okay.
12    Q   -- I personally helped the Defendants obtain
13  an NSN for their DC IMPAC wrench, do you see that?
14    A   Yes, I do.
15    Q   What do you mean by their impact wrench?
16    A   Mr. Waldmann presented this wrench, and so
17  I'm not sure if I wrote that correctly or not.  But I
18  did help the Defendants, Mr. Waldmann and crew, get an
19  NSN for this item.
20    Q   And this, by this item you mean --
21    A   The --
22    Q   -- 24-volt slave-cabled impact wrench?

**121**

1  here today that when you got the NSN for DC Power
2  Equipment's impact wrench, that you thought it was a
3  Tesla product?
4  **A   I assumed the company was affiliated with**
5  **Tesla.**
6  Q   In Paragraph 3 on Page 3 you say that,
7  quote, my assumption that this was a Tesla Industries
8  product --
9  **A   Yes.**
10  Q   -- right there you say that you believed it
11  was a Tesla Industries product; is that correct?
12  **A   Yes, I do.**
13  Q   In this -- so --
14  **A   And at the time, yes, at the time I believed**
15  **it was a Tesla product.**
16  Q   Even though you were getting the NSN for DC
17  Power Equipment you thought it was a Tesla product?
18  **A   Correct.  Correct.**
19  Q   Okay.  On Page 4 --
20  **A   Uh-huh.  Yes.**
21  Q   -- the bottom of that first partial
22  paragraph you state that none of the individuals at

**122**

1  the military installations or locations like TACOM who
2  would have purchasing or technical review
3  responsibilities are readily identifiable to any
4  vendor unless that vendor has access or prior
5  knowledge of the point of contact persons (POC) at
6  these facilities, end quote.  Do you see that?
7  **A   Yes.**
8  Q   Can you explain what you're trying to say
9  there?
10  **A   Okay.  What I'm saying there is at military**
11  **installations or locations like TACOM that have**
12  **purchasing or technical review responsibility are**
13  **(sic) readily identifiable to any vendor unless that**
14  **vendor has access or prior knowledge to point of**
15  **contact.**
16  **What I'm referring to there is that the**
17  **names and telephone numbers of these individuals are**
18  **not publicly known.  They aren't published.  And so to**
19  **find a true point of contact, you have to know them**
20  **is what my reference there was.**
21  Q   And this testimony is solely related to
22  TACOM, correct?

**123**

1  **A   Yes, this is TACOM, but keeping in mind that**
2  **TACOM is a microcosm of all the Army installations,**
3  **the major subordinate commands.  We all go under**
4  **basically the same procurement guidance.  And as I**
5  **stated before, there's some little tweaking of**
6  **procurements at the local installations.  However,**
7  **this is basic Army-wide as it applies to the Army**
8  **Material Command, which is out of Washington, D.C.,**
9  **out of the Pentagon which covers all the, all the**
10  **support commands.**
11  Q   So then you're testifying that you are
12  providing expert testimony, then, as to every single
13  military installation and/or location like TACOM?
14  **A   I'm testifying about TACOM and the fact that**
15  **other installations are very similar to TACOM, and**
16  **that procurement officials' names are not published**
17  **Army-wide.**
18  Q   So even for a Request for Quotation they
19  would not list the procurement official's name?
20  **A   They would possibly put an E-mail down and**
21  **that doesn't necessarily tell you exactly who that**
22  **individual is.**

**124**

1  Q   But a company can E-mail that person and
2  then establish a point of contact that way; isn't that
3  correct?
4  **A   Through a Request for Purchase, yes, you are**
5  **correct.**
6  Q   Okay.  So there are ways for new companies
7  to begin establishing point of contact persons at
8  facilities?
9  **A   Yes.**
10  Q   Okay.  You then state, none of the names and
11  duties of military or civilian personnel having
12  purchasing responsibility or interest is generally
13  known either inside or outside of the military.  Do
14  you see that?
15  **A   Yes, I do.**
16  Q   Can you explain to me what you're saying
17  there?
18  **A   Basically that it's not public knowledge.**
19  **The civilian and military employees that are**
20  **procurement officials, generally their names and**
21  **numbers are not public knowledge.  There would be a**
22  **need to know.  If -- you're not going to know all of**

# Exhibit H

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TESLA INDUSTRIES, INC., a Delaware Corporation, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 06-55-GMS |
| DAVID C. WALDMANN, LYNDOL W. HOLLINGSWORTH, CHARLES MINNICK a/k/a CHUCK MINNICK, and NEW MILLENNIUM TOOLS, INC., an Oregon Corporation, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFF, TESLA INDUSTRIES INC.'S MEMORANDUM IN OPPOSITION TO NMT DEFENDANTS' MOTION IN LIMINE NO. 4 TO PRECLUDE CERTAIN TYPES OF TESTIMONY BY TESLA'S PRESIDENT DAVID MASILOTTI

Brian A. Sullivan (#2098)
Robert D. Wilcox (#4321)
Amy D. Brown (#4077)
WERB & SULLIVAN
300 Delaware Avenue, 13th Floor
P.O. Box 25046
Wilmington, Delaware 19899
Telephone: 302-652-1100
bsullivan@werbsullivan.com

Paul E. Crawford (#493)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 N. Orange Street
P.O. Box 2207
Wilmington, Delaware 19899
Telephone: 302-888-6262
pcrawford@cblh.com

April 19, 2007

Attorneys for Plaintiff
Tesla Industries Inc.

## TABLE OF CONTENTS

I.    Introduction.................................................................................................... 1

II.   Argument ....................................................................................................... 2

III.  Conclusion ..................................................................................................... 4

## TABLE OF AUTHORITIES

**Cases**

*Asplundh Manufacturing Division v. Benton Harbor Engineering*,
57 F.3d 1190 (3d Cir. 1995) ......................................................................2

*Newport Electronics, Inc. v. Newport Corp.*,
157 F.Supp.2d 202 (D. Conn. 2001) .............................................................3

**Rules**

Fed.R.Evid. 701 .............................................................................................2

This Memorandum is submitted by Plaintiff, Tesla Industries Inc. ("Tesla"), in opposition to NMT Defendants' Motion in Limine No. 4: "To Preclude Mr. David Masilotti From Offering Lay Opinion or Expert Testimony" (NMT MIL 4, DI 136).

## I.    INTRODUCTION

Mr. Masilotti, like Bill Gates[1], does not have a college degree. Both have been highly successful businessmen, one a little more than the other. Would anyone dare to suggest that Mr. Gates is not an expert in his field just because he lacks a college degree? Yet that is what the NMT Defendants assert (NMT MIL 4, page 3).

Mr. Masilotti, like Mr. Gates, is a self taught genius in the field of electronics, particularly for military applications. He almost single-handedly expanded Tesla operations from a garage to its current 120,000 square foot facility in New Castle (See Masilotti Dep Tr 179 attached at Exhibit 2 hereto).

NMT MIL 4 at page 1 argues in support of its Motion that it has not received "any information relating to the alleged uniqueness or superiority of Tesla products over its competitors" and thus there is no "foundation" for any testimony by Mr. Masilotti concerning the uniqueness or superiority of Tesla's products. That argument ignores at least three established "foundations" for Mr. Masilotti's expected trial testimony:

- Full details of the unique features of Tesla's products were provided in Tesla's eighteen (18) page November 1, 2006 Supplemental Response to NMT Defendants' Interrogatory 9 ("Supplemental Trade Secret Listing") which is attached as Exhibit 4 to one of Waldmann's MIL's (DI 139).

---

[1] See Biography of Bill Gates from www.wikipedia.com attached as Exhibit 1 hereto.

- In many instances Tesla has no competitors. As Mr. Masilotti explained in his deposition, Tesla is the sole source supplier for many of the items it sells to the U.S. Armed Forces (See Masilotti Dep Tr 191-2 attached at Exhibit 2 hereto). He also identified those companies who do sell competitive products (Masilotti Dep Tr 252 at Exhibit 2 hereto).

- Mr. Masilotti was deposed at length regarding the uniqueness and superiority of Tesla products. This opportunity to depose Mr. Masilotti eliminates the element of surprise addressed in NMT's MIL 4 (pages 4-5).

## II.    ARGUMENT

Any trial testimony by Mr. Masilotti that goes beyond recitation of pure facts would, at most, be based on lay opinion. Lay opinion is clearly permitted under Rule 701, Federal Rules of Evidence which in pertinent part states that lay opinion "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witnesses' testimony or the determination of a fact in issue ***" is permitted. The Third Circuit addressed this issue in *Asplundh Manufacturing Division v. Benton Harbor Engineering*, 57 F.3d 1190, 1201 (3d Cir. 1995) as follows:

> In particular, courts have permitted witnesses with firsthand knowledge to offer lay opinion testimony where they have a reasonable basis--grounded either in experience or specialized knowledge--for arriving at the opinion expressed. A conclusion by the trial court that the witness possessed sufficient experience or specialized knowledge has thus often been used to determine that the witness's opinion testimony satisfies the requirements that the opinion be both "helpful to a clear understanding...of a fact in issue" and "rationally based" upon the witness's perception, as expressed in the text of Rule 701.

Because Mr. Masilotti has **first hand** information about the technology misappropriated by Defendants there is little anticipated need for him to go beyond that knowledge in his trial testimony in the form of expert opinion. To the extent he does testify as to the comparative benefits of Tesla products versus others it is anticipated he would testify based on first hand knowledge of these competitive products. Thus, comparisons based on first hand information would therefore not constitute expert testimony.

It is clear that first hand competitive information acquired by a party can be used in testimony "as to what products his company sells and what he understood [his competitor] was selling". *Newport Electronics, Inc. v. Newport Corp.*, 157 F.Supp.2d 202 (D. Conn. 2001) ("Such testimony stems **from his own experience** and is relevant to the issue of when Newport Electronics learned of the possible infringement and any actual confusion that exists") (emphasis added).

3

## III.    CONCLUSION

Mr. Masilotti is the most knowledgeable witness, within and without Tesla, regarding issues pleaded in this case.  His testimony should not be artificially circumscribed by arbitrarily labeling it as "expert" testimony.

Respectively submitted,

Dated: April 19, 2007

/s/ Robert D. Wilcox
Robert D. Wilcox (#4321)
Brian A. Sullivan (#2098)
Amy D. Brown (#4077)
WERB & SULLIVAN
300 Delaware Avenue, 13th Floor
P.O. Box 25046
Wilmington, Delaware 19899
Telephone: 302-652-1100

Paul E. Crawford (#493)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 N. Orange Street
P.O. Box 2207
Wilmington, Delaware 19899
Telephone: 302-888-6262

Attorneys for Plaintiff
Tesla Industries Inc.

4

# Exhibit 1



# Before Microsoft

## by John Mirick



**Family and Early Childhood**

**First Computing Experience**

**Roots of his Business Career**

**The Birth of Microsoft**

**Bill Gates Links**

**Bibliography**

### Family and Early Childhood

On October 28, 1955, shortly after 9:00 p.m., William Henry Gates III was born. He was born into a family with a rich history in business, politics, and community service. His great-grandfather had been a state legislator and mayor, his grandfather was the vice president of a national bank, and his father was a prominent lawyer. [Wallace, 1992, p. 8-9] Early on in life, it was apparent that Bill Gates inherited the ambition, intelligence, and competitive spirit that had helped his progenitors rise to the top in their chosen professions. In elementary school he quickly surpassed all of his peer's abilities in nearly all subjects, especially math and science. His parents recognized his intelligence and decided to enroll him in Lakeside, a private school known for its intense academic environment. This decision had far reaching effects on Bill Gates's life. For at Lakeside, Bill Gates was first introduced to computers.


Bill's Dad

### First computing Experience

In the Spring of 1968, the Lakeside prep school decided that it should acquaint the student body with the world of computers [Teamgates.com, 9/29/96]. Computers were still too large and costly for the school to purchase its own. Instead, the school had a fund raiser and bought computer time on a DEC PDP-10 owned by General Electric. A few thousand dollars were raised which the school figured would buy more than enough time to last into the next school year. However, Lakeside had drastically underestimated the allure this machine would have for a hand full of young students.

Paul Allen Bill Gates, Paul Allen, and a few other Lakeside students (many of whom were the

first programmers hired at Microsoft) immediately became inseparable from the computer. They would stay in the computer room all day and night, writing programs, reading computer literature and anything else they could to learn about computing. Soon Gates and the others started running into problems with the faculty. Their homework was being turned in late (if at all), they were skipping classes to be in the computer room and worst of all, they had used up all of the schools computer time in just a few weeks. [Wallace, 1992, p. 24]

In the fall of 1968, Computer Center Corporation opened for business in Seattle. It was offering computing time at good rates, and one of the chief programmers working for the corporation had a child attending Lakeside. A deal was struck between Lakeside Prep School and the Computer Center Corporation that allowed the school to continue providing it's students with computer time. [Wallace, 1992, p. 27] Gates and his comrades immediately began exploring the contents of this new machine. It was not long before the young hackers started causing problems. They caused the system to crash several times and broke the computers security system. They even altered the files that recorded the amount of computer time they were using. They were caught and the Computer Center Corporation banned them from the system for several weeks.

Bill Gates, Paul Allen and, two other hackers from Lakeside formed the Lakeside Programmers Group in late 1968. They were determined to find a way to apply their computer skills in the real world. The first opportunity to do this was a direct result of their mischievous activity with the school's computer time. The Computer Center Corporation's business was beginning to suffer due to the systems weak security and the frequency that it crashed. Impressed with Gates and the other Lakeside computer addicts' previous assaults on their computer, the Computer Center Corporation decided to hire the students to find bugs and expose weaknesses in the computer system. In return for the Lakeside Programming Group's help, the Computer Center Corporation would give them unlimited computer time [Wallace, 1992, p. 27]. The boys could not refuse. Gates is quoted as saying "It was when we got free time at C-cubed (Computer Center Corporation) that we really got into computers. I mean, then I became hardcore. It was day and night" [Wallace, 1992, p. 30]. Although the group was hired just to find bugs, they also read any computer related material that the day shift had left behind. The young hackers would even pick employees for new information. It was here that Gates and Allen really began to develop the talents that would lead to the formation of Microsoft seven years later.

**Roots of Business Career**

Computer Center Corporation began to experience financial problems late in 1969. The company finally went out of business in March of 1970. The Lakeside Programmers Group had to find a new way to get computer time. Eventually they found a few computers on the University of Washington's campus where Allen's dad worked. The Lakeside Programmers Group began searching for new chances to apply their computer skills. Their first opportunity came early the next year when Information Sciences Inc. hired them to program a payroll program. Once again the group was given free computer time and for the first time, a source of income. ISI had agreed to give them royalties whenever it made money from any of the groups programs. As a result of the business deal signed with Information Sciences Inc., the group also had to become a legal business [Wallace, 1992, p. 42-43]. Gates and Allen's next project involved starting another company entirely on their own, Traf-O-Data. They produced a small computer which was used to help measure traffic flow. From the project they grossed around $20,000. The Traf-O-Data company lasted until Gates left for college. During Bill Gates' junior year at Lakeside, the administration offered him a job computerizing the school's scheduling system. Gates asked Allen to help with the project. He agreed and the following summer, they wrote the program. In his senior year, Gates and Allen continued looking for opportunities to use their skills and make some money. It was not long until they found this opportunity. The defense contractor TRW was having trouble with a bug infested computer similar to the one at Computer Center Corporation. TRW had learned of the experience the

two had working on the Computer Center Corporation's system and offered Gates and Allen jobs. However thing would be different at TRW they would not be finding the bugs they would be in charge of fixing them. "It was at TRW that Gates began to develop as a serious programer," and it was there that Allen and Gates first started talking seriously about forming their own software company [Wallace, 1992, p. 49-51].

In the fall of 1973, Bill Gates left home for Harvard University [Teamgates.com, 9/29/96]. He had no idea what he wanted to study, so he enrolled as prelaw. Gates took the standard freshman courses with the exception of signing up for one of Harvard's toughest math courses. He did well but just as in high school, his heart was not in his studies. After locating the school's computer center, he lost himself in the world of computers once again. Gates would spend many long nights in front of the school's computer and the next days asleep in class. Paul Allen and Gates remained in close contact even with Bill away at school. They would often discuss ideas for future projects and the possibility of one day starting a business. At the end of Gates's first year at Harvard, the two decided that Allen should move closer to him so that they may be able to follow up on some of their ideas. That summer they both got jobs working for Honeywell [Wallace, 1992, p. 59]. As the summer dragged on, Allen began to push Bill harder with the idea that they should open a software company. Gates was still not sure enough to drop out of school. The following year, however, that would all change.

### The Birth of Microsoft

In December of 1974, Allen was on his way to visit Gates when along the way he stopped to browse the current magazines. What he saw changed his and Bill Gates's lives forever. On the cover of Popular Electronics was a picture of the Altair 8080 and the headline "World's First Microcomputer Kit to Rival Commercial Models." He bought the issue and rushed over to Gates's dorm room. They both recognized



this as their big opportunity. The two knew that the home computer market was about to explode and that someone would need to make software for the new machines. Within a few days, Gates had called MITS (Micro Instrumentation and Telemetry Systems), the makers of the Altair. He told the company that he and Allen had developed a BASIC that could be used on the Altair [Teamgates.com, 9/29/96]. This was a lie. They had not even written a line of code. They had neither an Altair nor the chip that ran the computer. The MITS company did not know this and was very interested in seeing their BASIC. So, Gates and Allen began working feverishly on the BASIC they had promised. The code for the program was left mostly up to Bill Gates while Paul Allen began working on a way to simulate the Altair with the schools PDP-10. Eight weeks later, the two felt their program was ready. Allen was to fly to MITS and show off their creation. The day after Allen arrived at MITS, it was time to test their BASIC. Entering the program into the company's Altair was the first time Allen had ever touched one. If the Altair simulation he designed or any of Gates's code was faulty, the demonstration would most likely have ended in failure. This was not the case, and the program worked perfectly the first time [Wallace, 1992, p. 80]. MITS arranged a deal with Gates and Allen to buy the rights to their BASIC.[Teamgates.com, 9/29/96] Gates was convinced that the software market had been born. Within a year, Bill Gates had dropped out of Harvard and Microsoft was formed.

### Bill Gates Links

As you might know Bill Gates has been quite busy since forming Microsoft. Here are a few links to

keep you abreast to what he and Microsoft are up to these days.

- Bill Gates Biography: A short biography from the people at Microsoft
- The Road Ahead: The homepage of Gates's 1996 book
- Speeches: Links to Bill Gates's speeches that can be found on the web
- More speeches: More on line speeches
- Interview: An interview that Bill gave to Upside magazine
- How rich is Bill NOW!: Self-explanatory

## Bibliography

Wallace, James. 1993. Hard Drive: Bill gates and the Making of the Microsoft Empire, HarperCollins Publishers, New York, NY.

TeamGates.com. Sept 29, 1996, Bill's Life, http://www.teamgates.com/library/life.htm

T. Carlson. Sept 29, 1996. Altair 8800, http://www.ncsc.dni.us/fun/user/tcc/cmuseum/altair.htm

Number of Words:1716 +4 images
© John Mirick
Last updated Sept 29, 1996

Exhibit 2

CONFIDENTIAL VIDEOTAPED DEPOSITION OF DAVID MASILOTTI
CONDUCTED ON WEDNESDAY, NOVEMBER 22, 2006

1 (Pages 1 to 4)

**Page 1**

```
1    IN THE UNITED STATE DISTRICT COURT
2      FOR THE DISTRICT OF DELAWARE
3    ---------------------X
     TESLA INDUSTRIES, INC.        :
4                      : Civil Action
     Plaintiff,         : No. 06-055 GMS
5                       :
6      vs.              :
                        :
     DAVID C. WALDMANN, LYNDOL W.   :
7    HOLLINGSWORTH, CHARLES MINNICK  :
     a/k/a CHUCK MINNICK, and NEW   :
8    MILLENNIUM TOOLS, INC.,        :
                        :
9    Defendants.        :
10   ---------------------X
11
12   Confidential videotaped deposition of DAVID MASILOTTI
13            Wilmington ,Delaware
14         Wednesday, November 22, 2006
15              9:19 a.m.
     Job No.: 24-91258
16   Pages 1 - 303
     Reported by: Gail L.Inghram Verbano, CSR, RMR, CRR
17
18
19
20
21          CONFIDENTIAL
22
23
24
25
```

**Page 2**

```
1
2      Confidential videotaped deposition of
3    DAVID MASILOTTI, held at the offices of:
4
5
6       CONNOLLY, BOVE, LODGE & HUTZ
        1220 North Market Street
7       Wilmington, DE 19801
        (302)658-9141
8
9
10
11      Pursuant to agreement, before Gail L.
12   Inghram Verbano, California Certified Shorthand
13   Reporter, Registered Merit Reporter, and Certified
14   LiveNote Reporter.
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1           A P P E A R A N C E S
2
3    ON BEHALF OF PLAINTIFF TESLA INDUSTRIES
4
5       ROBERT WILCOX, ESQUIRE
6       WERB & SULLIVAN
7       300 Delaware Avenue, 13th Floor
8       Wilmington, Delaware 19801
9       (302)652-1100
10
11
12       and
13
14      PAUL CRAWFORD, ESQUIRE
15      CONNOLLY, BOVE, LODGE & HUTZ
16      1220 North Market Street
17      Wilmington Delaware  19801
18      (302)658-9141
19
20
21
22
23
24
25
```

**Page 4**

```
1    A P P E A R A N C E S (Continued):
2    ON BEHALF OF DEFENDANT DAVID WALDMANN:
3
4       JOHN A. ADAMS, ESQUIRE
5       SUSANIN, WIDMAN & BRENNAN, P.C.
6       Suite 240, Executive Terrace,
7       455 South Gulph Road
8       King of Prussia, Pennsylvania 19406
9       (610)337-4510
10
11
12   ON BEHALF OF DEFENDANTS LYNDOL HOLLINGSWORTH, CHARLES
13   MINNICK AND NEW MILLENNIUM TOOLS, INC.:
14
15      RODNEY R. SWEETLAND, III, ESQUIRE
16      ADDUCI, MASTRIANI & SCHAUMBERG, LLP
17      1200 Seventeeth Street, N.W.
18      Washington, D.C. 20036
19      (202)467-6300
20
21
22   ALSO PRESENT:
23      DAVID WALDMANN
24      TRUEE DORSEY
25      SCOTT PICKERING, VIDEOGRAPHER
```

CONFIDENTIAL VIDEOTAPED DEPOSITION OF DAVID MASILOTTI
CONDUCTED ON WEDNESDAY, NOVEMBER 22, 2006

45 (Pages 177 to 180)

**177**

1    A   That, to my best of knowledge, that the
2  contents of this are accurate or correct.
3    Q   Directing your attention on Page 5 to
4  Interrogatory No. 4 -- do you see that?
5    A   Yeah, I see it.
6    Q   Nowhere, as far as I can tell, among the
7  response from Tesla to Interrogatory No. 4, is there
8  any mention of the videotape which has consumed so
9  much of our record today.  Is that correct?
10   A   And your question about this, again, sir?
11   Q   I did not see in my review any mention of
12  the videotape that we've talked about on the record
13  several times today.
14   A   I fail to understand what No. 4 has to do
15  with the videotape.
16   Q   Okay. But is it correct that when you
17  signed your -- the verification of these responses,
18  that the response to No. 4 did not mention the
19  existence of a videotape?
20       MR. WILCOX:  The document speaks for
21  itself.  Objection on that basis.
22       Please answer.
23       THE WITNESS:  Yeah, I don't see any
24  mention of a videotape in here.
25  BY MR. SWEETLAND:

**178**

1    Q   If you please direct your attention to
2  page, Interrogatory No. 7, and the response follows
3  over on to Page 8. It wasn't clear to me in
4  reviewing this response, does Tesla or does it not
5  have not a written document retention or destruction
6  policy?
7    A   The only policy that we have is in regards
8  to the removal of documents from the company.
9    Q   Is that policy in writing?
10   A   Yes, it is. And every employee signs it.
11   Q   How long are files maintained at Tesla?
12   A   Indefinitely.
13   Q   Is that true with data files on electronic
14  forms of data storage?
15   A   That depends on the type of data storage.
16   Q   And what are the different manners in
17  which data is treated at Tesla?
18   A   Well, we have inventory data. We have
19  accounting data, we have quality control data. We
20  have HR data, payroll data. Those records are
21  maintained indefinitely.
22       We don't destroy any electronic or paper
23  records at Tesla, unless they're in error or defunct
24  or if somebody prints out something and it's in
25  error; then it gets shredded. Nothing gets thrown

**179**

1  out. Everything gets shredded.
2    Q   And Tesla has shredders on-site?
3    A   At every work station in every office.
4    Q   Approximately how much square footage is
5  occupied by Tesla's principal location?
6    A   Approximately total, 120,000 square feet.
7    Q   And does Tesla have any other locations?
8    A   When you say, "other locations" --
9    Q   Does Tesla do business at any other
10  address?
11       MR. WILCOX:  Other than the one with the
12  120,000 --
13       MR. SWEETLAND:  Yes.
14       THE WITNESS:  Well, that's two locations.
15  One's -- one is across the street from the other
16  one.
17       Other than that, I have a -- a lab that is
18  located at my home that I do research and
19  development in. They're located across the street
20  from each other.
21  BY MR. SWEETLAND:
22   Q   What's the intersection where that's
23  located?
24   A   From Center Point Boulevard.
25   Q   And is the square footage that you gave me

**180**

1  the total between the two?
2    A   Yes.
3    Q   And with Center Point Boulevard, what is
4  the cross street with Center Point Boulevard?
5    A   They're on the same street. The cross
6  street is Route 141, I believe.
7    Q   And between the two buildings,
8  approximately how many doors are there?
9    A   How many doors are there? I'd say
10  probably maybe a dozen.
11   Q   At the time Mr. Waldmann was employed at
12  Tesla, was there access control measures installed
13  on every door in both buildings?
14   A   Yes, there was.
15   Q   And were those key card controlled or
16  otherwise?
17   A   Only two doors in the whole company were
18  accessible. The rest of them were locked down.
19  They were key pad and -- they were key pad
20  accessible, and they were also controlled by a
21  receptionist.
22   Q   I see. Could employees leave from the
23  inside going out?
24   A   Yeah. Oh, yeah.
25       MR. WILCOX:  Objection; vague.

CONFIDENTIAL VIDEOTAPED DEPOSITION OF DAVID MASILOTTI
CONDUCTED ON WEDNESDAY, NOVEMBER 22, 2006

48 (Pages 189 to 192)

**189**

1  A  He gave the information about where we
2  purchase the boxes that we fabricated them from. He
3  gave them all pictures of the connectors that we
4  used. He gave them all pictures of the circuitry
5  that was involved in it. That's all in an email to
6  them.
7  Q  And Tesla purchased the boxes from
8  somebody else?
9  A  Yeah, just the metal box that housed all
10 the connectors and the circuit breakers and all of
11 the parts.
12 Q  With regard to the FEMA power unit, what
13 is that?
14 A  All I know is that I met with FEMA down in
15 Orlando in 2004 to discuss building emergency power
16 supplies for FEMA.
17     When FEMA contacted Tesla in regards to
18 obtaining them after Hurricane Katrina, Mr. Waldmann
19 never informed Tesla that they had made contact. He
20 immediately sent the information to your clients,
21 along with information on the power unit, the UAV
22 power unit, which we had a variation of, that we
23 were planning on supplying them with.
24     We never knew the customer called and made
25 the inquiry. He turned around and directly supplied

**190**

1  it to your clients, who then pursued it as a
2  business venture and incorporated it into their
3  business plan.
4  Q  With regard to Item 9, the AC and DC power
5  inverter system and custom tool systems, what are
6  those?
7  A  Tesla Industries had started to
8  incorporate custom-built inverters into their ground
9  power units to power up tool systems, which could be
10 anything from drills, grinders, any kind of portable
11 hand or power tool -- boroscopes, lights. They were
12 for powering tools and equipment in the field.
13     Tesla had also developed a DC-to-DC
14 converter that he would control motor torque, and
15 had produced that for an application for the Navy
16 regarding power tools.
17     Mr. Waldmann was aware of that program.
18 Q  And what information did you have to
19 suggest that he transmitted that information to my
20 clients?
21 A  Well, he started up a business inside of
22 my company marketing with your clients their
23 product, in direct competition with what I was
24 planning on marketing to my customers.
25 Q  What were your plans with regard to

**191**

1  marketing that?
2  A  What was our plans regarding the marketing
3  of that? We were -- we are in the process of
4  introducing that product next month.
5  Q  And why is it being --
6  A  We also have a contract pending with the
7  United States Navy to supply it to them.
8  Q  Was that a bid contract?
9  A  No, that's not a bid contract. We gave
10 them a -- we gave them a proposal.
11 Q  Is -- does Tesla bid on contracts for the
12 United States military?
13 A  Do we bid on them? Not necessarily.
14 Because we're sort of what you would call a sole
15 source for most of the products that we make.
16 Q  So it's your testimony today that Tesla is
17 the sole source supplier for items to the United
18 States armed forces?
19 A  There are quite a few of them we're the
20 sole source.
21 Q  Can you name any of them?
22 A  Our ground power units.
23 Q  Anything else?
24 A  Our connectors.
25 Q  Anything else?

**192**

1  A  All of the unmanned aircraft parts, the
2  engine parts that we're developing for them, the
3  wheels.
4  Q  What is your understanding, if any, of the
5  nature of the sole sourcing to you? Do you know --
6  A  In other words, we're the only -- we're
7  the only current manufacturer, and they don't have
8  any technical data to turn over to other
9  contractors.
10 Q  Do you understand the term "sole source"
11 as a term of art in government contracting law?
12 A  Certainly I do.
13 Q  Is it your understanding that you are a
14 sole source supplier under that term of art?
15     MR. WILCOX: Objection to the extent it
16 calls for a legal conclusion.
17     If you understand, please answer.
18     THE WITNESS: Well, that's kind of
19 debatable. Because while we may be the only company
20 producing lightweight equipment, that's not to say
21 that they couldn't go out and buy something
22 substantially bigger or different.
23 BY MR. SWEETLAND:
24 Q  Okay. With regard to Item 10, there's a
25 statement there, on Page 10, that no Tesla

CONFIDENTIAL VIDEOTAPED DEPOSITION OF DAVID MASILOTTI
CONDUCTED ON WEDNESDAY, NOVEMBER 22, 2006

63 (Pages 249 to 252)

**249**

1  dual-output power supply?
2      A   I guess so.  I design them for a living.
3      Q   All right.  So who manufactures them?
4      A   Who manufactures them?
5      Q   Yes.
6      A   Well, that's a very broad term, a
7  dual-output power supply.  I mean, that could be a
8  lab power supply that, you know, you could buy from
9  Hewlett-Packard.  That's a very broad term.  That's
10 like saying "transistor" or "integrated circuit
11 chip."
12     Q   Okay.  How about -- is Tesla alleging that
13 any of the defendants in this case misappropriated
14 any form of dual-output power supply?
15     A   They misappropriated a lot of information.
16 They misappropriated a piece of equipment that we
17 designed for the Silent Watch program for the United
18 States Army.
19     Q   Which piece of equipment is this?
20     A   That was also a dual-output power supply.
21     Q   Does anyone else manufacture that kind of
22 dual-output power supply?
23     A   Not to my knowledge.
24     Q   You allege that my client stole an AC and
25 DC power inverter system and custom tool system; is

**250**

1  that correct?
2      A   No.  I alleged that -- I did not allege
3  that they stole it.  Mr. Waldmann took the
4  information from it.
5          What I am alleging is that they subverted
6  my organization to market their product with my
7  finances, my money, my office, my vehicles, my
8  travel expenses, my entire organization behind my
9  back while I paid for it, in prelude to me marketing
10 my own systems.
11     Q   Did you market that product
12 before you allege that they took this information?
13         MR. WILCOX:  Objection.  Which product?
14         MR. SWEETLAND:  Well, whatever he was just
15 expositing on.
16         THE WITNESS:  Not like ours, no.
17 BY MR. SWEETLAND:
18     Q   Well, did anybody else market something
19 that served the same function as yours?
20     A   Oh, certainly.  It's just I didn't pay for
21 it.
22     Q   Does anybody else manufacture a UAV power
23 unit assembly?
24     A   Not to my knowledge.
25     Q   Does anybody else manufacture a Global

**251**

1  Hawk power system?
2      A   Not to my knowledge.
3      Q   Does anybody else manufacture an interface
4  box for a UAV unit of the U.S. Navy Pioneer?
5      A   Not to my knowledge.
6      Q   Are you active in the defense contracting
7  electrical engineering field trade associations?
8      A   Yes.
9      Q   What trade associations, if any, does
10 Tesla belong to?
11     A   Oh, jeez.  The Army Aviation Association;
12 the Airborne Law Enforcement Association.  Quite a
13 few of them.
14     Q   Anything else comes to mind?
15     A   The National Business Aircraft
16 Association; the International Helicopter
17 Association; the United States Army Warrant Officers
18 organization, which I'm also a personal member of.
19     Q   Were you a warrant officer?
20     A   No, I was not.
21     Q   You're an honorary warrant officer in the
22 association?
23     A   No.  They made -- you know.  We're also a
24 member of the Army Aviation Heritage Foundation.
25         I guess I could send you a list.

**252**

1      Q   Does Tesla attend any trade shows?
2      A   Do we attend any trade shows?  Yes, we do.
3      Q   Which trade shows do you attend?
4      A   The International Helicopter show; the
5  National Business Aircraft show; EBASE over in
6  Europe.  Numerous ones.
7      Q   At those trade shows does Tesla display
8  any of its products.
9      A   Yes, we do.
10     Q   At any -- at any of the trade shows at
11 which Tesla has attended in the past year, has it
12 displayed any of the items we have discussed today?
13     A   Has it -- not any of the items that we had
14 marked as -- as trade secret or had been stolen, no.
15     Q   Based upon your knowledge of the field
16 from your company's membership in a variety of
17 associations and participation at trade shows, who
18 would you identify as Tesla's largest competitors?
19     A   Companies like Hobart, Trilectron.
20     Q   Anybody else?
21     A   The competitors?  Going through trying to
22 think of some names of some of these organizations,
23 although I know who they are.
24         That's all I can think of at the moment.
25         MR. SWEETLAND:  Mr. Wilcox, I have three

### CERTIFICATE OF SERVICE

I hereby certify that on April 19, 2007, a true and correct copy of the foregoing

PLAINTIFF, TESLA INDUSTRIES INC.'S MEMORANDUM IN OPPOSITION TO NMT

DEFENDANTS' MOTION IN LIMINE NO. 4 TO PRECLUDE CERTAIN TYPES OF

TESTIMONY BY TESLA'S PRESIDENT DAVID MASILOTTI was caused to be served on the

following via CM/ECF filing:

<u>VIA HAND DELIVERY AND</u>
<u>ELECTRONIC MAIL</u>
John D. Demmy
Stevens & Lee
1105 North Market Street
7th Floor
Wilmington, Delaware 19801
jdd@stevenslee.com

<u>VIA HAND DELIVERY AND</u>
<u>ELECTRONIC MAIL</u>
Steven J. Balick
John G. Day
Ashby & Geddes
222 Delaware Avenue
P.O. Box 1150
Wilmington, Delaware 19899
sbalick@ashby-geddes.com

<u>VIA ELECTRONIC MAIL</u>
John A. Adams
Adam C. Gerber
Susanin, Widman & Brennan, P.C.
South Gulph Road, Suite 240
King of Prussia, PA 19406
Jaadams@swbcounsellors.com

<u>VIA ELECTRONIC MAIL</u>
Louis S. Mastriani
Rodney R. Sweetland, III
David F. Nickel
Adduci, Mastriani & Schaumberg, L.L.P.
1200 Seventeenth Street, N.W., Fifth Floor
Washington, District of Columbia 20036-3006
Nickel@adduci.com

*/s/ Paul E. Crawford*
Paul E. Crawford, Esquire (#493)
pcrawford@cblh.com

1

# Exhibit I

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2005 WL 3005484 (N.D.Ind.), 59 UCC Rep.Serv.2d 1159
**(Cite as: Not Reported in F.Supp.2d)**

**H**
R.I. Spiece Sales Co., Inc. v. Bank One, N.A.
N.D.Ind.,2005.

United States District Court,N.D. Indiana, Fort
Wayne Division.
R.I. SPIECE SALES COMPANY, INC. and
Thomas G. Spiece, Plaintiffs,
v.
BANK ONE, NA, Defendant.
**No. 1:03-CV-175-TS.**

Nov. 9, 2005.

Gene R. Leeuw, John M. Mead, Leeuw Oberlies &
Campbell PC, Indianapolis, IN, for Plaintiffs.
John R. Burns III, Mark A. Werling, Baker &
Daniels, Fort Wayne, IN, for Defendant.

MEMORANDUM OF DECISION AND ORDER
SPRINGMANN, J.
**\*1** On July 7, 2005, this Court issued a
Memorandum of Decision and Order granting in
part and denying in part the Defendant's Motion for
Summary Judgment. The Defendant, Bank One, has
filed a Motion for Partial Reconsideration of that
order [DE 67] arguing that it is entitled to summary
judgment on Plaintiff Spiece Sales Company's
remaining claims.

The Defendant raises two issues for
reconsideration: First, the Defendant insists that
under the Seventh Circuit decision in *Zenith
Electronics Corp. v. WH-TV Broad. Corp.,* 395
F.3d 416 (7th Cir.2005), published after briefing on
summary judgment was completed, Spiece Sales
does not have an adequate means of proving lost
profits due to their failure to designate a qualified
expert for this purpose; and, second, the Defendant
argues that, under Indiana Code § 26-1-9.1-513, it
had twenty days to remove inadvertent UCC filings.

Spiece Sales, on the other hand, argues that it can

present testimony about its actual and future losses
through Mr. Spiece's lay testimony because Mr.
Spiece, as an owner of the business, may testify
about its value, including lost profits. Spiece Sales
does not address the Defendant's second argument
in any considerable detail.

A. Lost Profits and Federal Rule of Evidence 701

*WH-TV* does not mandate that the Court change its
earlier decision, as *WH-TV* is distinguishable from
the case at hand. In *WH-TV,* the defendant filed a
counterclaim against a plaintiff who sought to
collect unpaid bills for cable boxes it produced. The
defendant claimed that it lost profits because of
defects in the plaintiff's merchandise. The defendant
intended to use the cable boxes in a new and unique
market of San Juan. This plan fell through,
however, when the cable boxes failed to perform as
promised. At trial the defendant presented a
testimony from an expert who merely "eyeballed"
his projections about the defendant's losses. As the
Seventh Circuit noted, the expert "all but conceded
that he had not applied 'reliable principles and
methods." ' *Id.* at 418. Rather, he relied on
intuition, which the Court refused to allow. *Id.* The
Court stressed that an expert's estimates must be
testable and must be founded in sound
methodology, and reiterated the well-settled law
that "[a]n expert who supplies nothing but a bottom
line supplies nothing of value to the judicial process.
" *I d.* at 419 (citing cases). The Court finished its
analysis by stating that what is true about an expert's
approach "goes double for [the defendant's] internal
projections, which rest on its say-so rather than a
statistical analysis." *Id.* at 420.

*WH-TV* did not change the law in the Circuit that
those who have special knowledge of the business
and its operations may also testify as to the facts of
the business that underlie profit expectations under
Federal Rule of Evidence 701 without qualifying as
experts. *Id.* at 420 (citing *Lightening Lube, Inc. v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 2

Not Reported in F.Supp.2d, 2005 WL 3005484 (N.D.Ind.), 59 UCC Rep.Serv.2d 1159
**(Cite as: Not Reported in F.Supp.2d)**

*Witco Corp.,* 4 F.3d 1153 (3d Cir.1993)). Of course, these witnesses may not make inferences from the data but must testify only as to the facts known to them.

**\*2** Mr. Spiece promises to be such a witness, and his proffered testimony sets tangible parameters of the Spiece Sales value and alleged losses. Mr. Spiece is not going to testify about a theoretical or a unique market, such as in *WH-TV.* Rather, he intends to present evidence about the facts known to him from his day-to-day management of Spiece Sales. Although some of his deposition testimony as to the value of the company was confusing, it states the basic framework of how he arrived to his numbers. Mr. Spiece is not merely speculating or guessing about the losses but has a basis for his assertions. His calculations of lost profits and projections of future lost profits are based on Spiece Sales' actual past performance. If the Defendant is convinced otherwise, it will be able to challenge Mr. Spiece's claims during cross-examination and with its own witnesses.

B. The Twenty-Day Statutory Period for Removing the Second Liens

The Defendant challenges the Court's ruling that the Plaintiff may proceed against the Defendant for the harms suffered by the Plaintiff as a result of the illicit continuation statements filed on August 6, 2004, and removed on October 8, 2004. Specifically, the Defendant challenges the Court's determination that the twenty-day period for removing satisfied liens after the request of the debtor, as provided by Indiana Code § 26-1-9.1-513 , is inapplicable when the liens at issue never had a basis in law. It is noteworthy, though, that the Defendant is taking a different approach to Indiana Code § 26-1-9.1-513 than it did in its motion for summary judgment.

The Defendant previously argued that "the duty to terminate 'financing statements' found in Section 9-513(c) applies to legally valid statements rather than *inadvertent,* ineffective continuation statements." (Df.'s Memo. Sum. J. 19) (emphasis added). Now, the Defendant argues that Section

9-513(c) also applies to inadvertent filings: The Official Comments makes clear that Ind.Code § 26-1-9.1-513 applies to (i) financing statements that become ineffective upon the payoff of an underlying debt and (ii) inadvertent filings. Official Comment 3, which is labeled 'Bogus Filings,' describes the steps required to correct an ' unauthorized filing statement.' Specifically, it states how the debtor can comply with the 'authenticated demand' requirement, and thereby start the clock on the 20-day rule, when it has no contractual relationship with the secured party of record.

(Df.'s Memo. Part. Reconsid. 9.)

Unauthorized liens over the property or collateral of another are a serious matter. "Bogus" liens have been utilized by domestic terrorist groups, convicted criminals, disgruntled employees, and political activists to harass public figures and disrupt the business of their adversaries. *See* Juliet M. Moringiello, *Revised Article 9, Liens From the Fringe, and Why Sometimes Signatures Don't Matter,* 10 Widener J. Pub.L. 135, 139 (2001). " Unauthorized or bogus financing statements may seem harmless since they do not create an interest in anyone's property; however, because lenders search the U.C.C. records before making loans to potential debtors, the existence of these financing statements might delay the aggrieved party in obtaining a loan, such as a mortgage or car loan." *Id.* at 139-40; *see also* Terry M. Anderson, et al., *Attachment and Perfection of Security Interests Under Revised Article 9: A "Nuts and Bolts" Primer,* 9 Am. Bankr.Inst. L.Rev. 179 (2001). Here, the Plaintiff claims that the Defendant's unauthorized financing statements had precisely this effect: other banks were scared off by the illicit liens on the Plaintiff's inventory.

**\*3** However, a review of the UCC's history confirms that the Defendant's second interpretation is correct, and it requires the Court vacate its earlier ruling concerning Spiece Sales' tort claim. The procedure for removing illicit liens and the remedy for those who suffer from them have developed with time. Former Article 9, which was replaced by Indiana statute in 2001, contained no statutory remedy at all for illicit liens filed by stubborn or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 3

Not Reported in F.Supp.2d, 2005 WL 3005484 (N.D.Ind.), 59 UCC Rep.Serv.2d 1159
**(Cite as: Not Reported in F.Supp.2d)**

uncooperative parties. "If the filing office accepted the financing statement, it remained on the record until the expiration of five years or the filing of a termination statement." Moringiello at 142. If no termination statement was agreed to, the rightful owner was either stuck with a black mark in its UCC record or "was required to bring an action in court to remove the financing statement from the public record." *Id.*

Revised Article 9 introduced the availability of a type of "self help" for the rightful owner. Under these revisions to the UCC, the debtor may file a " correction statement with respect to any financing statement filed under that person's name 'if the person believes that the record is inaccurate or was wrongfully filed." ' Anderson at 206 (quoting UCC § 9-518). However, these correction statements are " incomplete relief," as the illicit lien remains on the UCC records. *Id.* The correction statement simply serves as notice to potential lenders that the debtor disputes this claim of interest.

Additionally, though, Revised Article 9 introduced a means for the debtor to completely remove bogus liens: if the debtor requests that the party of record file termination statements for the liens and the claimant fails to do so after twenty days, "section 9-509(d)(2) will allow the debtor to file a termination statement without the secured party's consent." *Id.* This remedy is particularly helpful when the liens have been filed by surreptitious, malevolent parties. But the authors of the UCC did not provide a penalty for filers of bogus liens so long as they were removed within twenty days of receiving a notice. Instead, the burden is on the security holder to request immediate removal of the lien:
... within twenty (20) days after a secured party receives an authenticated demand from a debtor, the secured party shall cause the secured party of record for a financing statement to send to the debtor a termination statement for the financing statement or file the termination statement in the filing office if:
...
(4) the debtor did not authorize the filing of the initial financing statement.

Ind.Code 26-1-9.1-513(c). The security holder may

recover damages only if the secured party fails to cause the secured party of record to file or send a termination statement as required by § 513(c). *See id.* § 625(e)(4).

Therefore, even though the Defendant's second lien on Spiece Sales' property was unauthorized, the Defendant had twenty days from receiving the notice to remove the lien from the record. Having done so, it is not liable to Spiece Sales in tort.

### CONCLUSION

\*4 For the reasons stated above, the Court GRANTS in PART and DENIES in PART the Defendant's Motion for Partial Reconsideration of the Court's July 7 Order [DE 67].

SO ORDERED.

N.D.Ind.,2005.
R.I. Spiece Sales Co., Inc. v. Bank One, N.A.
Not Reported in F.Supp.2d, 2005 WL 3005484 (N.D.Ind.), 59 UCC Rep.Serv.2d 1159

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2007, a true and correct copy of the foregoing

PLAINTIFF, TESLA INDUSTRIES INC'S, **REDACTED** MEMORANDUM IN OPPOSITION

TO DEFENDANTS' DAUBERT MOTION was caused to be served on the following via

CM/ECF filing and electronic mail:

<table>
<tr>
<td>

HAND DELIVERY
John D. Demmy
Stevens & Lee
1105 North Market Street
7th Floor
Wilmington, Delaware 19801
jdd@stevenslee.com

</td>
<td>

HAND DELIVERY
Steven J. Balick
John G. Day
Ashby & Geddes
222 Delaware Avenue
P.O. Box 1150
Wilmington, Delaware 19899
sbalick@ashby-geddes.com

</td>
</tr>
<tr>
<td>

John A. Adams
Adam C. Gerber
Susanin, Widman & Brennan, P.C.
South Gulph Road, Suite 240
King of Prussia, PA 19406
Jaadams@swbcounsellors.com

</td>
<td>

Louis S. Mastriani
Rodney R. Sweetland, III
David F. Nickel
Adduci, Mastriani & Schaumberg, L.L.P.
1200 Seventeenth Street, N.W., Fifth Floor
Washington, District of Columbia 20036-3006
Nickel@adduci.com

</td>
</tr>
</table>

    _/s/ Paul E. Crawford_
    Paul E. Crawford, Esquire (#493)
    pcrawford@cblh.com

15